# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

J. K. Idema, Brent Bennett,
Edward Caraballo, and,
Zorro Rasuli Banderas,

          *Petitioners,*

*vs.*

Zalmay Khalilzad, Ambassador, *and,*[1]
Robert S. Mueller, Director of the FBI,

          *Respondents.*

**PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER AND OTHER RELIEF AND RULE 60 MOTION**

**Case # 05 CV 2064 (EGS)**

**Assigned Judge:** Hon. Emmet G. Sullivan, US District Judge

———————————————

    **NOW COMES,** Petitioner, J. K. Idema, through counsel, and Petitioners Brent Bennett, Zorro Banderas, Edward Caraballo,[2] joining through their *next friends*, and move for an Emergency Temporary Restraining Order, and other relief, and, submit this Rule 60 Motion. In support thereof, Petitioners respectfully show unto this Court the following:

    Edward Caraballo is joining through his *next friend* as **he is currently held hostage by Taliban and al-Qaida terrorists.** He was officially declared a hostage by the Afghan government on February 26th, 2006, after al-Qaida and Taliban prisoners seized control of Pulacharke Prison in Afghanistan. Petitioners Idema, Bennett, and Banderas are currently under siege in the Block 2 Annex of the prison. The terrorists control all other blocks as of this time. The prison fell under siege during a prisoner revolt which started on February 25, 2006. Afghan government sources state that Caraballo may have been beaten; other sources contradict this. It is indisputable that on Monday night, February 27th, Taliban prisoners in Block 1 of Pulacharke Prison told prison generals that if any other shots were fired into Block 1 they would kill Caraballo and "throw his body out piece by piece." A terrorist named Wardaq, tried to kill Caraballo, but was killed by Afghan soldiers.

---

[1] This is the correct caption, Condoleezza Rice was dismissed May 24, 2005, (Rule 41 (a)(1)(i)).
[2] Petitioner Edward Caraballo joins through his *next friend* and brother, Richard Caraballo.

This case was filed in the SDNY on March 17, 2005. On or about April 28, 2005, Respondents filed a motion to dismiss.[3] On May 18, 2005, prior to receiving Petitioners' Response, and in violation of the rules, the Court entered its Order Denying Respondents' Motion to Dismiss and transferring Petitioners' application for writ of *habeas corpus* to the District of Columbia. The SDNY Clerk's Office assured Petitioner's counsel[4] that the case was transferred and they would be contacted by the DCDC Court.

However, the case was "misplaced" by the SDNY Clerk of Courts, and then allegedly "lost." Even after transfer to the DCDC, which Petitioners opposed then, and still oppose, Respondents failed to answer the Petition within the 23 day maximum limit set by the Rules, and have filed various non-dispositive and disingenuous pleadings which seek to redirect the focus of this case from the factual issues and merits to petty arguments about collateral irrelevant issues.

While the last year has brought not one resolution or discussion of any factual issue or the merits of the case, it has brought repeated attempts on Petitioners' lives by Taliban and al-Qaida terrorists. While Respondents have repeatedly assured family, friends, counsel, and the media that Petitioners were safe and well-cared for, these statements have been bold-faced sanctimonious lies.

Just as this case warned this Honorable Court, and just as counsel's letter to the Court outlined in the words of Jack Idema, the situation did not just approach critical mass, it reached critical mass. All four Petitioners are now under siege by America's terrorist enemies, one is a hostage, and, upon information and belief, the United States Departments of Justice and State maliciously and wrongfully ordered Afghan forces not make a rescue attempt originally planned for last Sunday at 11:00am. Had the Afghans not been stopped from going forward with their own rescue operation, Pulacharke Prison would now be in the hands of authorities, more than one dozen people would still be alive, there would be at least 40 less people wounded, and 80 some women would not have been taken hostage and raped by terrorists. Nor would Caraballo still be a hostage or the others now under siege.

---

[3] Respondents failed to file a Notice of Motion, and a Response was not due under the Rules.
[4] References to "Petitioner's counsel," refers only to John Edwards Tiffany, counsel for Idema.

Although this motion is filed on behalf of Idema, through counsel, the other Petitioners, who have been without counsel for almost one year now, have joined in this motion and seek the same relief.

**First,** Petitioners respectfully request this Honorable Court enter an Emergency Temporary Restraining Order preventing the Respondents, or their agents, 1) from interfering in the ongoing siege at Pulacharke Prison, 2) withholding, seizing, or returning, relief parcels and mail from the men under siege at Pulacharke, 3) directing Respondents to accept, and expeditiously send, mail from Petitioners until at least 15 days after the siege ends, and 4) directing FBI agents to remove themselves from Pulacharke Prison.

**Second,** Petitioners respectfully request this Honorable Court render a decision on the merits and facts of this Motion and applicable law quoted herein.  The specific requests are outlined in the table of contents and detailed under the *Issues at Bar* in this Motion.

**Third,** in the alternative, treat this Motion as a Rule 60 Motion.[5]

**Fourth,** Petitioners request that this case be transferred back to the SDNY jurisdiction where it can be administered fairly and without prejudice to Petitioners or the exorbitant expense which is being foisted upon Petitioners by Respondents.  Respondents have answered Petitioners' request for *habeas* relief only by asserting lack of jurisdiction punctuated with disingenuous statements and misrepresentations of the facts on the record.

Respondents' false assertions have been unsupported by any affidavit or sworn statement, and are therefore irrelevant and not subject to consideration by any Court. Respondents' SDNY Motion to Dismiss was properly denied but should be <u>without</u> leave to file again.  Petition should have been retained in the SDNY jurisdiction for a variety of reasons, many of which are addressed herein.  To this end, transfer back to the SDNY would not only serve judicial economic interests, and correct the inability of the DCDC to adequately insure *due process* and access to the courts to these Petitioners, but would also provide the opportunity for the unrepresented Petitioners to have counsel appointed.[6]

---

[5] Petitioners respectfully refer the Court to Rule 60(a), (b)(1), and (b)(6).
[6] This Court has previously acknowledged the lack of available *pro bono* counsel in the DCDC because of the overwhelming amount of petitions filed by *al-Qaida* terrorists held or rendered.

**Fifth,** Petitioners respectfully request this Honorable Court issue a Temporary Restraining Order preventing Respondents from interfering with a) Petitioners' right to counsel, *due process*, and communication with counsel and the court, b) food, water, medicine, and mail, and lastly, c) to cease all 8th Amendment violations.

Specifically, Petitioners ask this Honorable Court to immediately grant a Temporary Emergency Restraining Order: 1) barring the United States government from intercepting, delaying, obstructing, or refusing mail between the petitioners and their attorneys, family, and friends; 2) ordering Respondents to cease and desist their privacy violations and violations of the attorney-client privilege, and 3) ordering Respondents to provide drinking water, medicine, and relief packages to Petitioners, which are currently being refused.

That the order stand in effect for at least 120 days so that: a) this case may be prosecuted without retaliatory interference by Respondents, b) the attorney/client privilege will not be violated during this case, and c) to prevent Respondents recent and future retaliatory acts from adversely affecting the physical and mental health[7] of Petitioners.[8]

**Sixth,** because of Respondents' failure to answer, Petitioners request this Court accept all material allegations as fact, or, in the alternative, issue a show cause order directing Respondents to answer the Petition forthwith in accordance with the Rules of *habeas corpus*. Section § 2243 makes the requirement clear: a **"**court, justice or judge entertaining an application for a writ of *habeas corpus* shall forthwith award the writ <u>or</u> issue an order directing the respondent to show cause why the writ should not be granted … It shall be returned **within three days** unless for good cause additional time, **not exceeding twenty days,** is allowed." As of now, Respondents are over 300 days late.

The rules are clear, and Respondents are in violation of these rules. The delays and posture of this case has brought upon Petitioners a complete denial of *due process*, access, and an unconstitutional deprivation of liberty. This Court can not delay that which is set forth by the same rules which Respondents so often claim are inflexible.

---

[7] And also the emotional health of their families and parents.
[8] Caraballo has been especially affected by Respondents who have maliciously withheld medication from him for 18 months which resulted in the manifestations of a nervous breakdown.

# TABLE OF CONTENTS

RELEVANT FACTS OF THE CASE                                                          6

ISSUES AT TO BE PRESENTED                                                          14

    I.    Rule 60 Provides For Reconsideration Based On Mistakes            15

    II.   The SDNY Court Has Territorial Jurisdiction Over Respondents      15

    III.  The SDNY Court Has Subject Matter Jurisdiction Over Respondents   18

    IV.  Petition Should Be Transferred Back To The SDNY                  19

    V.   Petitioners Have a Right To, But should Not Be Forced To Amend    21

    VI.  Petitioners Should Be Granted A Temporary Restraining Order       22

    VII. Respondents' Should Be Barred From Further Dispositive Motions    23


CONCLUSION                                                                         24

PRAYER FOR RELIEF                                                                  25

VERIFICATION OF FACTS                                                              26

CERTIFICATE OF SERVICE                                                             27

LIST OF EXHIBITS                                                                   28


**Exhibit -A-**  Transcript of January 19, 2006 Hearing. . .                         6
**Exhibit -B-**  FBI Wanted Poster – ONE of at least five versions. . .              9
**Exhibit -C-**  A Few Examples of returned mail…                                   12
**Exhibit -D-**  May 10, 2005 email from Department of State to R. Caraballo…       12
**Exhibit -E-**  Proposed US holding facility at Pulacharke Prison . . .            17
**Exhibit -F-**  Signed FBI Receipt for Petitioners' Evidence…                     18

## RELEVANT FACTS OF THE CASE

1.      First, Respondents have ignored the territorial jurisdiction link to NY including, but not limited to, a) the exculpatory evidence illegally seized from Petitioners is located in two places: 1) Kabul, Afghanistan, outside the Continental United States, and 2) the FBI Counter-Terrorist Task Force office in New York, NY.  More importantly is that b) the FBI is now believed to be seeking to extradite Petitioners from Afghanistan to the Southern District of New York; c) the FBI office in the SDNY is seeking to serve arrest warrants in that jurisdiction;[9] d) Petitioners' right to be free from extradition and denial of liberty interests resulting from sealed indictments and/or pending arrest warrants in that district; e) the interference with mail which is primarily between the SDNY and Afghanistan, as none of that interference is between Washington and Afghanistan;[10]   f) additional Respondents specifically related to liberty interest violations in the SDNY.

2.      Second, Petitioners adamantly object to Respondents' prior statement that they are "incarcerated in Afghanistan, following arrest by Afghan authorities and conviction by an Afghan court."  Petitioners also object to opposing counsel's statements at the January 19, 2006 hearing (*see* **Exhibit A,** transcript) related to the custody of Petitioners, including this colloquy:

| | |
|---|---|
| Mr. Lev: | "I would point out to Your Honor, this is not a typical habeas case in which the United States has an individual in its custody." |
| Court: | "And I think everyone agrees, he's not in the custody of the United States.  Although it sounds like the plaintiffs are making an argument that he's in the custody of agents of the United States.  Isn't that one of your arguments?" |
| Mr. Tiffany: | "Yes, Judge." |
| Mr. Lev: | "They're essentially asking Your Honor to overturn two Afghani courts." |

---

[9] Therefore, even if these claims remain in the District of Columbia, Petitioners would still have a right to bring a claim for § 2241 relief in the Southern District of New York based on future liberty interests in the exculpatory evidence located in that district, and their right to be free from extradition in contravention of international law and treaties.

[10] With the exception of the mail interference occurring between Petitioners and this Court, and that did not arise until the Petition was improperly transferred from the SDNY to the DCDC.

3.    **Related to Mr. Lev's first statement;** Fifty years ago, Mr. Lev would have been correct, this is not a typical *habeas* case, but since this administration's novel war on terror began, rendition and prisoners held in foreign countries behind a façade of extraterritorially sovereignty, have become common place events.  Regardless of whose physical facility these men are in, just as if they were held in the CIA's SCIF in Kabul,[11] or the FBI's secretly contracted *Saderat* Extreme Interrogation facility in Kabul (where Petitioners were previously held and tortured), or at GITMO, Respondents and their US government employed agents, exercise day to day control over them either directly or through proxies, and are the sole individuals making the decisions which are alleged in the Petition to be in violation of US law.  **Related to this Court's response;** If Mr. Lev, and the Court, constitute "everyone" than there is an agreement, but that is certainly not the position of either Petitioner Idema's counsel, or the Petitioners.  That should be clear from the Petition.  **Related to Mr. Lev's second statement;** By NO MEANS are Petitioners asking this Court to overturn the verdict of "two Afghani courts."  Petitioners are asking this Court to 1) stop specific Constitutional violations imposed <u>by</u> US citizens and US Government employees on American citizens rendered incommunicado overseas, 2) uphold the decision of an Afghan court which found Petitioners innocent and was stopped from releasing them SOLELY by Respondents (it is, in effect, a detainer), 3) order Respondents to return exculpatory evidence and property held in violation of law by US government employees/US Citizens, 4) order Respondents to stop the illegal rendition of three American citizens and one foreign citizen, and 5) other relief as set forth.

4.    Finally, in regards to Mr. Lev's remarks regarding overturning "two Afghani courts," he says this as if Afghanistan's judicial system were capable of dispensing fair justice. The Court is urged to examine the official documentation of these proceedings, and would likely be surprised by the results: Afghanistan's judicial system is non-existent, corrupt, and simply broke.  There are no transcripts, notes, or records from the "trials."

---

[11] Secure Compartmented Intelligence Facilities, Enemy Prisoner Interrogation Facilities, Extreme Interrogation Facilities, and similar "black sites" covertly used for rendition, detention, and interrogation by the US government.

5.      Idema, Bennett, and Banderas were working with senior Afghan authorities to interdict terrorists. The mission was approved at the highest levels of the Afghan government, including the Minister of Defense and Vice President and conducted in concert with Afghanistan's Ministry of Defense, Ministry of Education, the National Police, and the Afghan CIA intelligence service. In addition to Afghan authorities, they worked with Swedish, German, French, and other coalition forces, the U.S. DIA, and DOD.  The investigations led to the interdiction of several dangerous individuals. Intelligence and EPWs[12] were shared with America's Task Force 180, and covert US units, who understood, approved of, and valued these efforts. Idema's sources and intelligence proved accurately prescient: last year (2005) was the deadliest yet, with 92 American military killed in Afghanistan as a result of the revived *al-Qaida*/Taliban insurgency. Many of these deaths occurred from tactics that Idema's group was combating: attack *via* IED (Improvised Explosive Device).  In April 2004, Idema, who had been working with the FBI, by supplying them with *al-Qaida* HUMINT and other forms of intelligence, terminated his information sharing with the FBI after a disagreement over tactics and techniques.  The FBI then began a vicious campaign against Idema.

6.      The operative facts of the case are clear[13]—in early May, 2004, US authorities (the Federal Bureau of Investigation) issued a fabricated warrant for the arrest of Idema and circulated their first phony Wanted Poster in Afghanistan.  In May 2004, prior to that first wanted poster, the FBI informally requested Special Operations elements of the U.S. Army arrest and detain Petitioners during their turnovers of al-Qaida EPWs to U.S. military forces. The U.S. military refused, and warned Petitioners that the FBI was conducting a "vendetta."  The first Wanted Poster was withdrawn after the U.S. Department of Defense objected, and the situation seemed resolved.  However, in June 2004, after Ambassador Khalilzad was briefed on Petitioners' operations and their interdiction of a terrorist plot to kill Hamid Karzai's political opponents, Idema was told to

---

[12] EPW – Enemy Prisoners of War- also "illegal combatants" – as to *al-Qaida* terrorists.
[13] See First Sworn Declarations of Petitioners attached to the Petition and filed separately under oath and Second Verification of Petitioners as to the additional facts of this motion.

coordinate his activities with a Naval Captain at the US Embassy.  Idema objected to this because of the covert nature of his operations with the Afghans, but primarily because although the Northern Alliance political targets he was protecting were US allies, they were also political opponents to Khalilzad and Karzai. Shortly thereafter, the FBI issued and circulated a second Wanted Poster requesting the detainment of Idema for:

**"INTERFERRING IN MILITARY FORCE/OPS PROTECTION"**

7.      Apparently frustrated with the military's refusal to assist the FBI, and continued U.S. and Coalition military operations with Petitioners, the FBI began circulating the second Wanted Poster.[14]  Once again, the Department of Defense had no involvement in this.  In fact, the highest levels of the DOD opposed this action by the FBI. This included an office of the Assistant Secretary of Defense, which was directly involved in attempting to quash this illegal action by the FBI (*see* petition at pg. 15 ¶6, pg. 16 ¶8). The FBI circulated this second Wanted Poster to the United Nations, US Military, and NGO's[15] throughout Afghanistan in an effort to illegally co-opt neutral parties into the FBI's illegal enforcement and wrongful prosecution efforts.  By doing this and other acts, the FBI not only violated prohibitions on using journalists and aid workers as spies and informants, but also engaged them in law enforcement activities in violation of international law.  **BOTH Wanted Posters were printed in only ONE language— English**.  The posters did not come into existence by any act or through the assistance of any member of the Afghan government.  Nor did the Afghan government approve, authorize, or coordinate in either poster's genesis.[16]

8.      In fact, the Afghan authorities never saw this document until late June 2004, when United Front officials in the Afghan government were first shown this poster by

---

[14] There were at least five variations of the Wanted Poster, presumably depending upon the audience it would be released to, but all were in English, and not a single one was in Dari or Pashtu, the national languages of Afghanistan.  One version of the Wanted Poster is attached hereto as **Exhibit B**.  It is obviously NOT of Afghan origin. Some posters were multiple pages.
[15] Non-Governmental Organizations, such as UN aid workers, foreign aid groups, and even restaurants and bars where foreigners frequented.
[16] The poster listed two **FBI** office DSN phone numbers to report information on Idema and his whereabouts.  No local Afghan number was listed.  No Afghan contact was listed, **ONLY FBI.**

Petitioners.  Certain U.S. Department of Defense officials were disturbed by the poster, and had notified Idema as to its existence.  The existence of this poster was even more disturbing news to Afghan officials which included the Minister of Defense, the Minister of Education, high-ranking officials in the Afghan National Security Council, two Afghan Ambassadors, and even *Amniat* (the Afghan CIA) agents officially working with Petitioners.[17]  The multi-page poster put out by the FBI included pictures of two prominent Afghan Ambassadors and numerous Afghan four star general officers, and stated:

> "IDEMA is well connected within the Afghan society and he has dealings with key military, political and local authority figures, he has been working in Afghanistan for approx 3 years and has traveled extensively within the country."

The posters included a May 2004 picture of Idema at a Corps Commanders[18] meeting and with General Officers of the Ministry of Defense and United Front Military Forces.[19] Because Idema, Bennett, and Banderas were officially assigned to the Afghan Department of Defence, the Minister of Defence was irate to learn of the poster and confronted Ambassador Khalilzad about the poster on July 2, 2004.  Khalilzad personally assured General Fahim that no further action would be taken against Petitioners by the FBI.

9.      The FBI's Wanted Poster also stated that Idema was:

**"WANTED BY THE FBI ON A SERIES OF CRIMINAL CHARGES"**

even though this was completely untrue at the time.  There were NO warrants for Idema on ANY charges, anywhere in the world, no less the United States, at that time.  Even so, assuming hypothetically that there was, there is no extradition treaty with Afghanistan, therefore, the FBI had no jurisdiction to arrest any Petitioner, or to request their arrest on behalf of the FBI.  The FBI's power to do such an act extended solely from the subjugation

---

[17] Of note: Petitioner, Lt. Banderas, is an *Amniat* (CIA) Agent employed by the Afghan government, and is not being held by his own government.

[18] General Officers which are similar in form and function to the US Joint Chiefs of Staff.

[19] Also known as the Northern Alliance, a part of the interim government which was the primary ally of the United States military forces during the 2001-2002 war, but which was later abandoned by the DOS and determined to be an "illegal force,"  (*see* Exhibit B – Poster). Following this designation by the DOS, the US DOD was directed to cease contact with and support of this erstwhile allied force because it was perceived as in political opposition to President Hamid Karzai and Zalmay Khalilzad, both Pashtuns who had previous links to the Taliban.

of Afghanistan by Zalmay Khalilzad[20] who acts[21] as the *de facto* ruler of the country.  This is well known, and President Karzai is still referred to as the "Mayor of Kabul," an acknowledgement that the ultimate control, administration, and destiny of Afghanistan fell, and still falls, under the exclusive domain of Ambassador Khalilzad.[22]

10.    Even if this arrest was approved by the president of Afghanistan, Hamid Karzai remains a US citizen, contrary to false DOS assertions that he has given up his US citizenship.[23]  This is relevant in that Karzai, a US citizen, was personally complicit, at the direction of Khalilzad, in the March 2005 denial of Petitioners' release after an Afghan Appeals Court found Petitioners innocent of all charges on three separate occasions.

11.    In April 2005, five Appeals Court judges[24] restated the complete innocence of all Petitioners after their second trial concluded in March 2005.  **The prosecutor also withdrew all charges** and pronounced the innocence of all Petitioners during that trial, and again restated his position one month later that Petitioners were innocent.[25]

12.    Contrary to Respondents' position in their April 2005 Motion to Dismiss, the Afghan government is not holding these Petitioners,[26] nor restricting their other liberty

---

[20] Prior to Respondents' assertion in fn #3 of Respondents' Original Motion to Dismiss, Khalilzad was served in accordance with 22 C.F.R. §172.2.  "Overnight Mail ED 72 3279 548 US delivered on April 28, 2005 in Washington, DC 20520 to State 20520 R10." Signed for by "L Upshaw."

[21] Respondents will make the point that Khalilzad is no longer in Afghanistan, and is in Iraq and therefore simply a predecessor with no further relevance in this case.  Petitioners are prepared to present evidence at a hearing that Zalmay Khalilzad still exercises substantial personal control over the Karzai government and still makes adverse decisions related to Petitioners, thereby affecting their liberty interests.

[22] *See*: *Prosecutor v. Dusko Tadic*, [1999] ICTY 2 (15 July 1999) (dec. by Judge Antonio Cassese)

[23] Upon information and belief, Hamid Karzai's US citizenship remains in full force through a classified agreement between Karzai, Khalilzad, and Secretary Rice's predecessor.

[24] This included all three judges which formally sat on the bench, one visiting judge from the Supreme Court, and the Chief Judge who had just returned from an all-expense paid trip (funded by DOS and DOJ) to America during the second trial.  The DOS and DOJ have refused all FOIA requests for information related to that trip.  All stated during and after the trial *de novo*, that the Petitioners were completely innocent of all charges, often saying, "*the foreign hand*" "*...is working against you from behind a curtain,*" referring to Khalilzad and the US Embassy.

[25] Petitioners will provide irrefutable evidence of this to the Court *in camera* at a hearing.

[26] One example of this is that Northern Alliance officials (the pre-Bonn Conference UN recognized government) continue to take no adverse action against Petitioners and continue to lobby for their release.  The mail is ordered to be delivered sealed, and they are allowed virtually

interests such as mail, contact with their counsel, visitation rights, or other liberty deprivations complained of in Petitioners' application for writ.  Nor is the Afghan government in possession of the exculpatory evidence and personal property illegally seized from Petitioners by the FBI.  As an example, since the filing of this case, Khalilzad,[27] through his agents, such as US Consul Russel Brown and Adrianne Harchick, has retaliated with continued extraordinarily nefarious liberty deprivations.  Khalilzad has imposed a complete blackout on all external communication by Petitioners.  Respondents' agents have consistently returned relief packages and mail which were received in Kabul with Russel Brown's personal handwritten notation; "*wrong address*."  Prior to returning packages and mail, Russel Brown (hereafter "Brown") conducted illegal searches of the mail, and illegal seizures of documents, evidence, and attorney/client privileged materials.  This conduct has been continued by US Consul Harchick, except that she attaches unsigned memos so that the handwriting cannot be traced to her (*see* **Exhibit #C**, mail).

13.    On behalf of Khalilzad, the US Consuls have also requested prison officials block all visitation by visitors of any nationality <u>unless</u> they carry a letter of permission signed by Khalilzad or Brown.  After filing the Petition, Brown refused to deliver Petitioners' appeal to the Supreme Court, thereby directly denying Petitioners access to both domestic (Afghan) and foreign (international) courts.  At the same time, Brown notified Petitioners' families that Petitioners did not want to file an appeal and refused to give their appeal to the Embassy for filing.  This was a knowingly false statement by Brown to subvert the liberty interests of Petitioners by misleading their families and to establish a false and fabricated record of events.  This was further perpetrated by DOS employee/agent Elizabeth A. Kirincich in a May 10, 2005 email misstating virtually every fact (*see* **Exhibit #D**, email from DOS to Richard Caraballo).  These same acts have been continued by Adrianne Harchick who has blocked the filing of Afghan court pleadings,

---

any item sent to them, even if prohibited to other prisoners.  This is hardly evidence that that Afghan government thinks they are prisoners, and in fact, they have been cataloged as "political prisoners" by the Ministry of Justice and as Prisoners of War by the Ministry of Defence.
[27] Any references to Ambassador Khalilzad also include, by reference, his successor Ambassador Ronald Neumann.

blocked correspondence with Idema's counsel, and blocked all correspondence with this Court, and family mail.  Since the Pulacharke siege, Harchick has consistently issued false statements to the press and others, blaming Petitioners for the prison revolt, saying that Caraballo was not held hostage in Block 1, and Petitioners were leading the riot.

14.    Subsequent to filing the writ, it was learned that Minister of Justice Karimi,[28] announced he would order the release of Petitioners after he stated that their detention and rendition was in violation of Afghan and international law.  Upon information and belief, shortly before Karimi's confirmation as the continuing Minister of Justice, Khalilzad learned of this, called Hamid Karzai, and had Minister Karimi removed from the new cabinet at least partly because Karimi stated that upon his December 2005 re-confirmation as permanent Minister he would ignore Khalilzad and immediately release Petitioners.  Once again, these actions by Khalilzad, and his ability to determine cabinet level ministers in the Afghan government, confirms that Khalilzad was, and still is, the military, political, and diplomatic ruler of Afghanistan.  This becomes a critical factor when considering Petitioners' Geneva Convention Status, and their actual custodian.[29]

15.    Some of the most egregious acts by Consul Harchick occurred as this case approached the first hearing in Washington.  Harchick cut off water to Petitioners, blocked medicine—even medicine from the Afghan government, seized mail from the AFGHAN POST OFFICE, then destroyed and returned letters and packages, cut off financial aid from Idema's 86 year old father,[30] and paid informants at the prison[31] to spy on Petitioners should they receive mail, water, or food from outside sources.  Consider this—Harchick went to an Afghan Post Office, seized AFGHAN mail to Idema and Bennett, searched it, and returned it to the states.  Is it really a mystery of whose custody they are in?

---

[28] Minister Karimi, deputy leader of the Hazara *Mujahadeen* faction, a member of the Northern Alliance, led by Vice-President Kareem Khalili, has repeatedly thanked Idema for his work in Afghanistan against terrorists.

[29] *See*, *Prosecutor v. Dusko Tadic*, [1999] ICTY 2 (15 July 1999) (Judge Antonio Cassese)

[30] Idema's father is a WWII Marine veteran of Iwo Jima and other island assaults, and has NEVER been allowed to send or receive mail from his only son and only surviving member of his family.

[31] So far three Afghan senior officers have been relieved of duty for abusing Petitioners on behalf of the US Consul.

# ISSUES TO BE PRESENTED

Petitioners preface their individual issues by stating, that in spite of opposing counsel's unsupported and unsworn statements to the contrary, it is clear that day to day custodial control over Petitioners is exercised by Zalmay Khalilzad, a U.S. citizen, and his successor, Ronald Neumann, Robert Mueller, and their agents, outside the territorial jurisdiction of any court who are illegally denying the liberty interests of US citizens also outside the territorial jurisdiction of any US district Court.  There is extensive evidence of this, all verified under oath by Petitioners, yet there is not a single shred of evidence to the contrary before the Court.  While this motion contains some newly discovered evidence and facts previously unknown, the main facts of the case remain the same:

The arrest was ordered by American citizen Zalmay Khalilzad, who directed American citizen Hamid Karzai to order American citizen Ahmad Ali Jalali[32] to make the arrest with American citizen Amrullah Saleh.[33]  Afghan citizens, like National Police Chief Babajan, who initially refused to participate, were threatened with prison if they did not assist.  General Babjan was later fired. It has been alleged by former NDS officers that the underlying reason for Babjan's termination was his opposition to Petitioners' arrest.  Jalali has since fled the county, and all of the American citizens involved in the arrest, including Jalali, are now under investigation by a special commission in the Afghan Parliament.

There is no evidence to indicate that ANY non-American citizen authorized or ordered Petitioners' arrest, or took any action against them since.  **Petitioners <u>challenge</u>** Respondents to present the signature of ANY non-US citizen[34] **<u>contradicting</u> this.**

---

[32] Jalali is a former US government employee/translator, who was appointed Minister of Interior and has frequently voiced violent hate for Commander Massoud's United Front.  He allegedly resigned shortly after Yunis Qanooni, the man who's life Idema and his men saved, was elected Prime Minister in October 2005.  Jalali returned to the United States and now lives in Maryland.
[33] Amrullah Saleh, is a former US government employee/translator, who was appointed Chief of the National Directorate of Security and is currently under investigation by the Afghan Parliament, and the subject of Parliamentary hearings related to his misconduct.  His salary, before, during, and after the arrest of Petitioners, was paid by the FBI.
[34] In a position at that time during which they could have legally ordered or authorized the arrest.

## I.    RULE 60 PROVIDES FOR RECONSIDERATION BASED ON MISTAKES

Rule 60 of the Federal Rules of Civil Procedure provides for the relief from a judgment or order based upon clerical mistakes, or errors arising from an oversight or omission by the court upon the motion of any party.

Basis for the motion is set upon Petitioners being denied the opportunity to respond prior to the Court transferring the case and the subsequent events related to delays, prejudice, new evidence and other factors.  Therefore, this motion is warranted, and in good faith.  Additionally, Rule 60(b) allows for an order to be amended or reversed based on mistakes, such as inadvertence or excusable neglect.  On motion and upon such terms as are just, the court may relieve a party from a final judgment, order, or proceeding for (b)(1) mistake, inadvertence, surprise, or excusable neglect, or (b)(6) any other reason justifying relief from the operation of the judgment.

Petitioners respectfully request this Honorable Court enter a new order transferring this case back to the SDNY as soon as possible for a decision based on the facts, arguments, and case law as set forth in the record.

## II.    THE SDNY COURT HAS TERRITORIAL JURISDICTION OVER RESPONDENTS

Where American citizens confined overseas (and thus outside the territory of any district court) have sought relief in *habeas corpus*, the courts have held, if only implicitly, that the petitioners' absence from the district does not present a jurisdictional obstacle to the consideration of the claim.

Here, the primary persons to who the alleged violations are imputable are Zalmay Khalilzad, a US citizen, his successor and agent, Ambassador Ronald Neumann, a US citizen living in Afghanistan, Russel Brown, a US citizen domiciled in Montana, then living in Afghanistan, and his successor, Adrianne Harchick, also a US Citizen, believed to be a resident of New York or New Jersey, who has continued the violations, and even

increased the unlawful conduct against Petitioners, and finally, various members of the FBI, living in NY, Afghanistan, and Virginia.[35]

Petitioners in the instant case are both US and Afghan citizens, held extraterritorially in an occupied foreign country under the direct control of Respondents and other US citizens in Afghanistan.

- Their original arrest warrant and "Wanted Poster" was issued by Respondents.

- Their arrest was ordered by Respondents and other American citizens.

- Two FBI agents sat in a car and oversaw the arrest, then searched their compound.

- Their property has been seized by the FBI on THREE separate occasions.

- Their evidence is held by FBI agents in NY and Afghanistan.

- Their trial and "conviction," which occurred without regard for Afghan or international law, and violated the Afghan Criminal Code and international treaties, was conducted, orchestrated, and driven solely by Respondents.

- Their day-to-day liberty restraints are imposed solely by American citizens.

- Their detainer is lodged solely by American citizens and their agents.

- Since their incarceration, the filing of their Afghan appeal was directly denied by Russel Brown, an American citizen.

- Their mail, family contact, and contact with counsel is controlled NOT by the government of Afghanistan, but by Americans Khalilzad, Neumann, and Harchick.

- Their visitation is controlled/impeded by Khalilzad and/or Neumann's agents.

- Even their food and water is controlled by Khalilzad's agents and his successors— all American citizens or U.S. government paid employees.

- Finally, their release, after a finding of not guilty, was directly stopped by Khalilzad, and American citizens.

---

[35] Condoleezza Rice was dismissed as a Respondent, and two additional FBI agents in control of Petitioners' property and believed to be attempting extradition to NY, have been designated as agents of Respondents by and through this motion, along with Russel Brown, DOS, and Adrianne Harchick, US Consul, as are U.S. citizens Hamid Karzai, Ahmad Ali Jalali, and Amrullah Saleh.

Yet Respondents comically assert they have no involvement in what is an "internal matter" of the Afghan government, and this Court has no jurisdiction to entertain this petition. Much, like a blood splattered man caught with a freshly emptied smoking gun standing directly over his victim's body they say, "what are you looking at? It wasn't me."

In fact, 9 months ago the US government began a classified plan to transfer GITMO detainees to Pulacharke. A special section has been designed and is being built with a cover story that it will be used for counter-narcotics enforcement. In reality, it is for GITMO terrorists, and the FBI has already designated a special high security area for these specific Petitioners where their rendition will continue (_see_ **Exhibit E,** EPW map).

Of considerable consequence is the identity of the primary Respondents who control most of the day to day custody and control over these Petitioners at this moment, and who are responsible for the vast majority of liberty deprivations outlined in the Petition. These persons are Ambassador Khalilzad, his successor Ambassador Neumann, and US Consul Russel Brown and his successor, Adrianne Harchick, who, like the Petitioners, are all U.S. citizens located outside the formal borders of the United States.

In the end, the answer to the question presented is clear. Petitioners contend that they are being held in federal custody at the direction of the US government, and are being subjected to a wide range of liberty deprivations, in violation of the laws of the United States under color of law at the direction of Respondents and their agents.

Respondents have offered NO EVIDENCE to the contrary, only the transparent, unavailing, and unsworn opinions of their counsel, who has neither been to Afghanistan, nor has any direct knowledge of any relevant facts nor one single material fact or occurrence as outlined in the Petition.

Therefore, again, just as Petitioners state on page 12—the main basis of this case evaporates on a simple challenge met head-on by Respondents:

There is no evidence to indicate that ANY non-American citizen authorized or ordered Petitioners' arrest, or took any action against them since. **Petitioners challenge** Respondents to present the signature of ANY non-US citizen[36] **contradicting this.**

---

[36] In a position at that time during which they could have legally ordered or authorized the arrest.

17

### III.    THE SDNY COURT HAS SUBJECT MATTER JURISDICTION OVER RESPONDENTS

Contrary to Respondents' position for the past year, it has <u>not</u> been the "tradition" that prisoners were allowed to bring *habeas* petitions only against their immediate custodians (*i.e.*, the warden of facility at which they were held) or <u>only</u> in the federal district in which they were physically confined.  In fact, there have been numerous historical situations in which prisoners were allowed to bring petitions against parties who were responsible for liberty deprivations outside the warden's control, or Fourth, Fifth, Sixth, and Fourteenth Amendment violations, or against parties other than the "warden."

The core of this case goes to the daily actions of Respondents and their agents, and the very basis and foundation of *habeas corpus* law.  There is no evidence in front of this Court to undermine or impugn Petitioners' claim that they are being denied their liberty interests by US officials, or their agents, under color of authority of the United States.

As an example, while Petitioners originally believed that their evidence was held solely in Afghanistan or Washington, new information indicates that the evidence is currently in both Kabul and New York (*see* petition at pg. 52) after being illegally seized by FBI Agents (*see* **Exhibit F**, FBI Evidence Receipt signed by Special Agent Kevin Thuman in Afghanistan).  Interestingly enough, Respondents, their agents, and other officials of the United States have denied verbally, in press conferences, and in writing,[37] that this ever occurred.  These are the types of disingenuous and outright false statements made by Respondents which have punctuated this case with deplorable and illegal conduct by Respondents and their agents (*see* **Exhibit D**, DOS Email to Richard Caraballo).

While this Court has clear and present jurisdiction over these liberty restraints and over Respondents and evidence located in New York and Afghanistan, Petitioners assert that the interests of justice would best served by transfer back to the SDNY.  Respondents in Afghanistan can be reached just as easily from the Southern District of New York, as they can be from the District of Columbia.  As such, the SDNY Court clearly had subject matter and territorial jurisdiction over this case, and it should not have been transferred.

---

[37] *See* Exhibit D, Department of State, Kirinchich Email to Richard Caraballo.

## IV.    PETITION SHOULD BE TRANSFERRED TO THE SOUTHERN DISTRICT OF NY

Respondents stated in their original April 2005 motion to dismiss that "the forum 'with the most immediate connection' to each of the Respondents is Washington D.C.," and that "only the district court in the District of Columbia may hear a *habeas* petition against them." There are several facts that belie this. First, The FBI office in NY is directly involved in this case, in that, upon information and belief, the evidence and videotapes which Petitioners need to provide irrefutable proof of innocence are in the FBI NY Office. Further, Respondent Mueller has direct supervisory control over the agents therein and the physical evidence moved from Kabul to New York, although it is believed that copies may exist at the FBI office in the US Embassy compound in Kabul.

The seriousness of these illegal acts and interference cannot be underestimated or taken lightly. Those videotapes not only contain exculpatory evidence which would literally force the release of these men, they also contain evidence relating to the murder of Corporal Jamie Murphy[38] by the terrorists Petitioners arrested, the murder of US citizens in other bombings (including the August 2004 bombing of DYNCORP in Kabul)- which captured terrorist Ghulamsaki,[39] later released by the FBI, took part in, and the conspiracy to murder hundreds of American soldiers at Bagram Airbase.[40]

---

[38] Jamie Murphy was a Canadian soldier killed on January 29, 2004 while on patrol on Darlaman Road in Kabul. Originally designated a "random suicide bombing" by ISAF and coalition authorities, it was later discovered that Mohammed Sidiq and his brother, Mohammed Araf *aka* Malikyar (*see* petition at pg. 10 ¶27 and 17 ¶13), terrorists arrested by Petitioners and the Afghan MOD, and three of the other terrorists captured by Petitioners and the UFMF (Northern Alliance) MOD forces, were the terrorists responsible for Murphy's murder at the direction of most wanted terrorists Gulbideen Hekmatyar and Osama Bin Laden.

[39] (*See* petition at pg. 17 ¶12; Ghulamsaki had been previously captured by Petitioners. He is the brother-in-law to Osama bin Laden's current chief of security and protection.

[40] The terrorist operations to bomb Bagram Air Base north of Kabul were ordered by Bin Laden's chief of sabotage and subversion, an unknown terrorist leader known as "*Zarb Sayev*." Two of the terrorists Petitioners arrested were directly involved in this terrorist operation. The videotapes not only contain surveillance and interrogations substantiating this on them, they also contain irrefutable proof that Petitioners were working with and for clandestine services in the U.S. government and Afghan CIA with approval by the US government and, as hard as it is to believe, tacit approval of the FBI's Counter-Terrorist Office in Washington. The DOJ seeks to conceal these videotapes to prevent the information from becoming public.

The Canadian government requested copies of these videotapes in September and October 2004, and have repeatedly sought access since, yet the FBI has refused to provide anyone with access to Petitioners' evidence and personal property or return it.

Petitioners also assert that the FBI has a warrant for at least one Petitioner in the Southern District of New York, and are seeking extradition of all Petitioners should the Afghan government refuse to continue what is clearly a rendition by the FBI, *et al*.

Petitioner Idema, has, through a previous letter of counsel to the United States Attorney in the SDNY, demanded the opportunity to testify before any Federal grand jury inquiry regarding him. Petitioner has received no response from the government. This, standing alone, is a liberty deprivation clearly within the jurisdiction of the Courts.

So too, must the government attempt to return Petitioner, or Petitioners, who are facing US charges, from Afghanistan so that the issue of forcible extradition can then be addressed, or if Petitioners chose, they can voluntarily appear. But, Petitioners must be given the opportunity to make that decision for themselves. They may not be involuntarily held through rendition, then, when the government feels ready or willing, be involuntarily extradited contrary to law and without a specific extradition treaty.[41]

Regardless of the final outcome, Petitioners' claim is one which they are legally entitled to assert because Petitioners have also raised the claim that their future liberty interests are also deprived in that US government agents obtained statements, information, documents, videotapes, and other evidence in violation of the Fourth, Fifth and Fourteenth Amendments.

Lastly, while it would supposedly be inconvenient for actual government parties involved in the case to be summoned for testimony, that was one of the original purposes the case was transferred to DCDC in the first place. Therefore, Respondents should neither object to discovery, nor transfer back to the SDNY since none of the parties from which discovery would be sought are in the DCDC.

---

[41] 28 U.S.C. §2241(c)(3) authorizes a district court to grant writ of habeas corpus whenever a petitioner is "in custody in violation of the Constitution or laws or treaties of the United States."

## V.    PETITIONERS HAVE A RIGHT TO, BUT SHOULD NOT BE FORCED TO AMEND

While Petitioners have a right to amend, they should not be forced to amend which results in continuing and unnecessary delays and obstruction by Respondents.  Nor should Idema be ordered and forced to file an amended petition solely on his behalf simply because he is the only represented party.  In fact, this is so prejudicial as to call serious question to the way this case is being handled.  First the case is misplaced, then lost and in limbo, and finally, nine months later the case finally makes it the DCDC Clerk's office. Now, this Court seeks to separate and isolate Petitioners from each other and stay Respondents' answer.  Are these men not isolated enough?  They are in one of the world's most infamous prisons, under a complete communication ban imposed by Respondents, and sometimes in the dark for months and without running water and medicine for nearly two years.  They are defending themselves not just against daily threats, attacks, and assassination attempts by *al-Qaida* and Taliban terrorists, but also against extraordinary liberty deprivations and nefarious retaliatory acts by Respondents and their agents.[42]

As Petitioner Idema set forth in his letter to counsel, part of which was quoted in his Counsel's February 9th letter to this Court:

> "We will not file separate Petitions and be pitted against each other as though we were drug dealers or crack addicts which the US Attorney and courts are so familiar with and seek to turn against each other to secure convictions in that disgustingly common and normally effective tactic. . .
>
> We have fought, bled, and come close to dying many times together through this ordeal.  Three different religions, and two different nations, standing side-by-side.  We have watched our friends and brothers die next to us, and be murdered and executed by *al-Qaida* terrorists in front of us.  We will not be split apart, nor separated, by any force, including God."[43]

It is Idema's position, joined in by Bennett, Banderas, and Caraballo, that Respondents are in default, have been for ten months, and that the facts of the Petition are admitted.

---

[42] Counsel drafted this statement almost one month ago, and has now seen these statements become all too real again in the midst of the ongoing siege at Pulacharke Prison.

[43] Captain Bennett and Lieutenant Banderas confirmed this position by phone.  It is further supported in Petitioners Affidavit, attached hereto as <u>Verification</u>.

## VI.    PETITIONERS SHOULD BE GRANTED A TEMPORARY RESTRAINING ORDER

Petitioners' allegations of repeated mail interference, and an ongoing blockade of communication with counsel and the courts, are more than sufficient to state a claim because Petitioners have alleged that the interference with their mail constitutes an ongoing practice of unjustified censorship and causes them to be denied access to the courts prejudicing their legal actions.  They are illegally held incommunicado and they, their families, and counsel are subjected to extraordinary costs and hardship even when they can circumvent the communication ban through covert or clandestine means.

Furthermore, the arbitrary and capricious retaliatory acts such as the withholding, search, and seizure of relief parcels containing food and medicine, and denial of water, is so egregious as to literally shock the conscience and must be stopped by this Court, at least until such time as Respondents file an answer, and then, _if_ warranted, the TRO can be converted to a permanent injunction preventing Respondents' illegal conduct.

As an example of bad faith and obstruction by Respondents'—Mr. Lev has continually sought to direct the Court's attention away from the merits and facts to avoid scrutiny of the extraordinarily vicious conduct Respondents have engaged in against Petitioners.  This is not uncommon.  The Federal Prosecutors' Handbook specifically teaches Mr. Lev how to avoid responding to the merits of a prisoner's issues in _habeas corpus_ petitions under §2241.  This is _their_ strategy for a §2241 case:

> "The last thing you prosecutors should do, when faced with a collateral attack on a federal criminal conviction, is to respond on the merits. That is, you should respond on the merits, but only after advancing all of the logically prior arguments that relieve the court from even considering the prisoner's claim."[44]

A Temporary Restraining Order is clearly warranted and justified.  Therefore, Petitioners respectfully request this Honorable Court immediately intercede to protect these valued liberty interests from being further usurped by Respondents who have exhibited bad faith from day one in this matter.

---

[44] The handbook's author also tells all federal prosecutors to contact him immediately if any prisoner _or_ court attempts to expand the availability of _habeas corpus_.

22

## VII.  RESPONDENTS SHOULD BE BARRED FROM FURTHER DISPOSITIVE MOTIONS

Respondents' stated in their April 2005 motion, that the government "reserves its right to submit to this Court full briefing seeking to dismiss the Petition for failure to name proper respondents,"[45] and/or "for lack of subject matter jurisdiction."[46]  Although the SDNY Court's Order[47] denied Respondents' motion without prejudice, "including the argument, reserved therein…" motions to dismiss **cannot** be made piecemeal hoping that a Court will adopt one argument, and holding back another for a later day.

As in the case of a 12(b)(6) motion, Respondents must bring their grounds for dismissal at once and if denied, then answer the merits of the case.  In effect, what the government did, was receive their original request for an extension of time to answer through *coup d'état* by bringing their first motion, and hoping to bring others if they lost.

As the record demonstrates, this strategy has met with success.  One year after filing, this case will not have moved beyond locating misplaced court files and an uncompleted Rule 16 hearing.

By the March 2006 hearing, the government will have garnered itself an extension to answer of more than one year.  Each day the Petitioners in the instant case live in constant real danger of death and high probability they will be murdered by al-Qaida terrorists.  They have survived seven separate al-Qaida assassination attempts which have left more than a dozen people either dead or wounded.  The latest siege, contrary to press reports, has left at least one dozen more dead and more than 50 wounded.  Caraballo is a hostage, and the other three survived a crossfire of more than 4,000 bullets in four days.[48]

Respondents should be precluded from bringing further defenses under this rule, or relating to any matters designated in Rule 12(h), as they have been waived for failure to bring them all at one time.

---

[45] Page 2, fn2, SDNY Motion to Dismiss by Respondents, filed on or about April 29, 2005.
[46] Page 1, fn1, SDNY Motion to Dismiss by Respondents, filed on or about April 29, 2005
[47] Court's Order, May 19, 2005, Case # 05 CV 2497 (AKH).
[48] All of this occurred while FBI, DOJ, and DOS agents were present and <u>ordering</u> the Afghan authorities not to attempt rescues or the re-taking of the prison.

# CONCLUSION

One of the most difficult concepts to grasp from Respondents' motion is the government's position that "litigation outside of the District of Columbia [would] present a hardship to Respondents."  We are talking about the last remaining superpower in the world, with battalions of attorneys, in every major city and every state, all versed in federal court litigation, against four men, in the world's most infamous prison, denied all contact with the world, without the funds or resources for counsel, who are fighting for their very lives every day surrounded by more than 500 al-Qaida and Taliban terrorists, and who have barely survived seven prior assassination attempts.  Men who have been denied mail, medicine, food, and water directly by the United States government, and who are represented by one lone *pro bono* attorney with no experience in §2241 *habeas corpus* litigation who believes in their cause and continues to fight.  Yet the United States government claims hardship?

Respondents' positions in this case have been simply for the purposes of unwarranted and capricious delay.  As this court is well aware, *res judicata* does not apply to *habeas corpus*, when, as here, the facts are not reviewed, investigated, or refuted, and as such, just as the SDNY Court stated in its May 18, 2005 Order, dismissal is totally senseless.  *Salinger v. Loisel*, 265 U.S. 224, 230 (1924); *Wong Doo v. U.S.*, 265 U.S. 239 (1924).[49]  That a country which stands upon the proposition that "above all else, liberty…"[50] would take the position that US Attorneys are currently adopting in the current wave of *habeas corpus* actions is disturbing at best.

The Great Writ remains the last bastion of the United States Constitution and the Bill of Rights, and the Supreme Court's recent decisions have not undermined that position as Respondents' counsel would lead us to believe, but have in fact strengthened it against a legion of US government officials that have used the attacks of 9/11 and the war on terror to subvert and pervert that upon which our forefathers built this nation— liberty.

---

[49] A Memorandum of Law, Points, and Authorities in support of this motion is also being filed.
[50] Thomas Jefferson.

**WHEREFORE,** Petitioners request this Honorable Court a) hear this motion as expeditiously as possible under the rules, b) return this case to the Southern District of New York, c) enter all sworn facts by Petitioners admitted and conceded, d) or in the alternative, order Respondents to file an answer within 3 days, and e) grant a Temporary Restraining ORDER as set forth below:

1) barring the United States government from interfering in the siege at Pulacharke, and remove FBI agents at Pulacharke Prison.

2) barring the United States government from intercepting, delaying, obstructing, or refusing mail between the petitioners and their attorneys, family, and friends, and;

3) ordering Respondents, and/or their agents, from conducting continued illegal searches and seizures of personal and privileged communications.

4) ordering Respondents to provide water and medicine as needed and deliver relief packages currently being held at the US Embassy.

And further, Petitioner Idema requests as *next friend* to his co-Petitioners, that this Court enter an Order as follows:

5) appointing counsel for Bennett, Caraballo, and Rasuli, all of which are indigent (a separate motion was filed by these three Petitioners in June 2005, and second motion was filed in February 2006 by their *next friend*), and,

6) And other relief as is just and proper.

This 28th Day of February 2006.

_____S/_____
John Edward Tiffany,
Attorney (JT7322)
*For Petitioner Idema*
PO Box 190
55 Washington Street
Bloomfield, NJ  07003
Ph:  973/566-9300
Fax: 973/566-0007

## VERIFICATIONS OF PETITIONERS

**Pulacharke Prison, Kabul, Islamic Republic of Afghanistan: ss.**
1. I am a Petitioner in the §2241 Case of *Idema, et al.,* v. Khalilzad, *et al., DCDC,*
2. I declare under the penalties of perjury as follows, but expressly not limited thereto:
3. I join in the attached Motion and the additional facts stated in Petitioners' Motion under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4. Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this
26th Day of February 2006, in the Islamic State of Afghanistan.

_____S_____
J. K. Idema, Declarant/Petitioner

**Pulacharke Prison, Kabul, Islamic Republic of Afghanistan: ss.**
1. I am a Petitioner in the §2241 Case of *Idema, et al.,* v. Khalilzad, *et al., DCDC,*
2. I declare under the penalties of perjury as follows, but expressly not limited thereto:
3. I join in the attached Motion and the additional facts stated in Petitioners' Motion under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4. Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this
26th Day of February 2006, in the Islamic State of Afghanistan.

_____S_____
Brent Bennett, Declarant/Petitioner

**Pulacharke Prison, Kabul, Islamic Republic of Afghanistan: ss.**
1. I am the brother of Petitioner in the §2241 Case of *Idema, et al.,* v. Khalilzad, *et al., DCDC,*
2. I declare under the penalties of perjury as follows, but expressly not limited thereto:
3. My brother joins in the attached Motion and there are additional facts stated in Petitioners' Motion under 28 U.S.C. §2241, which are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4. Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this
28th Day of February 2006, in the State of New York.

_____S_____
Richard Caraballo, *Next Friend*

**Pulacharke Prison, Kabul, Islamic Republic of Afghanistan: ss.**
1. I am a Petitioner in the §2241 Case of *Idema, et al.,* v. Khalilzad, *et al., DCDC,*
2. I declare under the penalties of perjury as follows, but expressly not limited thereto:
3. I join in the attached Motion and the additional facts stated in Petitioners' Motion under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4. Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this
26th Day of February 2006, in the Islamic State of Afghanistan.

_____S_____
Zorro Rasuli Banderas,
Declarant/Petitioner

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing Motion has been duly served upon the below named Respondents by depositing it in the mail in the U.S. Post Office, *via* First Class mail, on the 28th day of February, 2006, addressed as follows;

ORI LEV, DC # 452565
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
Mail: P.O. Box 883, Washington, DC 20044
Delivery: 20 Massachusetts Ave., NW, Rm 7330
Washington, DC 20001
Tel: (202) 514-2395
Fax: (202) 318-7589

This 28th day of February 2006.

_____S/_____
John Edwards Tiffany

# EXHIBITS

| EXHIBIT | TITLE | PAGE REFERENCED |
|---|---|---|
| **Exhibit -A-** | Transcript of January 19, 2006 Hearing. . . | 5 |
| **Exhibit -B-** | FBI Wanted Poster – one of at least five versions. . . | 9 |
| **Exhibit -C-** | Examples of returned mail… | 12 |
| **Exhibit -D-** | May 10, 2005 email from Department of State to R. Caraballo… | 12 |
| **Exhibit -E-** | Proposed US holding facility at Pulacharke Prison . . . | 17 |
| **Exhibit -F-** | Signed FBI Receipt for Petitioners' Evidence… | 18 |

COPY

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.K. IDEMA, et al.,                    .
                                       .
          Plaintiffs,                  .  Docket No. CA-05-1334
                                       .
     vs.                               .
                                       .
                                       .
UNITED STATES DEPARTMENT OF            .
STATE, et al.,                         .
                                       .  Washington, D.C.
          Defendants.                  .  Thursday, January 19, 2006
                                       .  11:30 a.m.

. . . . . . . . . . . . . . . . .

TRANSCRIPT OF A HEARING
BEFORE THE HONORABLE EMMET G. SULLIVAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:        JOHN EDWARDS TIFFANY, Esquire
                           55 Washington Street
                           Bloomfield, NJ 07003


For the Defendants:        ORI LEV, Esquire
                           UNITED STATES DEPARTMENT OF JUSTICE
                           20 Massachusetts Avenue, No. 883
                           Washington, DC 20044


Court Reporter:            Elaine A. Merchant, RPR, CRR
                           Official Court Reporter
                           333 Constitution Avenue, NW
                           Room 6822
                           Washington, DC 20001
                           (202)289-1571


Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

**Exhibit A**

1    With respect to the habeas, I have no problem with

2    Mr. Tiffany amending his petition. So Your Honor is aware,

3    this is the original petition. It is 70 pages. It contains

4    legal arguments.

5    THE COURT: Look, I'm going to tell counsel now if it

6    doesn't conform to our rules, I'm going to strike it without

7    waiting for a response from the government. I'm just going to

8    do it. And the case law is clear as to what a complaint should

9    contain and what it shouldn't contain.

10    MR. LEV: I appreciate that. And I would ask that

11    once we get an amended petition filed that we have 60 days to

12    respond to it.

13    THE COURT: Absolutely.

14    MR. LEV: I would point out to Your Honor, this is

15    not a typical habeas case in which the United States has an

16    individual in its custody.

17    THE COURT: And I think everyone agrees, he's not in

18    the custody of the United States. Although it sounds like the

19    plaintiffs are making an argument that he's in the custody of

20    agents of the United States.

21    Isn't that one of your arguments?

22    MR. TIFFANY: Yes, Judge.

23    MR. LEV: They're essentially asking Your Honor to

24    overturn two Afghani courts.

25    I'll get into that in the papers. If we have 60 days



**WANTED BY THE FBI ON A SERIES OF CRIMINAL CHARGES**

# JONATHAN KEITH IDEMA

***ARMED AND DANGEROUS***
**SECURITY FORCES SHOULD DETAIN IF ENCOUNTERED**
**WANTED**
**FOR**
**INTERFERRING WITH MILITARY OPS/FORCE PROTECTION**
**CALL BDOC (DSN 237-1025)**
**AND**
**C2X (DSN 237-1303)**
**IMMEDIATELY**

## APPROACH WITH FORCE

IDEMA is well connected within the Afghan society and he has dealings
with key military, political and local authority figures, he has been
working in Afghanistan for approx 3 years and has traveled extensively
within the country.  IDEMA is wanted by the FBI.  He is known to travel
with large and heavily armed soldiers from the illegal Northern Alliance.
**IF SEEN CONTACT THE FBI IMMEDIATELY.**

# Exhibit  D

**Examples of some of the several hundred boxes and letters that have been returned by Respondents illegally, and at taxpayer expense.**



**Exhibit  C**

----- Original Message -----                                 **[All Emphasis Added]**
From: Kirincich, Elizabeth A
To: '[richardcaraballonewsmedia@salespresence.net](mailto:richardcaraballonewsmedia@salespresence.net)'
Cc: Foo, Jenny J
Sent: Tuesday, May 10, 2005 4:07 PM
Subject: Edward Caraballo

Mr. Caraballo:

I apologize for not getting back to you sooner. I do want you to know that I followed up on our conversation and have spoken with Russel Brown via email.

Russel explained that there is no political angle to your brother's case. **Unfortunately, Mr Idema has indicated that there is a conspiracy against him by the FBI. There is however, no evidence of this.**

The political section has never been, and is not now, a part of this case.  The Embassy's Front Office is only marginally involved (**now mostly because of the lawsuit that Mr. Idema filed against the Ambassador**). The Front Office played a larger role earlier in the case in trying to figure out what Mr. Idema had done and in trying to verify his claimed "ties" to the US Government - **it appears** that Mr. Idema was acting on his own with no US Government sanction.

Our embassy believes that there was no pressure put on the courts for any verdict, guilty or not. That continues to be the case. **This Embassy's view is that the trial was fair by Afghan standards.**

Finally, **our embassy reports that the defense counsel interviewed all witnesses in private meetings** between the judges, prosecution, and defense, though they may not have done so in court.

Finally, in answer to your question about evidence being confiscated, **the embassy is not aware that the FBI "confiscated" evidence as Mr Idema and his lawyers claim.**

I understand that you have asked the embassy to file the appeal with the Supreme Court. As you know, this is outside our consular role and responsibility, **and would amount to getting involved in a private legal case.** Your brother and his two co-defendents continue to have Afghan contacts who can file the appeal with the Supreme Court (as they reportedly did with the 1st Appellate court) or they can submit the paperwork through the prison authorities.

Mr Idema did, as you indicated, appoint himself legal counsel for all three in the Appellate court. Mr Bennett and your brother reportedly fired their court-appointed attorneys soon after they were appointed to them during the lower-court hearings.

We certainly understand your family's frustration and anguish at finding their brother in this situation. We will continue to work to his safety and to work within the bounds imposed on us by the situation in Afghanistan and the Afghan justice system.

I hope this is somewhat helpful. Please continue to remain in contact with Russel Brown and Jenny Foo if you have any further questions.

Betty

# Exhibit   D



**Confidential Pulacharke Prison Compound Design
For GITMO Detainees and Extreme Interrogation**

**Exhibit   E**

**FBI Signature**
**On Dari Evidence sign-out Sheet**
**July 24, 2004**



- 'Cards -- 7 pieces'

[This refers to ID Cards]

- 'Pictures -- 3 pieces'

[This refers to 3 cases of pictures]

- 'Paper of E-mail'

[This refers to hundreds of emails between Idema and the DOD, FBI, CIA, ISAF, and other similar organizations]

- 'File in booklets and notes.'

[This refers to about 30 intelligence files containing highly exculpatory documents]

- 'Chair that has arms with all the documents in the bags.'

[This refers to a chair with bags of documents and photos sitting on it, also evidence]

- 'More than 500 pieces of paper which are written in English.'

[This refers to about 30 intelligence files containing highly exculpatory documents]

'CPO, two altogether.'

[This refers to laptop computers with highly exculpatory evidence on them]

Signature in English of 'Kevin Thuman'

Dated, July 24, 2004

**Exhibit   F**