**Richard Caraballo** 60 Erie Street, Jersey City, NJ 07302 | 201-420-0055 | newsmedia@salespresence.net

RE: Ed Caraballo Request for *pro se* status
in Civil Case Number 05-1334 (EGS) and
Civil Case Number 05-2064 (EGS)

March 1, 2006

The Honorable Emmet G. Sullivan
United States District Judge
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Sullivan:

As per your Jan 19 order, I've attached a written request from
Plaintiff Ed Caraballo to proceed pro se in the matters before your
Honor. [Exhibit 1]

Thank you for allowing his case to proceed before you. We pray that you
give these matters your serious consideration.

Please note that Plaintiff Caraballo's intent is proceed *pro se* in both
cases concerning him before the Court. Due to an oversight on my part,
I mistakenly conveyed just one case number to him when we spoke
regarding the preparation of the attached document. Should any further
confirmation be required as to his desire to proceed with both cases,
official representatives may reach him directly by phone at the number
he's provided.

Court records should also show that when this matter was before the
Southern District of New York a year ago, Ed filed a motion in that
venue for appointment of counsel.

Because he is unable to speak for himself, he's asked me to speak on
his behalf so that at least he has a means of being heard by the Court.

I'm well-suited for this role since my background knowledge of this
case is substantial. I recruited and closely supported both lawyers who
represented Ed in Afghanistan during 2004. From that time to this, I've
also dealt extensively with the State Department regarding Ed's
situation.

Your Honor, the principle of a fair trial is at the core of civil and
criminal law.

Ed Caraballo is a four-time Emmy award winning journalist specialized
in undercover and hidden camera work. In his 25 years in broadcast
news, Ed has shot footage for CBS, CNN, ABC, as well as local stations
in several markets around the US.

The US War on Terror is the most important news story of the past 5
years and will be for some time to come. Ed was in the process of
completing documentary on this story when he went to Afghanistan to
film the efforts of civilian counter terrorism consultant Idema.

Caraballo's documentary was to focus both on Mr. Idema's efforts and
the larger counter terrorism story in Afghanistan.

In Afghanistan, Ed Caraballo spent almost three months filming Mr. Idema going about his work.  During this time, Caraballo observed and documented Mr. Idema working with US military, ISAF, several Afghan law enforcement agencies, as well as senior Afghan politicians -- which included then Vice President/Defense Minister Muhammad Qasim Fahim and Karzai Administration Special Security Advisor Yunis Qanooni.

By all indications and as documented on Caraballo's voluminous body of footage, the services provided by Mr. Idema and his group were useful and indeed welcomed by all Afghan and US authorities that the group came in contact with.

For his part, Mr. Idema maintained intelligence sources within Afghanistan as a by-product of his 2001 volunteer service on of behalf Afghan and US forces. These indigenous sources correctly predicted a dramatic escalation of insurgent terrorism activity in that country.

After providing both the FBI and DOD with information that he had received regarding an elevated general threat in Afghanistan and details on specific instigators, Mr. Idema arrived in Afghanistan on April 14, 2004. Ed Caraballo and Brent Bennett arrived with him.

As a result of Mr. Idema's 2001-2002 network of relationships, my understanding is that Idema was informally engaged by then Afghan Vice President Fahim and Special Security Advisor Qanooni to investigate the terrorism threats that Mr. Idema's Afghan sources had exposed. Within weeks, the investigations led to the interdiction of one plotter who was surrendered to US Task Force 180 on May 3, 2004.

Although the relationship between Mr. Idema and FBI agents was cooperative as late as March 2004, by Mid-May it had became adversarial.

At the apparent prompting of unidentified FBI officials in Afghanistan, the group was detained by Afghan national police and US civilians on the morning of July 5, 2004 and "officially" arrested hours later.

No word of the arrest was announced for three days but a report filed two weeks later would note:

>"After Idema's arrest, heavily armed American officials sealed off his house, which also served as the private jail. They searched the house and carted off weapons, videotapes, documents and other items."
>    -- From "American accused of running private prison faces trial in Afghanistan"
>                    By Mark McDonald, Knight Ridder (7/20/04)

Despite the best efforts by relatives to contact Ed Caraballo via the State Department, direct access to him was denied.

Meanwhile, over the subsequent two and a half weeks, Caraballo and the other two Americans were aggressively interrogated without access to counsel or impartial translators at Amniat-E-Melli's (Afghanistan's 'CIA') Waliat facility.

FBI employees were at a number of sessions.

Another regular visitor to the American prisoners at the Waliat interrogation facility, US Consular Officer Sandra Ingram. She was fully aware of the dire situation the Americans were in. Consular officers are presumably required to study, pass tests on and know US regulations before undertaking their responsibilities overseas.

Department regulations also urge foreign service officers to understand host country law and, in cases where more detailed knowledge is required, regulations instruct them to consult the Department's legal experts or retain a local lawyer in the host country.

Neither the US Embassy nor Afghan court resolved the chronic problem of competent translation over six very public court hearings over the two months that would follow.

Yet, in those early days, behind the closed doors of the Afghan interrogation facility, as DOS and FBI employees came and went, Afghan prosecution interrogators worked the Americans unimpeded by the US or Afghan law and managed to 'translate' all manner of 'incriminating' statements that were attributed to the Plaintiffs. For example:

> "In a preliminary hearing, Caraballo told Bakhtiari that he and Idema were outraged that American security officials in Afghanistan had been releasing so many Taliban and al-Qaida detainees."

> "'He said the FBI was only here in Afghanistan to line its own pockets,' Bakhtiari said, reading from the official police file, a thick sheaf of documents and depositions in a yellow binder."
> -- From "American accused of running private prison faces trial in Afghanistan"
> By Mark McDonald, Knight Ridder (7/20/04)

Although both attending US Justice and State Department personnel were fully aware of the wholesale rights violations under US law to which they were attendant, the abuse continued.

Since no one apparently had bothered to consult Afghan law, the general presumption seemed have been that whatever the interrogators, the FBI and State Department visitors were doing at Waliat, since they're "the law," their activities must be legal.

An illustration of the misinformation the Consular section was operating under three weeks into the arrest: On the morning of July 19, in response to my concerns that Ed was being railroaded by the Afghans, that he had no lawyer and that no one but Sandra Ingram had had access to him, Consular Officer Ingram replied that "the fact of the matter is that US law in no way shape or form APPLIES. Everything that you and I know about acceptable justice, acceptable due process...none of that applies."

When the Afghan prosecutors had a "thick sheaf of documents and depositions" ready, news media were summoned, and in a packed, auditorium-sized court room the Americans were charged.

I learned the details of my brother's first appearance before the
Afghan court on July 19 from a Knight Ridder news item filed by Mark
MacDonald, which noted, in part:

> "Jonathan Keith Idema, 48, and two American subordinates, Edward
> Caraballo and Brent Bennett, face prison terms of five to 15 years
> on charges of torture, assault and robbery. Four of Idema's Afghan
> followers also have been charged.[...]Several of Idema's alleged
> victims said the former special forces reservist had forced his
> captives - eight Afghan men he suspected of ties to the al-Qaida
> terrorist network - to wear black hoods continuously for seven days
> and nights. He shackled and starved them, they allege, and deprived
> them of sleep. They became so disoriented that when he dunked them
> in ice water they thought they'd been set on fire.
> [...]
> "This is the clearest case I have seen in my 20 years as a judge,"
> said Abdul Baset Bakhtiari, the presiding judge, who's read the
> police file. "The criminals were arrested at the scene of the crime,
> they were armed and their prisoners were there for the police and
> everyone to see."
>             -- From "American accused of running private prison faces trial in
>                                                          Afghanistan"
>                                 By Mark McDonald, Knight Ridder (7/20/04)

Three of the terror suspects whom Idema had detained, were invited by
the Afghan judge to speak. They alleged many things. They said that
they were maltreated and starved by the Americans standing in the court
dock. They said that bags were put on their heads. They said that they
were drowned.

At this early point, no defendant had an attorney. No one was permitted
to question accusers then. When defense attorneys later did join the
case, the accusers were not allowed to be questioned then either. The
accusations were not sworn. Hence, the accusers were free of personal
liability and could accuse anything. Yet, the judge ruled the remarks
were evidence.  Meanwhile, the State Department had this to say of the
situation:

> "An American diplomat, speaking on condition of anonymity, said
> privately that the men were in good health and had made no special
> requests of the embassy."
> [...]
>             -- From "American accused of running private prison faces trial in
>                     Afghanistan"  By Mark McDonald, Knight Ridder (7/20/04)

Late on July 19, Michael Skibbie, New Hampshire attorney, volunteered
to become Ed Caraballo's attorney. Mr. Skibbie was then early in an
eight-week mentoring fellowship with Legal Aid Afghanistan. He attended
the following day's hearing.

> "A succession of inept translators never managed to put the
> proceedings into understandable English, and the court's sound
> system buzzed loudly, then screeched, then stopped working
> altogether."
>             -- From "Americans accused of torture claim ties to Pentagon "
>                                 By Mark McDonald, Knight Ridder (7/21/04)

Since the head Afghan judge had indicated on July 19 his intent to complete the trial before the end of that week, Mr. Skibbie (and the LAA team's) first major contribution was to persuade the court to allow time to prepare a defense.

Next, Mr. Skibbie requested permission from the court to view the collected evidence, which consisted, among other things, of Defendants' memoranda, letters, faxes, photos, and hundreds of hours of audio and video tape documenting their dealings with US, Afghan and ISAF interlocutors.

The court's response was that the FBI had removed all the evidence and taken it to Bagram airbase, approximately 40 miles away.

In contrast to the Bureau's thorough US Chain of Custody procedures, the only documentation of their presence in the domestic Afghan case was a brief voucher note in Dari, signed on behalf of the Bureau by someone named Kevin Thuman.

The voucher is dated July 24, 2004, four days after the American defense counsel joined the case, and the day after Mr. Skibbie had made the first of several evidence discovery requests to the Afghan court.

Because the allegations that Ed was charged with involved actions taken by others within Afghanistan's borders against Afghan citizens, FBI involvement in the remains as unexplainable as the fact that the domestic US agency filed no official notice of any kind that the three defense lawyers working on the case are aware of.

Yet, despite the lack of documented legal authority, domestic US agents were free to remove from Afghan jurisdiction the entire evidence set before it had been seen or cataloged by any party that could certify the integrity of the materials this "backdoor" entity would return three weeks later.

The FBI's MIOG, 2-28 "Attorney General's Guidelines on Methods of obtaining Documentary Materials held by third parties" describes proper privacy protections and procedures.

Why weren't such rules were observed in this case?

Since the domestic Afghan matter was already in litigation before a court, it's difficult to see a benign justification for the Bureau to urgently confiscate the full evidence set. Why ignore the same legal safeguards that are required in a comparable ongoing case in the US against our citizens?

For the next three weeks, Plaintiff Caraballo's lawyer made repeated requests to review evidence to no avail. The result of the FBI evidence confiscation was that Mr. Skibbie ultimately had to prepare Plaintiff Caraballo's defense, due on August 16, with none.

At the August 16 hearing, Mr. Skibbie announced, to the surprise of the growing media contingent that the case evidence remained in the custody of domestic US agents.

Meanwhile, to Mr. Idema's remarks, that defendants were denied evidence in the case, the Afghan judge complained that the American wasn't responding to the charges and just wanted to "waste time."

In fact, much of the August 16 hearing could be summarized as an effort by Mr. Idema to get the court to procure basic requirements that any defendant anywhere needs to prepare a defense: proper (in this case, English) translations to case documentation, evidence, access to defense witnesses, etc.   BBC News reported:

> "The former US soldier said all the evidence he needs is being kept away from him. He said there are hundreds of photos, videos and documents that were at the house in Kabul where he was arrested in early July. He says this has been handed over to the FBI. Mr. Idema also complained about the quality of the translation. This was a frequent source of confusion for others too, with many Afghans in the audience who speak English shaking their heads in surprise at some of the translations that were being made."

Towards the end of the hearing, a clerk arrived at the head of the cavernous courtroom and deposited a box that was said to be from the FBI. The hearing was adjourned for a week.

At the August 23 hearing, Mr. Skibbie and his team presented video clips from the evidence set returned by the FBI. Two clips showed the first-hearing accusers being questioned by Plaintiff Idema. Ghulam Sakhi, one accuser, described plots against two high-level Afghan politicians, procedures for procuring bomb ingredients from co-conspirators and tactics for delivering an Improvised Explosives strike using a parked bicycle. Other footage showed multiple Afghan agencies and NATO contingents from Germany, France and Holland participating in the arrest of Sera Jan, another first-day accuser. Another clip showed Plaintiff Idema meeting with Afghan Special Security Advisor Qanooni. Qanooni congratulates Idema for his successes and pledges his small security force for future operations.

Another clip, played at the final hearing, documents Mr. Idema speaking on the phone to staff members in the office of Under Secretary of Military Intelligence, William Boykin, regarding FBI wanted posters.

By now, those covering of the trial were starting to notice that many of the once outlandish-sounding claims by Mr. Idema, are corroborated by the documentary evidence.

Behind the scenes, I lobbied the State Department to do something about patent unfairness of trial proceedings.  The case was all but over; there was only going to be one more public court date.

During an August 25 phone call, Ms. Ingram told me; "Let me just assure you that the front office, which means the Ambassador, our Deputy Chief of Mission to the Ambassador, are briefed on this case every time I come out of court. They know what's going on. They are actively involved.[...] We have several concerns that are probably the same ones, if not more or, are very similar to the ones that Skibbie raised. We have raised those and have made it known to the Afghan government that we are concerned about aspects of the trial, so far. It isn't over

yet, but we are concerned about the way things have gone, that criminal code is not being ....followed."

When I asked at what point the US government would step in to enforce fairness to proceedings, she replied, "It's all going to depend upon what happens. [That's h]ow we're going to determine it. If they, say, find all four of the guilty of everything, or they find them all guilty of every charge and they say 'Fine them $500. each compensation to the victims and then deport them or give them 15 years and decide to deport them immediately, then are we going to PROTEST?"

"Obviously not," I replied. She continued, "It depends on the totality of the situation. If they find that everybody's guilty of everything then, and they're going to get 15 years, then we've got to start talking about what's wrong here. Was this a fair trial or not. And defense counsel's going to have their weigh in but part of it is us say 'What issues have we been tracking all along.'"

Yet 2 and a half weeks later, when, the Afghan Primary court case handed out 8 and 10- year sentences, the State Department did not "weigh in" to correct or undo or even protest the misconduct and rights abuses of the trial.

Resolution to some of the rights violations were promised and then conveniently forgotten (i.e., calling witnesses & cross-examining accusers.)

Resolution to other violations were deemed 'solved' simply because the State Department spokesman pronounced them 'solved' on TV.

Though all non-Dari speakers invariably agreed that the hearing translations were, for the most part, incomprehensible, DOS insisted that "translation was provided."

A young woman lacking any criminal defense experience appeared to act as Brent Bennett's lawyer prior to the final hearing. Mr. Bennett, decided to continue *pro se*, DOS declared his right to counsel was "satisfied."

At one point, the Afghan judge said that he would allow prosecution witnesses to be cross-examined and defense witnesses to be called. These things never occurred. Yet, DOS declared these requirements "satisfied" all the same.

The State Department is statutorily responsible for defending US nationals against just such rights abuses by foreign courts. Yet, they occurred from start to finish with no intervention. Instead, the Department's solution was to simply pronounce that everything HAD been resolved.

On October 2, 2004, I drove to New Hampshire to interview Michael Skibbie in detail about the case. At that face-to-face meeting, I learned from Mr. Skibble a key dynamic regarding the American Embassy's relationship to the case.

He said that on or about August 12, 2004, the Afghan Judge had told the LAA's Afghan lawyers in court chambers that senior US embassy management had been in contact with him.

According to Mr. Skibbie's account, LAA's Director and Founder, Natalie Rea, told him that she had learned that "the judge [Judge Bakhtiyari] had told the two Afghan lawyers on the case, Aminat and Najiba, that he had been summoned to the Embassy and had a meeting with the Deputy United States ambassador who urged him to give the harshest possible sentence to the Americans in this case."

Mr. Skibbie said that the "judge apparently warned Najiba and Aminat not to mention the US government or the FBI and I don't know really what that means. I think that what that means is that the judge was concerned about the ramifications of us talking publicly about the misconduct of the government and the FBI."

In November, the Appellate case began. After a hearing presentation on December 1, 2004, the Afghan appellate court exonerated all 4 Afghan defendants in the case. Three were released. A forth chose to remain and to assist and translate for the Americans until they were release as well. Consular Officer Russel Brown wrote in part in his E-mail to me, dated December 2, 2004:

> "The appeal is continuing and they met again with the judge yesterday. The judge freed three of Jack's Afghan employees (these were the guys whose room Ed was sharing when he was apart from Jack and Brent) so I am cautiously hopeful that means there's going to be something positive in Ed's case soon as well. Let's hope for the best."

As the hearings were set to proceed, evidence custodians informed the appellate panel was that documentary case evidence had been taken the prior week of November 23 by the FBI.

The subsequent hearing was to be the following week. But was postponed again and again.

On December 17th, Al Qaeda inmates at the prison where the three Americans are, killed 4 guards and attempted to kill Ed and the other two Americans in an uprising.

On December 29, 2004, I phoned acting US Consul Dawn Schrapel to inquire about the appeals case scheduling delays and the re-impounded evidence back in the custody of the FBI.

I said to her, "There was documentary evidence that was apparently again back in the custody of the FBI. What is the status..."

Ms. Schrapel replied, "That I don't know... I don't know much about that at all... I've made inquiries but I have not gotten any information back."

She said that a hearing would be scheduled for the following week of January 1, 2005.

Three weeks later, the Appellate case remained in suspension, so on January 18 I called Ms. Schrapel again to inquire about the mysterious delay. She replied that the judge "has been inundated, based on what he's telling us with a lot of new cases."

Queried about the still missing evidence at the FBI, Ms Schrapel replied, "I honestly don't...I, I...I'm happy to try to find out additional information but I just don't know."

She then referred me to her supervisor, US Consul Russell Brown. He had just returned from almost two months in the US. Mr. Brown insisted that, essentially, the American defendants were lying and that the all the case evidence was not missing.

Mr. Brown said: "No one had been in and out of that evidence room since the lawyers, the American lawyers, were here back in September. That's all I know about THAT. Um...so basically, this is Jack's allegation but the Afghan government is saying, "No, everything that basically was in that room, stayed in that room, nobody went into that room. From the time that the lawyers had access to the evidence. So, you can draw your own conclusions from that."

Mr. Brown's statement was in direct conflict both with what Plaintiffs Caraballo, Idema and Bennett had observed and reported and what I had been told by Ms. Schrapel on December 29 conversation when she said that she had made inquiries to get the missing materials returned.

When I asked Mr. Brown if he had any official documentation to corroborate that all the evidence was indeed available for the defendants to use in future hearings, he said that I would have to have a lawyer file a FOIA or TOUHY request for such confirmation.

In late January, we learned that hearings would begin with the Appellate Judges' panel. But, the case verdict would be delayed as the presiding Judge was going on a two-week junket sponsored by the US Departments of State and Justice. One of events during this junket was a seminar entitled "JUDICIAL REFORM AND RULE OF LAW" at Duke University.

A program from this seminar lists Appellate Judge Abid. [Exhibit 2.] In addition to him, a second listed guest turns out to be Judge Bakhtiari, the first Afghan trial judge. In his biography, the State Department notes:

> "Mr. Bakhtiari has recently earned a reputation for passing a judgment in the case of three Americans who faced charges of running their private prison in Kabul to try Taliban and Al-Qaeda suspects. Despite opposition from certain religious circles, he was able to pass a favorable judgment in the case of the three Americans. He is one of the three judges recommended by the Afghan chief Justice for the program."

Your Honor, many of the defendant protections that one finds in US law are also codified into Afghan law. These include the following rights:

- Right to have an attorney present when being questioned.
- Right to abstain from making incriminating statements
- Right to remain silent.
- Right to have improperly collected testimony or evidence invalidated.
- Right to lawful handling and collection of evidence.
- Right to timely notification of charges.

- Right to access to evidence.
- Right to be present at all case hearings.
- Right to adequate time to prepare defense.
- Right to call witnesses.
- Right to be present during depositions.
- Right to confront and question accusers.
- Right to have adequate translation

(Note: I've included at the end of this letter: a summary of the specific language from Afghan Laws referenced, the State Department Foreign Affairs Manual and the Federal Bureau of Investigation's FBI Manual of Administrative Operations and Procedures and Manual of Investigative Operations and Guidelines.)

Yet, throughout the entire two months of the first Afghan trial which caused these matters to come before you, the above crucial protections under Afghan law were denied to Ed and the other Plaintiffs. Which is why the statutory protections afforded by US law to accused US citizens abroad are so crucial.

For their part, both the State Department and Department of Justice are governed by US laws designed to protect defendants' rights and ensure fair proceedings. The rules and regulations regarding citizen protections are available to all FBI employees in the document set that includes the FBI Manual of Administrative Operations and Procedures (MAOP) and Manual of Investigative Operations and Guidelines (MIOG.)

Section 1-2, "Personal Conduct of the FBI", of the Manual of Administrative Operations and Procedures states:
> 1-4 "(1) Illegal activities on the part of any employee, in addition to being unlawful, reflect on the integrity of the FBI and betray the trust and confidence placed in it by the American people."[...]It is, therefore, expected that employees will obey not only the letter of the law but the spirit of the law as well whether they are engaged in activities of a personal or official nature. With respect to investigative activities, this admonition particularly applies to entrapment or any other improper, illegal, or unethical tactics in the procurement of evidence."

> "(2) As a member of a federal investigative agency, FBI employees must at all times zealously guard and defend the rights and liberties guaranteed to al individuals by the Constitution. Therefore , FBI employees must not engage in any investigative activity, including illegal surreptitious entries, which could abridge in any way the rights guaranteed to a citizen of the United States by the Constitution and under no circumstances shall employees of the FBI engage in any conduct which may result in defaming the character, reputation, integrity, or dignity of any citizen or organization or citizens of the United States."
> [...]

> "All of the foregoing prohibitions, including those pertaining to illegal surreptitious entries are applicable to all security, phases of the FBI's work, applicant, criminal, civil, domestic security, and foreign counterintelligence."

The rules and regulations regarding citizen protections pertinent to State Department personnel are available to all, to read and learn, from Ambassadors to consular assistants, in the document set that includes the Foreign Affairs Manual(FAM) and Foreign Affairs Handbook (FAH.) A summary of pertinent DOS regulations include the following:

- "2 FAM 1100 REGULATIONS AND RELATED PROGRAMS" establishes FAM as the documentary and evidentiary basis for all state department operations.
- "7 FAM 000 CONSULAR PROTECTION OF U.S. NATIONALS ABROAD" defines the role of protecting US citizens abroad as the State Department's greatest responsibility.
- "7 FAM 400 - ARREST OF U.S. CITIZENS ABROAD" is DOS policy that defines the protection of private us citizens as the most important function of consular services.
- "7 FAM 422 Access" is DOS Policy defining consular officers' responsibility to meet with accused and facilitate legal representation.
- "7 FAM 413.1 The Vienna Consular Convention" is the international law that defines DOS's authority to confer with a defendant, convey requests and arrange legal representation.
- "7 FAM 432 POLICY" is requires consular officers to actively protect civil rights and track case progress.
- "7 FAM 430 PRETRIAL CONFINEMENT" is policy defining the importance of rapid, proactive consular protection following citizen arrest.
- "7 FAM 423.8 Protecting Prisoner's Personal Property" defines consular role in protecting arrested citizens' personal property.
- "7 FAM 423 INITIAL VISIT" is policy defining consular responsibilities for first visit.
- "7 FAM 453 PROTESTING JUDICIAL DISCRIMINATION" is policy requiring immediate action to counteract discrimination in court proceedings.
- "7 FAM 413.5 22 CFR Sec. "§71.1 Protection of Americans abroad" is law defining the Foreign Services' obligation to protect US nationals in accordance with FAM.
- "1 FAM 013.2 Chiefs of U.S. Missions' Responsibilities" and ""2 FAM 111.3 Authorities" are laws and authorities that vest the US ambassador (Chief of Mission) with responsibility for executive branch (FBI) personnel abroad.
- "1 FAM 246.3 Consular Affairs (L/CA)" are regulations that identify where consular officers can get correct legal advice.
- "1 FAM 246.9 Law Enforcement and Intelligence (L/LEI)" is a regulation that identifies an expert source of legal advice, ensuring overlapping DOS/FBI affairs comply with law.
- "7 FAM 426 Protests" is DOS policy defining the State Department obligation to protest abuse or rights violations.
- "7 FAM 425 ABUSE AND MALTREATMENT" is DOS policy defining abuse against u.s. citizen detainees as intolerable.

As an arrested US citizen, US State Department regulations entitle journalist Caraballo (and his fellow US detainees) to robust advocacy from the US Embassy to protect their rights to fair proceedings and due process.

Yet, in this case, not only were Ed Caraballo's rights under Afghan law routinely violated, FBI and US State Department regulations designed to protect US citizen rights were casually tossed aside as well.

In adjudicating BIVENS remedies, US courts have noted that an agent of the Federal Government, acting unconstitutionally in the name of the U.S., possesses a far greater capacity for harm than an individual exercising less authority.

As a private citizen who's only prior law experience were a few small-claims, I've been appalled by the contempt for law that has been exhibited by those whose profession it is to uphold the law.

To we, the plaintiffs, a concerted effort appears clearly at work to withhold any official documentation.

But, Your Honor, as we fully realize, you are obliged to look at this impartially.

We hope, that as an impartial observer, you are curious to know what interest of Justice is served by having the US Deputy ambassador try to influence a case before a foreign court. Did it even happen at all as Judge Bakhtiyari claimed to the LAA lawyers? It seems clear: a sworn affidavit from DCM Richard Christensen would quickly and conveniently resolve the issue one way or another.

[Attorney Skibbie has indicated a willingness to testify on his knowledge of the above matter, should the opportunity arise. LAA Director Natalie Rea is the other US citizen who is also knowledgeable.]

An impartial observer should wonder whether any quid-pro-quo connection exists between the coveted DOS/DOJ junket and the DCM's intervention in the case.

An impartial observer should wonder what interest of Justice is served when FBI agents are given free leave in the backrooms of foreign prisons to ignore the constitutional rights of fellow Americans? Detailed depositions from the relevant FBI SAs and SSA(s) on assignment in Kabul from 2004 to date -- as is indicated by the MANUAL OF INVESTIGATIVE OPERATIONS AND GUIDELINES, Section 13-5 "Signed Sworn Statements" - would resolve this question.

An impartial observer should wonder how a presiding Afghan judge in an impaneled case, moves toward exoneration after hearing testimony in December, receives a substantial gratuity from an interested prosecution interest, and, returns to overrule a panel who'd participated in all hearings and voted for exoneration.

Your Honor, it is our prayer that you move forward with these cases and give them your serious, impartial consideration.

Respectfully,

*Richard Caraballo*

Richard Caraballo
On behalf of *pro se* Plaintiff Ed Caraballo

AFGHAN LAWS: ..................................................................15
    RIGHT TO HAVE AN ATTORNEY PRESENT WHEN BEING QUESTIONED. ...............15
    RIGHT TO ABSTAIN FROM MAKING INCRIMINATING STATEMENTS ....................15
    RIGHT TO REMAIN SILENT.............................................................15
    RIGHT TO COUNSEL ..................................................................15
    RIGHT TO DEFENDANT/ATTORNEY CONFIDENTIALITY .....................................16
    RIGHT TO HAVE COUNSEL APPOINTED IF UNABLE TO PAY. ...........................16
    RIGHT TO HAVE IMPROPERLY COLLECTED TESTIMONY OR EVIDENCE
    INVALIDATED. ......................................................................16
    RIGHT TO LAWFUL HANDLING AND COLLECTION OF EVIDENCE ........................16
    RIGHT TO TIMELY NOTIFICATION OF CHARGES.........................................16
    RIGHT TO ACCESS TO EVIDENCE. ...................................................16
    RIGHT TO BE PRESENT AT ALL CASE HEARINGS .....................................17
    RIGHT TO ADEQUATE TIME TO PREPARE DEFENSE....................................17
    RIGHT TO CALL WITNESSES. ........................................................17
    RIGHT TO BE PRESENT DURING DEPOSITIONS.........................................17
    RIGHT TO CONFRONT AND QUESTION ACCUSORS .....................................17
    RIGHT TO HAVE ADEQUATE TRANSLATION .............................................18

DEPARTMENT OF STATE – FOREIGN AFFAIRS MANUAL. ........................................18
    POLICY DEFINING FAM AS THE DOCUMENTARY AND EVIDENTIARY BASIS FOR ALL
    STATE DEPARTMENT OPERATIONS..................................................18
    POLICY DEFINING FAM'S AUTHORITY AS WORLDWIDE IN SCOPE.......................19
    LAW VESTING US AMBASSADOR (CHIEF OF MISSION)WITH RESPONSIBILITY FOR
    EXECUTIVE BRANCH (FBI) PERSONNEL. ...........................................19
    AUTHORITIES DEFINING AMBASSADOR'S (COM) RESPONSIBILITY OVER FBI
    EMPLOYEES AT OVERSEAS POSTING, (I.E., FBI.) .................................20
    POLICY DEFINING THE INTEGRATED MISSION STRUCTURE (INCLUDING FBI)
    UNDER AMBASSADOR'S DIRECTION. ...............................................20
    REGULATION IDENTIFYING THE OFFICE RESPONSIBLE FOR ENSURING CONSULAR
    SERVICE HAS CORRECT LEGAL ADVICE...........................................21
    REGULATION IDENTIFYING THE OFFICE RESPONSIBLE FOR ENSURING DOS/FBI
    AFFAIRS ARE INFORMED WITH CORRECT LEGAL ADVICE. ............................21
    REGULATION DEFINING FAM'S AS THE DEFINATIVE SOURCE ON STATE
    DEPARTMENT POLICY. ............................................................21
    REGULATION DEFINING THE STATE DEPARTMENT'S ROLE IN PROTECTING US
    CITIZENS ABROAD AS IT'S GREATEST RESPONSIBILITY. ............................22
    POLICY DEFINING THE STATE DEPARTMENT'S LEGAL RIGHT TO DEFEND US
    CITIZENS.......................................................................22
    POLICY DEFINING US CITIZENS PROTECTIONS AS THE MOST IMPORTATANT
    FUNCITON OF CONSULAR SERVICES...............................................22
    INTERNATIONAL LAW DEFINING DOS AUTHORITY TO CONFER WITH A
    DEFENDANT, CONVEY REQUESTS AND ARRANGE LEGAL REPRESENTATION. .........23
    LAW DEFINING FOREIGN SERVICES' OBLIGATION TO PROTECT US CITIZEN IN
    ACCORDANCE WITH FAM..........................................................24
    POLICY DEFINING EMBASSY OBLIGATION TO KEEP UPDATED MATERIALS TO AID
    ARRESTED CITIZENS. ...........................................................24
    POLICY DEFINING CONSULAR OFFICERS' RESPONSIBILITY TO MEET WITH
    ACCUSED AND FACILITATE LEGAL REPRESENTATION. .................................24
    POLICY DEFINING CONSULAR RESPONSIBILITIES FOR FIRST VISIT. .................25

POLICY DEFINING CONSULAR ROLE IN PROTECTING ARRESTED CITIZENS' PERSONAL PROPERTY. ...............................................................................25
POLICY DESCRIBING USE OF PHOTOGRAPY TO DOCUMENT ABUSE. ..................25
POLICY DEFINING ABUSE AGAINST U.S. CITIZEN DETAINEES AS INTOLERABLE. 26
POLICY DEFINING STATE DEPARTMENT OBLIGATION TO PROTEST ABUSE OR RIGHTS VIOLATIONS ...............................................................................27
POLICY DEFINING THE IMPORTANCE OF RAPID, PROACTIVE CONSULAR PROTECTION FOLLOWING CITIZEN ARREST. ...................................................27
POLICY REQUIRING CONSULAR OFFICERS TO ACTIVELY PROTECT CIVIL RIGHTS AND TRACK CASE PROGRESS. ...............................................................28
POLICY DEFINING CIRCUMSTANCES WHERE CONSULS IS REQUIRED TO ATTEND TRIAL. ...............................................................................28
POLICY REQUIRING IMMEDIATE ACTION TO COUNTERACT DISCRIMINATION IN COURT PROCEEDINGS. ...............................................................29
LAWS DEFINING CONSULAR AUTHORITY TO TAKE DEPOSITIONS.....................29

FBI ...............................................................................29
FBI Manual of Administrative Operations and Procedures. ...............................29
Section 1-2 Personal Conduct....................................................29
MANUAL OF INVESTIGATIVE OPERATIONS AND GUIDELINES. PART 2................30
2-28 Attorney General's Guidelines on Methods of obtaining Documentary Materials held by third parties ...............................................................30
Section 13 Disciplinary Matters....................................................30
"13-4 Interviews of Employees Involved ...........................................30
"13-5 Signed Sworn Statements....................................................31
AFGHANISTAN LAW - LAW FOR THE PROSECUTION AND PUNISHMENT OF BRIBERY ...............................................................................31
[…]...............................................................................31

AFGHAN LAWS:

RIGHT TO HAVE AN ATTORNEY PRESENT WHEN BEING QUESTIONED.
   Art. 38 Interim Criminal Code for Courts (Defence Counsel Presence)
   1. The defence counsel has the right to be present at all times
   during the interrogation of the suspect.
   2. The suspect and the defence counsel have the right to be present
   during searches, confrontations, line-up procedures and expert
   examinations as well as during the trial.
   3. In the investigation phase the Saranwal and the judicial police
   shall notify the suspect and his defence counsel of searches,
   confrontations, line-up procedures and expert examinations in order
   to allow them to be present. This duty can be waived only when there
   is an urgent need to conduct the said operations, which is defined
   as when it is a flagrante delicto crime or there is a fear of the
   loss of evidential facts.

RIGHT TO ABSTAIN FROM MAKING INCRIMINATING STATEMENTS
   Art. 30 Afghan Constitution (Chapter 2, Art. 9) para. 2: Confession
   to a crime is: a voluntary confession before an authorised court by
   an accused in a sound state of mind; Art. 5 Interim Criminal Code
   for Courts (Suspect and Accused);

   Art. 30 Afghan Constitution (Chapter 2, Art. 9) para 6. The suspect
   and the accused have the right to abstain from making any statement
   even when they are questioned by the relevant police or judicial
   authorities;

RIGHT TO REMAIN SILENT.
   7. The police, the Saranwal and the Court are duty bound to clearly
   inform the suspect and the accused before interrogation and at the
   time of arrest about his or her right to remain silent, right to
   representation at all times by defense counsel, and right to be
   present during searches, line-ups, expert examinations and trial;

   Art. 53 Interim Criminal Code for Courts, Item 3g: g. The accused
   can testify if he does not avail himself of the right to remain
   silent and the accused or his defense counsel can ask questions to
   the witnesses and the experts;

RIGHT TO COUNSEL
   Art. 31 Afghan Constitution (Chapter 2, Art. 10) para. 1: Every
   person upon arrest can seek an advocate to defend his rights or to
   defend his case for which he is accused under the law. para. 2: The
   accused upon arrest has the right to be informed of the attributed
   accusation and to be summoned to the court within the limits
   determined by law. para. 3: In criminal cases, the state shall
   appoint an advocate for a destitute.

   Art. 11 Law on the Structure and Competencies of Courts: Every
   person upon arrest has the right to appoint a defence counsel to
   defend himself in regard of the accusation and evidence against him.
   In criminal cases a defense counsel shall be appointed for destitute
   persons according to the provisions on law;

RIGHT TO DEFENDANT/ATTORNEY CONFIDENTIALITY

Art. 31 Afghan Constitution (Chapter 2, Art. 10) para. 4: The confidentiality of oral, written or telephonic communications between an advocate and his accused client are immune from invasion.

RIGHT TO HAVE COUNSEL APPOINTED IF UNABLE TO PAY.

Art. 19 Interim Criminal Code for Courts (Legal Aid) 1. The suspect or the accused financially unable to appoint a defense attorney is entitled to have a free defense attorney appointed for him or her in the following manner: a. The investigating Saranwal or the Court adjudicating the case, on the petition of the person, appoints a defence attorney for the destitute person from amongst the lawyers officially permitted to work as defence attorney. b. The person for whom an attorney has been appointed reserves the right not to accept the appointed defence attorney and to defend himself in person. c. The fees of the aforesaid attorney shall be paid from the State budget and its extent shall be fixed by regulation.

RIGHT TO HAVE IMPROPERLY COLLECTED TESTIMONY OR EVIDENCE INVALIDATED.

Article 29 of Afghan Constitution,
Para. 1: Any statement, testimony, or confession obtained from an accused or of another person by means of compulsion, is invalid; para. 2: Confession to a crime is: a voluntary confession before an authorized court by an accused in a sound state of mind; Interim Criminal Code for Courts, article 5: Their [Suspect and Accused] statements shall be made in a condition of absolute moral freedom;

RIGHT TO LAWFUL HANDLING AND COLLECTION OF EVIDENCE

Art. 7 Interim Criminal Code for Courts: The evidence which has been collected without respect of the legal requirements indicated in the law is considered invalid, and the Court cannot base its judgment on it;

Art. 30 Afghan Constitution (Chapter 2, Art. 9) para. 1: Any statement, testimony, or confession obtained from an accused or of another person by means of compulsion, is invalid;

RIGHT TO TIMELY NOTIFICATION OF CHARGES.

Art. 42 Interim Criminal Code for Courts (Preparation of the Trial) 2. The deed concerning the commencement of trial] shall contain the name of the accused and the indication of the alleged crime with its factual circumstances in reference to the related law provisions and shall be served on the accused and his defense counsel, the victim and the Saranwal at least five days in advance;

RIGHT TO ACCESS TO EVIDENCE.

Art.43 Interim Criminal Code for Courts (Access of the Accused to the Findings of the Investigation) 1. The accused and his defence counsel are entitled to examine the documents contained in the file mentioned in the last paragraph of article 39 [act of indictment, file containing all the deeds formed during the investigations] and the objects under seizure.

RIGHT TO BE PRESENT AT ALL CASE HEARINGS

Art. 53 Interim Criminal Code for Courts (Conduct of the Hearing)
Item 2. The accused and his defence counsel have the right to be
present.
3. The Court proceedings are conducted according to following order:
a. At the opening of the hearing the Court reads out the act of
indictment; [...]
g. The accused can testify if he does not avail himself to the right
to remain silent and the accused or his defence counsel can ask
questions to the witnesses and experts;
i. The primary Saranwal and the defence lawyer can ask questions of
the accused.

RIGHT TO ADEQUATE TIME TO PREPARE DEFENSE

Art. 56 Interim Criminal Code for Courts (Concurrent Crimes and
Circumstances) 1. If from the deeds of the investigations or during
the trial it results that there are alleged additional crimes and/or
facts contributing as aggravating circumstances which have not been
included in the act of indictment, the Court, at the request of the
Primary Saranwal, makes the related accusation to the accused and/or
to his defence counsel, when present, giving them adequate time to
prepare the defence.

RIGHT TO CALL WITNESSES.

Art. 51 Interim Criminal Code for Courts (Admission of Witnesses and
Experts) 1. The Primary Saranwal submits to the Court the list of
the witnesses and experts he wants to be heard together with the act
of indictment, indicating the reasons of the relevance of their
testimony and exams. 2. The accused and/or his defence counsel have
the right to present their own lists of witnesses and experts
indicating the reasons of the relevance of their testimony and
exams. 3. The Court can exclude those witnesses or experts that in
its view do not appear material for the adjudication of the case.

RIGHT TO BE PRESENT DURING DEPOSITIONS.

Art. 55 Interim Criminal Code for Courts (Evidentiary Value of
Investigative Activities)

1. The records of the testimonies of the witnesses as well as of the
expert exam, collected during the investigative phase, can have the
value of evidence as basis for the decision only if it results that
the accused and/or his defence counsel were present during the
operations and were in a position to raise questions and make
objections.

2. Otherwise the related deeds have the sole value of clues.

RIGHT TO CONFRONT AND QUESTION ACCUSORS

Art. 14 International Covenant on Civil and Political Rights: 3. In
the determination of any criminal charge against him, everyone shall
be entitled to the following minimum guarantees, in full equality:
(e) To examine, or have examined, the witnesses against him and to
obtain the attendance and examination of witnesses on his behalf
under the same conditions as witnesses against him;

Art. 31 Afghan Constitution (Chapter 2, Art. 10) para. 2: The accused upon arrest has the right to be informed of the attributed accusation and to be summoned to the court within the limits determined by law.

RIGHT TO HAVE ADEQUATE TRANSLATION

Art. 135 Afghan Constitution (Chapter 7, Art. 20) If parties involved in a case do not know the language in which the trial is conducted, they have the right to understand the material and documents related to the case through an interpreter and the right to speak in their mother language in the court.

Art. 20 Interim Criminal Code for Courts (Interpreter) 1. The suspect or the accused who does not know the language used during the
Investigations and the trials or who is deaf, dumb or deaf and dumb shall be given an interpreter for, at least, explaining to him the charge and the indictment and for assisting him during the interrogations and confrontations. Art. 14 International Covenant on Civil and Political Rights

3. In the determination of any criminal charge against him, everyone shall be entitled to the following minimum guarantees, in full equality: a. To be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him; f. To have the free assistance of an interpreter if he cannot understand or speak the language used in court;

DEPARTMENT OF STATE - FOREIGN AFFAIRS MANUAL.

POLICY DEFINING FAM AS THE DOCUMENTARY AND EVIDENTIARY BASIS FOR ALL STATE DEPARTMENT OPERATIONS.

2 FAM 1100 REGULATIONS AND RELATED PROGRAMS 2 FAM 1110 DIRECTIVES (TL:GEN-295; 09-14-1999)
2 FAM 1111 POLICY AND OBJECTIVE

2 FAM 1111.1 Policy (TL:GEN-295; 09-14-1999) (State Only)

It is the policy of the Department of State to articulate its official policies and procedures in a uniform, consistent, and single program.

2 FAM 1111.2 Objective (TL:GEN-295; 09-14-1999) (State Only)

a. It is the objective of the Directives Program to provide a documentary and evidentiary basis for operations by ensuring that the necessary policy and regulatory information is available to program management and operating offices so that responsibilities can be carried out in accordance with statutory and Executive mandates.

b. This objective is achieved by:

(1) Providing a single, comprehensive and authoritative source, the Foreign Affairs Manual (FAM), and related Foreign Affairs Handbooks (FAH), for policies and regulations that govern the operations of the Department, the Foreign Service, and when applicable, other Foreign Affairs Agencies;
[...]
(3) Incorporating statutes, Executive Orders, other agency directives, and Department policies into the FAM and FAH;

POLICY DEFINING FAM'S AUTHORITY AS WORLDWIDE IN SCOPE

2 FAM 1111.3 Scope (TL:GEN-295; 09-14-1999) (State Only)

These regulations apply to the Department of State and its operations worldwide.

LAW VESTING US AMBASSADOR (CHIEF OF MISSION)WITH RESPONSIBILITY FOR EXECUTIVE BRANCH (FBI) PERSONNEL.

1 FAM 013.2 Chiefs of U.S. Missions' Responsibilities (TL:ORG-125; 07-08-2003)

a. Section 102(3) of the Foreign Service Act of 1980 (Public Law 96-465, October 17, 1980) states:

(3) "chief of mission" means the principal officer in charge of a diplomatic mission of the United States or of a United States office abroad [...]

b. Section 207 of the Foreign Service Act of 1980 (Public Law 96-465, October 17, 1980, as amended) reads: Sec. 207. CHIEF OF MISSION.

(a) Under the direction of the President, the chief of mission to a foreign country—

(1) shall have full responsibility for the direction, coordination, and supervision of all Government executive branch employees in that country (except for employees under the command of a United States area military commander); and

(2) shall keep fully and currently informed with respect to all activities and operations of the Government within that country, and shall insure that all Government executive branch employees in that country (except for employees under the command of a United States area military commander) comply fully with all applicable directives of the chief of mission.

2 FAM 113.1 Chief of Mission and Principal Officer (TL:GEN-296; 10-01-1999)) (State Only)

a. See also 1 FAM 013.2.

b. Each U.S. mission is under the direction of a chief of mission, who is an ambassador or chargé d'affaires, of the United States and the official spokesperson to the government or international organization to which accredited. Under the direction of the President and the general supervision of the Secretary of State, the

chief of mission is in charge of the entire United States diplomatic mission and supervises all of its activities. The chief of mission's authority encompasses not only the personnel of the Department of State and the Foreign Service, but also personal representatives of other United States Executive Branch agencies (excluding those personnel under the command of a U.S. area military commander) which have programs or activities in the country (see 1 FAM 013.2).
[...]
d. While differences in emphasis at various Foreign Service missions will occur, [...] chiefs of mission [...] perform a wide range of functions which include, but are not limited to:
[...]
(2) Have full responsibility for the direction, coordination, and supervision of all U.S. Government Executive Branch employees in that country (except for employees under the command of a U.S. area military commander);
(3) Keep fully and currently informed with respect to all activities and operations of the U.S. Government within that country, and ensure that all U.S. Government Executive Branch employees in that country (except for employees under the command of a U.S. area military commander) comply fully with all applicable COM directives;
[...]
(14) Advise, protect, and assist U.S. citizens abroad;

AUTHORITIES DEFINING AMBASSADOR'S (COM) RESPONSIBILITY OVER FBI EMPLOYEES AT OVERSEAS POSTING, (I.E., FBI.)

2 FAM 111.3 Authorities (TL:GEN-296; 10-01-1999) (State Only)

a. Foreign Service Act of 1980 (Pub. L. 96-465) Section 207 (U.S.C. 3927) defines COM authority over Executive Branch personnel in their countries, as well as the basic relationships between the Department of State and other departments, agencies, and offices of the U.S. Government.

[...]

d. NSDD-38 is a National Security Determination Directive ("Staffing at Diplomatic Missions and Their Constituent Posts") providing authority for Chief of Mission authority to determine the size, composition, or mandate of personnel operating under their authority. This is the preferred procedure for implementing provisions of the Diplomatic Security Act of 1986 (paragraph c, above). See 2 FAM 111 Exhibit 2 FAM 111.3.

[...]

h. State-Justice-Treasury Memorandum of Understanding of 1996 sets forth the authorities of the COM in relation to law enforcement personnel abroad and outlines agreed principals with respect to the coordination of law enforcement.

POLICY DEFINING THE INTEGRATED MISSION STRUCTURE (INCLUDING FBI) UNDER AMBASSADOR'S DIRECTION.
2 FAM 112 MISSION ORGANIZATION

2 FAM 112.1 Integrated Mission Structure (TL:GEN-296; 10-01-1999)
(State Only)

a. The United States mission is an integrated structure, usually
headed by an ambassador, who is the personal representative of the
President. The mission is comprised of all United States agencies
(except those agencies under the command of a United States area
military commander) represented in the country such as USAID,
Foreign Agricultural Service, Foreign Commercial Service, Peace
Corps, military groups, law enforcement, and Defense attachés, as
well as the traditional functions concerned with political,
economic, commercial, labor, consular, science, administrative, and
related affairs.

b. The precise structure of a mission is to be determined by the
chief of mission[...]

REGULATION IDENTIFYING THE OFFICE RESPONSIBLE FOR ENSURING CONSULAR
SERVICE HAS CORRECT LEGAL ADVICE.

1 FAM 246.3 Consular Affairs (L/CA)
(CT:ORG-139; 06-15-2005)

a. Provides legal advice and supports interagency efforts and
international negotiations concerning visas; immigration, parole,
citizenship, and passport issues; the protection of and provision of
benefits and services to U.S. citizens abroad; international
children's issues; international judicial assistance; and the
performance of other consular functions by U.S. consular officers or
U.S. protecting powers abroad;

b. Provides general legal advice on the performance of consular
functions by foreign consular officers in the United States and on
U.S. obligations relating to the performance of such functions;

c. Handles international, foreign, and domestic litigation and
witness requests relating to the performance of consular functions;

REGULATION IDENTIFYING THE OFFICE RESPONSIBLE FOR ENSURING DOS/FBI
AFFAIRS ARE INFORMED WITH CORRECT LEGAL ADVICE.

1 FAM 246.9 Law Enforcement and Intelligence (L/LEI)
(CT:ORG-139; 06-15-2005)

a. Provides legal advice and services on international aspects of
law enforcement matters, including the international extradition of
fugitives, legal assistance in the administration of justice in
criminal matters, international anti-corruption enforcement ,and
international counter-terrorism efforts;

REGULATION DEFINING FAM'S AS THE DEFINATIVE SOURCE ON STATE DEPARTMENT
POLICY.

2 FAM 1113 DEFINITIONS (TL:GEN-295; 09-14-1999) (State Only)

a. Directive is a written communication that establishes and
prescribes the organization, policies, regulations, or procedures
that provide an official basis of operation. Directives are
incorporated in the Foreign Affairs Manual and Handbook series.

These directives derive their authority from statutes, Executive Orders, other agency directives, and further policies established by the Department. The Directives Management Staff (DIR) must clear and publish all Department Directives (see section 2 FAM 1115). With certain DIR-approved exceptions, all procedural and regulatory materials (Foreign Affairs Handbooks, etc.) must have their basis in the Foreign Affairs Manual. Department directives are often commonly referred to as regulations.
[...]
g. Other Agency Directives. Statutes and Executive Orders designate lead agency responsibilities for developing and managing policies which affect the operations of the Executive Branch of the U.S. Government.

h. Program Offices are those Department organizations that have been officially delegated the responsibility of developing, implementing, and managing appropriate policies and regulations. Program offices are also responsible for oversight and periodic review to ensure that operating offices are complying with Department Directives addressing their respective areas of program responsibility.

i. Regulation is another term for directive, see paragraph a above.

REGULATION DEFINING THE STATE DEPARTMENT'S ROLE IN PROTECTING US CITIZENS ABROAD AS IT'S GREATEST RESPONSIBILITY.
7 FAM 000 CONSULAR PROTECTION OF U.S. NATIONALS ABROAD
7 FAM 010 INTRODUCTION (CT:CON-106; 06-06-2005) (Office of Origin: CA/OCS/PRI)

7 FAM 011 SUMMARY (CT:CON-106; 06-06-2005)

a. The U.S. Department of State and our embassies and consulates abroad have no greater responsibility than the protection of U.S. citizens overseas.
[...]
c. Overseas Citizens Services: Within CA, the Directorate of Overseas Citizens Services (CA/OCS) is charged with exercising the Secretary of State's responsibility to provide consular protection and services to United States citizens abroad.

POLICY DEFINING THE STATE DEPARTMENT'S LEGAL RIGHT TO DEFEND US CITIZENS.
7 FAM 012 ELIGIBLITY (CT:CON-106; 06-06-2005)

a. U.S. Nationals Eligible for Consular Protection and Other Services: Nationality is the principal relationship that connects an individual to a State. International law recognizes the right of a State to afford diplomatic and consular protection to its nationals and to represent their interests.

POLICY DEFINING US CITIZENS PROTECTIONS AS THE MOST IMPORTATANT FUNCITON OF CONSULAR SERVICES.
7 FAM 400 - ARREST OF U.S. CITIZENS ABROAD

7 FAM 410 INTRODUCTION (CT:CON-87; 09-01-2004) (Office of Origin: CA/OCS/PRI)

7 FAM 411 SUMMARY (CT:CON-87; 09-01-2004)

This Chapter of 7 FAM outlines the Department of State's policies,
guidance and procedures in the important area of assistance to
arrested U.S. citizens or nationals. It provides a detailed frame of
reference to assist consular officers, from the most experienced to
the first-tour officer, in meeting your responsibilities, developing
internal procedures and controls, and reporting on the status of
U.S. citizen or national prisoners and your efforts on their behalf.

7 FAM 412 POLICY (CT:CON-87; 09-01-2004)

Our most important function as consular officers is to protect and
assist private U.S. citizens or nationals traveling or residing
abroad. Few of our citizens need that assistance more than those who
have been arrested in a foreign country or imprisoned in a foreign
jail.

(1) Neither arrest nor conviction deprives a U.S. citizen of the
right to the consular officer's best efforts in protecting the
citizen's legal and human rights. As consular officers we must
assist arrested or imprisoned U.S. citizens with dedicated
professionalism, regardless of any private views as to their guilt
or the heinousness of the crime.

(2) You must also remember that there are potential flaws in any
judicial system, and must remain alert for them.

INTERNATIONAL LAW DEFINING DOS AUTHORITY TO CONFER WITH A DEFENDANT,
CONVEY REQUESTS AND ARRANGE LEGAL REPRESENTATION.

7 FAM 413.1 The Vienna Consular Convention (CT:CON-87; 09-01-2004)

Article 36 of the Vienna Consular Convention titled "Communication
and Contact with Nationals of the Sending State" provides, in part:

1. With a views to facilitating the exercise of consular functions
relating to nationals of the sending State:

(a) consular officers shall be free to communicate with nationals of
the sending State and to have access to them. Nationals of the
sending State shall have the same freedom with respect to
communication with and access to consular officers of the sending
State;

(b) [...] Any communication addressed to the consular post by the
person arrested, in prison, custody or detention shall also be
forwarded by the said authorities without delay. The said
authorities shall inform the person concerned without delay of his
rights under this sub-paragraph;

(c) consular officers shall have the right to visit a national of
the sending State who is in prison, custody or detention, to
converse and correspond with him and to arrange for his legal
representation.

LAW DEFINING FOREIGN SERVICES' OBLIGATION TO PROTECT US CITIZEN IN ACCORDANCE WITH FAM.

   7 FAM 413.5 22 CFR Sec. 71: (CT:CON-87; 09-01-2004)

"§71.1 Protection of Americans abroad.

Officers of the Foreign Service shall perform such duties in connection with the protection of American nationals abroad as may be imposed upon them by rules and regulations prescribed by the Secretary of State."

POLICY DEFINING EMBASSY OBLIGATION TO KEEP UPDATED MATERIALS TO AID ARRESTED CITIZENS.

   7 FAM 415.3 Develop Judicial Materials (CT:CON-87; 09-01-2004)

Legal systems vary greatly, particularly outside common law areas. Arrested U.S. citizens or nationals often have an imperfect understanding of American criminal procedure and less or no understanding of the legal procedures of the country in which they are detained. Each mission (or where variations in local conditions warrant, each constituent post) must develop and keep updated informational material for delivery to each arrested U.S. citizen regarding the judicial process the arrestee is likely to face. Posts should prepare a packet of information covering:

(1) Initial arrest
(2) Remand procedure
(3) Trial procedure
(4) Appeal process
(5) Penal conditions
(6) Rules established by prison administration.

POLICY DEFINING CONSULAR OFFICERS' RESPONSIBILITY TO MEET WITH ACCUSED AND FACILITATE LEGAL REPRESENTATION.

   7 FAM 422 Access (CT:CON-90; 09-03-2004)
Consular officers must make every effort to gain prompt personal access to an arrested U.S. citizen or national for a number of reasons:
[...]
c. Experience shows that abuse of a prisoner is most likely during the early arrest and pre-trial detention stages. Your prompt access to the detainee can often forestall physical abuse of the prisoner by the arresting and/or investigating authorities.
d. In instances where abuse has, or is alleged to have, already occurred, your prompt access to the prisoner permits possible visible verification [...]
e. You can provide the arrestee with a list of reputable lawyers or information concerning local legal aid before the arrestee selects a lawyer who may prove to be a charlatan.
f. You have the opportunity to explain the legal and judicial procedures of the host government and the detainee's rights under that government at a time when such information is most useful.
[...]

   7 FAM 422.1-1 Personal Visit (CT:CON-90; 09-03-2004)

As consular officer, you are required to visit the arrestee as soon
as possible following receipt of consular notification

POLICY DEFINING CONSULAR RESPONSIBILITIES FOR FIRST VISIT.
   7 FAM 423 INITIAL VISIT (CT:CON-90; 09-03-2004)

   Your first consular visit to the prisoner, which in most cases is
   also the first contact outlined in 7 FAM 422.1 above, is designed to
   accomplish several goals, including:

   1 Verification of Citizenship and Identity
   2 Detecting Apparent or Alleged Abuse
   3 Explaining Your Role
   4 Delivering Attorneys List
   5 Outlining the Judicial System
   6 Obtaining Privacy Act Consent
   7 Identifying Family and Persons to Contact
   8 Protecting Prisoner's Personal Property
   9 Providing Minimal Personal Comfort items
   10 Photographing The Prisoner
   11 Obtaining Advance Information and Signatures
   [...]

   7 FAM 423.4 Delivering Attorneys List (CT:CON-90; 09-03-2004)
   Provide the arrestee with a current list of attorneys that might be
   available to him/her. Explain you cannot recommend an attorney, but
   that you can point out those on the list who speak English, and
   those who either have some past experience in, or who have indicated
   a willingness to, defend a U.S. citizen or national accused of the
   same or similar crimes.
   [...]

POLICY DEFINING CONSULAR ROLE IN PROTECTING ARRESTED CITIZENS' PERSONAL
PROPERTY.
   7 FAM 423.8 Protecting Prisoner's Personal Property (CT:CON-90; 09-
   03-2004)
   In most countries, it is the practice of arresting officials to
   confiscate the personal property (such as money, clothing, watches,
   rings, computers, automobiles) of newly arrested persons. Often no
   receipts are given for these items, and, with no records, the items
   may disappear.

   a. During the initial visit to a U.S. citizen or national arrestee,
   you should ask the prisoner if the arresting authorities took any
   personal property, including a passport, and, if so, whether a
   signed and dated receipt was given in exchange.

   b. If the arresting authority did not follow these procedures, you
   should take immediate steps to determine the whereabouts of the
   confiscated items and to obtain a receipt acknowledging custody from
   the local authorities. Prompt action is necessary if the items are
   to be located and retrieved.

POLICY DESCRIBING USE OF PHOTOGRAPHY TO DOCUMENT ABUSE.
   7 FAM 423.10 Photographing The Prisoner (CT:CON-90; 09-03-2004)

a. Although not a requirement, the Department strongly recommends taking a few photos of the arrestee. This is assuming that the host country authorities permit and the arrestee consents. These photos often prove useful for a number of reasons:

(1) They may serve as evidence in validating and protesting any allegations of physical abuse.
[...]

c. If there are signs of abuse, or injuries sustained during the actual arrest, also photograph any bruises, cuts, abrasions etc. closely and carefully.

POLICY DEFINING ABUSE AGAINST U.S. CITIZEN DETAINEES AS INTOLERABLE.

7 FAM 425 ABUSE AND MALTREATMENT (CT:CON-90; 09-03-2004)
Abuse is an unfortunate reality that can occur even in the most enlightened police and penal systems for any number of reasons, including:

a. Unauthorized and inappropriate punishment for resisting arrest
b. Attempts to extract a confession or admission of guilt through torture
c. An authorized or unauthorized process of "softening up" arrestees to render them more controllable during incarceration
d. Reactions to a perceived display of improper attitude or disrespect on the part of the arrestee
e. Gratuitous acts by detention authorities with sadistic tendencies or a propensity towards violence.
f. A reaction to cultural or language differences and misunderstandings
g. Xenophobia, racism or zealotry

NB: Regardless of the reason, or lack of reason, it is the Department's position that acts of abuse against U.S. citizen or national detainees are intolerable, and require prompt and appropriate action by the consular officer and the post.

7 FAM 425.1 Identifying Abuse (CT:CON-90; 09-03-2004)
Abuse, alleged, potential or actual, might come to your attention in a number of ways:
[...]

d. Preemptory statements by detaining officials: At times, a guard, warden or other official might offer the unsolicited comment that a certain prisoner "hurt himself," "fell," or was "attacked by other prisoners." These comments may later prove to be an attempt to "explain away" abuse of the arrestee by detaining authorities.

7 FAM 425.2-3 Evaluate Unsubstantiated Allegations (CT:CON-90; 09-03-2004)
Occasionally, an arrestee may allege abuse when none has occurred, usually from the notion that this may expedite his or her release, or get him or her transferred to a more hospitable environment such as a prison clinic or hospital. While any allegation of abuse must be taken seriously, it is essential that you exercise judgment on the basis of all evidence at hand, including:

(1) Your own in-depth interview of the arrestee
(2) The general likelihood of abuse given your knowledge of the
penal system and the arresting authorities
(3) Your assessment of the prisoner's credibility based on past
experience (generally useful only with longer-term prisoners)
(4) Presence or absence of any physical indicators

POLICY DEFINING STATE DEPARTMENT OBLIGATION TO PROTEST ABUSE OR RIGHTS
VIOLATIONS
    7 FAM 426 Protests
    7 FAM 426.1 Purpose (CT:CON-90; 09-03-2004)

    If the legal and human rights of U.S. citizens and nationals
    arrested abroad are to be adequately protected, we must be prepared
    to protest substantiated violations of those rights. The purposes of
    such protests include:

    a. Protecting American prisoners against further abuse or violation
    of their rights
    b. Impressing on the host government that the U.S. Government is
    seriously concerned about the welfare of its citizens and nationals
    and will not condone or tolerate violation of their rights
    c. Protecting future American detainees against similar maltreatment
    d. Improving the general level of treatment of U.S. citizens and
    nationals arrested and detained in foreign countries
    NB: Experience demonstrates that a well-conceived and executed
    system of protests can often achieve these objectives in many
    countries. Failure to protest when the situation warrants only tends
    to perpetuate abuse.

    7 FAM 426.2 ACTIONS MERITING PROTEST (CT:CON-90; 09-03-2004)

    The following are the most frequent grounds for protests:

    1 Failure to Notify
    2 Abuse or Maltreatment
    3 Obstructing Consular Access to a Prisoner
    4 Undue Interference With Communications Between Prisoner And
    Consular Officer

    NB: This list is not intended to be all-encompassing. If you have an
    unusual situation, or are not sure whether a specific set of
    circumstances warrant a protest, or if there is a difference of
    opinion within the mission whether to protest, you are strongly
    encouraged to contact the Department CA/OCS/ACS for consultation and
    guidance.

POLICY DEFINING THE IMPORTANCE OF RAPID, PROACTIVE CONSULAR PROTECTION
FOLLOWING CITIZEN ARREST.

    7 FAM 430 PRETRIAL CONFINEMENT (CT:CON-84; 08-26-2004) (Office of
    Origin: CA/OCS/PRI)
    7 FAM 431 BACKGROUND (CT:CON-84; 08-26-2004)

    A U.S. citizen or national prisoner often finds the period between
    initial arrest and final judicial action the most confusing and
    daunting part of the incarceration experience. It is also generally

the period in which consular involvement is most needed, and often
the period in which you can provide the most effective consular
assistance. [...]

(3) Difficulties with local attorneys who do not appear to be taking
aggressive action; who make unexpected demands for increased fees;
who do not stay in contact with the arrestee, and/or do not provide
adequate feedback;


POLICY REQUIRING CONSULAR OFFICERS TO ACTIVELY PROTECT CIVIL RIGHTS AND
TRACK CASE PROGRESS.
    7 FAM 432 POLICY (CT:CON-84; 08-26-2004)
The Department expects consular officers to be particularly active
in, and to fully engage in, the case during the often-lengthy
pretrial period. You should take whatever steps, including frequent
visits, needed to:

(1) Protect the well-being and civil rights of the arrestee;
(2) Provide needed consular services such as EMDA or administer a
trust fund in a timely and efficient manner;
(3) Track the process of the case through the host country's legal
system; and
(4) Keep the Department, family members, congressional
representatives and others full informed on all aspects of the case.


POLICY DEFINING CIRCUMSTANCES WHERE CONSULS IS REQUIRED TO ATTEND
TRIAL.
    7 FAM 451.2 When Consular Attendance Is Mandatory (CT:CON-092; 10-
28-2004)

There are indications of discrimination against the U.S. citizen or
national on the basis of U.S. nationality, race, religion or
ethnicity either in procedure or sentence. Such indications could
include, but are not limited to:

(1) Past history of discriminatory treatment of other U.S. citizen
or national prisoners;
(2) Treating an U.S. citizen or national prisoner of one race,
religious or ethnic background differently than an U.S. citizen or
national prisoner of another racial, religious or ethnic background;
(3) Refusal to provide the U.S. citizen or national with translation
facilities when proceedings are in a language the prisoner does not
understand;
(4) Slanted pre-trial publicity, particularly where the press is
government-controlled, or it is clear the host government is
"leaking" the information;
(5) Proposed sentences or fines that clearly exceed those normally
accorded local nationals or third country nationals convicted of
similar crimes;
(6) The charges are political in nature, or the trial is expected to
have political overtones;
(7) The charges and/or the trial are a pertinent factor in the
bilateral relationship with the host government;

(8) The prisoner or his family has specifically requested your
presence at the trial, and it is reasonably feasible for you to do
so; and
(9) You are instructed to do so by the Department.


POLICY REQUIRING IMMEDIATE ACTION TO COUNTERACT DISCRIMINATION IN COURT
PROCEEDINGS.
   7 FAM 453 PROTESTING JUDICIAL DISCRIMINATION (CT:CON-092; 10-28-
2004)

   Whenever you encounter discrimination against U.S. citizen or
national prisoners in the judicial system, you should take immediate
action to counter this discrimination at whatever level appears most
effective.


LAWS DEFINING CONSULAR AUTHORITY TO TAKE DEPOSITIONS.
   7 FAM 912 AUTHORITY TO PERFORM JUDICIAL SERVICES

   7 FAM 912.1 Depositions (TL:CON-60; 6-17-94)

   a. Federal Authority

   Federal authority for consular officers to take depositions is
contained in the following:

   (1) 22 U.S.C., sections 4215 (notarial acts, oaths, affirmations,
affidavits, and depositions; fees) and 4221 (depositions and
notarial acts; perjury).
   (2) Rules 28-31, Federal Rules of Civil Procedure (F.R. Civ. P.,
Rule 28(b)), expressly provide that depositions may be taken in
foreign countries by any of the following methods: on notice, by
commission, or pursuant to letters rogatory.
   (3) Rules 15 and 17, Federal Rules of Criminal Procedure (F.R. Crim.
P.).


FBI

FBI Manual of Administrative Operations and Procedures.

Section 1-2 Personal Conduct
   1-4   "(1) Illegal activities on the part of any employee, in
        addition to being unlawful, reflect on the integrity of the
        FBI and betray the trust and confidence placed in it by the
        American people."[...]<u>It is, therefore, expected that
        employees will obey not only the letter of the law but the
        spirit of the law as well whether they are engaged in
        activities of a personal or official nature. With respect to
        investigative activities, this admonition particularly applies
        to entrapment or any other improper, illegal, or unethical
        tactics in the procurement of evidence</u>."

      "(2)  <u>As a member of a federal investigative agency, FBI employees
        must at all times zealously guard and defend the rights and</u>

liberties guaranteed to al individuals by the Constitution. Therefore , FBI employees must not engage in any investigative activity, including illegal surreptitious entries, which could abridge in any way the rights guaranteed to a citizen of the United States by the Constitution and under no circumstances shall employees of the FBI engage in any conduct which may result in defaming the character, reputation, integrity, or dignity of any citizen or organization or citizens of the United States."

[...]

"(5) All of the foregoing prohibitions, including those pertaining to illegal surreptitious entries are applicable to all security, phases of the FBI's work, applicant, criminal, civil, domestic security, and foreign counterintelligence."

MANUAL OF INVESTIGATIVE OPERATIONS AND GUIDELINES. PART 2

2-28 Attorney General's Guidelines on Methods of obtaining Documentary Materials held by third parties

"§ 59.1 Introduction.
"(a) A search for documentary materials necessarily involves intrusions into personal privacy. First, the privacy of a person's home or office may be breached. Second, the execution of such a search may require examination of private papers within the scope of the search warrant, but not themselves subject to seizure. In addition, where such a search involves intrusions into professional, confidential relations, the privacy interests of other persons are also implicated."

"(b) It is the responsibility of federal officers and employees to recognize the importance of these privacy interests, and to protect against unnecessary intrusions. Generally, when documentary materials are held by a disinterested third party, a subpoena, administrative summons, or governmental request will be an effective alternative to the use of a search warrant and will be considerably less intrusive.[...]

"(c) The term 'documentary materials' means any materials upon which information is recorded, and includes, but is not limited to, written or printed materials, photographs, films, negatives, audio or video tapes, or materials upon which information is electronically or magnetically recorded."[...]

Section 13 Disciplinary Matters

"13-4 Interviews of Employees Involved
"(1) Interviews of employees should be conducted at the earliest logical time and in a forthright manner. There should be no evasiveness on the part of the Bureau official conducting the interview."
"(2) The employee should be fully and specifically advised of the allegations which have been made against him/her in order that

he/she may have an opportunity to fully answer and respond to
them."

"13-5 Signed Sworn Statements
    "Whenever <u>there are circumstances in connection with investigations
    or inquiries indicating misconduct of personnel, harassment or
    intimidation of subjects, other individuals or groups, or
    derelictions of any kind by the Bureau, all Agents engaged in such
    investigations or inquiries must</u>:
    "(1) Immediately prepare signed sworn statements of fact so that a
    clear record will be available should a question arise at a later
    date. These statement should:
            (a) Cover the facts bearing directly upon the charges made.
            (b) Be specific as to each allegation, if allegations are
            specific.
            (c) Be general in nature, if allegations are general in
            nature. "
    [...]
    "(3) <u>If the matter, whether criminal or administrative in nature, is
    considered sufficiently serious, an attempt should be made to obtain
    the complainant's allegation in the form of an affidavit or sworn
    signed statement also</u>."
    [...]


AFGHANISTAN LAW - LAW FOR THE PROSECUTION AND PUNISHMENT OF BRIBERY

    15 HOOT 1351 [1972]

    "Article 1:
            "It is a bribe if any person in charge of a public service
            accepts or demands, directly or indirectly, property or
            advantage in return for carrying out an action, or refuses to
            carry out an action for which he is responsible. The offender
            is subject to one to 10 years imprisonment and a fine of not
            less than one thousand Afghanis nor more than the amount
            accepted. If, as the result of the commission of the crime any
            damages occur, the offender is also liable to compensate such
            damage."

[...]
    "Article 2:
            "In this law, the following persons are regarded to be in
            charge of the public services:
    [...]
            "b) Judges, members of the Provincial Council, [...]"

    [also see "Penal Law for Civil Servants and Crimes Against the
            Public Security".]