**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| J.K. IDEMA, et al., ) | |
| ) | |
| Petitioners, ) | No. 05 CV 2064 (EGS) |
| ) | |
| v. ) | |
| ) | |
| RONALD NEUMANN, et al.,[1] ) | |
| ) | |
| Respondents. ) | |

**RESPONDENTS' OPPOSITION TO
PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND OTHER RELIEF AND RULE 60 MOTION**

Petitioners have brought this habeas case challenging their arrest, conviction and

incarceration by Afghan authorities in Afghanistan.  Their claim for habeas relief rests largely on

their unsubstantiated assertions that the Afghan authorities are mere agents of the United States

and that Ambassador Zalmay Khalilzad – the former American Ambassador to Afghanistan and

the current American Ambassador to Iraq – was, and still is, the de-facto ruler of Afghanistan.

See, e.g., Pet. Motion at 10-11 & n. 21, 13-14.

Although this Court has never directed Respondents to respond to the underlying Petition,

see 28 U.S.C. § 2243, Petitioners have now filed a Motion for Temporary Restraining Order

asking this Court to enter preliminary injunctive relief related to (i) a prison uprising that ended

on the day Petitioners filed their Motion, and (ii) the provision of consular services to Petitioners.

---

[1] Petitioners assert that Secretary of State Condoleezza Rice was dismissed as a
respondent on May 24, 2005.  Moreover, as previously noted, Ambassador Neumann is the
current United States Ambassador to Afghanistan, and is automatically substituted as a
Respondent in Ambassador Khalilzad's place.

Because Petitioners are not in custody of the United States, however, but rather are serving prison sentences in Afghanistan imposed by an Afghan court after a criminal trial and appeal, this Court lacks habeas jurisdiction over the Petition.  Additionally, the Petition should be dismissed pursuant to the act of state doctrine and as a matter of international comity.  Moreover, to the extent that Petitioners ask this Court to issue an order governing the United States' communications with Afghanistan, their claim is nonjusticiable, and the relief they seek is beyond this Court's powers.  Much of the other relief Petitioners seek – in both their Petition and their Motion – relates to the provision of consular services to them in Afghanistan and other matters that are beyond the scope of any proper habeas relief.  For all of these reasons, the Petitioners' Motion should be denied and the Petition should be dismissed.

## BACKGROUND

I.    <u>General Background</u>

Petitioners are three American citizens – Jonathan Keith Idema, Brent Bennett, and Edward Caraballo – and one Afghan citizen[2] who were tried and convicted in Afghanistan for running a private prison.  Petition at 29 n.22 (Petitioners were "convicted of running a private prison, illegally arresting and torturing suspected terrorists, and secretly entering Afghanistan with forged Indian passports").[3]  The three Americans were sentenced to prison terms of ten, ten,

---

[2] The Petition asserts that the fourth Petitioner's name is Zorro Rasuli Banderas. Respondents cannot confirm that this is in fact his proper name.

[3] Because the Petition does not appear on the Court's docket, and as a courtesy to the Court, Respondents attach a copy of the Petition as Exh. A hereto.

and eight years, respectively.  Petition at 30 (¶ 41).[4]  On appeal, the American Petitioners'

sentences were reduced to terms of five years for Idema, three years for Bennett, and two years

for Caraballo.  See UPI, *Afghan court cuts US prisoners' sentence* (April 1, 2005); Amir Shah,

Associated Press, *Afghan court upholds convictions, cuts sentences for Americans jailed for*

*freelance terrorist hunt* (March 31, 2005) (collectively attached hereto as Exh. B).[5]  Mr.

Caraballo is thus scheduled to be released from custody this summer (having been arrested in

July 2004).  The Petition seeks to hold Respondents responsible for the alleged violations of due

process that occurred during Petitioners' criminal trial in Afghanistan, as well as for their

continued detention there.  Petitioners also complain about the manner in which various consular

services are being provided to them and seek the return of evidence that they allege is in the

possession of the FBI.  See, e.g., Petition at 73, Prayer for Relief.

Petitioners originally brought this action in the United States District Court for the

Southern District of New York.  Respondents moved to dismiss the Petition for lack of personal

habeas jurisdiction over the Respondents.  See Motion to Dismiss, filed by Respondents in

S.D.N.Y., attached hereto as Exh. C.  Before Petitioners had responded to the Motion to Dismiss,

the New York court entered an Order denying the motion without prejudice, but transferring the

case to this Court.  See Order, May 18, 2005, attached hereto as Exhibit D.  Subsequently,

---

[4] The Petition does not contain a single set of consecutively numbered paragraphs. Accordingly, citations to the Petition are to page numbers, with the appropriate paragraph noted parenthetically.

[5] The length of Banderas' initial prison term is unclear.  The Petition, however, asserts that Petitioner Banderas was ordered released on appeal, but "refused to be released without Idema and the rest of the team, requesting the judges allow him to stay in prison with" the Americans.  Petition at 34 (¶ 57).  On the face of the Petition, therefore, it is clear that Banderas is not entitled to habeas relief.

Petitioners filed a motion for reconsideration of the transfer order in New York. That motion was also denied by the New York court. See Order, June 2, 2005, attached hereto as Exh. E.

As the Court is aware, it took several months before this matter was docketed in this Court. At the most recent status conference in this matter, counsel for Petitioner Idema indicated that he wished to file an amended Petition, and that he would do so by February 9, 2006. See Tr. of Jan. 19, 2006 Hrng. ("Jan. 19 Tr.") at 15, 17-18, 32, attached as Exhibit F. This Court granted counsel leave to do so, and also indicated that (i) any amended Petition would be stricken if it failed to comply with the rules, and (ii) the Government would have, at a minimum, 60 days in which to respond to any amended Petition. Id. at 27, 32. Rather than file the amended Petition as indicated, counsel for Petitioner Idema instead filed a somewhat incoherent letter with the Court, in which he objected to the alleged "requirement" that an amended Petition be filed. See Notice of Electronic Filing, Feb. 9, 2006 (docket no. 5).

This Court has not directed Respondents to respond to the Petition. See 28 U.S.C. § 2243 (Court shall not issue writ or direct a response to the Petition "if it appear from the application that the applicant or person detained is not entitled" to the writ; otherwise, Court shall either issue writ or enter order to show cause why writ should not be granted); Rule 4, Rules Governing Section 2254 Cases ("2254 Rules");[6] Watson v. McCotter, 782 F.2d 143, 145 (10th Cir. 1986). Indeed, the Court expressly stated that any obligation to respond would be suspended at least until the next status conference, currently scheduled for March 24, 2006. See Jan. 19 Tr. at 32.

Nevertheless, Petitioners have now filed a Motion for Temporary Restraining Order and

_____

[6] By their terms, the 2254 Rules may be applied to all habeas cases. Rule 1(b), 2254 Rules.

Other Relief and Rule 60 Motion.  Much of the Motion is directed at Petitioners' contention that

this case should be transferred back to New York.  The basis for the alleged need for a temporary

restraining order[7] is the recent uprising at Pol-e-Charkhi prison, where Petitioners are

incarcerated.  Contrary to Petitioners' hyperbolic claims on the first page of the Motion, however,

published reports indicate that the uprising was in fact over by the time Petitioners filed their

Motion on March 1, 2006.  See Agence France Press, *Taliban-led revolt at Afghan jail 'over',

fifth body found* (March 1, 2006); Reuters, *Afghans said bloody Kabul prison siege over* (March

1, 2006); L.A. Times, *Prison Inmates End Deadly Rebellion* (March 1, 2006) (attached

collectively as Exh. G).[8]

---

[7] Although Petitioners refer to a temporary restraining order, it is clear that they are really
seeking a preliminary injunction.

[8] The  Motion alleges that the U.S. government "ordered" Afghan forces not to launch a
rescue attempt during the uprising and asserts that such a rescue attempt would have rescued Mr.
Caraballo.  Pet. Motion at 2.  Accordingly, the Motion seeks an injunction preventing the United
States from "interfering" in the uprising.  Id. at 25.  Petitioner Caraballo – who was alleged to be
a hostage in Petitioners' Motion – managed to phone Anderson Cooper of CNN during the course
of the uprising, and excerpts of his conversation were broadcast on CNN.  Mr. Caraballo is
quoted as having asked that no such rescue attempt be made: "I would say to the American forces
. . . or the Afghan forces, that they should not storm the prison."  See CNN Live Today, March 1,
2006, at 6, attached hereto as part of Exh. H.  Mr. Caraballo's statement to the press raises
questions – yet again – as to whether the filings purportedly made on his behalf are in fact
authorized by him.  During the course of his interview with CNN, Mr. Caraballo also stated that
he had "been in contact with [U.S. Consul Adrienne Harchik] constantly throughout the past
couple of days.  She's done a really good job of keeping me safe."  Id. Compare Pet. Motion at
13, ¶ 13 (alleging Consul Harchik issued false statements to press during uprising).  See also
Agence France Press, *US citizen says life under threat inside Afghan jail riot* (Feb. 28, 2006)
(Caraballo interview with Agence France Press), attached hereto as part of Exh. H.  Press reports
indicate that the Afghan prison authorities rejected the contention that Mr. Caraballo had been
taken hostage, and that the authorities confiscated his cell phone and computer, which they claim
had been used to disseminate false information during the uprising.  Agence France Press,
*Taliban-led revolt at Afghan jail 'over', fifth body found* (March 1, 2006), attached hereto as part
of Exh. G.

Notwithstanding the fact that the "emergency" allegedly necessitating this Court's intervention ended on the very day the Motion was filed, Petitioners seek preliminary injunctive relief directed at (i) Respondents' alleged acts with respect to the uprising, and (ii) the consular services provided to Petitioners, including the delivery of mail, the provision of bottled water, and other matters.

II.     Petitioners' Allegations

Petitioners admit that they are "currently incarcerated in Pulacharke Prison in Afghanistan," and that "they are in the physical custody of the Islamic State of Afghanistan," Petition at 4 (¶ 4).  Although they allege that they are "actually in the custody and control of the Respondents, and it is the Respondents who have directly engaged in the liberty deprivations," id., they have provided no evidence to substantiate this claim.  As is evident from both the Petition and Petitioners' Motion, this case is predicated on Petitioners' unfounded assertions that the United States Government generally, and Ambassador Khalilzad in particular, are the de facto rulers of Afghanistan, notwithstanding the country's status as a sovereign nation.

Thus, for example, the Petition asserts that:

- although the Afghanistan National Directorate of Security ("NDS") is "an official agency of the Afghan Government which works directly for the President of Afghanistan," in reality it is "overseen by the U.S. Department of Justice, the U.S. FBI, and in part, other agencies," Petition at 9 (¶ 22);

- the head of the NDS was "appointed at the direct request of the FBI," id. at 10 (¶ 24);

- Judge Abdel Baset Bakhtyari – who, as Petitioners acknowledge, is "a lower court judge in the NDS" who presided over Petitioners' criminal case – is "currently an agent of the U.S. government acting under the direction of the FBI, and is believed to receive compensation from the United States Government," id. at 10 (¶ 25);

6

- Mahammed Nahim Dawari, a prosecutor in Petitioners' criminal case, "is an agent of the U.S. government acting under the direction of the FBI," id. at 10 (¶ 26);

- Mudafea, alleged to be an investigator and interrogator for the NDS, is "an agent of the U.S. government who specifically acted under the direction of the FBI," id. at 11 (¶ 28);

- "Respondents had orchestrated Petitioners' convictions," id. at 30 (¶ 42);

- the Afghan court of appeals stated that all Petitioners were innocent but could not be released because of coercion by the U.S. Embassy and the FBI, id. at 31-32, 35 (¶¶ 47-48, 60).

In keeping with their view that Respondents wield ultimate control over the government of Afghanistan, the Petition asserts further that "the prison warden, the chief of prisons, the Minister of Justice and even the Afghan Court of Appeals . . . would release Petitioners immediately if it were not for the direct orders of the Respondents." Id. at 13.

The Motion makes Petitioners' theory of the case even more clear, referring as it does to the "subjugation of Afghanistan by Zalmay Khalilzad who acts as the *de facto* ruler of the country." Pet. Motion at 11 (internal footnotes omitted). To ensure that there is no mistake about Khalilzad's powers, Petitioners add, in a footnote, that although "Khalilzad is no longer in Afghanistan, and is in Iraq . . . Petitioners are prepared to present evidence at a hearing that Zalmay Khalilzad still exercises substantial control over the Karzai government and still makes decisions related to Petitioners." Id. at 11 n. 21. Petitioners also assert that Hamid Karzai, the elected President of Afghanistan, acted at Khalilzad's direction in allegedly denying Petitioners' release during their appeal. Id. at 11. Indeed, according to Petitioners, Khalilzad is so powerful that he had President Karzai remove the Minister of Justice from his post out of fear that he would release Petitioners. Id. at 13. Petitioners themselves sum up the basis for their contention

that the Respondents are their "actual custodian" and responsible for their ongoing incarceration

as follows:  "Khalilzad['s] ability to determine cabinet level ministers in the Afghan government,

confirms that Khalilzad was, and still is, the military, political and diplomatic ruler of

Afghanistan." Id. at 13.  Although they promise to provide evidence of Ambassador Khalilzad's

powers in the future, Petitioners have not provided any such evidence in support of their Motion.

## ARGUMENT

Petitioners seek unprecedented preliminary injunctive relief from this Court. Yet they fail

to cite the standards for issuance of such relief – standards they simply cannot meet.  "[I]n

considering a plaintiff's request for a preliminary injunction a court must weigh four factors:

(1) whether the plaintiff has a substantial likelihood of success on the merits; (2) whether the

plaintiff would suffer irreparable injury were an injunction not granted; (3) whether an injunction

would substantially injure other interested parties; and (4) whether the grant of an injunction

would further the public interest." Al-Fayed v. Central Intelligence Agency, 254 F.3d 300, 303

(D.C. Cir. 2001).  The same factors apply in evaluating requests for temporary restraining orders.

Id. at 303 n.2.  When, as here, requested injunctive relief deeply intrudes into the core concerns

of the Executive Branch, however, a court is "'quite wrong in routinely applying to this case the

traditional standards governing more orthodox stays.'" Adams v. Vance, 570 F.2d 950, 954

(D.C. Cir. 1978), quoting Sampson v. Murray, 415 U.S. 61, 83-84 (1974); see also Barr v. United

States Department of Justice, 645 F. Supp. 235, 238 (E.D.N.Y. 1986), aff'd on other grounds, 819

F.2d 25 (2d Cir. 1987).  As discussed below, Petitioners' Motion fails on all four prongs of this

test.

I.      Overview of Argument

Because Petitioners are admittedly in the custody of a foreign government, pursuant to a criminal sentence imposed by that government, this Court lacks habeas jurisdiction, the Motion should be denied, and the Petition must be dismissed.  Petitioners' outlandish and unsupported conclusory assertions that the United States – and, specifically, Ambassador Khalilzad – is the effective ruler of Afghanistan does not change the underlying facts or the concomitant legal conclusion that this Court lacks habeas jurisdiction.  Petitioners' allegations do, however, demonstrate that adjudication of their claims would necessarily require this Court to pass judgment upon the official acts of the Islamic Republic of Afghanistan, something that this Court cannot do pursuant to the act of state doctrine and notions of international comity, which each provide an independent basis upon which the Motion should be denied and the Petition should be dismissed.

Furthermore, the relief sought by Petitioners is unavailable to them.  To the extent that they seek an order effectively requiring this Court to supervise the Executive's diplomatic communications with Afghanistan, their claim is non-justiciable, and any such order would violate principles of Separation of Powers and exceed this Court's Article III authority.  The other relief Petitioners seek (in both the Petition and the Motion) does not in any way relate to the legality of their detention or otherwise seek their release.  Rather, it challenges the provision of consular services to Petitioners and seeks the return of evidence that Petitioners allege is in the possession of the FBI.  Such relief, however, is not available to a habeas petitioner, demonstrating further that this case is not a proper habeas case.  For these reasons as well, the Motion should be denied and the Petition should be dismissed.

Because this Court lacks habeas jurisdiction over Petitioners' challenge to their conviction

9

and incarceration in Afghanistan, it should not entertain the Petition.  A fortiori, the instant

Motion should be denied, as it seeks to invoke this Court's injunctive power in a case over which

the Court has no jurisdiction.  Accordingly, Petitioners cannot establish a likelihood of success

on the merits of their claim.  Moreover, the other preliminary injunction factors also support

denial of the requested injunction.

II.     This Court Lacks Jurisdiction Over the Petition

As noted above, there is no dispute that Petitioners were tried and convicted by an

Afghani court, and are currently incarcerated in Pol-e-Charkhi prison in Afghanistan, where they

are serving their Afghani criminal sentences.  These facts alone suffice to demonstrate that this

Court lacks habeas jurisdiction over the Petition because Petitioners are not in Respondents'

custody.  Under the habeas statute, habeas relief is available only where the petitioner is in the

custody of a respondent subject to the jurisdiction of United States courts.  A longstanding line of

binding case law holds that habeas jurisdiction does not extend to a case like this one, where the

petitioner is held abroad by a foreign sovereign pursuant to a judicial decision of that foreign

sovereign.

A.     The Statutory Scheme Envisions Petitioners in the Custody of Respondents

Writs of habeas corpus may be granted by district courts "within their respective

jurisdictions."  28 U.S.C. § 2241(a).  A habeas corpus proceeding brought in federal court must

name as a respondent "the person who has custody over [the individual on whose behalf the

petition is filed]."  28 U.S.C. § 2242.  Similarly, the writ or order to show cause "shall be directed

to the person having custody of the person detained."  28 U.S.C. § 2243.  Moreover, to the extent

the writ is granted, "the person to whom the writ is directed shall be required to produce at the

10

hearing the body of the person detained."  Id.

This statutory scheme is thus clearly predicated upon the notion that habeas relief is available in United States courts only to challenge detentions of petitioners who are in the custody of U.S. custodians, when those custodians are subject to the jurisdiction of those courts. This aspect of the statute codifies the implicit territorial limitation of the Great Writ – it is simply not available to challenge detention by a foreign sovereign outside the United States.  Cf. Rasul v. Bush, 124 S. Ct. 2686, 2696-97 (2004) (describing historical reach of the writ to those places "under the sovereign's control").  Indeed, the very term "habeas corpus" derives from the Latin phrase meaning "have the body."  See, e.g., Random House Dictionary of the English Language at 856  (2d ed. unabridged 1987).  Thus, a writ of habeas corpus cannot be issued where the petitioner is in the custody of a foreign sovereign outside of the United States pursuant to a foreign criminal conviction.  A habeas petitioner suing the United States government to challenge custody by a foreign sovereign in a foreign country based on a foreign conviction simply cannot prevail.

B.    Binding Precedent Demonstrates That Habeas Jurisdiction Does Not Lie When a Petitioner Is in the Custody of a Foreign Power Pursuant to a Judgment of a Foreign Tribunal

Controlling precedent confirms this conclusion.  The Court of Appeals for this Circuit has expressly held that when, as here, an American citizen is incarcerated abroad pursuant to a judgment of conviction by a foreign court, habeas jurisdiction will not lie, notwithstanding allegations of collusion or conspiracy on the part of the American respondents.

In Keefe v. Dulles, 222 F.2d 390 (D.C. Cir. 1954), an American soldier stationed overseas was serving a five-year prison sentence pursuant to a conviction in a French court.  The

habeas petitioner (the soldier's wife) claimed that the Secretaries of State, Defense, and the Army

had conspired to deprive the soldier of his liberty in connection with his incarceration in a French

prison.  Id. at 391.  Despite these allegations, the court rejected out of hand the theory that it had

jurisdiction to grant habeas relief, stating:

> [t]he petition shows on its face that Keefe is not in the custody of the respondents.
> It also shows, because it alleges he is detained by French civil authorities, that
> there is no one within the jurisdiction of the court who is responsible for his
> detention and who would be an appropriate respondent.  It was therefore necessary
> to dismiss the petition insofar as it sought a writ of habeas corpus, as a court will
> not issue that writ unless the person who has custody of the petitioner is within
> reach of its process.  Cf. Ex parte Mitsuye Endo, 1944, 323 U.S. 283, 306.[9]

222 F.2d at 392.

Notwithstanding the allegations of conspiracy between the American respondents and the

French authorities in Keefe, the court concluded that it had no jurisdiction over the habeas

petition in that case.  So, too, Petitioners' conspiracy claims here do not alter the fact that the

Petition "shows on its face that [Petitioners are] not in the custody of the respondents."

Therefore, Keefe is binding precedent for the proposition that it is "necessary to dismiss the

---

⁹ Endo involved a petitioner who was taken into custody by the federal government in
one district and then, during the pendency of her habeas case, was moved to another district.  The
Court held that the first district retained jurisdiction to decide the habeas case, even though the
petitioner's immediate custodian at the time of decision was not in that district.  The Supreme
Court discussed Endo in Rumsfeld v. Padilla, 542 U.S. 426 (2004), characterizing Endo as a
limited decision that does not govern a habeas case brought in a district in which the prisoner
seeking release was never incarcerated in the first place.  Id. at 440-41.  In citing Endo as it did,
the D.C. Circuit made clear in Keefe that it also viewed the Endo decision as being entirely
consistent with – and, in fact, supportive of – the proposition that a habeas case cannot be
brought against the United States government in connection with a prisoner who is in the
physical custody of a foreign power pursuant to foreign conviction.

petition insofar as it [seeks] a writ of habeas corpus." Id.[10]

The Supreme Court's holding in Hirota v. General of the Army MacArthur, 338 U.S. 197 (1948) (per curiam), further supports this conclusion.  In Hirota, the Supreme Court considered, and rejected, a habeas petition filed on behalf of several individuals who had been convicted by an international military tribunal in Japan that had been "set up by" American General Douglas MacArthur.  Id. at 198.  The petitioners in Hirota were in the physical custody of another American general, "who held them pursuant to the orders of respondent MacArthur."  Id. at 199 (Douglas, J., concurring).  The petitioners were in custody in Japan, id. (Douglas, J., concurring), which the Court noted was at the time both "occup[ied] and control[led]" by the United States, id. at 198.

Nevertheless, the per curiam opinion of the Court concluded that because "the tribunal sentencing these petitioners is not a tribunal of the United States," the "courts of the United States have no power" to grant the requested relief.  Id.  The Court reached this conclusion even though it was undisputed that, as Justice Douglas pointed out in his concurrence, the "chain of command from the United States to the Supreme Commander [General MacArthur] [was] unbroken," id. at 207 (Douglas, J., concurring), and the respondents therefore had directive power over the physical custodians of the petitioners, id. at 199, 207 (Douglas, J. concurring). Because General MacArthur was acting as an "agent of the Allied Powers," the Court held that

---

[10] Nor do Petitioners' allegations that Respondents somehow interfered with their trial allow for a different result.  The habeas remedy is prospective, and it is undisputable that Petitioners are in Afghan custody pursuant to an Afghan court judgment of conviction.  In the words of Keefe, "there is no one within the jurisdiction of the court who is responsible for his detention and who would be an appropriate respondent" who could effectuate Petitioners' release. 222 F.2d at 392.

habeas relief was unavailable.

If United States courts lacked the "power" to provide habeas relief to petitioners who had been convicted by an international tribunal "set up" by the United States and of which the United States was a party, and who were held by an American General under the direct command and control of the United States, a fortiori this Court lacks such "power" in this case, where Petitioners have been convicted by a foreign court and held in foreign custody.[11]  Admittedly, Hirota involved petitioners who were not U.S. citizens.  The fundamental premise of the Court's holding, however – that U.S. courts have no power to entertain a habeas petition by a petitioner in custody pursuant to a sentence imposed by a foreign tribunal – did not turn on the citizenship of the petitioners and applies with equal – or even greater – force to the facts at bar.  For in this case, the United States had no role in establishing the tribunal that tried and convicted Petitioners, nor are the Petitioners held by anyone within the Armed Forces' chain of command.

The cases of United States v. Sinclair, 702 F. Supp. 477 (D. Del. 1989), and Duchow v. United States, 1995 WL 425037 (E.D. La. 1995), aff'd, 114 F.3d 1181 (5th Cir. 1997), are equally instructive.  Sinclair involved a prisoner held by a foreign government at the express request of the United States, but the court nonetheless refused to grant relief.  The petitioner in that case had been tried, convicted, and sentenced to prison in a federal court, but he left the country before reporting to serve his sentence.  Ten years later, he was arrested in Great Britain (where he had established residency) pursuant to an extradition request made by the American

---

[11]  The Hirota court phrased its holding as a statement regarding the "power" of an article III court to grant habeas relief in the circumstances of that case.  It is unclear whether this was intended as a statement regarding the subject matter jurisdiction of the court, or another inherent limitation on the Court's habeas power.  Either way, the lesson of Hirota is clear:  in this case, this Court "ha[s] no power" to grant the relief requested in the Petition.

authorities.  He then filed a motion in federal court opposing his arrest and seeking relief from

his conviction.  In denying his petition on the ground that he was not "in custody" within the

meaning of the relevant statute,[12] the court acknowledged that the "in custody" concept has been

interpreted broadly.  Nonetheless, the court reasoned that "inherent in a federal habeas remedy is

the ability of a federal court to direct the release of the person in custody.  Thus, the remedy is

only available for a person in custody under federal, state, or military authority."  702 F. Supp. at

478.  Citing Hirota, the court in Sinclair ruled that even though the petitioner was being held at

the express request of the United States government, the court lacked jurisdiction to adjudicate

his habeas petition because "Sinclair's restraint [was] being imposed by a foreign sovereign."  Id.

at 479.

Similarly, in Duchow, the American petitioner had been detained and prosecuted by the

Bolivian government, allegedly based on a false complaint filed by an American official

stationed at the American Embassy in La Paz.  Duchow, 1995 WL 425037 at *1.  Noting that "it

is the Bolivian government who has custody over plaintiff and would be required to produce the

body" in the event that the writ issued, the court held that such a writ would not issue.[13]

In light of these cases, it is abundantly clear that habeas relief is unavailable here.  The

Petitioners in this case seeks to challenge their detention in Afghanistan by Afghan authorities

pursuant to a criminal conviction issued by an Afghan court.  Although Petitioners conclusorily

_____

[12]  Sinclair's petition was filed under 28 U.S.C. § 2255, and not section 2241, under which
Petitioners here seek relief.  That difference, though, is of no moment.  Both sections entitle a
prisoner to seek habeas relief if the prisoner is "in custody."  It was on the basis of that language
that the court in Sinclair denied the petition in that case.

[13]  As discussed below, the court in Duchow relied on the act of state doctrine in reaching
this decision.

assert that the "ultimate control, administration and destiny of Afghanistan" is "under the exclusive domain of Ambassador Khalilzad," Pet. Motion at 11, they provide no support for their far-fetched allegations.  Given the undisputable fact that "the tribunal sentencing these petitioners is not a tribunal of the United States," Hirota, 338 U.S. at 198, and that the Petition itself establishes that "it is the [Afghan] government who has custody over [Petitioners] and would be required to produce the body," Duchow, 1995 WL 425037 at *3, this Court lacks jurisdiction. That is, because the Petition "shows on its face that [Petitioners are] not in the custody of the respondents," Petitioners' Motion should be denied, and it is "necessary to dismiss the petition." Keefe, 222 F.2d at 392.[14]

Because Petitioners are in the custody of a foreign sovereign pursuant to a criminal conviction in that foreign sovereign's courts, they cannot be (and are not) in the custody of Respondents.  Accordingly, this Court lacks habeas jurisdiction over the Petition, Petitioners'

--------

[14] Nor is Abu Ali v. Ashcroft, 350 F. Supp. 2d 28 (D.D.C. 2004), to the contrary.  Abu Ali involved a petitioner who had been detained *without trial* in Saudi Arabia, and the Court in Abu Ali relied on that fact, in part, in distinguishing Hirota and Keefe.  Thus, the court in Abu Ali noted that "[t]he act of a foreign state in arresting an individual, entering judgment against him, and sentencing him in a court of law is of a different order altogether than the decision by the executive to hold him through the intercession of another country.  *The former acts require the United States courts to sit as a court of appeals over the court of a former country*."  Id. at 57 n. 26 (emphasis added).  The Abu Ali court also emphasized that the petitioners in that case had presented "considerable" evidence – including affidavits describing conversations with United States and Saudi officials – to support their specific allegations of United States involvement in Abu Ali's detention.  Id. at 67-68.  By contrast, Petitioners here have provided *no* evidence to support their far-reaching and conclusory assertions that the United States Government and Ambassador Khalilzad control Afghanistan.  Cf. Omar v. Harvey, No. 05-2374 (RMU), __ F. Supp. 2d __, 2006 WL 335764 (D.D.C. Feb. 13, 2006) (petitioner presented evidence raising substantial question as to whose custody he was in).  Omar is also distinguishable in that there is no dispute in that case that Mr. Omar is being physically held by U.S. troops; the jurisdictional question there is whether those troops are acting in the capacity of U.S. troops, or as part of a multinational military force.  Id. at *2.

Motion should be denied, and the Petition should be dismissed.

III.    The Petition Should Be Dismissed Under the Act of State Doctrine

As explained above, this case is fundamentally flawed as a matter of habeas jurisdiction. But even were this not the case, denial of Petitioners' Motion and dismissal of the Petition would be appropriate under the act of state doctrine. Pursuant to the act of state doctrine, courts of this country generally refrain "from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." Banco Nacional De Cuba v. Sabbatino, 376 U.S. 398, 401 (1964). The doctrine "requires that, in the process of deciding [a case], the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., 493 U.S. 400, 409 (1990). That is, the act of state doctrine is a "principle of decision binding on federal and state courts alike." Sabbatino, 376 U.S. at 427. "[T]he act within its own boundaries of one sovereign State . . . becomes . . . a rule of decision for the courts of this country." Ricaud v. American Metal Co., 246 U.S. 304, 310 (1918). The jurisprudential foundation of the doctrine is a "consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of the foreign acts of state may hinder' the conduct of foreign affairs." Kirkpatrick, 493 U.S. at 404, quoting Sabbatino, 376 U.S. at 423.

There can be no doubt that "[a] sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction." Wilson v. Gerard, 354 U.S. 524, 529 (1957). Put another way, a state's decision to arrest, try and detain an individual within its borders is "peculiarly sovereign in nature." Saudi Arabia v. Nelson, 507 U.S. 349, 361 (1993).

17

Applying these principles to the facts of this case, it is clear that adjudication of Petitioners' claim would require this Court to "inquir[e] into the validity of the public acts a recognized foreign sovereign power committed within its own territory," Sabbatino, 376 U.S. at 401– to wit, the acts of the Afghan courts that first convicted, and then affirmed the conviction of, Petitioners – and to declare those acts invalid.  Indeed, one of the earliest applications of the act of state doctrine involved a case challenging the detention of a United States citizen by a foreign power abroad.  In Underhill v. Hernandez, 168 U.S. 250 (1897), plaintiff Underhill sought damages as a result of his alleged unlawful detention by the defendant in Venezuela.  Recognizing that the defendant "was carrying on military operations in support of" a revolution at the time of the detention, and that the "acts complained of were the acts of a military commander representing the authority of the revolutionary party as a government" which was later recognized by the United States, the Court in Underhill applied the act of state doctrine and held that "the acts of the defendant were the acts of the government of Venezuela, and as such are not properly the subject of adjudication in the courts of another government."  Id. at 254.  See also Sabbatino, 376 U.S. at 416 ("None of this Court's subsequent cases in which the act of state doctrine was directly or peripherally involved manifest any retreat from Underhill.").  Underhill's holding applies with even greater force here, where adjudication of Petitioners' claim would not only require this Court to pass judgment upon the validity of Petitioners' continued detention by Afghan authorities, but also "require" this Court "to sit as a court of appeals over the court of [another] country."  Abu Ali, 350 F. Supp. 2d at 57 n.26.

Duchow is to the same effect.  As noted above, Duchow involved an American detained by the Bolivian government based upon a complaint filed against him by two U.S. officials and

who sought relief against the United States and the officials. <u>Duchow</u>, 1995 WL 425037 at * 1. In rejecting the petitioner's application for a writ of habeas corpus, the <u>Duchow</u> court held that issuance of the writ "would require [the] Court to judge the validity of Bolivia's acts within its boundaries and would be inappropriate." <u>Id.</u> at *3. Rejecting the petitioners' constructive custody argument in that case, the <u>Duchow</u> court noted that "[a] finding of constructive custody in this case effectively requires a finding that in this matter the Bolivian government is acting as a mere 'puppet' of the United States." <u>Id.</u> This was a finding the court was unwilling to make in light of the act of state doctrine.

> Whatever the U.S. presence in Bolivia, the Act of State doctrine, in the very least, requires this Court to recognize Bolivia as a separate sovereign with its own interests in prosecuting those who violate its law within its territory. A Writ of Habeas purportedly directed to the defendants would have the effect of demanding that Bolivia deliver custody, thus inhibiting the investigation of alleged crimes within its borders. This Court will not issue such a writ.

<u>Id.</u> The same reasoning applies to the case at bar even more forcefully in light of Petitioners' conviction by an Afghan court.

Nor does Petitioners' attempt to characterize their claim as one challenging only the United States' conduct change this conclusion.[15] Because Petitioners have been convicted and sentenced by an Afghan court, and are in custody pursuant to that Afghan court judgment, their *habeas* claim – which goes to the legality of their detention – necessarily challenges the validity of their foreign conviction. The Afghan court's criminal judgment establishes the legality of

---

[15] Although Petitioners seek relief only against Respondents, it is clear that their claim is based upon the alleged improprieties in their Afghan trial. <u>See, e.g.</u>, Petition at 5 (¶ 8) ("This Petition is also for violations of the Afghan Criminal Code for Courts [and] the Afghan Penal Code"), 24 (¶ 30) (describing alleged problems with trial), 27 (¶ 37) (same), 29 (¶ 41) (same); Pet. Motion at 7 ("Afghanistan's judicial system is non-existent, corrupt, broke").

Petitioners' detention, and thus provides the rule of decision in this case, which compels denial of the writ.  Adjudication of Petitioners' claim challenging that detention would necessarily "require[] the Court to declare invalid, and thus ineffective as a 'rule of decision for the courts of this country,' the official act of a foreign sovereign."  <u>Kirkpatrick</u>, 493 U.S. at 405, <u>quoting</u> <u>Ricaud</u>, 246 U.S. at 310 (1918).[16]

At bottom, granting Petitioners' habeas relief would necessarily require the Court to pass upon the validity of Afghanistan's sovereign acts in arresting, trying, convicting, and incarcerating Petitioners.  Pursuant to the act of state doctrine, those sovereign acts are deemed to be valid.  <u>Kirkpatrick</u>, 493 U.S. at 409.  Accepting the validity of these acts, and in particular the validity of Petitioners' criminal conviction, necessitates denial of habeas relief, for such relief is grounded upon a finding of illegal detention.  That is, the Court cannot make such a finding of illegal detention without essentially invalidating the Afghan courts' decisions, which is precisely what the act of state doctrine precludes.  Because the Petition is expressly predicated on the notion that Petitioners' trial and conviction were invalid acts, the act of state doctrine applies, the Motion should be denied, and the Petition should be dismissed.

IV.    <u>International Comity Requires that the Petition Be Dismissed</u>

"'Comity,' in the legal sense, . . . .  is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws."  <u>Hilton v. Guyot</u>, 159 U.S. 113, 163-64 (1895).  Applying

---

[16] The fact that Petitioners have been tried and convicted by a foreign sovereign distinguishes this case from <u>Abu Ali</u>, where there was no foreign court judgment at issue.

this principle, the Supreme Court has long held that "every sovereign state must recognize the independence of every other sovereign state; and that the courts of one will not sit in judgment upon the acts of the government of another, done within its own territory." United States v. Belmont, 301 U.S. 324, 327 (1937). Put another way, "the conduct of one independent government cannot be successfully questioned in the courts of another." Oetjen v. Central Leather Co., 246 U.S. 297, 303 (1918).

This principle, closely related to the act of state doctrine, has been applied to afford due respect to a foreign country's criminal judgments. Thus, for example, in Casey v. Department of State, 1980 F.2d 472 (D.C. Cir. 1992), in rejecting a challenge to the Department of State's efforts to extradite the plaintiff from Costa Rica based in part on an argument regarding Costa Rican law, the D.C. Circuit recognized that "[s]urely, a foreign court's holding as to what that country's criminal law provides should not lightly be second-guessed by an American court – if it is ever reviewable." Id. at 1477. Similarly, in habeas corpus cases challenging extradition from the United States, courts are unwilling to examine the demanding country's compliance with its own laws. See Matter of Assarsson, 635 F.2d 1237, 1244 (7th Cir. 1980) ("While our courts should guarantee that all persons on our soil receive due process under our laws, that power does not extend to overseeing the criminal justice system of other countries."); Lindstrom v. Gilkey, No. 98 C 5191, 1999 WL 342320, at *6 (N.D. Ill. 1999). Finally, in the immigration context, courts have recognized as "axiomatic" the impropriety of "challeng[ing] the legitimacy of a criminal conviction duly obtained under the laws of a foreign country." Chiaramonte v. INS, 626 F.2d 1093, 1098 (2d Cir. 1980). "To hold otherwise would entail disrespect for the judgments of that sovereign, and thus undermine the principle of international comity." Id. See also Esposito

v. INS, 936 F.3d 911, 915 (7th Cir. 1991).  Cf. Blanco v. Banco Indus. de Venezuela, S.A., 997

F.2d 974, 982 (2d Cir. 1993) ("[i]t is not the business of our courts to assume the responsibility

for supervising the integrity of the judicial system of another sovereign nation") (internal

quotations omitted).

    Petitioners here essentially ask this Court to act as a super-appellate court over the courts

of Afghanistan and determine that the Afghan criminal proceedings were so tainted as to require

Petitioners' release from custody.  See, e.g., Petition at 5 (¶ 8) ("This Petition is also for

violations of the Afghan Criminal Code for Courts [and] the Afghan Penal Code"), 24 (¶ 30)

(describing alleged problems with trial), 27 (¶ 37) (same), 29 (¶ 41) (same); Pet. Motion at 7

("Afghanistan's judicial system is non-existent, corrupt, broke").  Alternatively, Petitioners ask

this Court to hold that the Afghan courts (and indeed, President Karzai himself), are simply

instruments of United States power, and simply do whatever the United States (in the person of

Ambassador Khalilzad) says.  See, e.g., Petition at 26 (¶¶ 33-34) (alleging U.S government

personnel met with Judge to "orchestrat[e]" events), 28 (¶ 37) ("It was at Respondents' directive

that these due process violations occurred"), 30 (¶ 42) ("Respondents had orchestrated

Petitioners' convictions"); Pet. Motion at 7, 10-11, 13-14.   In either case, the Court is asked to

set aside a valid judgment of conviction of the courts of Afghanistan.  This the Court cannot do

without violating principles of international comity.  And Petitioners' outrageous and conclusory

assertions of United States control simply do not afford a basis to do so.  Accordingly, this Court

should decline to exercise its jurisdiction based on international comity.

V.    Petitioners' Claim Raises Non-Justiciable Political Questions & the Relief They Seek
      Would Violate Separation of Powers

Petitioners' claim also raises non-justiciable political questions. Petitioners essentially

ask to have this Court direct the conduct of the Nation's foreign relations, a task that is

constitutionally committed to the political branches of government. Moreover, the Court lacks

judicially cognizable standards by which to make the policy decision that is at the heart of the

habeas relief that Petitioners seek – whether, and how, to interact with the Afghan government

regarding Petitioners. Even were Petitioners' claim justiciable, that aspect of their relief directed

at the United States' Government's communications with Afghanistan is beyond this Court's

Article III powers.

The Petition asks this Court to enter an order directing Respondents "to cease all

communications, intended to obstruct justice, with the government of Afghanistan related to

Petitioners' criminal case in Afghanistan." Petition at 73, Prayer for Relief, ¶ 3. While this relief

may at first blush appear to be unproblematic, given its limitation to communications "intended

to obstruct justice," it is, in effect, an effort to have this Court supervise Respondents' ongoing

communications with a foreign sovereign. As formulated by Petitioners, this aspect of their

relief is entirely unworkable, as it revolves around the "inten[tions]" behind any such

communication, and requires some understanding of what "obstruction of justice" means in this

context. The court would thus be thrust into the role of supervisor of diplomatic

communications, with all of the attendant policy-making and foreign-relations implications of

such a position. As discussed below, that would be entirely inappropriate.

"The political question doctrine excludes from judicial review those controversies which

revole around policy choices and value determinations constitutionally committed for resolution

to the halls of Congress or the confines of the Executive Branch." Japan Whaling Association v.

American Cetacean Society, 478 U.S. 221, 230 (1986). The doctrine arises from two key

constitutional principles of our system of government: the separation of powers among the three

coordinate branches and the inherent limits of judicial competence. See, e.g., Baker v. Carr, 369

U.S. 186, 210 (1962); Chicago & Southern Airlines, Inc. v. Waterman Steamship Corp., 333 U.S.

103, 111-12 (1948).

> Prominent on the surface of any case held to involve a political question is
> found a textually demonstrable constitutional commitment of the issue to a
> coordinate political department; *or* a lack of judicially discoverable and
> manageable standards for resolving it; *or* the impossibility of deciding without an
> initial policy determination of a kind clearly for nonjudicial discretion; *or* the
> impossibility of a Court's undertaking independent resolution without expressing
> lack of respect due coordinate branches of government; *or* an unusual need for
> unquestioning adherence to a political decision already made; *or* the potentiality
> of embarrassment from multifarious pronouncements by various departments on
> one question.

Baker, 369 U.S. at 217 (emphasis added). The existence of any one of these factors indicates the

existence of a political question. Id.

Petitioners' requested relief implicates many of the factors identified by the Court in

Baker, as it would involve this Court in the conduct of the Nation's foreign affairs. Granting the

relief sought by petitioners would "involve courts in matters of the most delicate diplomacy."

Smith v. Reagan, 844 F.2d 195, 198 (4th Cir. 1988). The Petition thus clearly raises issues

constitutionally committed to the other branches of government, for it is now well-settled that

matters "vitally and intricately interwoven with contemporaneous policies in regard to the

conduct of foreign relations . . . are so exclusively entrusted to the political branches of

government as to be largely immune from judicial inquiry or interference." Harisiades v. Shaughnessy, 342 U.S. 580, 589 (1952).  See also Haig v. Agee, 453 U.S. 280, 292 (1981); United States v. Pink, 315 U.S. 203, 222-23 (1942); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 316-20 (1936).  The courts "must leave these sensitive determinations where the text of the Constitution . . . place[s] them – with the political branches of government." Smith, 844 F.2d at 199.

Similarly, this Court lacks "judicially discoverable and manageable standards for resolving" Petitioners' claim insofar as it relates to what the United States can and cannot say to Afghanistan, and could not enter such relief "without an initial policy determination of a kind clearly for nonjudicial discretion."  Baker, 369 U.S. at 217.  This Court lacks the institutional competence to make the sensitive foreign policy decisions involved in determining what, if anything, the United States' position should be with respect to Petitioners' ongoing detention in Afghanistan.  Such a decision is to be made based on a wide array of considerations – relating not only to Petitioners and their conduct in Afghanistan, but to other matters relevant to the ongoing relations between the two countries – that are unavailable to the Court, and that are inappropriate for judicial review and resolution.  See Smith, 844 F.2d at 198 (relief requested would require judiciary to "make determinations of fact in an area where the judiciary lacks power to obtain information, and in which it has neither the expertise to evaluate the information brought before it nor standards to guide its review").  Cf. Flynn v. Shultz, 748 F.2d 1186 (7th Cir. 1984) (suit challenging extent of Executive's actions to assist American jailed in Mexico presented nonjusticiable political question); Freiberg v. Muskie, 651 F.2d 608 (8th Cir. 1981) (affirming dismissal of suit seeking to compel Department of State to intervene on plaintiff's

behalf with West German authorities on political question grounds).

The decision as to what, if anything, to tell the Government of Afghanistan about the future treatment of Petitioners is fundamentally a policy decision. There is no rule – constitutional or otherwise – barring the United States Government from cooperating with or otherwise supporting a foreign government's prosecution of a U.S. citizen for acts committed abroad if the Executive determines that such cooperation or support is appropriate under the circumstances. The key point here is that the decision regarding what to say, how to say it, and when to say it is a policy decision.

And policy decisions – particularly in the realm of foreign relations – are to be made by the political branches of our government. As the Supreme Court held in a related context over half a century ago:

> The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are nor ought to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret. Nor can courts sit in camera in order to be taken into executive confidences. But even if courts could require full disclosure, the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

Chicago & Southern Airlines, 333 U.S. at 111.

Put simply, "[t]he judiciary cannot oversee the conduct of foreign relations, and could not order the President to take specific action to obtain the release of any American it declared to be

the object of a wrongful detention." Smith, 844 F.2d at 200 (dismissing action seeking to direct

Executive to seek release of American POW's in Vietnam). See Flynn, 748 F.2d at 1194-95

(rejecting suit by American citizen incarcerated in Mexico); Redpath v. Kissinger, 415 F. Supp.

566 (W.D. Texas) (dismissing petition for mandamus by American citizen incarcerated in

Mexico), aff'd 545 F.2d 167 (5th Cir. 1976).[17]

Because Petitioners' requested relief would require this Court to direct the conduct of the

Nation's foreign relations with Afghanistan – a task that is constitutionally committed to the

political branches of government and is laden with the types of policy choices for which Article

III courts are particularly ill-equipped – their claim is non-justiciable, their Motion should be

denied, and the Petition should be dismissed.

Indeed, even if Petitioners' claim were somehow held to be justiciable, the habeas relief

they seek – an order essentially governing Respondents' communications with Afghanistan – is

---

[17] Smith, Flynn and Redpath were cases brought under the Hostage Act, 22 U.S.C.
§ 1732. That Act requires the President to demand the release of a United States citizen and to
take such acts "as he may think necessary and proper to obtain or effectuate the release" of such a
citizen if he has been "unjustly deprived of his liberty" and if the detention "appears to be
wrongful and in violation of the rights of American citizenship." 22 U.S.C. § 1732. As the
Flynn court held, the "vagueness of the term ['unjustly deprived'] indicates . . . that Congress did
not intend traditional judicial review of the Executive's actions taken pursuant to this statute.
Rather, Congress seems to have contemplated that the President would make a subjective
judgment." Flynn, 748 F.2d at 1193. See also Smith, 844 F.2d at 199-200. Any review of such
an Executive judgment – like an order of the sort Petitioners want – would run afoul of the
political question doctrine. Flynn, 748 F.2d at 1193-95; Smith, 844 F.2d at 198-200. Flynn did
hold that the Hostage Act places "a judicially enforceable duty on the Executive to inquire into
the circumstances of an American citizen's extended detention abroad." 748 F.2d at 1195.
Respondents respectfully disagree with this holding, but in any event the Court need not reach
this issue, as the Petition itself does not allege that Respondents have failed to ascertain the
reason for Petitioners' detention. Cf. Smith, 844 F.2d at 199. Any contention to the contrary
would be completely inconsistent with the Petitioners' assertion that Respondents are somehow
responsible for their continued detention.

not available to them, as it is beyond this Court's Article III powers.  An order such as the one

sought by Petitioners would inject this Court into the conduct of the foreign relations of the

United States and would require this Court to "approach the outer limit of its constitutional

authority," Palestine Information Office v. Schultz, 674 F. Supp. 910, 917 (D.D.C. 1987), aff'd,

853 F.2d 932 (D.C. Cir. 1988), or to surpass it.

        Recognizing the political branches' exclusive role in the exercise of the Nation's foreign

relations, and the limited institutional competence of the judiciary in making determinations

regarding foreign affairs, this Circuit has long recognized that where, as here, the

> requested injunctive relief deeply intrudes into the core concerns of the executive
> branch, a court is quite wrong in routinely applying to th[e] case . . . traditional
> standards . . . .  A request for an order directing action by the Secretary of State in
> foreign affairs plainly constitutes such an intrusion. . . .  [W]e think it clear that if
> such a request is justiciable, the party seeking this kind of relief would have to
> make an *extraordinarily strong showing* to succeed.

Adams, 570 F.2d at 954-55 (D.C. Cir. 1978) (internal quotation and citation omitted) (emphasis

added).  See also Office of Personnel Mgmt. v. AFGE, 473 U.S. 1301, 1304 (1985) (noting that

"the District Court's grant of a temporary restraining order in Adams was extraordinary" ).

        Indeed, even when plaintiffs have established entitlement to some relief, courts have been

reluctant to intrude into areas involving foreign affairs.  See, e.g., Hirt v. Richardson, 127 F.

Supp. 2d 833, 845-49 (S.D. Mich. 1999) (finding plaintiffs likely to succeed on merits of claims

seeking to enjoin shipment of weapons-grade plutonium to Canadian border and to be irreparably

injured absent preliminary injunction; declining to enter preliminary injunctive relief in light of

foreign policy implications of relief sought); National Org. for the Reform of Marijuana Laws v.

U.S. Dep't of State, 452 F. Supp. 1226, 1234 (D.D.C. 1978) (although court ordered government

to prepare environmental impact statement in connection with program that involved foreign

state, court refused to order United States to refrain from working together with that state on the

program because to do so would infringe on President's authority to conduct foreign relations).

Because Petitioners are asking this Court to order the Executive Branch to communicate with a

foreign government in a particular fashion, their Petition should be seen for what it is:  an attempt

to run this country's foreign affairs through the Judiciary, an approach to foreign relations that

would be wholly at odds with Adams and the Separation of Powers principles upon which it was

based, and which should, therefore, be rejected.

VI.    Much of the Relief Sought By Petitioners Is Not Appropriate for a Habeas Case

Further demonstrating the inappropriateness of Petitioners' habeas claim is the nature of

the relief sought in both the Petition and the Motion.  Traditionally, habeas corpus was a means

to seek judicial review of unlawful detention, in order to obtain release from that detention.

Indeed, as noted above, the very term "habeas corpus" derives from the Latin phrase meaning

"have the body."  See, e.g., Random House Dictionary of the English Language at 856  (2d ed.

unabridged 1987); see also Sinclair, 702 F. Supp. at 478 ("inherent in a federal habeas remedy is

the ability of a federal court to direct the release of the person in custody").

> As its Latin meaning suggests, the writ of habeas corpus performs a precise and
> specific function: it forces the government to justify a decision to hold an
> individual in custody.  "The very office of the Great Writ, its only function, is to
> inquire into the legality of the detention of one in custody."  Heflin v. United
> States, 358 U.S. 415, 421, 407 (1959); see also Zadvydas v. Davis, 533 U.S. 678,
> 699 (2001) (holding that the "historic purpose of the writ [is] to relieve detention
> by executive authorities without judicial trial") (quoting Brown v. Allen, 344 U.S.
> 443, 533 (1953) (Jackson, J., concurring in result)).  A habeas court must thus
> confine the scope of its review to considering the legality of the custody at issue.

Zalawadia v. Ashcroft, 371 F.3d 292, 299 (5th Cir. 2004).  See also Moore v. Pemberton, 110

29

F.3d 22, 23 (7th Cir. 1997) ("It is not enough to be 'in custody'; unless one is attacking the legality, duration, or (rarely) severity of that custody," a habeas petition is improper.).

Moreover, "[h]abeas' singular focus on the legality of detention not only constrains the scope of a habeas court's review, it constrains . . . the nature of relief that court may afford if and when the writ issues." Zalawadia, 371 F.3d at 300.  Because "habeas relief relates directly to the underlying nature of the writ itself – undoing current or future legal restraints on a person's freedom flowing from an illegal detention," it "*cannot be utilized to bootstrap other claims for relief* unless necessary to assure or to protect the right to the personal liberty interest that is at issue." Id.

Petitioners here, however, apparently recognizing that they are not in the custody of the Respondents, and that Respondents therefore cannot free them, notably do *not* seek an order directing that they be released.  The closest they come is asking for an order (i) directing Respondents to "cease all communication, intended to obstruct justice, with the government of Afghanistan related to the Petitioners' criminal case in Afghanistan," and (ii) "removing all restrictions on liberty which Respondents have imposed upon Petitioners through their agents, through the use of rendition."[18]  Setting aside the entirely vague nature of this relief and the separation of powers issues it raises, it is clear that it is not directed at Petitioners' custodians, and that even were the Court to enter an order along these lines, it would still be up to the Government of Afghanistan whether or not to release Petitioners from custody.[19]

_____

[18] Petitioners' repeated reference to "rendition" is puzzling, since it is undisputed that they were arrested in Afghanistan by Afghan government agents.

[19] Put another way, because entry of such an order would not effectuate Petitioners' release – which would still depend on the acts of a foreign sovereign – the Petitioners lack

The remaining relief sought in the Petition is even further removed from traditional habeas jurisprudence.  In addition to the above, the Petition seeks an order (i) barring Respondents from interfering with Petitioners' mail, (ii) directing Respondents to return evidence allegedly taken from Petitioners by the FBI, (iii) barring Respondents from conducting illegal searches and seizures, (iv) ordering Respondents to acknowledge Petitioners' status (presumably as Prisoners of War) under the Geneva Convention, and (v) directing Respondents to not violate Petitioners' privacy.  See Petition at 73, Prayer for Relief; see also Petition at 74 (asking, in addition, that Petitioners be granted POW status, and seeking sanctions against Respondents).  Likewise, the Motion seeks an order directed at (i) Respondents' participation in the quelling of the uprising that has ended, and (ii) the provision of consular services (regarding mail, water and medicine) to Petitioners.  None of these remedies relate in any way to Petitioners' liberty, and granting Petitioners the relief they seek in these respects would in no way result in their release from Afghan custody.  It is entirely inappropriate, therefore, for Petitioners to seek to use the vehicle of a habeas corpus petition to litigate these issues.  See Zalawadia, 371 F.3d at 201 ("Although there may be other causes of action or other procedural remedies under which such relief would be available, it would not be under habeas").

Petitioners' request that the Court direct Respondents to return evidence that Petitioners allege was taken by the FBI is especially inappropriate for a habeas case.  Petitioners' bald assertion that the evidence they seek would prove their innocence does not change this conclusion or render this relief appropriate for a habeas case.  To the extent Petitioners believe

standing to bring their habeas claim as the injury they complain of – their continued detention – would not "likely" be redressed by the relief they seek.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

the FBI is in possession of material or information material to their criminal case, Petitioners

should pursue whatever applicable legal means might exist to obtain that information.  Cf. Fed.

R. Crim. P. 41(g) (providing for motions for return of property).  To do so, of course, they first

must identify a cause of action and an applicable waiver of sovereign immunity.  See First

Virginia Bank v. Randolph, 110 F.3d 75, 78 (D.C. Cir. 1997).  The habeas statute – concerned as

it is with individuals "in custody" and the legality of their detention – does not provide either, and

this aspect of Petitioners' claim should be summarily dismissed.[20]

The remainder of the relief sought in the Petition and the Motion relates to the provision

of consular services to Petitioners, and not to Petitioners' ongoing detention.  Even challenges to

an individual's conditions of confinement brought against one's physical custodian, however, are

not proper topics for a habeas petition.  Preiser v. Rodriguez, 411 U.S. 475 (1973).  See also

Brown v. Plaut, 131 F.3d 163, 167-68 (D.C. Cir. 1997); Ramirez v. Galaza, 334 F.3d 850, 858-

59 (9th Cir. 2003); Glaus v. Anderson, 408 F.3d 382, 386-88 (7th Cir. 2005).  A fortiori, habeas is

not the proper vehicle by which to challenge the provision of consular services to Petitioners

incarcerated abroad, who indisputably are not in Respondents' physical custody.  Respondents

simply do not control the flow of mail or the provision of water or medical care at Pol-e-Charkhi

Prison – which is run by the Afghan government, notwithstanding Petitioners' unsubstantiated

and unfounded allegations to the contrary.

---

[20] One possible means by which Petitioners could seek the information that they want is
by filing a Freedom of Information Act ("FOIA") request with the appropriate office of the FBI.
Petitioners have filed a FOIA action against, inter alia, the FBI, alleging that they made such a
FOIA request, see Idema v. Dep't of State, No. 05-1334 (EGS) (D.D.C.), but the FBI has no
record of ever having received such a request.  Nothing, of course, prevents Petitioners from still
submitting such a valid FOIA request.

It is clear that Petitioners' bombastic allegations regarding mail service relate to Petitioners' continued improper attempts to send and receive mail via the diplomatic pouch, and the Embassy's unwillingness to allow them to do so. The returned packages pictured in Exhibit C to Petitioners' Motion carry the Dulles, Virginia diplomatic pouch address. See Pet. Motion, Exhibit C; see also Petition at 37 (¶ 69) (referencing Dulles, Virginia address); <http://foia.state.gov/mms/postrpt/pr_view_all.asp?CntryID=173> (Dulles, Virginia address is diplomatic pouch address); Notice Regarding Mail Service to Plaintiffs, filed in Idema v. Dep't of State, No. 05-1334 (EGS) (D.D.C.) (docket no. 9) (discussing delivery of mail to Petitioners). Similarly, Petitioners' allegations regarding water apparently relate their dissatisfaction with the Embassy's provision of free bottled water to them as an accommodation. Whatever the basis of Petitioners' complaints, it is clear that they are – by definition – related to the provision of consular services to Petitioners, and not to any conditions of confinement imposed by their physical custodians. Cf., Petition at 39 (¶ 76) ("none of these violations are imposed by Afghan prison authorities"). Accordingly, these matters are wholly inappropriate for this Court to consider in this habeas case.

As a practical matter, Petitioners are now utilizing the pendency of the instant action to provide them ready access to the Court for their various and sundry complaints. This is improper and inappropriate. The Court should not allow Petitioners to shoehorn their random and disparate complaints into a habeas petition, let alone allow such claims to form the basis of emergency motions for injunctive relief. Put simply, the Court should not countenance such abusive litigation. See also Government's Response to February 9 Letter to Court (docket no. 6) at 2 (asking that Petitioners not be permitted to file any motions for preliminary injunctive relief

given the posture of the case).

VII.     Petitioners Have Failed to Establish Their Entitlement to Preliminary Injunctive Relief

For all of the reasons discussed above, Petitioners have failed to establish a likelihood of success on the merits, and for this reason alone, their Motion for preliminary injunctive relief should be denied.  In addition, the other factors governing issuance of such a motion – irreparable harm, harm to other interested parties, and the public interest – also support denial of Petitioners' Motion.

First, Petitioners completely fail to address these factors, which alone should be sufficient basis for denial of their Motion.  Second, the event that apparently prompted the filing of the Motion – the uprising at Pol-e-Charkhi prison – ended on the day the Motion was filed, and any relief sought with respect to the uprising is moot.  Third, Petitioners have failed to establish any irreparable injury with respect to the matters for which they seek preliminary injunctive relief.  In their 25-page brief they devote two conclusory sentences to the allegations that form the basis for most of the relief they seek.  See Motion at 13, ¶ 15 (alleging that the U.S. Consul has cut off water, medicine and mail to Petitioners).  These allegations do not describe – and no evidentiary support is provided with respect to – any specific acts alleged to be causing Petitioners irreparable injury.[21]  Indeed, the one relevant piece of evidence provided by Petitioners demonstrates that their conclusory allegations regarding mail service relate to their improper attempts to send and receive mail via the diplomatic pouch.  See Pet. Motion, Exhibit C.  Such

_____

[21] The same is true with respect to Petitioners' unsupported allegation that Respondents "ordered Afghan forces not to make a rescue attempt," Pet. Motion at 2, which single sentence is the basis for Petitioners' request that Respondents be ordered not to "interfere" in the uprising and to remove FBI agents from the prison.

conclusory and unsupported allegations simply do not constitute irreparable injury.  Finally, the third and fourth factors strongly support denial of the preliminary injunctive relief sought by Petitioners, as such relief would embroil the Court in the provision of consular services to Petitioners half a world away, with no identified legal basis for Petitioners' claim and no standards by which to assess the adequacy of those services.  For all of these additional reasons, the Motion should be denied insofar as it seeks preliminary injunctive relief.

VIII.    Petitioners' Rule 60 Motion Should Be Denied

Petitioners' Rule 60 Motion essentially asks this Court to reconsider the New York court's decision to transfer this case.  As discussed above, the transfer order was entered upon a motion by Respondents to dismiss the Petition due to lack of personal habeas jurisdiction over the Respondents in New York.  See Exhibit C.  Specifically, Respondents argued that although they did not concede that these Respondents are "proper respondents" for purposes of habeas, it was clear that "the United States District Court for the District of Columbia is the only district court with territorial jurisdiction over these Respondents for purposes of this habeas petition."  Id. at 2. In this regard, Respondents explained that "habeas jurisdiction lies only in the district in which a respondent is found, i.e., in the district court with 'territorial jurisdiction' over the respondent," and that "the location of Petitioners, their families, or their counsel is not a factor considered by the Supreme Court in its analysis of habeas jurisdiction."  Id. at 3, 9.

Petitioners fail to address these arguments in their Motion.  Instead, they argue that "the interests of justice would best [sic] served by transfer back to the SDNY."  Pet. Motion at 18. They argue further – without providing any evidence to support their contention – that the "FBI office in NY is directly involved in this case, in that, upon information and belief, the evidence

and videotapes which Petitioners need to provide irrefutable proof of innocence are in the FBI

NY Office." Id. at 19. See also id. at 20 (arguing that FBI has an arrest warrant for one

Petitioner in New York, and that Idema has demanded the opportunity to testify before a grand

jury in New York).

Petitioners' arguments are unavailing. First, the facts they identify are simply irrelevant to

the habeas case before the Court, which relates to their current incarceration in Afghanistan.

Second, and more importantly, as explained in Respondents' Motion to Dismiss filed in the New

York court, even where habeas petitioners "have been allowed to 'name as respondent a

supervisory official' of their custodian – a senior civilian official exercising responsibility with

respect to the challenged detention," the petition "must still be filed 'in the district where the

respondent resides.'" Exhibit C at 6, quoting Padilla, 542 U.S. at 447 n. 16. The other

considerations raised by Petitioners simply play no role in determining where a habeas corpus

petition can be brought.[22]

---

[22] Respondents hereby incorporate the Motion to Dismiss filed in New York in opposition to Petitioners' Rule 60 Motion.

## CONCLUSION

For all of these reasons, Petitioners' Motion should be denied, and the Petition

dismissed.[23]

Dated: March 9, 2006.                    Respectfully submitted,

                                         PETER D. KEISLER
                                         Assistant Attorney General

                                         KENNETH L. WAINSTEIN
                                         United States Attorney

                                         VINCENT M. GARVEY
                                         Deputy  Branch Director


                                         ___/s/ Ori Lev_____
                                         ORI LEV, DC # 452565
                                         Senior Trial Counsel
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         Mail:  P.O. Box 883, Washington, DC  20044
                                         Delivery:  20 Massachusetts Ave., NW, Rm 7330
                                                  Washington, DC 20001
                                         Tel:  (202) 514-2395
                                         Fax:  (202) 318-7589
                                         Email:  ori.lev@usdoj.gov

---

[23] Respondents believe that Petitioners' Motion should be denied for all of the reasons set forth above.  In the event that the Court nevertheless deems it necessary for Respondents to respond to the conclusory factual allegations set forth in the Motion and for which Petitioners seek preliminary injunctive relief (which allegations Respondents do not concede), Respondents respectfully request that the Court enter an Order pursuant to the Privacy Act, 5 U.S.C. § 522a(b)(11), authorizing Respondents to file with the Court, and provide to counsel and all of the parties to this case, the relevant factual information, some of which may be Privacy Act protected.  Respondents would be happy to provide the Court with a proposed Order in the event that the Court deems such a factual response necessary.

## <u>CERTIFICATE OF SERVICE</u>

  The undersigned hereby certifies that he has, this 9th day of March 2006, caused a copy of the foregoing RESPONDENTS OPPOSITION TO PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER AND OTHER RELIEF AND RULE 60 MOTION to be served, via U.S. mail, postage prepaid, upon the following persons at the following addresses:

     Edward Caraballo c/o
     Consular Section
     Adrienne Harchik, Consul
     American Embassy
     Great Massoud Road
     Kabul, Afghanistan

     Brent Bennett c/o
     Consular Section
     Adrienne Harchik, Consul
     American Embassy
     Great Massoud Road
     Kabul, Afghanistan

  John Tiffany, attorney for Petitioner Idema, will be served via the Court's ECF system.

         _____/s/  Ori Lev_____
         Ori Lev