**A**

# Judge Hellerstein UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

J. K. Idema, Brent Bennett,
Edward Caraballo, and,
Zorro Rasuli Banderas,

    *Petitioners,*

 *Vs.*

Condoleezza Rice, Secretary of State,
Zalmay Khalilzad, Ambassador, *and,*
Robert S. Mueller, Director of the FBI,

    *Respondents.*

**PETITION FOR WRIT
OF HABEAS CORPUS
28 U.S.C. §2241**

05 # CV 2947



Assigned Judge: _____

MAR 17 2005

U.S.D.C. S.D. N.Y.
CASHIERS

**NOW COMES**, Petitioner, J. K. Idema, through counsel, and Petitioners Edward
Caraballo, Brent Bennett, and Zorro Wahid Rasuli Banderas, through their next friend, J.
K. Idema, acting in their behalf, and move this Honorable Court, pursuant to 28 U.S.C.
§2241, for an ORDER: 1) barring the United States government from intercepting,
delaying, obstructing, or refusing mail between the petitioners and their attorneys,
family, and friends; 2) ordering the Federal Bureau of Investigation to return exculpatory
evidence and personal property confiscated and seized illegally from Petitioners without
jurisdiction, 3) ordering the Respondents to cease all communication, intended to
obstruct justice, with the government of Afghanistan related to the Petitioners' criminal
case in Afghanistan, 4) ordering the Respondents, and/or their agents, from conducting
continuing illegal searches and seizures, 5) ordering the Respondents to acknowledge
protected status and abide by the Geneva Conventions and other protections to which
Petitioners are entitled to, 6) removing all restrictions on liberty which Respondents have
imposed upon Petitioners through their agents, through the use of rendition, 7) ordering
Respondents to cease and desist their privacy violations and release of personal, private,
and privileged information to the public and to the press. In support thereof, Petitioners
show unto this Court the following:

- 1 -

# TABLE OF CONTENTS

STATEMENT OF FACTS OF THE UNDERLYING CASE                                    3

OVERVIEW OF THE APPLICABLE LAWS AND TREATIES                                 4

PETITIONERS                                                                  6

OTHER PARTIES RELATED TO THE PETITIONERS                                     7

RESPONDENTS                                                                  8

OTHER PARTIES RELATED TO THE RESPONDENTS                                     9

ISSUES UNDER CONSIDERATION - OVERVIEW                                        12

STATEMENT OF THE CASE                                                        13

FACTS OF THE CASE                                                            14

MEMORANDUM OF LAW IN SUPPORT OF ISSUES UNDER CONSIDERATION                   42

   I.    Whether a Petition filed pursuant to 28 United States Code §2241 is
        the proper procedural vehicle for the relief Petitioners request.          42
   II.   Whether the Southern District of New York is the proper jurisdiction due to
        the Petitioners' current incarceration in the Islamic State of Afghanistan.   46
   III.  Whether Respondents are engaging in the illegal rendering of Petitioners
        to violate their constitutional rights and for the explicit purpose of denying
        Petitioners *due process* protections.                                      49
   IV.  Whether, as a result of Respondents' actions, Petitioners have been, and are
        being, denied vital liberty interests; such as the right to be free from illegal search
        and seizure. And, whether Respondents have intentionally, maliciously, and
        knowingly violated Petitioners' constitutional rights by: withholding exculpatory
        evidence, illegal confiscation and/or destruction of exculpatory evidence,
        engaging in denial of *due process*, obstruction of justice, and abuse of process.   51
   V.   Whether Respondents are engaging in the denial of fundamental liberty interests
        by denying, restricting, searching, and seizing personal correspondence, and
        attorney/client privileged correspondence, rights and *due process* to Petitioners.   55
   VI.  Whether Respondents' decisions, actions, and intentionally false statements
        to a foreign court were arbitrary and did not comport with the Petitioners'
        *due process* and constitutional rights.                                    61
   VII. Whether Respondents' acts in obstructing mail, confiscating and copying mail,
        refusing to send mail, and refusing to respond to letters and requests by Petitioners
        denies Petitioners *due process* and other protections of the U.S. Constitution,
        including subjecting Petitioners to cruel and unusual punishment.            64

GENEVA CONVENTION STATUS                                                     66

NEXT FRIEND STATUS                                                           70

EXHAUSTION OF ADMINISTRATIVE REMEDIES                                        71

CONCLUSION                                                                   72

## STATEMENT OF FACTS OF THE UNDERLYING CASE

1.    On July 5, 2004, Petitioners were arrested in Kabul, Afghanistan at the request of, and under the direct supervision of, the United States Department of Justice, more specifically, the Federal Bureau of Investigation (hereafter the "FBI"). Although the FBI worked through Afghan proxies (NDS) to effect the arrest, FBI agents were covertly present for and in direct control of the arrest and supervised all activities and acts during the arrest and the subsequent search and seizure. The FBI covertly orchestrated the torture, and was overtly in charge during the searches and seizures explained herein. NDS is the National Directorate of Security, and is explained more fully below.

2.    During the proceeding months, FBI agents, and United States Embassy officials and agents, engaged in wide range of constitutional violations, many of which have and are continuing at this time. Some of these constitutional violations include: 1) torture, mortal threats, and "aggressive" interrogations, 2) failure to administer *Miranda* rights, 3) illegal search and seizure of U.S. property, 4) unlawful imprisonment through the use of a proxy (*i.e.:* rendering), 5) obstruction of justice, 6) withholding and destruction of exculpatory evidence, 7) suborning perjury, 8) interference with attorney/client privileged communications, 9) illegal search, seizure, and obstruction of United States mail, 10) making intentionally false statements to a foreign court, 11) cruel and unusual punishment through threats, coercion, and intimidation of family and friends in the United States, and false arrest of family members.

3.    All of these acts were the sole dominion of agents and supervisors of the FBI acting under the direct control and authority of the Director of the FBI, and officials of the United States Department of State (hereafter the "State Department" or the "DOS") acting under the dominion and control of Respondents Condoleezza Rice[1] and Ambassador Zalmay Khalilzad.

---

[1] Prior to Secretary Rice's appointment as Secretary of State, Secretary Colin Powell was the initiator and responsible party for many of the deprivations of liberty complained of herein, however, consistent with Habeas Corpus law, Secretary Rice has been substituted as the appropriate respondent.

- 3 -

4. Petitioners are currently incarcerated in Pulacharke Prison in Afghanistan, but although they are in the physical custody of the Islamic State of Afghanistan, Petitioners are in fact in the actual custody and control of the Respondents, and it is the Respondents who have directly engaged in the liberty deprivations contained herein.[2]

## OVERVIEW OF THE APPLICABLE LAWS AND TREATIES

5. This Petition is based upon Respondents' violations of the 1st, 4th, 5th, 6th, 8th, & 14th Amendments to the United States Constitution as more fully set forth below.

6. This Petition is also based upon violations of Article 14 of the *International Covenant on Civil and Political Rights*, the *United Nations Universal Declaration of Human Rights*, and the *Geneva Conventions of August 12, 1949* relative to both Combatants and Non-Combatants in time of war and accompanying *Protocols Relative to the Geneva Conventions*. The United States of America and the government of Afghanistan are both signatories to those three aforementioned agreements and/or conventions. These violations by Respondents also give rise to additional claims by Petitioners for liberty restraints prohibited by the United States Constitution.

7. This Petition also includes allegations of torture, physical abuse, physical threats, psychological and emotional abuse, and intended starvation, denial of *due process*, illegal search and seizure, and denial of the right to counsel as more fully outlined below, and which violated the United States Constitutions, the *Geneva Convention on Human Rights*, the *U.N. Declaration of Human Rights*, and the other agreements mentioned herein, to which the Respondents are bound.

---

[2] This case is similar to, although not identical to, cases involving suspected terrorists in which the technique known as "rendering" (FBI terminology) *aka* "rendition" (CIA terminology) is used by the U.S. government; wherein U.S. officials or agents of the United States remove a subject from, or place a subject in, the custody of a foreign government for the purposes of avoiding *due process* and circumventing the United States Constitution and associated protections for U.S. citizens and foreign nationals by removing or holding the subject outside the territories of the U.S. in an attempt to avoid jurisdiction by U.S. federal courts.

- 4 -

8.    This Petition is also for violations of the *Afghan Criminal Code for Courts*, the *Afghan Penal Code*, and the *Status of Forces Agreement* between the United States and Afghanistan. It should be noted that although no formal Status of Forces Agreement (SOFA) exists by that name, and the U.S. has denied the existence of a SOFA to international monitoring organizations, such as the Red Cross, an agreement does exist relative to U.S. combatants in Afghanistan, which includes U.S. citizens operating with resistance forces such as Commander Ahmad Shah Massoud's United Front Military Forces (more popularly known as the "Northern Alliance" or "N.A.").[3] It is this agreement, signed in September, October, and updated in November 2001, in Khoja-Bahaudeen, and the Panshir, to which this Petition refers to as the "Letter of Agreement" awarding status to military, para-military, and civilian forces operating against the Taliban and al-Qaida terrorists. That agreement will not be explained in detail because it remains a classified document under U.S. law. However, because the violations of Afghan law are being orchestrated and directed by the Respondents, a right to habeas corpus relief attaches because it is Respondents who are effectuating these violations.

9.    Violations of the Afghan Criminal Code are also included because President Karzai assured the United States his government would abide by those laws in order to obtain financial support from the U.S. and international community (*i.e.:* Italy). Based on those assurances by President Karzai, which the United States relied upon, Afghanistan obtained financial support and U.S. tax dollars for reconstruction, security, and equipment. As one minor example of this– U.S. taxpayers provided the handcuffs and training which were used to torture Petitioners, at the direction of Respondents.

---

[3] The United Front Military Forces, *aka* the N.A., was commanded by Commander Ahmad Shah Massoud, under the political leadership of President Rabanni. This was acknowledged as the rightful and legal government during the time of the Taliban, and operated in exile, holding out in North Eastern Afghanistan and maintaining control of roughly 15% of the country. The NA maintained Embassies in Washington, Dushanbe, Tashkent, Delhi, and London, among other places. The NA was fully recognized by the United Nations and the United States as a legitimate government and resistance force against the Soviets, Hekmatyar, and later the Taliban. Therefore, because all Task Force Saber/7 members were officially attached to the NA, and Major Amin and Lieutenant Banderas were commissioned serving officers in the NA, it is clear that they have full Geneva Conventions POW status.

- 5 -

## PETITIONERS

10.  J. K. Idema ("Jack Idema"), a North Carolina resident, is a former member of
the U.S. Army Special Forces and is a Green Beret.  He has operated for the U.S.
government, and trained foreign counter-terrorist forces, in Nicaragua against the
Sandinistas, in El Salvador with the Ramon Bellosa Immediate Reaction Battalion
against the FMLN terrorists, in East Germany and Europe against the Bader Meinhoff
Gang, in Thailand with the Thai Special Warfare Command, in Haiti protecting the U.S.
Mission against dissidents, in the Middle East against Hezbollah, Hamas, and Abu Nidal
terrorists, in Lithuania against the OMON terrorists, and numerous other operational
areas.  His Special Operations and Special Forces background includes more than two
dozen Special Forces, Special Operations, police, counter-terrorist, and classified
courses and schools.  He is an expert in counter-terrorism, intelligence asset
development, and hostage-rescue, with more than 25 years experience in those areas.  He
is currently employed by the Counter-Terrorist Group U.S. (Counterr Group) as a CT
Operator in a direct action capacity against international terrorism, specifically al-Qaida
and related terrorist groups and operates with the UFMF at the rank of Commander.

11.  Brent Bennett ("Bennett"), a California resident, is a former member of the
U.S. Army 82nd Airborne Division.  Bennett is an Airborne Forward Observer who
specializes in Forward Air Control (FAC), and is a Forward Infantry Surveillance Team
(FIST) operator.  His Special Operations cross-training in the U.S. Army Airborne
includes combat medic, unit armorer, and Ranger tactics.  He is employed by the
Counter-Terrorist Group U.S. (Counterr Group) as a CT (counter-terrorism) operator in a
direct action capacity against al-Qaida and related terrorist groups at the rank of Captain.

12.  Edward Caraballo ("Caraballo"), a New York resident, is a four-time Emmy
Award winning investigative journalist, with a background spanning twenty-five years in
news reporting and documentary production having worked for CNN, CBS, NBC, ABC,
HBO, BBC, CBC, UPN, and others.  Caraballo is currently the Chief Executive Officer

of Caraballo Video, Inc. and was with co-Petitioners in Afghanistan as an embedded journalist, after providing a written request for assistance to the U.S. Department of Defense and after having received their assistance with his travel authorization.

13.   Zorro Rasuli Banderas ("Rasuli"), an Afghan national, is an interpreter for the Afghan Ministry of Defence employed by the 7th Corps Commander, Lieutenant General Atta Mohammed. Rasuli is an experienced CT operator who was attached to and trained by French Military Special Operations during the 2001-2002 conflict. Rasuli was later assigned to the Counter-Terrorist Group as an interpreter, liaison, and aide to Jack Idema, by the 7th Corps Commander, on loan at the rank of First Lieutenant. He also holds a classified position that can be related to the Court *in camera.*

## OTHER PARTIES RELATED TO THE PETITIONERS

14.   Ezmerai Amin, an Afghan national, is a commissioned officer in the Afghan Ministry of Defence, currently holding the rank of Major and commander of the Communications Battalion of the 1st Base of the Panshir. During the 2001-2002 conflict he was officially assigned to the Counter-Terrorist Group as a close protection officer for Jack Idema. He is currently operating with Counterr Group at the rank of Major.

15.   John Does 1 through 12, are all either commissioned field grade senior officers in the Afghanistan Ministry of Defence or Northern Alliance Security Services or are Special Forces qualified US citizens. All are longtime members of the Counter-Terrorist Group and were assigned to the Counterr Group Task Force operating in Afghanistan, starting in 2001, by the Afghan Ministry of Interior, Ministry of Defence, and Secret Service (*Amniat*). Their names are being withheld for security reasons because they continue to operate in a covert counter-terrorist role. John Does 1-12 are all engaged in activities against al-Qaida and their related terrorist organizations.

16.   The Counter-Terrorist Group U.S., also known as Counterr Group, is an organization based in the United States which engages in counter-terrorism activities in

- 7 -

support of U.S. government initiatives. Counterr Group conducts; training, organization, direct action, HUMINT,[4] and advisory services to foreign and domestic government agencies. Counterr Group has been in operation, in various forms, and in various countries, for approximately 27 years. Counterr Group began deploying personnel to Afghanistan and other countries weeks after 9/11 as part of the effort to combat Osama bin Laden, al-Qaida, and other terrorist forces such as the Taliban. Counterr Group's foreign operating group and CONUS[4] personnel worked in conjunction with Commander Massoud's Northern Alliance which were primarily responsible for the liberation of Afghanistan with U.S. Army Special Forces and Special Operations units.

## RESPONDENTS

17.   Condoleezza Rice is the United States Secretary of State and most senior official of the United States Department of State. Her offices are in Washington, DC, and she exercises complete control over the actions of the DOS employees and officials outlined herein.

18.   Zalmay Khalilzad is the United States Ambassador to Afghanistan. Ambassador Khalilzad personally directed certain liberty restraints herein, such as the denial of mail between the Petitioners and their families, the denial of the right to attorney/client privileged communication, and the destruction of evidence and mail. Furthermore, Khalilzad, through his agents, Sandra Ingram, and Russel Brown, concealed the torture of Petitioners, engaged in the denial of *due process*, and authorized the illegal searches and seizures of US mail and evidence from Petitioners.

19.   Robert S. Mueller is the Director of the FBI, in Washington, DC. Director Mueller has directly, and is directly, violating Petitioners' constitutional rights through the intentional withholding of exculpatory evidence which Petitioners need to defend themselves in the Afghanistan Court of Appeals,[5] International Courts, and before a

---

[4] HUMINT – Human Intelligence; information from human assets; CONUS - Continental United States.
[5] The Afghan Court of Appeals overturned Petitioners' original conviction and ordered a trial *de novo*.

- 8 -

Geneva Convention Tribunal. Further, Mueller is the person ultimately responsible for the rendering of Petitioners, and through that rendering, Petitioners' cruel and unusual punishment, which includes; torture, aggressive interrogation, and seven assassination attempts on Petitioners by al-Qaida terrorists, as recently as February 18, 2005.

## OTHER PARTIES RELATED TO THE RESPONDENTS

20.    The Islamic State of Afghanistan is a foreign sovereign nation which, upon the liberation of Afghanistan in 2001 and 2002, returned from exile and became the Interim Government of Afghanistan, it has, and is undergoing, transitional changes and is also known as the Transitional Government of Afghanistan; and now operates under the laws of the Republic of Afghanistan, originally adopted in 1976. The Afghanistan government entities are hereafter collectively referred to as the "Afghan government."

21.    The Islamic Transitional Government of Afghanistan is the interim name of the current Afghan government. Like the other names and former names, the Afghan government entities are hereafter collectively referred to as "the Afghan Government."

22.    The Afghanistan National Directorate of Security (hereafter "NDS") is the Afghan Government's security service, also known as *"Amniat"* ("Security" in the Dari language) and is also referred to as the National Security Directorate (NSD). NDS is similar to a hybrid of the American CIA and FBI, although it was based on and formed by the KGB during the Soviet occupation of Afghanistan. The NDS not only employs the KGB's arcane tactics and brutal methods, but carries a version of the KGB logo signifying the oppression and total control of a plunging dagger. The NDS is an official agency of the Afghan Government which works directly for the President of Afghanistan, although, in reality, it is now funded, advised, and overseen by the U.S. Department of Justice, the U.S. FBI, and in part, other agencies.

23.    Hamid Karzai was the Interim President of Afghanistan, appointed by the Bonn Conference on December 5, 2001, and inaugurated on December 22, 2001. On December 7, 2004, he became the formal president of Afghanistan. Hamid Karzai

- 9 -

(hereafter "Karzai" or "President Karzai") is a citizen and resident of the United States,[6] in either Virginia or Maryland, and holds dual citizenship in Afghanistan.

24.  Amrullah Saleh (hereafter "Amrullah") is the chief of NDS, headquartered in Kabul. He was appointed by Hamid Karzai to replace the former Northern Alliance Chief of NDS, Engineer Araf. Amrullah is responsible for all NDS employees and the operation of the NDS prison and interrogation facilities. Amrullah was formerly an interpreter for the U.S. government, and is believed to have been appointed at the direct request of the FBI, and is believed to be a U.S. citizen.

25.  Abdul Baset Bakhtyari (hereafter "Bakhtyari") is currently an official with the Afghan Government acting as a lower court judge in the National Directorate of Security in Kabul. He is a citizen of Afghanistan and is a former Taliban official. It is now known that Bakhtyari was a Taliban Judge during their terrorist reign and was well known for imposing a wide variety of barbaric sentences. It is widely known that Bakhtyari solicits bribes from defendants in his court, and in fact, directly solicited bribes from Major Ezmerai, Lieutenant Rasuli, and two others involved in Respondents' case. Bakhtyari is currently an agent of the U.S. government acting under the direction of the FBI, and is believed to receive compensation from the United States government.

26.  Mohammed Nahim Dawari (hereafter "Dawari") is a citizen of Afghanistan, and is currently a prosecutor in the National Directorate of Security. Dawari was also a former member of the Taliban. Dawari is an agent of the U.S. government acting under the direction of the FBI.

27.  Mohammad Sidiq (hereafter "Sidiq") is a citizen of Afghanistan, and is currently a religious punishment judge in the Afghan Government. Mawlawi[7]

---

[6] Contrary to official and unofficial reports, Hamid Karzai has NOT given up his US citizenship and has retained both citizenship and a US passport in a secret agreement with the U.S. Department of State.
[7] Mawlawi is an honorific title given to high religious leaders. As an example, a Mawlawi is far above a Mullah in both status and power in Afghanistan. Mullahs and Mawlawis gained infamous notoriety during the Taliban reign for their sponsorship of terrorism and recruitment of terrorists and Taliban fighters in Pakistan Madasras. In February 2005, the Appeals Court of Afghanistan stripped Sidiq of his Mawlawi title after reviewing evidence of his links with terrorism and Gulbideen Hekmatyar.

- 10 -

Mohammed Sidiq was a high-ranking member of the Taliban. Sidiq is also a terrorist who has known ties to Gulbideen Hekmatyar (on the U.S. Wanted Terrorist List), meets with Hekmatyar frequently, and is in charge of recruiting members for the Hezb-i-Islami Party, a known terrorist organization with a bloody history.[8] Prior to the Taliban takeover, Sidiq spent approximately ten years in an Afghan prison for subversive activities against the pre-Taliban government. He was released by Mullah Omar (also on the U.S. most wanted terrorist list). Both of Sidiq's brothers, "Malikyar" and "Asarulhaq," are also known terrorists working with Hekmatyar and Osama bin Laden. These two brothers were high-ranking members of the Taliban and are currently members of the Taliban resistance. Sidiq and his two brothers were all appointed to government positions in the new Afghan Government by President Karzai.

28.  Mudafea is an investigator and interrogator for the NDS. He is responsible for investigations and oversees torture and interrogation for Amrullah and Karzai. Mudafea is an agent of the U.S. government who specifically acted under the direction of the FBI.

29.  Ten Unnamed Agents of the Afghan Government and Respondents are unidentified by name. Upon information and belief, at least four of these "Agents" are American citizens, possibly five, and are employed by the FBI. The others are believed to be Afghan Nationals who either engaged in or aided the conduct outlined herein and conspired to conceal acts of terror against American and Afghan citizens. These Ten Unnamed Agents personally engaged in the acts identified herein against Petitioners and carried out directives by the Respondents to violate the human rights and liberty interests of Petitioners. They are referred to hereafter as either "NDS Agents" or "agents," 1-10.

---

[8] *See:* HOLY WAR, INC., Author: Peter L. Bergen, *Weidenfeld & Nicolson*, ©2001, London; page #s 75-82, 180; Hekmatyar "slaughtered thirty-six men under the command of [ ] Massoud in north-eastern Afghanistan in July 1989...Hekmatyar would kill thousands of civilians in Kabul during his daily rocket attacks on the city..." In fact, the State Department listed him as a most wanted terrorist in February 2002, and has asserted that Hekmatyar killed more than 20,000 civilians during his terror attacks.

- 11 -

## ISSUES UNDER CONSIDERATION

I.    Whether a Petition filed pursuant to 28 United States Code § 2241 is the
proper procedural vehicle for the relief Petitioners request.

II.    Whether the Southern District of New York is the proper jurisdiction due to
the Petitioners' current incarceration in the Islamic State of Afghanistan.

III.    Whether Respondents are engaging in the illegal rendering of Petitioners
to violate their constitutional rights and for the explicit purpose of denying
Petitioners *due process* protections and subjecting them to continued false
imprisonment by Respondents' proxies.

IV.    Whether, as a result of Respondents' actions, Petitioners have been, and are being,
denied vital liberty interests; such as the right to be free from illegal search and
seizure.  And, whether Respondents have intentionally, maliciously, and
knowingly violated Petitioners' constitutional rights by: withholding exculpatory
evidence, illegal confiscation and/or destruction of exculpatory evidence,
engaging in denial of *due process*, obstruction of justice, and abuse of process.

V.    Whether Respondents are engaging in the denial of fundamental liberty
interests by denying, restricting, searching, and seizing personal
correspondence, and attorney/client privileged correspondence, with the
intention of denying liberty rights and *due process* to Petitioners.

VI.    Whether Respondents' decisions, actions, and intentionally false statements
to a foreign court were arbitrary and did not comport with the Petitioners'
*due process* and constitutional rights.

VII.    Whether Respondents' acts in obstructing mail, confiscating and copying mail,
refusing to send mail, and refusing to respond to letters and requests by Petitioners
is in fact an intended, arbitrary and capricious obstruction for the sole purpose of
denying Petitioners *due process* and other protections of the U.S. Constitution,
including subjecting Petitioners to cruel and unusual punishment.

- 12 -

## STATEMENT OF THE CASE

As a matter of introduction, Petitioners respectfully submit that the events which transpired, and are ongoing, constitute of denial of the Petitioners' *Due Process* rights, and 1st, 4th, 5th, 6th, 8th & 14th Amendments to the United States Constitution. In short, understanding that a Habeas Corpus Petition is usually required to be pled against the warden of a prison, Petitioners submit that it is the Respondents, NOT the actual custodial supervisors that have imposed the liberty restraints alleged herein and denied constitutional protections to the Petitioners. In fact, the prison warden, the chief of prisons, the Minister of Justice, and even the Afghan Appeals Court are not imposing **any** liberty restrictions upon Petitioners, and would release Petitioners immediately if it were not for the direct orders of the Respondents to retain Petitioners in custody.

The courts have found that "[f]or purposes of petition for habeas corpus, the prisoner's "custodian" is the individual making the decision to keep the petitioner in custody." *See*: *Procacci v. Sigler*, D.C.D.C. 1973, 61 F.R.D. 5. Another case which is similar to the situation in the instant case is *Dunn v. U.S. Parole Com'n*, C.A. 10 (Kan.) 1987, 818 F.2d 742, in which that court stated; for "purposes of challenge to parole decision, the Parole Commission could be considered, under the circumstances of the case, [as] prisoner's "custodian." Thus, the district court had subject matter jurisdiction over prisoner's habeas corpus petition challenging decision of the Commission, even though warden was not named in the petition; "the commission, rather than the warden, **directly controlled** whether petitioner remained in custody," [emp. added], declining to follow *Billiteri v. United States Bd. Of Parole*, 541 F.2d 938 (2d Cir.).

In this case, like *Dunn, supra*, it is NOT the warden who is restricting liberties or release of Petitioners. It is the Respondents. Therefore, the named Respondents are the correct parties for this petition. Three Respondents are named out of an abundance of caution, because the three Respondents are in effect, operating in concert and jointly making the decisions adverse to Petitioners' liberty interests.

- 13 -

# FACTS OF THE CASE

1.      In 2004, the combatant Petitioners assisted in, participated in, or independently conducted military operations known as OPERATION RUBICON, OPERATION MONK, OPERATION ROADRUNNER, OPERATION ACME, and assisted U.S. and NATO Forces in OPERATION ENDURING FREEDOM. Petitioners were part of TASK FORCE SABER and TASK FORCE 7 implemented by Counterr Group between September 12, 2001 and July 2004. These two activities, hereafter referred to collectively as "Task Force Saber/7," conducted military and humanitarian operations in support of the U.S. and Coalition War on Terror and ongoing efforts to continue the liberation of Afghanistan and permanently defeat the Taliban and al-Qaida terrorist forces waging a guerilla war and resurgence in Afghanistan.

2.      Prior to 2004, TASK FORCE SABER personnel had participated in numerous other operations starting in October 2001. These operations included combat advisor and combat medic operations in OPERATION ANACONDA in March 2002, and humanitarian assistance and rescue operations during the 2002 Nahrin earthquake disaster and other similar crises. All of these activities were officially as part of, or attached to, the Northern Alliance Anti-Taliban Forces and the United Front.

3.      During these operations Task Force Saber/7 personnel and several of the Petitioners were repeatedly commended for their actions by U.S. forces such as Task Force 180, high-ranking members of both the Northern Alliance and the Afghan government, including numerous cabinet level Ministers, National Security Council members, Vice-President Kareem Khalili, and even President Karzai himself.

4.      During November and December 2003, Counterr Group developed intelligence identifying al-Qaida threats to U.S. citizens and American diplomats. By February 2004 Counterr Group had identified two distinct terrorist cells. Once again, Counterr Group delivered significant actionable intelligence on al-Qaida terrorists to the U.S. DOD, DIA, CIA, NSA, and FBI. These exchanges and intel reports occurred on a

- 14 -

regular basis between December 2003 and April 2004, prior to Task Force Saber/7 returning to Afghanistan. This Human Intelligence (HUMINT) included; a) the location of Osama bin Laden, b) the location and satellite phone numbers of Ayman al-Zawahiri, c) information regarding al-Qaida operatives in both the United States and Afghanistan, including probable American targets, and d) classified information on al-Qaida and other associated terrorist groups.

5.     In February and March 2004, the FBI, through their Washington, D.C. Headquarters and CT Watch Command (Counter-Terrorism Watch- a supposed clearing house for terrorist information), made concerted efforts to co-opt Counterr Group intelligence assets inside al-Qaida. Co-opting an asset refers to one agency attempting to seize total control and operational direction over another organization's human intelligence source. Counterr Group resisted FBI efforts to co-opt their assets and refused to release their identities. However, Counterr Group continued to pass actionable intelligence to the DOD, DIA, and NSA. The FBI then sought to discredit Counterr Group's assets and intelligence, and coerce Counterr Group officers and their families with a wide-range of threats.

6.     Between April 2004 and July 2004, Petitioners interdicted and captured numerous terrorists in Afghanistan. While some were turned over to U.S. military forces and Afghan Ministry of Defence forces, others were in custody and awaiting transfer to the U.S. military's TASK FORCE 180 (JTF-180), the U.S. Defense Intelligence Agency, and other classified activities in Afghanistan. Petitioners were working with and briefing the U.S. Department of Defense and the Afghan Ministry of Defense on a daily basis, sometimes an hourly basis. Furthermore, Afghan government employees, such as Lieutenant Rasuli, were always operating with Task Force Saber/7 twenty-four hours a day, as were John Does 1-12.

7.     Petitioners were also working on a regular basis with the International Security Assistance Force (ISAF), the Afghan Security Service (NDS), the National Police, the Corps Commanders of the Ministry of Defense (10 General Officers

- 15 -

responsible for the corps commands throughout the country), commanders of the United Front Military Forces, various Ministries at the cabinet level, and even the Afghan Presidential Protective Detail was involved in the operation. These relationships had been ongoing for almost three years, as had the exiled Afghan government's relationship with Counterr Group prior to the liberation of Afghanistan.

8.      Counterr Group also continued their work with the Pentagon and DIA. All of Counterr Group's activities were done with the full knowledge and assistance of the Afghan MOD military forces, Afghan National Security Council, and coalition forces.

9.      These captured terrorists were working with and/or for; Osama bin Laden, al-Qaida, Gulbideen Hekmatyar, Hezb-i-Islami, and the Taliban. Specifically, these terrorists had participated in, supported, and/or personally conducted terrorist bomb attacks against foreign and domestic persons in Afghanistan.

10.      A prime target of these terrorists was U.S. military forces at Bagram Airbase north of Kabul in Afghanistan. In fact, the American FBI later confirmed Task Force Saber/7's intelligence reports that several of the terrorists were going to drive fuel trucks into Bagram and explode them into U.S. military barracks in a terrorist bomb attack similar to the bombing of the U.S. Marine Barracks in Beirut in 1983 in which 244 U.S. Marines were killed. Using a rare incendiary explosive to detonate fuel tanks on the gas trucks entering Bagram daily, and taxis, **the terrorists expected to kill more than 500 American soldiers,** two ministers, and two ambassadors in at least five separate coordinated attacks. These same terrorists had already made at least one attempt on the Defence Minister, and two failed attempts on the 3rd Corps commander, General Attiquallah Lodeen, a close friend and trusted ally of the United States and a candidate for Parliament.

11.      Furthermore, several of the captured terrorists were directly involved in the killing of Canadian Lance Corporal Jamie Murphy on January 27, 2004 in Kabul, the killing and wounding of election and aid workers in Nangahar and other provinces in Afghanistan, the attack of NATO ISAF forces in Kabul, and were currently planning and

- 16 -

coordinating the assassinations of several of Karzai's key political opponents in the *Jamiat* Party, including his Minister of Defense, Minister of Education, several Corps Commanders (former Northern Alliance Generals), and at least two Afghan Ambassadors (in Delhi and London) who supported the U.S. War on Terror. The Minister of Education, Yunis Qanooni, was the lead opponent to Karzai in Afghanistan's new election under the Bonn Agreement, and was a prime target of the terrorists, along with Marshall Fahim, the Minister of Defence, and General Rashid Dostum.

12.    All of the terrorists had been arrested by Task Force Saber/7 with either actual explosives, detonators, bomb parts, and/or bomb plans in their possession, as well as documents and correspondence proving their links and association with the Taliban, Hezb-i-Islami, and al-Qaida, including handwritten maps and diagrams of a past bomb attack on General Lodeen, a *Shabnama*[9] "night letter" calling for a *jihad* against Americans authored by none other than Mullah Omar himself, and in the case of a terrorist named Ghulamsaki a coded Red Cross letter from his brother (Mohammed Asef), an al-Qaida detainee in Cuba. Additionally, one of the terrorist's taxis tested positive for explosives by German ISAF bomb teams. The physical evidence against the terrorists was irrefutable, conclusive, and backed-up by incriminating videotaped statements, undercover surveillance, informants, and extraordinary physical evidence.

13.    On July 5th, 2004, the individual Petitioners were arrested by forces under the control the FBI, and with the assistance of Karzai forces in opposition to the former Northern Alliance and the interim government's Ministry of Defense. This was, upon information and belief, orchestrated by Taliban and Hezb-i-Islami forces loyal to Mullah Omar and Gulbideen Hekmatyar, with the knowledge and approval of then Interim President Hamid Karzai. Upon information and belief, the purpose of this was to prevent a high level Hezb-i-Islami terrorist (Sidiq) from being transferred to permanent U.S. military custody and exposing the depth and breadth of the high level plot. In

---

[9] *See:* TASK FORCE DAGGER–*The Hunt For Bin Laden*, Author Jack Idema, McMillian Publishing, © 2003, and THE HUNT FOR BIN LADEN, Co-Author: Jack Idema, Random House, © 2002, page #272-273.

MAR-28-2005  12:52                    2026474502                    96%                    P.23

return, Karzai would receive full support and votes from Hekmatyar controlled areas such as the Konar Province (he later did).

14. In spite of press reports to the contrary, Petitioners' arrest was peaceful and without active employment of arms. Each of the seven named Petitioners arrested were told they were not being arrested, and only that the "commander" (Idema) was being requested directly by President Karzai to meet "informally with the American FBI." Caraballo recorded the activities on tape. In fact, he specifically asked if anyone was being arrested and was told, "don't even talk that way, of course not. The FBI just wants to have a meeting with you" (Un-named Agent 1). The Task Force Saber/7 combatants were told to leave their assault weapons by their commander, Idema, taking only pistols.

15. Upon arriving at NDS for "the meeting," the combatant Petitioners were surrounded and forced to surrender,[10] then handcuffed in the courtyard, as were the non-combatants, and the journalist, Ed Caraballo. Five other Task Force Saber/7 combatants, all commissioned officers in the Ministry of Defence, had avoided detainment, as did seven other personnel not present that day (John Does 1-12).

16. Shortly after the arrest of Petitioners ("Petitioners" refers herein collectively to the individual Petitioners) they were subjected to varying degrees of torture and interrogation, apparently determined by rank. Jack Idema was repeatedly beaten by, and in the presence of Amrullah at NDS Headquarters, as was Lieutenant Rasuli. Upon information and belief, a palace official was personally aware of and authorizing, at a minimum, Idema's initial torture at NDS Headquarters by Amrullah, with FBI agents in close proximity and directing the interrogation (Un-named Agents 2 & 3).

17. During the following days and nights Idema was tortured with boiling water, starvation, threats of death, and assault with various implements (such as wire cables and rubber whips), resulting in broken ribs, a separated sternum, torn rotator cuffs, hemorrhaged eyes, multiple concussions, lacerations, contusions, and bruises. Although

---

[10] This constituted the first violation of the *Protocols to the Geneva Conventions of 12 August 1949*, Protocol 1, Article 37 – Prohibition of perfidy.

- 18 -

the U.S. Embassy later had medical reports indicating the extent of the torture, Sandra Ingram, Assistant U.S. Consul DOS Kabul, ordered the reports rewritten to tone down the extent of the injuries.  During the torture, Idema was restrained by Taliban iron leg bars and American Handcuff Company restraints (Serial Number # 177709) supplied, upon information and belief, by the U.S. Department of Justice.  Further, it is alleged that FBI personnel were well aware of the ongoing torture and did nothing to intercede or stop it, and actually encouraged it.

18.    Major Ezmerai was beaten, threatened with death, and repeatedly electrocuted during interrogation.  Lieutenant Rasuli was repeatedly beaten until bleeding and semi-conscious.  Sahibi, a young non-combatant, was initially beaten just after the arrest until Idema interceded.  Another non-combatant, Ahmadi, was threatened with death, as were Bennett and Caraballo who were not originally tortured during the initial interrogation phase because NDS thought they were both journalists.

19.    Karzai, Amrullah, Dawari, Mudafea, the Ten Unnamed Agents, and others, both known and unknown, either knew about, authorized, and/or personally (such as Amrullah and Mudafea) conducted interrogations and violent torture on a repeated basis.  Based on conversations with FBI Agents (Un-named Agents 4 & 5), Respondent Robert Mueller was personally informed of this ongoing torture by the two un-named FBI agents.  Petitioners' screams during the torture sessions could be heard throughout NDS Headquarters and into the streets of Kabul night after night.  Although two of the Respondents, Mueller and Khalilzad were aware of the ongoing torture, neither of these Respondents acted in any way to stop the torture of Petitioners during this time.  More than a month later the beatings of Idema stopped because it was feared the marks would be shown in Court, and to the press.

20.    Subsequent torture after the "interrogation phase" included beatings, 24 hour a day restraints, *falaca*,[11] whipping, threats of execution, attempted rape, beatings with

---

[11] The beating of the soles of the feet with a triangular wooden stick while kneeling and restrained.

sticks[12] even while Petitioners were using bathrooms or naked taking baths (time between baths could be anywhere between 20 and 30 days– Bennett was only allowed one bath a month, while Muslim al-Qaida and Taliban prisoners were allowed baths two or three times per week), threats with knives to cut off eyes, noses, and lips for refusal to pray and accept the Muslim religion ("convert" for the American Petitioners), and even the use of scorpions on strings as a form of torture. This particular "torture art form" was referred to as *"Daancé hamrai Gazhdoom" – Dance with the Scorpion.*

21.    In most instances threats and torture were used to extract confessions or false information, or statements against co-defendants, was occasionally for enjoyment, and often later in the case of Idema, Bennett, and Caraballo, to coerce them into praying to Allah. Much of this torture was conducted by "former" Taliban officials and/or "former" Taliban members employed by NDS and at the direct orders of Amrullah, Dawari, Mudafea, and/or other deputies and officials under President Karzai, including the Ten Unnamed Agents, and with the knowledge of Respondent Mueller.

22.    The general conditions at the NDS facility were exceptionally brutal. Amrullah's personal house of horrors, funded by U.S. tax dollars was at the beck and call of President Karzai and the FBI exclusively. U.S. military and CIA forces were rarely, if ever, allowed entry, and then only on a highly restricted basis and to an extremely limited area– one room for meetings. This was the FBI's exclusive club and private Abu Ghraib. Director Mueller, and his agents, used, and still use, the NDS *Saderat* facility to engage in the rendering of terror suspects and American citizens in order to employ illegal aggressive interrogation techniques—such as electrocution, stick beatings, boiling water, and illegal drug use.

23.    At the direction of Amrullah, and other Respondents, torture at NDS still continues on a daily basis. Some prisoners are placed in special solitary cells to recover from signs of torture. Some are brought milk and olive oil daily by the prosecutors to

---

[12] The sticks used were approx. six-foot long and four-inch diameter and used to plunge toilet troughs.

speed their recovery and heal bruises when outside or family inquiries are made as to their whereabouts. One example of this is Haji Daoud Zalmia from Maidanshar, one of Petitioners' cellmates who barely survived Amrullah's bloody torture sessions. Other prisoners, with gruesome cigarette burn scars or electrical burns are threatened with execution if they show their injuries to the Red Cross. Major Ezmerai was threatened with death and the arrest of his family if he showed his electrical burns during Petitioners' court appearances because there were dozens of reporters and cameramen present. Others are threatened with execution if they show their injuries (cigarette burns, bruises, lacerations, electrical burns, etc.) to Red Cross visitors. Recently, after the Red Cross was finally allowed monthly visits, severely tortured prisoners would be transferred back to the secret NDS basement torture chamber in another building just prior to a Red Cross visit.[13] Prisoners who die as the result of torture are secretly removed at night under cover of darkness by placing their bodies in the back of Amrullah's Land Cruisers and taking them to an undisclosed location "for disposal."

24.    Petitioners were eventually charged with various crimes under Afghan law, to include secretly entering the country illegally and with false Indian passports (Idema, Bennett, and Caraballo), running a private and/or illegal jail, and torture. It should be noted that; a) the three Americans held valid U.S. passports, entered the country legally, have never had Indian passports, and were issued visas at the written request of the Department of Defense; b) they maintained a "safe house" for transfer of captured terrorists with full knowledge of Afghan and U.S. government officials; and, c) ironically, they were falsely accused of using the very same torture tactics that NDS had in fact used on Petitioners and continues to use on most persons in NDS custody. In other words, NDS, acting on behalf of the FBI, used their **own** experience with torture and coercion tactics to draft **their** false accusations against Petitioners.

---

[13] The United Nations has never been allowed to inspect NDS *Saderat* and the Red Cross is severely restricted and has admitted that the FBI and Afghan NDS limit access only to those areas where violations cannot be documented.

25.    During the first 12 weeks of NDS torture and custody, Petitioners were separated from all contact with other Petitioners, fed just enough rice and bread to survive, and interrogated and on a regular basis.  They were kept in 7'x 9' cells where they lived with an average of six or more al-Qaida and/or Taliban terrorists in their cells. They were forced to sit or lay on a concrete floor under 24 hour lights to ensure sleep deprivation as a form of punishment and torture, not interrogation.  The non-Muslim Petitioners were not allowed to have mattresses or visits.  In the case of Lieutenant Rasuli, because he was Idema's interpreter, he was kept in leg chains and leg bars 24 hours a day, 7 days a week.

26.    U.S. Embassy Consular Officer Sandra Ingram[14] was keenly aware of this treatment, and had personal knowledge of the ongoing torture having eye witnessed Idema's hemorrhaged eyes, facial lacerations, burns, and bruises.  However, in spite of that evidence, and Ingram's observation that Petitioners were losing considerable weight weekly and exhibiting increasingly evident physical deterioration and injuries, Ingram took the public position that the Petitioners were "doing fine," were "well-treated," and were in "good shape," even announcing this to their families and the press.

27.    Furthermore, although Caraballo notified Ingram that he was being threatened daily, including being "set on fire" in his sleep, Ingram did nothing.  Ingram refused to provide food to Petitioners in spite of a State Department circular[15] stating the US Consul would provide food and water to supplements.  Additionally, Caraballo implored Ingram to request NDS remove him from an al-Qaida cell to one with another American, and begged Ingram for medical attention for his injured feet.  Ingram waited for more than a week before sending a doctor, later forcing his family to pay for the visits.  Further, Ingram refused to provide even aspirin, forcing all Petitioners to hire a doctor to prescribe aspirin, even though their money had been confiscated by the NDS.

28.    Idema, as commander of the group, and in accordance with the *Geneva*

---

[14] Ingram is an employee of Respondents Khalilzad and Rice, and acts at their direction.
[15] *See:* Assistance to US Citizens Arrested Abroad; http://travel.state.gov/travel/arrest.html

- 22 -

*Conventions of 1949*, asserted Prisoner of War status for all seven individuals to Ingram on or about July 11, 2004. Ingram not only refused to acknowledge Idema's assertion, she refused to pass Petitioner's request on to the appropriate authorities, and refused to provide Petitioners with a copy of the Geneva Conventions as required by law. Idema also asserted Petitioners' POW status and right to protection to NDS, the FBI, and various Karzai officials. During a subsequent visit by Ingram, Idema put his request in writing and demanded she make an entry in her Embassy notebook (Ingram refused to sign a receipt for Idema's POW protected status request). Further, Ingram refused to forward this request to the Red Cross,[16] stating her DOS bosses "ordered" her not to.

29.    On or about this time, NDS, acting with agents of the FBI, and possibly Ingram herself, removed Bennett's and Idema's dog tags, removed the Petitioners' Geneva Convention Identity Cards, and removed Idema and Bennett's U.S. passports. The FBI also removed crucial exculpatory evidence from NDS headquarters; including approximately 50 rolls of 35mm film, 200 videotapes, and 500 documents, many of which were official documents which were evidence of actual innocence. Although the FBI later returned some videotapes in August 2004, it was during the trial and much too late for the defense to adequately examine and use. Furthermore, much of the evidence originally in NDS custody, and then taken by the FBI, was never returned and was missing. Specifically, any documents or evidence linking the Petitioners to the U.S. government and Afghan government were destroyed, or, in the case of videos, erased. As one example, a taped conversation between a high-ranking Pentagon civilian[17] official, Heather Anderson, was completely erased from the tapes. Another example is the actual arrest tape, which showed covert FBI agents and contained the entire exchange between Un-named Agent 1, stating the FBI simply wanted a meeting, and that the

---

[16] *"The Red Cross is the Guardian of the Geneva Convention..."* Comments of M. Cherif BASSIOUNI; Independent Expert of the Commission on Human Rights On the Situation of Human Rights in Afghanistan Office of the High Commissioner for Human Rights - UNOG-OHCHR, to Jack Idema and his men in January 2005, discussing the UN recognition of their POW status.
[17] Anderson is a "flag equivalent" civilian, meaning she holds general officer status as a civilian.

- 23 -

Afghan government was NOT involved and had NO problems with the group.

30.     As of the final trial and conviction date of September 15, 2004, no understandable, or English version of the criminal charges against the American Petitioners, or any translated indictment, was ever given to Petitioners as required by Afghan and International Law, and as required under the *Geneva Conventions*.  Still, numerous hearings (closed-door sessions were held when bruises or abrasions were noticeable on a Petitioner's face) and trials were held with no regard for international law.  All of the hearings and "trials" extensively violated the *International Covenant on Civil and Political Rights* (Article 14); the *Geneva Conventions* (Articles 71, 72, *et seq.*), the *Afghan Interim Government Criminal Code* (Violations of Articles 4(1), 5(4), 5(5), 5(6), 5(7), 15, 16, 18, 19, 20, 23(3), 31(1), 32(3), 38, 39(6), 43, 49, 50, 51, 52, 53, 55, and 58), and the *Geneva Convention on Human Rights*, all of which were legally adopted by the government of Afghanistan and to which Hamid Karzai and the Respondents were legally bound.  Furthermore, the arrest and prosecution of Petitioners violated the 2001 "Letter of Agreement."

31.     The parties were bound by these prior agreements and although Respondents deny Petitioners' right to POW status, the incarcerated Petitioners are POWs under the *1949 Geneva Conventions* considering the facts of the case; A) **Idema, Bennett, Rasuli, and Ezmerai[18] are Combatant Prisoners of War under the following circumstances and criteria;** 1) each were employed by the Counter-Terrorist Group, 2) each carried their arms openly, 3) each was responsible and subordinate to a commander, 4) the team operated in Afghanistan between October 2001 and July 2004, and was part of the liberation forces during the start of hostilities, 5) each man wore a distinctive uniform and recognizable insignia, 6) each man operated according to the laws and customs of war and abided by the Geneva Conventions, 7) each man carried a Geneva Convention Identity Card with name, rank, duty position, identity number, and organization name.

---

[18] Major Ezmerai was released from custody on December 17, at the direction and order of the Afghan Appeals Court.

B) Caraballo is a Non-Combatant Prisoner of War (War Correspondent) under the
following circumstances and criteria; 1) Caraballo was formally attached to the unit,
2) Caraballo never carried arms or participated in military operations other than as an
observer, 3) Caraballo carried a Geneva Convention Identity Card identifying him as an
embedded journalist, 4) Caraballo carried U.S. Press Credentials, 5) Caraballo is a well
known journalist having worked for CBS, NBC, ABC, CNN, HBO, BBC, UPN, and
other network news programs, 6) Caraballo's journalist standing is indisputable as
Caraballo has been awarded FOUR Emmy Awards for his news reporting. C) Sahibi
and Ahmadi[19] were Non-Combatant Prisoners of War under the following
circumstances and criteria; 1) they were non-combatants employed by the Counter-
Terrorist Group, 2) they never wore a uniform or carried any weapon, 3) they never
participated in or engaged in, or were present for, any military or counter-terrorist or
other type of operation, 4) they were engaged solely as administrative/house staff at one
of Counterr Group's compounds in Afghanistan, 5) they were subordinate to the Task
Force commander, 6) they carried Geneva Convention Non-Combatant Identity cards.

32.     Nor were Petitioners "mercenaries" or "vigilantes" by legal definition,
Geneva Convention definition, or under any other definition, in that, in spite of the U.S.
government and Afghan government disavowing them, they; a) were not, and have never
been, paid by a foreign power or nation, b) never swore loyalty to any foreign power, c)
were serving commissioned officers in the United Front Military Forces (the
combatants) and/or Afghan Ministry of Defence (Afghan combatants including the John
Doe Afghan combatants), and, d) Taliban Judge Abdul Baset Bakhtyari announced
during the verdict in their criminal trial that Petitioners were part of and working for the
"Resistance Forces." Respondents and Hamid Karzai have apparently now categorized
Commander Massoud's United Front Military Forces as illegal and/or unrecognized and
in opposition to the Karzai government and the United States government in spite of the

---

[19] Sahibi and Ahmadi were also released from custody on December 17, at the direction and order of the
Afghan Appeals Court.

- 25 -

fact that the Northern Alliance was the primary ally of the United States during the 2001-2004 war. These factors absolutely guarantee Geneva Convention POW STATUS. Further, Respondents have also ignored the fact that Massoud's Northern Alliance was part of the 2001 Bonn Conference, and were made part of the Interim government, which did not change until December 2004.

33. Respondents refuse to acknowledge Petitioners' POW status and the agreements and treaties entered into. Further, the U.S. State Department attempted to avoid the situation by refusing to provide the American Petitioners with copies of the Combatant Geneva Convention, failing to file official protests to the torture outlined herein, withholding medical reports on the effects of the torture, and conspiring to conceal evidence of Petitioners' torture, including directing a doctor to "modify" medical reports by rewriting them and watering down the extent of the injuries. Additionally, the U.S. State Department directed Ingram, and upon information and belief, others, including FBI agents (Un-named Agents 6-7), to secretly meet with Bakhtyari for the purpose of orchestrating several of the events outlined in this Petition. As one specific example, Ingram met with Bakhtyari on August 12, 2004 and, on behalf of her boss Ambassador Khalilzad, **requested** Bakhtyari find Petitioners guilty in their criminal trial and "impose the harshest sentence possible."[20]

34. Upon information and belief, Ingram, and/or Richard Christensen[21] also requested Bakhtyari limit the introduction of evidence which Khalilzad perceived harmful to U.S. interests and policy and "bury [Petitioners] as deep as possible for as long as possible," to avoid harm to U.S./Afghan relations (specifically, relations with the Pashtun population, which Karzai needed to win the election). Upon information and belief, the Department of State and Department of Justice wanted to avoid the disclosure

---

[20] This was documented in conversations between attorney Michael Skibbie and Bakhtyari, and further documented in at least five other conversations between various officials, some of which were tape-recorded.
[21] Christensen is a State Department official who is believed to have participated in the DOS acts alleged herein, and is Deputy Chief of Mission for the U.S. Embassy in Afghanistan.

- 26 -

of information and evidence of al-Qaida plans for specific attacks in the U.S. and Afghan terrorist plans to kill U.S. allies and U.S. soldiers prior to the October 2004 election. And, equally important was the State Departments' wish to prevent the disclosures that a high-ranking member of the Karzai government was not only a terrorist who had spent ten years in prison for terror-related crimes (Sidiq), but was a chief deputy for Gulbideen Hekmatyar (on the U.S. Most Wanted Terrorist List), and was supervising terror attacks against U.S. citizens and Coalition Forces.

35.     This intelligence and information had been developed by the Counter-Terrorist Group and was evidence of instability and threats the U.S. Department of Justice, Department of State, Karzai, and specifically the Respondents did not want disclosed prior to the Afghan and American elections.

36.     Violations of the various *Geneva Conventions* governing the Petitioners include, but are not limited to; a) denial of a fair trial (violations of Articles #3, 71, and 72), b) torture (violations of Articles #27, 32, 147), c) theft of personal property and looting (violations of Articles #53 and 97), d) confiscation of all identity documents issued by the U.S. government and removal of Geneva Convention Identity Cards (violations of Articles #53 and 97), e) inhumane living conditions (during NDS custody: violations of Articles #55, 76, 98, 116, 124, 125, 127), and f) various other acts such as violations of Articles #72, 106, 107, 110, 118, 144, and others.

37.     The most egregious trial violations of the *Interim Criminal Code for Courts*, and the other treaties and agreements included; a) refusing to appoint interpreters for Idema, Bennett, and Caraballo, b) refusing to appoint counsel for Bennett and competent counsel for the Afghan nationals/Petitioners, c) refusing to swear government witnesses under oath (only one witness testified under oath– Idema, who refused to testify unless sworn in), d) refusing to allow cross-examination of government witnesses, e) withholding and destroying exculpatory evidence (by Respondents), f) announcing a verdict before the trial even began, g) obtaining statements by torture and threats of execution, h) refusing to allow defense witnesses to be called or compelled to appear,

- 27 -

and, i) refusing to allow the defense to read their defense statement (Caraballo's counsel was threatened with arrest by Bakhtyari if he attempted to read past the first paragraph of the defense statement). What is critically important here is that the deprivations of rights were brought about by the direct actions of Respondents. It was at **Respondents' directive** that these *due process* violations occurred.

38.    Upon information and belief, in exchange for their false and fabricated statements against Petitioners, the terrorists were released at the direct orders of Respondents, and evidence of their terrorist acts and terrorist group links, was either returned to them or destroyed by Amrullah or his agents acting on the orders of Karzai and others, both known and unknown, to conceal the terrorists' acts, plans, and links. These acts by Respondents had the collateral effect of knowingly supporting terrorism.

39.    On or about August 18, 2004, Sandra Ingram finally delivered a copy of a Geneva Convention to Petitioners, unfortunately it was the treaty relating to civilians and shipwrecked persons. When Petitioners repeated to Ingram that they needed the *Combatant Conventions* and were again asserting their protected status, Ingram stated she had not been authorized to give Petitioners a copy of the proper convention (a violation of the *Geneva Conventions* in itself). Ingram then told Petitioners that the U.S. Department of Justice had made a determination that Petitioners were not entitled to protection, or a fair trial, or even food supplements, and she was **"ordered"** not to give Petitioners a copy of the *Combatant Geneva Conventions*. By this time several Petitioners had already lost considerable weight due to lack of food (Petitioners were required to buy their food at the NDS Prison and NDS had confiscated their money), and were deteriorating both physically and emotionally, especially in case of Caraballo, who had his medicine confiscated and destroyed. She also refused to provide Idema with, or return, life-critical drugs issued to him by the United States government, because they were in U.S. government packaging.

40.    In August 2004 a car bomb killed American and foreign DYNCORP employees in Kabul. The terrorist attack was the same *modis operandi* of the terrorists

- 28 -

captured by Petitioners and released at the request of Respondents and/or the Afghan officials named previously. One terrorist, Ghulamsaki, has a brother (Mohammad Asef, an al-Qaida operative) in detention at the Guantanamo Bay terrorist confinement facility (GITMO). Ghulamsaki also has a brother-in-law who is Osama bin Laden's Chief of Security (known as "Daoud"). Ghulamsaki had been unsuccessfully sought by the FBI for months. Petitioners captured Ghulamsaki, and the FBI later interrogated him with Idema acting as the primary interrogator. Ghulamsaki described his group's terrorist plans to attack Bagram Airbase and kill U.S. soldiers with explosive laden fuel trucks. The FBI Field Agents determined and concluded that Ghulamsaki was in fact a terrorist working with others terrorists captured by Petitioners, to murder U.S. citizens. After Respondents arranged the release of Ghulamsaki, the DYNCORP bombing occurred. Intelligence assets for Counterr Group learned shortly thereafter that Ghulamsaki and his brother-in-law had conducted the DYNCORP bombing in Kabul. The FBI has since classified the FBI "302 Field Reports" relating to the interrogation and confession of Ghulamsaki taken by Idema and U.S. government agents. This was the intentional withholding of exculpatory evidence which Petitioners required and had a right to.

41.     By September 15, 2004, the hearings were over and the trial was convened.[22] The entire trial took less than three hours. No evidence was, or has ever been, presented against Petitioners to this date. No testimony,[23] no physical evidence, no scientific evidence, no evidence of any kind, only statements by the "former" Taliban prosecutor, Dawari, who heavily relied on newspaper articles as his "physical" evidence. Petitioners were not allowed to call witnesses, and one of the Petitioners' attorneys was ordered to stop reading the defense statement after finishing the first paragraph of a 20+ page defense statement. Caraballo's attorney was threatened with arrest by Bakhtyari during

---

[22] The three Americans and four Afghans were convicted of running a private prison, illegally arresting and torturing suspected terrorists, and secretly entering Afghanistan with forged Indian passports to begin their pursuit of al-Qaida terrorists.
[23] The sole statements by government witnesses were given during the arraignment. They were unsworn, and were categorized as "for informational purposes only for the journalists here" by Bakhtyari.

- 29 -

a recess if he tried to continue his defense. During attempts to provide testimony, play defense videotapes, and submit evidentiary documents, Petitioners' attorneys were ordered to stop by Bakhtyari, Dawari, and as a result of directives by Fatah and unnamed agents of the Afghan government, and the FBI.[24] Without allowing a closing statement, and without any counsel for Bennett[25] and the foreign nationals on trial,[26] the court then concluded the trial, left the room for approximately five minutes and returned to read a lengthy pre-written verdict finding all Petitioners guilty and sentencing the Afghans to one to five years, and the Americans from eight (Caraballo) to ten years (Idema and Bennett), with anyone who claimed POW combatant status receiving higher sentences.

42.      In spite of this, the US State Department, and Respondent Khalilzad, issued statements that the trial was fair, and had been conducted in accordance with Afghan law and international standards. However, Respondents had intentionally withheld their explicit knowledge that Bakhtyari and Dawari were former Taliban officials, and the fact that Respondents had orchestrated Petitioners' convictions.

43.      On September 16, 2004, Petitioners were transferred to Pulacharke Prison due to intervention by the Northern Alliance and the Minister of Justice, who removed the seven men from NDS custody and into a Ministry of Justice controlled facility under their direct control and outside the physical custody of the FBI. Since the Minister of Justice interceded all torture has ceased, and Ministry of Justice general officers have gone to extraordinary efforts to exceed Geneva Convention requirements regarding treatment. Although Petitioners are still at grave risk– they were taken back into NDS custody in October and subjected to threats and abuse once more, but Northern Alliance Ministry of Justice personnel forcibly removed them from NDS custody again.

44.      Over the past six months, Iraqi, Pakistani, and Saudi al-Qaida terrorists have tried to assassinate the three American Petitioners and conspired to attack the Afghan

---

[24] Two FBI agents sat in the back of the courtroom and passed notes to the prosecution, who then passed notes to the judge. Upon information and belief, those notes directed the illegal actions of Bakhtyari.
[25] Bennett was never allowed to read his defense statement, call any witnesses, or even testify himself.
[26] Afghan Counsel failed to appear in court after being threatened by NDS agents working for the FBI.

- 30 -

Counter-Terrorist Group officers on at least seven different occasions. Each time the terrorists were interdicted and stopped by Northern Alliance officers at Pulacharke Prison. Although Petitioners are now being extremely well-treated by the Minister of Justice, they remain POWs and political prisoners[27] held at the direction of Hamid Karzai specifically acting under the orders of Respondents without having been afforded even a scintilla of *due process*.

45.   In fact, the Ministry of Justice, an official branch of the Afghan government, recognizes these men as POWs, as evidenced by their current living quarters which result from *Geneva Conventions* protections requiring accommodations commensurate with rank as required by Articles 25, 44, 45, 76, and 89 of the *Geneva Conventions*. As such, Jack and his TASK FORCE SABER 7 men have been placed in General Officer accommodations which are reserved for commander level officers in custody.

46.   On October 8th, 2004, Counterr Group intelligence assets were responsible for assisting security forces in seizing fuel trucks packed with explosives in Southern Afghanistan. Those Counterr Group assets and the other unnamed Counter-Terrorist Group officers continue to remain covert by necessity for their protection. Counterr Group personnel have also identified two other bombings prior to their detonation, one of which was in Jalalabad. The terrorists responsible for all of these bombings remain at large, and under the protection of Sidiq and other parties named as officials of the Afghan government and agents of the FBI.

47.   Finally, in November 2004, the Second Court of the Afghan Supreme Court, also called the Court of Appeals, heard preliminary evidence in the criminal case against these Petitioners. In spite of the fact that the Court of Appeals has been extremely considerate of Petitioners, and in spite of the fact that each of three judges privately expressed their belief that all of the Petitioners were innocent of all charges, they have been unable to administer *due process* and justice because of "pressure from the palace,

---

[27] The Petitioners are in fact classified as **political prisoners NOT criminal prisoners** at Pulacharke Prison by the Afghan Ministry of Justice, the Red Cross, and the British run Emergency Hospital.

- 31 -

the US Ambassador, and **the American FBI.**"

48.    Although the court stated they were unable to immediately release the Petitioners because of palace orders coming from the FBI and State Department, the Appeals court **did** overturn the convictions of Petitioners and order a trial *de novo*.

49.    Furthermore, on or about November 24, just days before the second trial *de novo* began; **the FBI seized all of the exculpatory evidence in the case <u>again</u>,** and physically removed it from the Court of Appeals evidence room, without the knowledge of the Appeals Court judges. This was an intentional interference with a judicial process and intended to prevent Petitioners from presenting a defense. This evidence tampering was done with the complicity and assistance of the United States DOS and Respondents.

50.    Between November 20th and 30th 2004, Ezmerai, Ahmadi, Idema, and other confidential witnesses all testified in a closed hearing in the Appellate Division of the Supreme Court of Afghanistan. They provided testimony about the charges, and their treatment at NDS prison during the summer of 2004. Their statements were horrifying. That sworn testimony revealed; that Major Ezmerai still had the NDS torture induced electrical burns on his body five months later, but even after nights of torture he refused to sign a statement against Idema or the others; that Ahmadi had been beaten and threatened into signing a statement against Jack Idema, but when beatings and threats failed, Ahmadi was given three blue Valium tablets (*Diazepam* 10mg each) in order to drug him into a condition whereby NDS agents (including Mudafea and, upon information and belief, agents of the FBI) could stamp his thumbprint on a statement they wrote for him (Ahmadi is illiterate as is much of Afghanistan). Ahmadi testified that the next morning he woke up and thought it was a dream until he looked down and was terrified to see the purple ink on his thumb which was used to sign his fabricated and false statement.[28] Idema testified that NDS agents (Un-named Agents 6-9) tortured him repeatedly and tried to force him to sign a statement in *Dari*, which they would not

---

[28] The Appeals Court conceded that this was a common occurrence at NDS *Saderat* Interrogation Facility.

allow him to read. American agents were sending messages into the interrogation room, and, upon information and belief, they were FBI agents. Idema was threatened with hanging and continued torture unless he signed the statement. He never did.

51.    It was recently discovered that Bakhtyari has been and is involved in a wide range of illegal civil and criminal acts. Although the FBI and Respondents directed the Court, and specifically Taliban Judge Bakhtyari not to allow Petitioners access to ANY court files or prosecution evidence, thereby denying all *due process* to Petitioners, the FBI had unlimited access to the files and evidence. Further, during the course of the trial Bakhtyari actually sold Petitioners' copyright protected photographs, and evidence file to journalists, even though Petitioners and their attorneys were NEVER allowed access to any of the court files, which contained statements, confiscated documents and photographs, many of which were of an exculpatory nature. Although Respondents had ordered Bakhtyari not to allow the Petitioners access to the files, Bakhtyari and Dawari repeatedly allowed western journalists to access the files, often for a cash fee.

52.    On December 1, 2004, the Court of Appeals of the Islamic Transitional Government of Afghanistan conducted another closed hearing in the case. A new trial *de novo* was granted, as was a bifurcated trial allowing the charges against the Afghans to be heard first, and then the issue of the Americans illegally entering the country on forged Indian passports. By the end of the hearing, the Afghan Court of Appeals had declared all four Afghans innocent of all charges and three of Idema's men were ordered released immediately by the Appeals Court after hearing evidence from Afghan government police officers and learning that the FBI was present during torture sessions and illegally seized Petitioners' evidence in the case for the second time.

53.    Caraballo's first lawyer, Michael Skibbie, was the first to publicly accuse the FBI of taking evidence during the initial series of hearings in July and August 2004. The defense's claims were later proven true when the FBI, under orders from the Afghan Ministry of Justice, returned hundreds of documents and videotapes in the middle of an August trial. However, much of that evidence remained missing.

- 33 -

54.    The Court summoned members of the NDS to chambers and inquired about the evidence. It was then disclosed that agents of the FBI had again removed all of the video, photographic, and audio evidence, including the team's computers which the men would need to defend themselves, without notifying the Court. This was the second time the FBI interfered in Petitioners' defense by taking and destroying evidence in the case.

55.    The Appeal Court's inquiry disclosed that the FBI had again taken the evidence just six days prior to the December 1st hearing. Without the evidence the Petitioners were unable to mount an adequate defense. This was an intentional interference with *due process* and obstruction of justice through the destruction of exculpatory evidence by the FBI which has no jurisdiction in the case.

56.    Ministry of Justice police official Mohammed Saboor testified that he witnessed members of President Karzai's Protective Detail and Ministry of Defense personnel present at the arrests of terrorists and Idema coordinating with the Presidential Palace. He also testified that Idema's treatment of suspected persons, women, children, and prisoners was exemplary and in full conformance with Islamic law. This was corroborated by video showing female Afghan National Police Detectives present during Idema's searches and raids.

57.    Members of Idema's team, including Major Ezmerai Amin, a commissioned officer in the Afghan Ministry of Defence were ordered released, as was Sohail Sahabi, a translator, and Sherzai Ahmadi, a house worker. Lieutenant Rasuli, who is a Ministry of Defence employee, refused to be released without Idema and the rest of the team, requesting the judges allow him to stay in prison with the Jack Idema and the two other Americans until the trials were completed. Rasuli told the judges, "In this group there is only one main point I have learned above all else, leave no man behind. I request to stay." The judges granted his request.

58.    Reviewing videotape of the three Americans entering Kabul and being greeted by a contingent of high-ranking Afghan authorities, including the Commander of the Border Police, the Airport Manager, and even one of President Karzai's brothers, **the**

- 34 -

**Court saw three US passports** being handed to Afghan government officials, customs forms being filled out, and National Police officers loading the American's bags, which consisted of approximately eight "Pelican Cases," three communications cases, six military equipment cases, and four gear bags, on a special trolley and through customs, where they were cleared by the Chief of Customs. The Court of Appeals ruled that the entry into Afghanistan had been legal and the charge was dismissed. The Court agreed to hear the other charges in a separate hearing scheduled for a future date.

59.    On December 17, 2004, eight al-Qaida terrorists implemented an assassination plot and attack on the Petitioners at Pulacharke. One of their motives was to collect a $250,000 reward Osama bin Laden had placed on Idema. Bokan, the Iraqi leader of the Pulacharke al-Qaida group, had previously tried to kill Marshall Mohammed Fahim, the Minister of Defence—one of the Ministers whose life Petitioners had saved. Bokan, the Iraqi terrorist, had told the others that his only goal was to kill Idema and the other Petitioners and then they could attempt an escape. Four Ministry of Justice officers were killed that day; two executed in front of Petitioners. Four others were wounded, three severely. Petitioners held off more than 100 terrorists who had been freed by Bokan with a barricade in level two of the prison block. Former Northern Alliance commanders and bodyguards arrived after being covertly alerted by Idema and killed all but one[29] of the remaining terrorist conspirators. The standoff lasted more than eight hours. The terrorists came very close to killing Petitioners.

60.    Approximately 40 days later, the Appeals Court met again, and repeated that all Petitioners were "completely innocent," but that they could not be released because of

---

[29] He was an Arab al-Qaida terrorist who was severely wounded and confessed to the entire plot one month later when he was released from intensive care. The United States government should have brought charges against the terrorist named Aziz for conspiracy to murder American citizens. However, during the 8 hour siege, the US government, specifically Lieutenant General David Barno, stated that he could care less if the Petitioners were killed in order to "end the problem" with them. Additionally, the US State Department, although notified that the Petitioners were under siege by al-Qaida terrorists, told Idema during the siege, that the US government would render no assistance, and had NO INTENTION of preventing their murder. LTG Barno was later quoted as stating Petitioners' murder would "be a good thing."

- 35 -

pressure and coercion by the U.S. Embassy and FBI. Further, the Appeals Court cleared
Petitioners of all torture charges after hearing covertly recorded statements of the alleged
"victims" and seeing evidence linking the "victims" to terrorist leaders and terror plots.

61.    The Court also informed Petitioners that US officials, namely Russel Brown,
US Consul, acting on behalf of Respondents, provided false information to the Court, by
stating that official US government documents, including a letter from a US Ambassador
and Defense Attaché were fake and forged. The US Consul and FBI had removed copies
of this letter from Petitioners' legal mail in violation of law, and then secretly met with
the Court prior to Petitioners' hearing in order to obstruct justice through knowingly
false statements and to cover-up U.S. government liability and complicity. Because the
U.S. Consul lied about the letter's authenticity, the Petitioners were not released. In
essence, Petitioners remain in custody solely at the direction of Respondents.

62.    On February 16, 2005, al-Qaida terrorists attempted a seventh assassination
attempt against Petitioners. Seventeen Pakistani, Red Chinese, and Arab terrorists
implemented another plan to kill Idema and the two other American POWs.[30] The
assassination attempt was interdicted by Northern Alliance officers again, and foiled just
twelve hours before their attack on Petitioners.

63.    Finally, on February 22, 2005, this U.S. Consul continued his assault on
Petitioners' *due process* and liberty rights. After Petitioners' U.S. attorney became
involved in the case in August 2004, the U.S. Consul, Russel Brown, agreed to allow
mail between the Petitioners and their families and attorneys. This mail was sent
through the U.S. State Department. Mail continued to flow without significant
problems, until such time as Petitioners' attorney informed the Ambassador that he
would be filing a civil suit against President Karzai and U.S. government officials.

64.    However, after the U.S. Embassy received the letter threatening litigation
and requesting the cessation of rendering and obstruction of justice by the United States,

---

[30] The terrorists were also planning to kill Lieutenant Rasuli because of his association with the Americans.

- 36 -

Respondents put a complete mail blackout in place, in that they refused to send letters from Petitioners and began the inspection, copying, and destruction of legal mail, evidentiary documents, and even personal mail between Petitioners and their families.

65.    Some of the legal mail confiscated and never sent by Respondents, was legal mail relating to ongoing civil cases in the United States. As a result of Respondents' actions Petitioners have been adversely affected in unrelated civil cases in the United States in violation of international treaties and *Geneva Conventions*.

66.    As an example, Petitioners were told they would be allowed to send Christmas presents to their families. They spent one month preparing handmade gifts. Caraballo had a beaded vest made for his 3-year old daughter, Idema had a necklace made for his wife and handmade cups made for his 85-year old ailing father, his attorneys, and friends. Bennett had necklaces and cups made for his family. Christmas cards and letters were prepared by all of the Petitioners. Petitioners were assured that they would be allowed to have communication with their families for Christmas, birthdays, and holidays. When the Embassy took the mail they assured Petitioners they would send it. Instead, they destroyed items, illegally searched and copied the mail, and then held the mail for more than forty days before returning the mail unsent.

67.    In response, Petitioners filed a formal letter of complaint with the US Consul, Russel Brown. Brown not only refused to provide a response, but he then stopped all mail and ordered the complete confiscation of legal mail.

68.    Worse, ALL of the attorney/client privileged legal mail given to the Embassy in 2004 ended up being posted on the internet on a blogging site (a Web Blog) before it was returned to Petitioners. This included highly confidential legal documents regarding Petitioners' defense strategy. One month later, the Embassy returned the mail opened, rifled, and in some cases with pages missing.

69.    Petitioners sent another letter, this time to the U.S. Ambassador, outlining a violation of Constitutional rights, and federal law. Khalilzad's response was to order a complete ban on all mail, including mail sent from the families and friends of Petitioners

- 37 -