through the U.S. State Department's Dulles, Virginia foreign mail processing facility. This was a complete reversal after four months of mail in this manner. This was intentionally done to destroy Petitioners' defense and emotional state.

70.     Furthermore, Russel Brown then advised Petitioners that all mail sent to them would be permanently confiscated, and neither delivered or returned. Brown took the position that any mail now sent through the State Department to Petitioners would become the property of the United States government.

71.     Even worse, Brown then informed the Petitioners that Khalilzad had ordered the ban imposed retroactively, and all mail en-route from Petitioners' attorneys would not only be read and copied, but permanently seized by the United States.

72.     Petitioners, especially Idema, whose ailing father was undergoing treatment for a terminal cancer condition, and was now incapacitated, was irate. Caraballo, who was now completely detached from his young daughter, was sent into a spiraling clinical depression. The United States government had arbitrarily and capriciously severed the Petitioners from all contact with their families, purely for vindictive and vicious motives. During one argument over the mail, Russel Brown stated that as far as Khalilzad was concerned, it would be better for everyone if al-Qaida finally succeeded and murdered the Petitioners.

73.     Petitioners demanded written clarification of the status of mail and on February 22, 2005, Russel Brown finally provided Petitioners with a written response that was extraordinary in its Machiavellian approach and viciousness. The letter claimed that Sandra Ingram was the one who originally allowed mail— this was completely untrue as Ingram never allowed mail. Brown claimed that Ingram had made a mistake, and told Petitioners that no mail would be allowed through the U.S. Postal Service, in ANY fashion, neither to the Dulles facility, or the APO. Brown stated the Petitioners would have to: **1) "use international mail."** Afghanistan does not yet have a working mail system; the one piece of mail delivered to the Afghan post office was intercepted, searched by the Embassy, and ordered held. Its whereabouts is unknown, but the cost of

- 38 -

that single letter was around $8 for delivery in 30 days, and the package was about $25; 2) **"use DHL."** This would first be searched and copied by the Embassy, including legal mail, and would cost roughly $85 for a single letter—in other words, if each of the three American Petitioners sent one family member one letter a week it would cost $14,720.00 per year. Christmas cards, would, of course, be extra; **3) "use Federal Express."** The cost would be equally prohibitive as DHL, probably more, but Respondents are well aware that Federal Express has refused to send any letter of package addressed from Petitioners for fear of reprisals by the FBI which has completely coerced the Kabul Federal Express office into refusing any mail from Petitioners. What happened to dozens of missing attorney/client privileged letters is unknown, but one thing is clear, Respondents are playing a shell game with guaranteed constitutional rights.

74.     What is exceptionally reprehensible about this is that, according to sources, Khalilzad made specific comments about Christmas, stating that because Petitioners were prisoners in a Muslim country (Khalilzad is also Muslim) Christmas mail insulted him and "his" country. Khalilzad clearly feels that Afghanistan is his county, that American religious holidays are a threat to his religion, and that he has the specific right to determine United States Postmaster General policy for American citizens.

75.     Petitioners have survived the torture, the daily threats against their lives by al-Qaida, constant abuse, interference by the FBI outside their jurisdiction, false statements by the United States government, abuse of process, and even invasion of privacy and violation of the attorney/client privilege—they cannot survive the denial of a right born from the blood of our forefathers to communicate with their families.

76.     Petitioners remain in custody, as Prisoners of War, held solely because of Respondents. NONE of these violations are imposed by Afghan prison authorities who are fully abiding by the provisions and protections of *Geneva Conventions* and have imposed NO liberty restrictions on incoming or outgoing mail, or other freedoms. This patently egregious conduct is the exclusive dominion of Respondents who continue to hold Petitioners incommunicado through the illegal rendering of American citizens.

- 39 -

77.     Finally, in early March, US Consul Russel Brown, at the direction of Respondent Khalilzad, informed Petitioners that all drinking water would be terminated by the United States government, and that Petitioners would no longer be allowed access to potable drinking water.  This was in direct retaliation to letters of complaint to Khalilzad about the new ban on mail.  Without water, Petitioners will be forced to drink local water which contains microorganisms and bacteria fatal to American citizens and forces in Central West Asia.  Although *ciprofloxacin* can be administered to combat the severe dysentery, vomiting, and eventually death[31] that will occur as the result of the denial of drinking water, two problems make this solution untenable.  First, *ciprofloxacin* is not readily available, the US Embassy has already refused to supply drugs to Petitioners, and the FBI confiscated the medical and surgical kits Petitioners possessed to avoid any link to the United States government.[32]  Second, because Idema has operated in Afghanistan for more than three years, he has already used *ciprofloxacin* extensively and is not a suitable candidate for continued long-term use.  The same situation would apply to Bennett and Caraballo if they were to be forced into long-term use of *ciprofloxacin*.  Therefore, the denial of water is not only completely retaliatory and nefarious, but brutally vindictive and unwarranted.

78.     In one last perverse twist of justice, the U.S. State Department recently issued a document referring to Bakhtyari stating:

> "Mr. Bakhtyari has recently earned a reputation for passing a judgment in the case of three Americans who faced charges of running their private prison in Kabul to try Taliban and al-Qaida suspects.  Despite opposition from certain religious circles he was able to pass a **favorable judgment** in the case of the three Americans. He is one of the three judges recommended by the Afghan Chief Justice for the program." [Emphasis Added] (State Department Biographical Info Section – International Visitor Program)

---

[31] The US government has already made it clear that they would like to see each of these Petitioners dead. *See* previous footnote; #29.

[32] The medical kits contained extensive US government issued surgical equipment and narcotics, such as Atchkinson Chest Valves, Quick Clot, Staple Guns & Suture Kits, and extensive antibiotics.

- 40 -

79.    This statement was related to a contingent of Afghan judges sent to the United States by Respondents. Bakhtyari himself admitted that this "all expense paid trip" was a "gift" from the United States for finding Petitioners guilty and giving them a ten-year sentence. While the Respondents are apparently proud of Bakhtyari's actions, during the same February/March 2005 time period, the *United Nations Independent Expert of the Commission on Human Rights on the Situation of Human Rights in Afghanistan*, for the Office of the High Commissioner for Human Rights, issued a scathing indictment of Bakhtyari, charging him with a veritable laundry list of human rights violations and crimes, and calling his court not only illegal, but contrary to all international laws.

80.    However, Respondents still considered Bakhtyari to be a suitable candidate for his trip to the United States paid for by American taxpayers. In the meantime, evidence surfaced (statements from NDS officers) that other judges were being similarly bribed to block the release of Petitioners in the Appeals Court, and that the DOS had provided cars and money to officials involved in the case, such as a Mercedes Benz to the Chief Prosecutor, who previously did not own a car. In fact, all of the NDS officials involved in the case, who make an average of a few hundred dollars a month in salaries, were all of sudden promoted, flush with cash, and driving new cars.

81.    Finally, there was one last ironic twist in this outlandish case. After all the work, money, and effort the State Department and Respondents expended to bolster Bakhtyari's credibility and prestige and to reward him for his illegal actions, Bakhtyari was never able to culminate his travel plans and appear in the United States as Respondents' "spokesman" on the new Afghan justice system. As it turns out, Bakhtyari's name is on the classified CIA and DIA suspected terrorist list, and was denied a visa, in spite of the best efforts of the DOS and FBI to remove his name and allow him entry in America.

## MEMORANDUM OF LAW IN SUPPORT OF ISSUES UNDER CONSIDERATION

I.    Whether a Petition filed pursuant to 28 United States Code § 2241
      is the proper procedural vehicle for the relief Petitioners request.

In *Priser v. Rodriguez*, 411 U.S. 475, 485 (1973), the United States Supreme Court recognized "that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."

However, in the instant case, Petitioners submit that because of the arbitrary actions of Respondents, the false statements to the Afghan Court of Appeals, the bribery and manipulation of the Primary Court Taliban judge (Bakhtyari), the torture by agents of the FBI, the illegal search of Petitioners' property, the illegal search and seizure of Petitioners' computers, files, and documents, and the destruction of exculpatory evidence in the underlying Afghan criminal case, the complete denial of Petitioners' right to send mail, and send and receive attorney/client privileged communications, and the interference by Respondents in *due process* and liberty rights of Petitioners through Respondents' **rendering of Petitioners**, this case **is** properly before the court.

Based on the facts alleged, Petitioners submit that a petition for habeas corpus pursuant to 28 United States Code § 2241 is the proper procedural vehicle for the relief Petitioners request in spite of the untraditional nature of rendering. The Seventh Circuit has recognized that "habeas corpus can be used to get from a more to a less restrictive custody..." *McCullom v. Miller*, 695 F.2d 1044 (7th Cir. 1982), *see* also *McCall-Bey v. Franzen*, 777 F.2d 1178 (7th Cir. 1985). In *McCullom*, a prisoner sought release from a disciplinary unit which denied his liberty beyond the confines of his sentence of imprisonment. Similar to the mail restriction in the instant case, the prisoner received little notice or procedure before the prison administration decided to discipline him. As a result, the court held that the prisoner did not receive the process he was due under the

- 42 -

Fifth Amendment. In the instant case, the Respondents arbitrarily decided to terminate outgoing mail from Petitioners to their family, friends, and attorneys when the Respondents learned that the Petitioners attorneys were planning and preparing to file suit against Respondents and members of the Karzai government. In effect, Respondents have denied liberty rights beyond the sentence of Petitioners' imprisonment.

Similarly, Petitioners submit that they have been unable to exert their *due process* rights as a result of the Respondents' arbitrary denial of mail privileges in spite of the fact that a DOS memorandum and circular specifically states that the State Department will handle mail for incarcerated American citizens abroad. On this issue, Petitioners seek an order preventing the State Department from denying mail services to ANY incarcerated US Citizen in any country so long as **that** country does not restrict the mail. As an example, in the instant case, the DOS refuses to send religious articles, Christmas presents, birthday presents, and items in anyway associated with religious or Christian holidays. Specifically, Respondent Khalilzad is a Muslim, and has refused to allow Petitioners and their families to interact in religious holidays other than those based on the Muslim faith. Further, Respondent Mueller has, in concert with the DOS Respondent, Rice, put a complete ban on all attorney/client privileged communication. However, the actual warden of the prison, the Afghan Chief of Prisons, the Minister of Justice, and the Afghan government have not placed ANY restrictions on Petitioners' mail. Therefore, the liberty restraint is imposed **by** the Respondents, in violation of law.

In *Waletzki v. Keohane*, 13 F.3d 1079 (7th Cir. 1994), the Seventh Circuit was faced with an appeal from a denial of habeas corpus relief pursuant to 28 U.S.C. § 2241. In that case, the Petitioner argued that the prison administration's denial of his good time credits was arbitrary. Id. at 1080. Although it denied the prisoner's claim on the merits, the court recognized that his claim was within the district court's habeas corpus jurisdiction. Id. at 1081.

In *Waletzki*, the court stated that "...habeas corpus is available to challenge the duration as well as the fact of custody." (Citing *Preiser v. Rodriguez*, 411 U.S. 475

- 43 -

(1973); *Hanson v. Heckel*, 791 F.2d 93 (7th Cir. 1986) (*per curiam*). According to *Waletzki*, the Petitioners' case falls under this court's habeas corpus jurisdiction. The instant case also follows *Waletzki, supra,* in that Petitioners would have been released from custody in December 2004 had it not been for the interference and obstruction of Respondents.

In *Joseph v. DeCastro*, 805 F.Supp. 1242 (D. Virgin Islands 1992) a district court held that "[w]hile there is no definitive list of situations constituting 'the core of habeas corpus' we are satisfied that as here, where the root of the action is an attack on the petitioner's detention, that is, his allegedly illegal confinement at a federal corrections institution, habeas is the appropriate means of redress..." Id. at 1248. In the instant case, the Petitioners have been rendered by Respondent Mueller, have been subjected to liberty deprivations and *due process* denials at the direction of all three Respondents, and have been subject to continued illegal search and seizure by Respondents, and therefore, are technically in federal custody.

Respondents are intentionally obstructing the new trial of Petitioners and delaying their release from prison for a variety of reasons, including, but not limited to, upon information and belief, Respondents desire to bring criminal charges against Petitioners in the U.S., see: *Schofs v. Warden, FCI Lexington*, D.C. Ky. 1981, 508 F.Supp. 78.

In support of this, the FBI Counter-terrorist Task Force[33] has been aggressively interviewing, threatening, and conducting surveillance of family members, business associates, Special Forces personnel, and Petitioners' friends in the United States. The FBI has made it abundantly clear that they intend to pursue whatever criminal charges they can develop against Jack Idema. Further, the FBI orchestrated and directed the arrest of Idema's wife on a non-existent warrant in order to interrogate her on January 7, 2005. Upon information and belief, the FBI, and Respondent Mueller, are taking the actions described herein for the sole purpose of delaying Petitioners' release until such

---

[33] Also included in this are the FBI's various local Joint Terrorist Task Forces.

- 44 -

time as they can develop grounds to move Petitioners into official US custody. To the FBI, this is of critical importance. They seek to first, prevent Petitioners from speaking to the press, Congress, or the Senate, regarding the events in Afghanistan, and second, to coerce Petitioners into divulging their al-Qaida undercover operatives. The FBI's primary concern is to co-opt Petitioners' agents inside al-Qaida.[34] This was a prime focus of their interrogations of Petitioners in July-August 2004. However, for the record, only one person knows the identities of the al-Qaida assets providing information to the Counter-Terrorist Group and the Department of Defense, and that is Jack Idema. All other operators, in Counterr Group, the DIA, the DOD, and other intelligence activities know only the code names of the assets. The FBI has long sought[35] clandestine assets inside al-Qaida with no success. The FBI, specifically Respondent Mueller, saw this situation as opportunity to co-op the assets of the Counter-Terrorist Group which had spent three years developing and vetting them. The fact is, that the highest levels of the FBI, at the direction of Mueller, had tried to "co-op" Idema's assets for more than six months prior to Petitioner's arrest. These conversations are memorialized on tape and can be supplied to the court if a controversy surfaces.

Respondents have made it abundantly clear, through their agents, that they will do everything within their power, including the violation of U.S. laws and rights, to prevent Petitioners from being released, even though the Afghan Court privately, even if "unofficially," found them innocent of all charges on February 21, 2005.

Accordingly, the appropriate procedural vehicle is a petition for habeas corpus relief pursuant to 28 United States Code § 2241.

---

[34] "Co-opt" is an intelligence term that refers to transferring by law, by jurisdiction, by money, or by force, one handlers' undercover intelligence assets from his control (usually the handler that developed the agent) to the control of higher authority or new handler for the purposes of controlling and gaining credit for the agent's information. It is also referred to by the FBI as the "co-op" and "co-oping" of another operations' covert intelligence agents.

[35] The Director has repeatedly testified in front of Congress as to the difficulty in placing an undercover agent inside the Taliban and al-Qaida organizations. In fact, in 2003 and 2004, Congress learned that the FBI had been 100% unsuccessful in this effort for more than five years.

- 45 -

II.    Whether the Southern District of New York is the proper jurisdiction due to Petitioners' current incarceration in the Islamic State of Afghanistan.

Petitioners submit that this jurisdiction is familiar with these types of cases, and the issues delineated herein, especially including rendering. Further, Caraballo is a resident of New York, and Petitioners' counsel is in New York. The correspondence issue, relating to the denial of *due process*, right to counsel, illegal search and seizure, and cruel and unusual punishment stem from the denial of family[36] mail primarily to the State of New York.

The traditional role of habeas corpus is to move the person restraining the liberty of the petitioner to take some action or stop some restraint of liberty by that "custodian." In the instant case, the physical custodian of the Petitioners is taking NO action to restrain Petitioners or deny their liberty. In fact, the physical custodians (the Afghans), have taken extraordinary measures to protect Petitioners, and to effect the release of Petitioners. They have been obstructed by the Respondents. Respondents, Rice and Khalilzad, have instructed and ordered their agents to deny all rights to Petitioners, avoid answering FOIA requests, complaint letters, and legal letters, to search and seize US Mail, deny water and medical care to Petitioners and to intentionally engage in obstruction of justice by providing knowingly false information to the Afghan Appeals Court and government. The Afghan government has repeatedly stated that they wish to release Petitioners but Respondents have explicitly ordered Petitioners held in custody.

One district court noted that it was "required by consideration of fairness and basic convenience to assume jurisdiction over petition by defendant to vacate sentence, despite his absence from territory or jurisdiction of the court..." *See; U.S. v. Tully*, D.C.N.J. 1981, 521 F. Supp. 331. In fact, the courts have found that the "[p]hysical presence of a habeas corpus petitioner within a judicial district in not an absolute jurisdictional

---

[36] Caraballo's three-year old daughter is in NY. His brother and family are in NY. Idema's 85 year-old father is in NY and is terminally ill. Counsel for Petitioners is in NY and the bulk of the legal mail obstructed is destined for NY or comes from NY.

- 46 -

prerequisite, but rather a requirement which can give way to considerations of fairness and basic convenience." *See; Kinnell v. Warner*, D.C. Hawaii 1973, 356 F.Supp. 779. The courts have also ruled that a federal court is "not required to dismiss a habeas corpus proceeding[s] simply because petitioner was not confined within its jurisdiction but was required to consider fairness and convenience to parties." *See; Noe v. Garland*, D.C. Md. 1975, 400 F. Supp. 691.

Under Section 2241, "so long as custodian can be reached by service or process, a court can issue a writ within its jurisdiction requiring that [a] prisoner be brought before court for a hearing on his claim, or requiring that he be released outright from custody, even if prisoner himself is confined outside court's territorial jurisdiction." *See; Braden v. 30th Judicial Circuit Court of Kentucky*, Ky.1973, 93 S.Ct. 1123, 410 U.S. 484, 35 L.Ed.2d 443; *see* also; *Fore v. U.S.*, D.C.Tenn. 1977, 436 F.Supp. 769. "Jurisdiction is appropriate in habeas corpus acts as long as the custodian can be reached by service or process, even though the prisoner may be confined outside the court's territorial jurisdiction," *see; King v. Lynaugh*, W.D.Tex. 1990, 729 F.Supp. 57.

In another case, loosely related to the situation in the instant case, the court decided that for "purposes of challenge to parole decision [similar to the Petitioners' situation in that a specific group— Rice, Khalilzad, and Mueller— have made a decision to impose the liberty restraints on Petitioners], the Parole Commission could be considered, under the circumstances of the case, prisoner's "custodian," and thus, the district court had subject matter jurisdiction over prisoner's habeas corpus petition challenging decision of the Commission, even though warden was not named in the petition; the Commission, rather than the warden, directly controlled whether petitioner remained in custody;" [emphasis added], declining to follow *Billiteri v. United States Bd. of Parole*, 541 F.2d 938 (2d Cir.). *Dunn v. U.S. Parole Com'n*, C.A. 10 (Kan.) 1987, 818 F.2d 742.

Most importantly, "[w]hile the language of [§ 2241] would indicate that writ of habeas corpus is appropriate only when petitioner is 'in custody,' this section **does not** attempt to mark the **boundaries of 'custody'** nor in any way other than by use of that

- 47 -

word attempt to limit the situation in which the writ can be used." *See; Hammond v. Lenfest,* C.A.2 (Conn.) 1968, 398 F.2d, 705. It is important to note, that "habeas corpus tests not only the fact, but the form of detention and the lawfulness of restrictions placed upon personal freedom." *See; Bland v. Rodgers,* D.C.D.C. 1971, 332 F.Supp. 989.

The district court in North Carolina ruled that "[t]o invoke federal writ of habeas corpus [a person] need not [even] be physically detained in jail or prison; it is only necessary to show that there are impediments significantly restraining his liberty to do those things free men are entitled to do." *See; Walker v. State of N.C.,* D.C.D.C. 1966, 262 F.Supp. 102, affirmed 372 F.2d 129.

Further, through the withholding of exculpatory evidence illegally seized from Petitioners, Respondents have in essence effected a false imprisonment. For, if Respondents returned the videotapes, photographs, documents, computers, and evidence illegally seized from Petitioners, the Afghan Appeals Court would have the necessary evidence to conclude the trial *de novo* currently underway and publicly announce a not guilty verdict on all charges. If fact, the Afghan Appeals Court has ordered Respondents to return all evidence taken from court's custody, but the Afghan Court has also stated that they have no jurisdiction to force Respondents to return evidence and property now in U.S. custody and control, and secured on U.S. property. Respondents' illegal custody of Petitioners' property is continuing their false imprisonment, because the evidence is of such a highly exculpatory nature that even the Respondents would be unable to continue Petitioners' rendering at the hands of the Afghan government. Therefore, only this court has the power to order Respondents to return property and evidence seized in violation of the Fourth Amendment and held in violation of law.

The law is not a straight jacket and in no area of law should this be more true than in the consideration of a habeas corpus petition.[37] In summation, jurisdiction is not only highly appropriate, but also completely warranted.

---

[37] *See;* Sokol, *Federal Habeas Corpus* (Michie Co. 1968), pg. 105.

- 48 -

III.   Whether Respondents are engaging in the illegal rendering of
       Petitioners to violate their constitutional rights and for the explicit
       purpose of denying Petitioners *due process* protections & subjecting
       them to continued false imprisonment by Respondents' proxies.

The rendition of a subject, or suspect, also referred to as "rendering" is the
intentional transference of a suspect, particularly a terror suspect, from U.S. custody or
territory, to foreign custody and/or territory.[38]  As an example, the subject is captured by
U.S. Forces in Thailand, then flown to Pakistan where he is placed temporarily in the
custody of the Pakistani ISI.[39]  The ISI allows the FBI (or CIA, or other intelligence
activity) to place the subject in ISI custody, usually for a high fee, where the subject can
be held without *due process* or interference, secretly without notification of the Red
Cross or any other similar agency, and without restrictions on interrogation techniques,
thereby allowing the FBI to administer aggressive interrogation techniques, including
torture techniques not even allowed under the DOD's aggressive interrogation policy
and known as *extreme interrogation*.  Further, if the subject dies in custody, he can be
left there and FBI agents are then insulated from repercussions resulting from the death.
Just as importantly, the FBI, impersonating[40] other federal agencies, or using deceptive
intelligence gathering techniques, can keep the Bureau at arms length from the torture
and interrogation should anything go wrong.  Once the intelligence is gleaned, if it ever
is, the subject is transferred back into official US custody prior to formal charges.
Should the FBI be unsuccessful, they might leave the subject in foreign custody, or turn
the subject over to the DCI.[41]

While recent focus has been on rendition by the CIA and DOD, the fact is the FBI
secretly engages in rendering as often, if not more so, than either of those agencies.

---

[38] The CIA and DIA refer to it as rendition.  The FBI refers to their covert participation in this activity as "rendering."
[39] Inter-Services Intelligence Agency, the Pakistani version of the CIA, and a supporter of terrorist activities.
[40] It should be noted that Petitioners assert that FBI agents have fabricated emails and cover-stories regarding
interrogations in Afghanistan in the past (Idema has firsthand knowledge of this) and used deception to shift
culpability to other agencies.
[41] Director Central Intelligence—although the CIA often refuses to take these tainted suspects into custody.

The instant case is a prime example of FBI rendering. The FBI,[42] and Respondent Mueller, placed the Petitioners in NDS custody for the sole purpose of rendering and circumventing the constitutional rights and *due process* protections of three American citizens. While Petitioners have NO objection to protect the security of the United States through the rendering of foreign terrorists and enemy combatants captured during terror operations, Petitioners have great objections to the rendering of US Citizens born in the United States, especially former Special Operations personnel and journalists engaged in **anti**-terror operations solely because their operations conflict with FBI goals. The rendering of these categories of personnel is completely at odds with the purpose of rendition, and is a complete violation of law by Respondents, who are sworn to uphold the Constitution. The fact is that the United States government, specifically the FBI, has used the War on Terror not to fight terrorists, but as an excuse to oppress US citizens and suspend the Bill of Rights.

The rendering of Petitioners clearly violates their Sixth Amendment rights as guaranteed by the United States Constitution on two plains because; first, while Petitioners are confined on the orders of the United States, they are denied a speedy trial, and all rights to *due process* by the Respondents, *see*; *Smith v. Hooey*, 393 U.S. 374, 89 S.Ct. 575, 21 L Ed 2d. Secondly, Respondents have continually, intentionally, and maliciously, subjugated Petitioners' *due process* rights in Afghanistan by repeatedly delaying the trial *de novo* granted by the Afghan Appeals Court. Further, when the Court of Appeals announced the complete innocence of all charges against Petitioners, it was Respondents that blocked the final written verdict and release of Petitioners.

Habeas corpus cases tend to cut across all branches of law, but they are particularly evident in cases involving abnormal deprivations of liberty, and this case illustrates why habeas corpus actions are indispensable where the rule of law has been abandoned.

---

[42] Bennett was directly interrogated by the FBI twice, Caraballo twice, Rasuli twice, and Idema seven times. These numbers do not include the torture interrogations during which the FBI directed the questioning from another room or the hallway.

IV.  Whether, as a result of Respondents' actions, Petitioners have been, and are being, denied vital liberty interests; such as the right to be free from illegal search and seizure. And, whether Respondents have intentionally, maliciously, and knowingly violated Petitioners' constitutional rights by: withholding exculpatory evidence, illegal confiscation and/or destruction of exculpatory evidence, engaging in denial of *due process*, obstruction of justice. and abuse of process.

The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."

In *Bivens v. Six Unknown Fed. Narcotics Agents*, the court decided a question that it had reserved in a previous case. *See: Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) discussing *Bell v Hood*, 327 U.S. 678 (1946). That decision was that a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct. The court held that the Fourth Amendment guarantees a citizen of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority. Most importantly, "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bell v. Hood*, 327 U.S., at 684 (footnote omitted); see also; *Bemis Bros. Bag Co. v. United States*, 289 U.S. 28, 36 (1933) (Cardozo, J.); *The Western Maid*, 257 U.S. 419, 433 (1922) (Holmes, J.).

In the instant case, the FBI, at the direction of Respondent Mueller, and with the assistance and complicity of Respondent Khalilzad, entered and searched Petitioners' house and compound without a valid search warrant and without probable cause. Further, the Respondents, through the FBI, illegally seized legal property of Petitioners from their compound without a warrant and without probable cause. Weeks later, the FBI again seized additional property which was evidence in Petitioners' Afghan criminal

- 51 -

case, and destroyed some property, kept most property, and returned some property.[43] In late November 2004, the FBI again seized Petitioners' property by removing it from the NDS evidence room without a valid warrant, without permission of the Afghan Appeals Court, and without legal grounds. That property, consisting of extensive exculpatory evidence which Petitioners need to defend themselves[44] in the ongoing trial *de novo*, is currently in the hands of the Respondents, and believed to be in either the United States Embassy in Kabul, Bagram Airbase, or in Washington, DC. As a result, regardless of the actual physical location, the property is in the custody and control of Respondents.[45]

The courts have long held that evidence obtained through an unconstitutional search and seizure may not be used as basis for trial and prosecution of a defendant, *Gambino v. United States,* 275 U.S. 310 (1927). If Respondents were to claim that they acted legally in concert with NDS agents who had valid authority, their assertions would be misplaced. First, the *Afghan Interim Criminal Code for Courts* specifically prohibits this type of search and seizure, <u>see</u>; Articles 5 §7, 23 §3, 32 §3, 38, and, 43. Second, the court need not ever reach the issue of whether or not it was legal under Afghan law or whether the FBI had jurisdiction (they do not), the fact remains that it was illegal under federal law. In *Byars v. United States,* 273 U.S. 28 (1927) the court was faced with a comparable situation. The petitioner was convicted on the basis of evidence seized under a warrant issued, without probably cause under the Fourth Amendment, by a state court judge for a state law offense. At the invitation of state law enforcement officers, a federal prohibition agent participated in the search. The court explicitly refused to inquire whether the warrant was "good under the state law... since in **no event** could it constitute the basis for a federal search and seizure." Id., at 29 [emphasis added].

---

[43] One box of videotapes was returned to Petitioners in open court on or about August 23, 2004. However, many of the those tapes had been erased by the FBI and many tapes were missing.

[44] This specifically violates Geneva Conventions Right To Defense, (<u>see</u>: Article 72, *Geneva Conventions relative to the Treatment of Prisoners of War of August 12, 1949*) and the *International Covenant on Civil and Political Rights, and the United Nations Universal Declaration of Human Rights.*

[45] This right to personal property is also guaranteed by the Geneva Conventions (<u>see</u>: Article 18 and Article 53, *Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949*).

- 52 -

And, the U.S. Supreme Court's decision regarding electronic surveillance have made it clear beyond peradventure that the Fourth Amendment is not tied to the [*Bivens*, 403 U.S. 388, 394] niceties of local trespass laws [or local Afghan laws, as might be applicable in the instant case]. *See also*: *Katz v. United States*, 389 U.S. 347 (1967); *Berger v. New York*, 388 U.S. 41 (1967); *Silverman v. United States*, 365 U.S. 505, 511 (1961). In light of those cases, any argument by Respondents that the Fourth Amendment serves only as a limitation on federal defenses to a state law claim, and not as an independent limitation upon the exercise of federal power, must be rejected.

Further, the interests protected by Afghan law and those protected by the Fourth Amendment's guarantee against unreasonable searches and seizures, may be inconsistent or even hostile. Thus, a private person or NDS agent might legally ask permission, and be granted admission to a person's house or office without recourse. *See*: W. Prosser, The Law of Torts 18, pp. 109-110 (3d ed. 1964); F. Harper & F. James, The Law of Torts 1.11 (1956). But, one who demands admission to the dwelling, or takes evidence under a claim of federal authority stands in a far different position. *Cf. Amos v. United States*, 255 U.S. 313, 317 (1921). The mere invocation of federal power by a federal law enforcement official will normally render futile any attempt to resist an unlawful entry, which is exactly what happened in Kabul on July 5, 2004, and a claim of authority is likely to unlock the door to the NDS evidence room as well, which is also what happened in July and November 2004 when the NDS allowed the FBI to seize all the exculpatory evidence in the case because, and solely because, the FBI used their claim of authority to seize custody and control of the evidence. *See*: *Weeks v. United States*, 232 U.S. 383, 386 (1914); *Amos v. United States, supra*.

Historically, damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials, *Bivens, supra*, and have been regarded as the ordinary remedy for an invasion of personal interests in liberty. *See*: *Nixon v. Condon*, 286 U.S. 73 (1932); *Nixon v. Herndon*, 273 U.S. 536, 540 (1927); *Swafford v. Templeton*, 185 U.S. 487 (1902); *Wiley v. Sinkler*, 179 U.S. 58 (1900); *cf West v. Cabell*,

- 53 -

153 U.S. 78 (1894); *Lammon v. Feusier*, 111 U.S. 17 (1884). And, although money damages through a *Bivens* suit are certainly available as a consequence of these acts by Respondents, it is <u>not</u> a required remedy. "It is… well settled that where legal rights have been invaded, and a federal stature provides for a general right to use for such invasion, **federal court may use any remedy available to make good the wrong done**." *Bell v. Hood*, 327 U.S., at 684 (footnote omitted) [emphasis added].

The question here is merely whether Petitioners are entitled to redress their injuries through a particular remedial mechanism normally available in federal courts. *Cf. J. I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964); *Jacobs v. United States*, 290 U.S. 13, 16 (1933). "The very essence of civil liberty certain consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 1 Cranch 137, 163 (1803).

The redress Petitioners request is simply that the evidence seized and now in the custody and control of Respondents be returned. It should be noted that the evidence, now in Respondents' possession and custody is on United States property, and therefore, cannot be returned to NDS, where Respondents could "arrange" another disappearing act, but must be returned to Petitioners who are U.S. citizens. In summation, the exculpatory evidence, needed by Petitioners to prove their innocence[46] in an Afghan Court, and in the international community, must be returned to its rightful owners.

Although this particular situation is unusual (federal agents seizing personal property from U.S. citizens without *due process* in a foreign country), it is perhaps just one more of the consequential events that has arisen from America's War On Terror and new assaults on the very fabric of the Constitution, for the federal judge who entertains a petition for habeas corpus must realize that the Great Writ is one of the primary means by which the law is adapted to a changing society.[47]

---

[46] This right of defense is also guaranteed by the Geneva Conventions (<u>see</u>: Article 72, *Geneva Conventions Relative to the Treatment of Prisoners of War of August 12, 1949*).

[47] <u>See</u>: Patterson, Law in a Scientific Age (1963)

- 54 -

V.    Whether Respondents are engaging in the denial of fundamental liberty
      interests by denying, restricting, searching, and seizing personal
      correspondence, and attorney/client privileged correspondence, with
      the intention of denying liberty rights and *due process* to Petitioners.

     The facts of the case are extraordinary, to say the least.  But Respondents
actions regarding mail are exceptionally egregious.  Respondents not only
misinterpreted memo's, letters, memorandum, and law, but took retaliatory actions
against Petitioners as a result of Petitioners filing letters of complaint, and
Petitioners attorneys threatening legal action.

     Communication with one's family is perhaps one of the most important and
fundamental rights that a United States citizen possesses.  The effect of mail
problems is well-documented in American society.  This lifeline, once violated,
cannot be cured by financial reparations, or apologies, it is an essential element of
developed societies.  In fact, the Department of State fully acknowledges the
importance of mail to American citizens incarcerated abroad, by stating:

          "One of the most essential tasks of the Department of State and US
          Embassies and consulates abroad is to provide assistance to U.S. citizens
          incarcerated abroad."[48]

This is followed up by another DOS memorandum which states;

          "Letters and packages from home constitute a real lifeline for many
          prisoners, and their replies in turn help reassure anxious family
          members."[49]

     However, Respondents have shown complete disregard for their own rules.
As an example, on February 22, 2005, in an attempt to justify their illegal actions,
Russel Brown wrote:

          "As non-US Government personnel are not to use the diplomatic
          pouch (nor the APO)…"

---

[48] *See:* DOS Assistance to US Citizens Arrested Abroad; http://travel.state.gov/travel/arrest.html
[49] *See:* 7 FAM 465.6 Mail, DOS Foreign Affairs Manual October 29, 2004.

- 55 -

This is completely false. Employees of ITT, ATT, Lockheed, and a variety of related companies all use the APO[50] in Afghanistan. So do NGOs under a special dispensation. This practice has been in place for more than three years. Furthermore, Petitioners sent and received mail through the APO both prior and after their incarceration. Additionally, Brown's description of his "diplomatic pouch" is fabulist at best. In reality it is not a "pouch" restricted to diplomatic correspondence. The Dulles, Virginia mail drop is for anything, from magazines to barbecue grills. It all arrives the same way into Afghanistan which has no formal mail system of its own.

"This system was set up by my predecessor..."

Another patently false statement. Russel Brown set that system up to calm Petitioner's families and to prevent Petitioners from taking adverse action against the US Embassy. When mail was being refused, in September 2004, Idema notified the US Government that he was going to invoke his *Geneva Conventions* rights under Article 91 (*Combatant Convention*) if Petitioners were denied the right to mail. Brown then relented and agreed to allow mail between Petitioners and their family and friends.

Using the FAM to justify the illegal actions of the DOS, Brown violates one of the most fundamental rights, then misrepresents the legality of it, then misinterprets and misquotes a government "regulation."[51] **Nowhere** in the FAM does it state that mail cannot be sent through the Dulles, Virginia address.

In fact, Brown stated that even DOS employees are not allowed to use that address for personal mail, yet Sandra Ingram, and other DOS personnel received dozens of personal magazines such as *Cosmopolitan* and *Elle*. Even *Playboy*, *Penthouse,* and *Hustler* are sent through the DOS Dulles address by DOS employees, contractors, family, and friends, but Petitioners cannot even send or

---

[50] APO: Army Post Office.
[51] This does not alter the fact that government regulations are not law, nor are they always legal.

receive a letter to or from a dying father, a 3-year old daughter, or their parents. Brown's statements were, and have continually been, despicably false.

Habeas corpus is not only the appropriate vehicle for relief, it is the perfect venue because **"habeas corpus tests not only the fact, but the form of detention and the lawfulness of the restrictions placed upon personal freedom"** [emphasis added]. _See: Bland v. Rodgers_, D.C.D.C. 1971, 332 F.Supp. 989.

In fact, from the very moment that Respondents imposed a restriction on mail, the search and seizure of mail, or even the delay of mail, they did not open the door for habeas corpus—they kicked it down. A district court in North Carolina ruled that "[t]o invoke federal writ of habeas corpus [a person] need not [even] be physically detained in jail or prison; **it is only necessary** to show that there are impediments significantly restraining his liberty to do those things free men are entitled to do." _See: Walker v. State of N.C._, D.C.D.C. 1966, 262 F.Supp. 102, affirmed 372 F.2d 129 [emphasis added].

Therefore, it does not even matter if Respondents, Brown, or anyone else states that Petitioners are in prison or in Afghanistan. All that matters is proving that Respondents are the ones imposing the liberty restraints. Petitioners assure this Court that the Pulacharke officials and Minister of Justice have placed **NO** restrictions on Petitioners' mail.

In fact, **because** of Respondents' undue liberty restraints, the Afghan Ministry of Justice has even attempted to set up internet access for Petitioners but two problems prevented it; first, it would not work in the remote area of Pulacharke, and second, the DOS refused to allow it.[52]

Respondents' actions are in violation of the First and Fourteenth Amendments and right to familial association. It is well established that a parent has a "fundamental liberty interest" in "the companionship and society of his or her

---

[52] The DOS was unaware that it would not work at Pulacharke when they objected and stopped it.

child" and that "interference with that liberty interest without due process of law is remediable..." *Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). "[T]his constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents," *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987) overruled on other grounds by *Hodges v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999). Moreover, "the First Amendment protects those relationships, including family relationships, that presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.' " *Board of Dir. v. Rotary Club*, 481 U.S. 537, 545 (1987) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 619-20 (1984)); <u>see also</u>: *Conti v. City of Fremont*, 919 F.2d 1385, 1388-89 (9th Cir. 1990).

The reckless, intentional, and deliberate acts and omissions of Respondents are a direct deprivation of Petitioners' constitutionally protected rights under the First and Fourteenth Amendments to the association, companionship and society of one and other as mother and son in the case of Brent Bennett, father and daughter in the case of Ed Caraballo, and father and son, and husband and wife in the case of Jack Idema.

Caraballo has now been denied all contact with his 3-year old daughter for more than three months. Additionally, Respondents' ban on packages,[53] such as the Christmas gifts Petitioners gave Russel Brown to mail and which were stopped by Respondent Khalilzad, not only violates the right to familial association, but raises a First Amendment issue relating to freedom of religion by and through the refusal to allow Petitioners to engage in a non-Muslim holiday tradition.

---

[53] This specifically violates Geneva Conventions Chapter VIII, Relations with the Exterior, (<u>see</u>: Articles 107, 108, and 110, *Geneva Conventions Relative to the Treatment of Prisoners of War of August 12, 1949*).

- 58 -

By restricting Petitioners' mail both in, and out, Respondents are restricting free speech which encompasses the discussion of "all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period," *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940).[54] Even if Respondents were to allow mail by DHL or Federal Express, the cost is so prohibitive that they are effectively denying the right to correspondence.[55]

As to the issue of Attorney/Client privileged communication,[56] That right is so fundamentally obvious that Petitioners need not waste the Court's time by expounding on that subject. But it should be noted that Russel Brown, who has apparently appointed himself to the United States Supreme Court, stated;

> "...please understand and expect that ALL mail, including that which you consider to be attorney-client privilege, will be opened and examined BY CONSULAR PERSONNEL ONLY... This examination also includes CD-ROMs, so please understand that anything which is encrypted will be returned to you."
>
> [All emphasis in original]

Brown, acting on behalf of Respondents, explained that they were upset that an encrypted CD with legal documents, and evidence, was sent FROM Petitioners to their attorney, and upon information and belief, because it could not be copied by the FBI,[57] the Embassy refused to send it, nor have they ever returned it. Upon information and belief, the CD was sent to Fort Meade, Maryland for decryption by the National Security Agency,[58] at the request of the FBI. This brought that liberty restraint clearly into U.S. jurisdiction.

---

[54] 84 L.Ed. 1093, 1102, 60 S.Ct. 736.
[55] This violates Article 111 of the *Geneva Conventions Relative to the Treatment of Prisoners of War of August 12, 1949*, and *Universal Postal Convention of 1947*, which require full mail privileges at no charge.
[56] Petitioners have no objection to legal mail being opened in their presence or inspected for contraband and sealed in their presence.
[57] More than one U.S. official has admitted the FBI is searching Petitioners' mail regardless of Brown's denials.
[58] A U.S. Consul from Islamabad was very upset to find out the CD carried RS4 Enhanced RSA and AES encryption. It was clearly addressed to Petitioners' attorney and the Embassy was notified that it contained legal documents, and was done as a result of the Embassy's and FBI's copying and public distribution of attorney/client privileged communications. The CD was not forwarded to Petitioners' attorney or returned.

- 59 -

"While the language of [§2241] would indicate that writ of habeas corpus is appropriate only when petitioner is 'in custody,' this section does not attempt to mark the boundaries of 'custody' nor in any way other than by use of that word attempt to limit the situation in which the writ can be used." *See: Hammond v. Lenfest*, C.A.2 (Conn.) 1968, 398 F.2d, 705.

Additionally, by refusing to send mail to Petitioners' attorneys, Respondents bring about a clear and actionable violation of the Sixth Amendment—the right to counsel. The right to counsel under the Sixth Amendment attaches when adversary criminal proceedings are initiated against an individual "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Gouveia*, 467 U.S. 180, 188 (1984). Petitioners not only face continued hearings and trials in Afghanistan, but face prosecution in the United States by Respondents in order to prevent Petitioners from releasing information the FBI considers harmful to their public image, and to force Petitioners to permit the FBI to co-opt Idema's intelligence assets inside al-Qaida. Respondents have no legal right to interfere with the attorney/client relationship between counsel and Petitioners and prevent Petitioners' access to counsel.[59]

The very foundation of the writ is to annihilate precisely these kinds of liberty restraints by government officials who feel they are above the law, and can toss the Bill of Rights into the dustbin of history. No man, no one, can interfere with the attorney/client privilege; this is the very foundation of *due process*.

Hence, this Court has the right, and the obligation, to order the U.S. State Department to cease and desist with all mail interference, especially, attorney/client privileged mail, as well as Respondents' flagitious interference and manipulation of Petitioners' Afghan Judicial Appeal.

---

[59] This specifically violates Geneva Conventions Chapter VIII, Relations with the Exterior, (*see:* Article 113, *Geneva Conventions Relative to the Treatment of Prisoners of War of August 12, 1949*).

VI.   Whether Respondents' decisions, actions, and intentionally false
      statements to a foreign court were arbitrary and did not comport
      with Petitioners' *due process* and constitutional rights.

In fact, the Department of State fully acknowledges the rights of American citizens

incarcerated abroad, by stating:

"One of the most essential tasks of the Department of State and US Embassies and

consulates abroad is to provide assistance to U.S. citizens incarcerated abroad."

Yet on one hand they say this, and the other hand, they intentionally violate this

mantra. As an example this same DOS circular claims that;

"The State Department is committed to ensuring fair and humane treatment
for American citizens imprisoned overseas. We stand ready to assist
incarcerated citizens and their families within the limits of our authority, in
accordance with international law. We can and do monitor conditions in
foreign prisons and immediately protest allegations of abuse against American
prisoners. We work with prison officials to ensure treatment consistent with
internally recognized standards of human rights and to ensure that Americans
are afforded due process under local laws."

Respondents did not just ignore this mission statement, they knowingly, and

intentionally violated every word of it, and then went out of their way to induce a foreign

government to violate their laws on behalf of the United States government. That same

DOS circular states;

"The State Department Consular services include: ...providing a
list of local attorneys to assist the prisoner obtain legal representation
[Ingram did this after the trial was almost completed, only two on the
list had a high school degree] ... providing information about judicial
procedures in the foreign country [Ingram refused to give Petitioners
a copy of Afghan law, even though she had it in her briefcase] ...
arranging dietary supplements... to qualified prisoners [Ingram stated
Petitioners were not qualified[60]— although she did sell vitamins for

---

[60] This specifically violates Geneva Convention Status and Treatment of Protected Persons, (*see*: Article 76,
*Geneva Conventions relative to the Treatment of Prisoners of War of August 12, 1949*)

- 61 -

$35 a bottle after she solicited money from Petitioners' families on her own volition[61]... protesting mistreatment or abuse to the authorities [at one point, after Idema showed Ingram third degree burns and multiple bruises, Ingram walked out of the room, told the Taliban guards Idema complained, and then left him to be beaten again for two hours. She also notified Taliban guards that Bennett and Idema requested an official complaint because they had not been allowed to bath in one month—that resulted in additional beatings].

Respondents have engaged in a policy of inaction and such inaction amounts to a failure to protect constitutional rights. *See*: *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also*: *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, at 690-91 (1978). Respondents' custom and policy of inaction is the result of a "conscious," (*City of Canton*, 489 U.S. at 389), and "deliberate" choice to follow a course of action . . . "made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Oviatt v. Pierce,* 954 F.2d at 1477 (9th Cir. 1992) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986) (plurality opinion)).

A deliberate indifference to a person's constitutional rights occurs when the need for more or different action, "is so obvious, and the adequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." (*City of Canton*, 489 U.S. at 390, and citing *Davis v. Mason County*, 927 F.2d 1473, 1482 (9th Cir.1991)).

---

[61] In fact, Ingram continually placed Petitioners' families under duress by requesting money on behalf of Petitioners without permission, and at the same time, refusing to forward mail and/or redacting messages from Petitioners to their families. Russel Brown then engaged in similar conduct by soliciting Petitioners' families to send money to pay off terrorists, misrepresenting court events by saying that the Afghan Court had ordered restitution, which was a complete misstatement of the facts and outright fabrication.

- 62 -

Most recently, US officials, namely Russel Brown, US Consul, acting on behalf of Respondents, provided knowingly false information to the Afghan Court of Appeals, by stating that official US government documents, including a letter from a US Ambassador and Defense Attaché were fake and forged. The US Consul and FBI had removed copies of this letter from Petitioners' legal mail in violation of law, and then secretly met with the Court prior to Petitioners' hearing in order to obstruct justice through knowingly false statements and to cover-up U.S. government liability and complicity. Because the U.S. Consul lied about the letter's authenticity, the Petitioners were not released.

Not only did this constitute a Fifth Amendment violation through the illegal search and seizure of legal mail, but raises Fourth and Sixth Amendment issues violation relating to unlawful search and seizure and right to counsel. The Fourth Amendment provides the "right of the people to be secure in their persons, houses, **papers, and effects,** against unreasonable searches and seizures, shall not be violated…." [emphasis added]. Russel Brown and Respondent Khalilzad have assumed the power to suggilate the United States Constitution and taken it upon themselves to determine the extent and reach of inalienable rights that have stood against oppressors for more than 200 years.

The custody of attorney/client privileged documents, and the accompanying release of them, along with the misinformation supplied to the Afghan Court regarding their authenticity, was a clear and heinous abuse of process and obstruction of justice which resulted in the continued incarceration of Petitioners. The Appeals Court of Afghanistan, stated, on the record, that:

> *"We have no trouble with you… Everyone in Afghanistan knows you are innocent. Only your government protests your release."*
> (February 2, 2005 Statement of the Chief Religious Judge, Appeals Court of Afghanistan, Supreme Court of the Islamic State of Afghanistan [emphasis in original])

In essence, Petitioners remain in custody solely at the direction of Respondents.

- 63 -

VII. Whether Respondents' acts in obstructing mail, confiscating and copying mail, refusing to send mail, and refusing to respond to letters and requests by Petitioners is in fact an intended, arbitrary and capricious obstruction for the sole purpose of denying Petitioners *due process* and other protections of the U.S. Constitution, including subjecting Petitioners to cruel and unusual punishment.

One hundred years ago, Justice Brewer made a statement that categorizes only so well, this Court's jurisdiction to specifically intercede in the issue of Petitioners' communication and contact being barred by appointed public servants such as Russel Brown and Zalmay Khalilzad;

> **"I do not believe it within the power of congress to give ministerial officers a final adjudication of the right to liberty..."**
> *United States v. Williams*, 194 U.S. 279, 295 (1904)

Absent a court order specifically prohibiting communication and contact between Petitioners and their families, friends, and legal counsel, Respondents have no jurisdiction or legal grounds to deny Petitioners the right to send mail which all other US citizens enjoy in Afghanistan.[62] Additionally, this blanket denial of mail, after months of allowing mail, was done for the sole purposes of petty retaliation and capricious denial of *due process* to arbitrarily prevent Petitioners from access to counsel to obstruct justice, obstruct Petitioners' new trial in Afghanistan, and prevent filings such as this habeas corpus case.

Collaterally, these acts by Respondents were intentionally designed to affect the emotional and mental state of Petitioners for the sole purpose of retaliation for Petitioners' exercise of their *due process* rights, thereby creating an Eighth Amendment violation constituting cruel and unusual punishment. Further, that this arbitrary and capricious punishment has just recently been increased to include the denial of water[63] to

---

[62] US citizens in Afghanistan are allowed to use both APO and DOS mail services.

[63] The right to receive potable drinking water is not only guaranteed by State Department policy but also by the Geneva Conventions (*see*: Article 26, *Geneva Conventions relative to the Treatment of Prisoners of War of August 12, 1949*).

- 64 -

Petitioners thereby making an Eighth Amendment violation exceptionally clear, and actionable.

The Supreme Court has made the responsibility and power of a court in a habeas corpus action patently clear as far back as 1904, when one of the great justices of the time, Justice Brewer, stated, "...the courts may and must, when properly called upon by petition of habeas corpus, examine and determine the right of any individual restrained of his personal liberty, to be discharged from such restraint." *United States v. Williams, supra.* It is precisely those types of rulings that give this court the power to address the types of liberty restraints outlined in this action, which although unusual, cry for justice.

Additionally, Lieutenant General David Barno's comments, and refusal to intercede in the al-Qaida assassination attempt on Petitioners in December 2004, was an Eighth Amendment violation constituting Failure to Protect from Harm. Barno specifically ordered coalition forces not protect Petitioners and U.S. Embassy officials, acting on behalf of Respondent Khalilzad refused to provide assistance to Petitioners, and also refused to investigate or prosecute the surviving terrorists who had conspired and attempted to murder American citizens. The psychological impact of these actions and inactions by Respondents also constitutes cruel and unusual punishment under the Eighth Amendment, and may also violate rights which arise under the *due process* clause of the Fourteenth Amendment (*see*: *Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

These actions by Respondents, all circling Respondents' desire to prevent and usurp Petitioners' *due process* rights, are untenable, and cannot be allowed to stand. As the Court stated in *Morris v. U.S.*; "Prisoners have the right to unfettered access to the courts, [ ] [t]o hold otherwise would offend the traditional notions of justice and fair play that underlie the due process clause. *Cf. Hannah v. Larche*, 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1959)." *See*: *Morris v. U.S.*, D.C.Va. 1975, 399 F.Supp. 720.

- 65 -

## GENEVA CONVENTION STATUS

Petitioners are at this time "Protected Persons" under the Geneva Conventions. Their status is irrefutable, and has been accepted by the Central Information Bureaux after being transmitted by Red Cross attorneys. The *PROTOCOLS Additional To The Geneva Conventions of August 12, 1949*, specifically Part I, **Article 1**, ¶ 2 states, in part:

> **"Article 41 -**
>
> 2.  In cases not covered by the Protocol or by other international agreements, civilians and combatants remain under the protection and authority of the principles of international law derived from established custom, from the principles of humanity and from the dictates of public conscience."
> [Therefore, regardless of Combatant POW Status, Petitioners are guaranteed *due process* and legal protections of in accordance with the convention.]

**Additionally,** Section II of the *PROTOCOLS Additional To The Geneva Conventions of August 12, 1949*, **Articles 43 and 44** state, in part:

> **"Article 43 - Armed Forces**
>
> 1.  The armed forces of a Party to a conflict consist of all organized armed forces, group and units which are under a command responsible to the Part for the conduct of its subordinates, even if that party is represented by a government or an authority not recognized by an adverse party..." [Note: This specifically applies to Jack Idema, Captain Bennett, Major Ezmerai, Lt. Rasuli Banderas, and others not originally captured because they were operating under the auspices of the United Front Military Forces]
>
> **"Article 44 - Combatants and prisoners of war**
>
> 1.  Any combatant, as defined in Article 43, who falls into the power of an adverse Party **shall be** a prisoner of war." [Emphasis added]

*Geneva Convention Protocol I*, Part III, § II, Article 45, ¶ 1 specifies that POW status is established by simply asserting the status upon capture or arrest in a conflict area. At that point a person has POW status.[64] After that, it is up to the high contracting

---

[64] Jack Idema, on behalf of all men, asserted protected status on the second day of capture, and no Petitioner has ever waived protected status since that time.

- 66 -

party to either accept or deny status. However, status <u>continues</u> until such time as a Geneva Military Tribunal meets and either awards permanent status, or rejects status.[65]

But, **from the moment of assertion,** a person **"in custody"** or "confinement" has **automatic status** the moment they assert that status, either verbally or in writing [emphasis added]. TASK FORCE SABER/7 personnel did that very quickly. Within 24 hours Petitioners asserted their Geneva Convention Status, within 30 days they asserted status in writing, and 60 days later they filed a complete legal grounds brief with the Central Information Bureaux in Switzerland, and copied the Red Cross.[66]

The *Geneva Convention Relative To The Treatment Of Prisoners Of War of August 12, 1949*, Part I, **Article 4,** states:

**A. Prisoners of war, in the sense of the present Convention, are persons belonging to one of the following categories, who have fallen into the power of the enemy:**

1. Members of the armed forces of a Party to the conflict as well as members of militias or volunteer corps forming part of such armed forces.

2. Members [This and #1 apply to Jack Idema, Brent Bennett, and the other Americans not originally captured/arrested by the Pro-Taliban forces] of other militias and members of other volunteer corps, including those of organized resistance movements, belong to a Party to the conflict and operation in or outside their own territory, even if this territory is occupied, provided that such militias or volunteer corps, including such organized resistance movement[67] fulfill the following conditions:

   a. that of being commanded by a person responsible for his subordinates;
   b. that of having a fixed distinctive sign recognizable at a distance;
   c. that of carrying arms openly;
   d. that of conducting their operations in accordance with the laws & customs of war.

3. Members of regular armed forces who profess allegiance to a government or an authority not recognized by the detaining power [Major Amin, Lt. Banderas-UFMF (The Northern Alliance)].[68]

---

[65] Petitioners are currently awaiting notification of a tribunal date.

[66] *"The Red Cross is the Guardian of the Geneva Convention..." Refer to:* footnote 16 for full text.

[67] Evidence showed that Task Force Saber/7 was driving government issued SUVs at the time of the arrest with Afghan Ministry of Defense official license plates and UFMF identity plaques with UFMF flags.

[68] United Front Military Forces, (*See also:* footnote 3), because all Task Force Saber/7 members were officially attached to the UFMF/NA, and/or commissioned officers in the NA, they have full status.

- 67 -

4. Persons who accompany the armed forces without actually being members thereof, such as civilian members of military aircraft crews, war correspondents [Ed Caraballo], supply contractors... [ ] provided that they have received authorization from the armed forces which they accompany, who shall provide them for that purpose with an identity card similar to the annexed model.

5. [Refers to Aircrews]

6. [Refers to inhabitants, who upon invasion, take up arms]

Because Petitioners claimed protected status, they have protected status, and only a Geneva military tribunal can terminate that status. *Geneva Convention Protocol I*, Part III, § II, Article 45, ¶ 1, which states;

> "A person who takes part in hostilities and falls into the power of an adverse Party shall be presumed to be a prisoner of war, and therefore shall be protected by the Third Convention, **if he claims the status of prisoner of war**, or he appears to be entitled to such status, or if the Party on which he depends claims such status on his behalf by notification to the detaining Power or to the Protecting power. Should any doubt arise as to whether any such person is entitled to the status of prisoner of war, he **SHALL** continue to have such status and, therefore, to be protected by the Third Convention and this Protocol until such time as his status has been determined by a competent tribunal." [Emphasis added]

Additionally, on the right of Protected Person to mail; all of the interferences with Petitioners' legal mail and case preparation are illegal under *Article 113 (see: Part III, Status and Treatment of Protected Persons, Section IV, Chapter VIII) of the Geneva Conventions of August 12, 1949* and specifically under *Article 115*, which states, in part;

> "In all cases where an internee is a party to proceedings in any court... the court [shall] be informed of his detention and shall, within legal limits, **ensure that ALL necessary steps are taken to prevent him from being in any way prejudiced, by reason of his internment,** as regards the preparation and conduct of his case or as regards the execution of any judgment of the court." [Emphasis added]

- 68 -

Finally, certain reporters have called TASK FORCE SABER/7 personnel "mercenaries." It is clear that they are not, nor ever were mercenaries. The *Geneva Convention Protocols* Article 47 clearly define the meaning of "mercenaries" by stating:

1. A mercenary is any person who:
   a. is specially recruited locally or abroad in order to fight in an armed conflict;
   b. does, in fact, take a direct part in the hostilities;
   c. is motivated to take part in the hostilities essentially by the desire for private gain and, in fact, is promised, by or on behalf of a Party to the conflict, material compensations substantially in excess of that promised or paid to combatants of similar ranks and functions in the armed forces of that Party;
   d. is neither a national of a Party to the conflict nor a resident of a territory controlled by a Party to the conflict.
   e. is not a member of the armed forces of a Party to the conflict; and
   f. has not been sent by a State which is not a Party to the Conflict on official duty as a member of its armed forces.

All TASK FORCE SABER/7 personnel are COMPLETELY excluded from this category on every issue, and any argument or characterization of them as mercenaries or bounty hunters is completely foreclosed by law.[69] All TASK FORCE SABER/7 officers were officially assigned to the Northern Alliance[70] controlled Ministry of Defense. Therefore, these types of hyperbolic press reports should not affect this Court's opinions.

Finally, as the result of their protected status, Petitioners are not just entitled to the unassailable Constitutional protections afforded to all American citizens, but are guaranteed further rights under the various *Geneva Conventions* outlined herein. In summation, **on all fronts,** the Respondents lose.

---

[69] *Geneva Convention For Combatant Prisoners of War (Protocols)* states; "Article 47 – Mercenaries; 1. A mercenary shall not have the right to be a combatant or prisoner of war."

[70] The United Front Military Forces *aka* Northern Alliance is more specifically outlined in the historical information footnotes above (*see*: footnote 3) along with their legal status regarding the Geneva Convention. Taliban Judge Bakhtyari's categorization of the Northern Alliance as a "Resistance Force" (of course it was-in the resistance AGAINST the Taliban) makes it clear that Bakhtyari was looking at this case from a Taliban point of view, and provides evidence of POW status to all Task Force Saber/7 personnel.

- 69 -

## NEXT FRIEND STATUS

"The practice of next friend applying for a writ is ancient and full accepted." *United States ex rel. Bryant v. Houston*, 273 F.915, 916 (2d Cir. 1921) (citing cases).

In the instant case, Jack Idema has filed the petition through counsel. Bennett, Caraballo, and Rasuli, have filed as Petitioners through their next friend, Jack Idema, in much the same way, that a family member would retain counsel to bring a next friend application for writ on behalf the party whose liberty interests are being restrained.

Further, the courts have repeated found that a co-defendant would qualify as a next friend, and would not be an "intruder or uninvited meddler, styling themselves as a next friend," and have permitted "next friend" petitions by co-defendants who were "clearly operating.... in the best interests" of the person on whose behalf the petition was filed. *Morris v. United States*, 399 F. Supp. 720, 722 (E.D.Va. 1975). The court's concern, regarding "the relationship and interest of the would-be 'next friend' merely calls for a determination that the third-party petitioner is likely to safeguard and advance the interests of the person on whose behalf the petition is brought. *Weber v. Garza*, 570 F.2d 511, 513-514 (5th Cir. 1978).

The courts have applied a virtually *"per se"* rule favoring next friend petitions by parents, spouses, siblings, and even sibling-in-laws, *see*: *In re Ferrents*, 8 F.Cas 1158 (S.D.N.Y. 1869) No. 4,746. In fact, the courts have permitted fellow inmates (*United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125 &n.8 (2d Cir. 1974)), co-defendants (*Morris v. United States, supra*), and even apparent strangers (*Collins v. Traeger*, 27 F.2d 842, 843 (9th Cir. 1928)), to proceed in a prisoner's behalf, as long as they are pursuing the best interests of the prisoner (*Morris v. United States, supra*).

Finally, as the courts have previously held, "[i]n situations in which the prisoner either authorizes the third-party to proceed in [their] behalf or gives no indication of opposing the suit, the courts have recognized a number of reasons why a third-party is better placed to proceed that the prisoner." *See*: *United States ex rel. Bryant v. Houston*,

- 70 -

273 F.915, 916 (2d Cir. 1921). The court stated; "[there are] many... circumstances under which it may not be... feasible that the detained person file a habeas corpus petition on [their] own behalf." Including, as one court found—susceptibility to duress or other conditions, including the threat of inhumane prison conditions, or retaliation by officials..." *See also*: *Hacklin v. State*, 102 Ariz. 218, 219, 427 P.2d 910, 911 (1967).

In the instant case, these concerns are all valid, and Idema has already received the explicit permission to represent the three other Petitioners in the Afghan Court of Appeals, and has been representing all Petitioners since November 2004, including the three related parties that were freed by the Afghan Appeals Court on December 17, 2004.

The validity of a next friend filing and the bona fides of the third party's interest in bringing the action are clearly established when a *real party in interest* has authorized the third party to proceed in their behalf, such as is the case here.[71] Therefore, as co-petitioners, his next friend status is warranted and authorized.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

The exhaustion of administrative remedies is not applicable here. There are no administrative remedies available to Petitioners. Even if there were, for eight months Respondents have refused to answer FOIA requests, letters, and even requests for medical care. Further, as the result of FOIA requests and administrative complaint letters, Respondents terminated all mail privileges. In other words, Respondents do not just ignore Petitioners' complaints regarding deprivations of constitutional rights, Respondents retaliate with increased deprivations and further *due process* and other violations.

---

[71] Liebman, *Federal Habeas Corpus Practice and Procedure*, (Michie 1988), pg. 97; *see also*: Rosenberg v. United States, 346 U.S. 273, 291-92 (1953); *Collins v. Traeger*, 27 F.2d 842, 843 (9th Cir. 1928); *Groseclose ex rel. Harries v. Dutton*, 594 F.Supp. 949, 951 (M.D.Tenn. 1984).

When Petitioners advised Respondent Khalilzad that they would file a suit regarding the right to mail, Respondent retaliated by terminating Petitioners' drinking water. The denial of the most basic necessity of life, water, is clear and convincing evidence that Respondents will retaliate each time Petitioners attempt any administrative action. Lastly, no administrative remedy procedure exists in DOS cases such as this. It is well settled that exhaustion of administrative remedies is not jurisdictional, and the courts have long recognized that the exhaustion requirement should be excused where the efforts would be futile or delayed so as to render the action moot.

## CONCLUSION

These Petitioners will continue to suffer each and every day, under threat of continued assassination attempts by al-Qaida terrorists and denial of all *due process* until this Court grants the relief requested. Petitioners have shown compelling and compassionate reason why this Court should immediately grant the Petitioners' requests. This is fully supported by the Court's decision in *Peyton*; "… a principle aim of the writ is to provide for swift judicial review of alleged unlawful restrains on [any] liberty," *Peyton v. Rowe*, 391 U.S. 54 (1968), ruling that "…the court shall… dispose of the matter as law and **justice** require," [emphasis added] *see also*: 28 U.S.C §2243.

Petitioners respectfully request this Honorable Court take into consideration the constant real threat of death which Petitioners are surviving under (there have already been four officers killed and four critically wounded as the result of al-Qaida attacks on Petitioners. As the Supreme Court has previously pointed out regarding the priority of habeas corpus actions, "… our decision today affects all procedural hurdles to the achievement of swift and imperative justice," *Fay v. Noia*, 372 U.S. 391, 435 (1963).

In closing, because of the length and scope of this §2241, the comment of Theodore Sorenson (*Decision Making in the White House*, page 8, (1962) is an apt one;

> "If some of my conclusions seem obvious I include them only
> because of the dangers inherent in omitting what seems to be obvious."

- 72 -

As the Supreme Court so eloquently stated more than forty years ago; "For when society acts to deprive one of its members of his life, liberty, or property, it takes it's most awesome steps." *See*: *Coppedge v. United States*, 369 U.S. 438, 449 (1962) [emphasis added].

Respondents have defenestrated the United States Constitution and taken actions which are clearly in opposition to the very basis upon which this country is founded. The purpose of the writ is to provide a prompt and efficacious remedy for **whatever society deems to be intolerable restraints upon ones liberty.** *Bland v. Rodgers, supra.* This habeas corpus action is not only warranted and appropriate, but necessary.

## PRAYER FOR RELIEF

**WHEREFORE,** Petitioners pray for an ORDER as set forth below:

1) barring the United States government from intercepting, delaying, obstructing, or refusing mail between the petitioners and their attorneys, family, and friends;

2) ordering the Department of Justice and Federal Bureau of Investigation to return directly to Petitioners all property and exculpatory evidence confiscated and seized illegally from Petitioners and without jurisdiction;

3) ordering Respondents to cease all communication, intended to obstruct justice, with the government of Afghanistan related to the Petitioners' criminal case in Afghanistan;

4) ordering Respondents, and/or their agents, from conducting continued illegal searches and seizures;

5) ordering Respondents to acknowledge protected status and abide by the Geneva Conventions and other protections to which Petitioners are entitled to;

6) removing all restrictions on liberty which Respondents have imposed upon Petitioners through their agents, through the use of rendition, and;

7) ordering Respondents to cease and desist their privacy violations and release of personal, private, and privileged information to the public and to the press.

- 73 -

8) **Petitioners Pray for additional Relief as set forth below;**

    a.  Granting Petitioners immediate POW status with all rights and privileges accorded, for those Petitioners still in custody by Respondents.

    b.  Imposing sanctions against Respondents for repeated, intentional, and grave violations of the Geneva Conventions, international and U.S. laws and treaties.

    c.  An award of attorney fees.

    d.  Other such relief as just and proper.

This 17th Day of March 2005.

John Edwards Tiffany (JT7322)
Attorney for Petitioner Jack Idema,
*And  Next Friend for Petitioners*
*Edward Caraballo, Brent Bennett*
*And Zorro Rasuli Banderas*
P.O. Box 190
55 Washington Street
Bloomfield, NJ  07003
(973) 566-9300 TEL
(973) 566-0007 FAX

**Respondents:**

Robert S. Mueller
Director
Federal Bureau of Investigation
J. Edgar Hoover Building
935 Pennsylvania Avenue, NW
Washington, DC 20535-0001

Condoleezza Rice
Secretary of State
US Department of State
2201 C Street NW
Washington, DC 20520

Zalmay Khalilzad
Ambassador
US Department of State
6180 Kabul Place
Dulles, VA 20189

- 74 -

## VERIFICATIONS OF PETITIONERS

**Pulacharke Prison, Kabul, Islamic Republic of Afghanistan: ss.**
1.  I am a Petitioner in the §2241 Case of Idema, *et al.*, v. Rice, *et al.*, *SDNY*,
2.  I declare under the penalties of perjury as follows, but expressly not limited thereto:
3.  The facts stated in Petitioners Application and Motion For a Writ of habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4.  Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this
___ Day of March 2005, in the Islamic State of Afghanistan.

_____S_____
J. K. Idema, Declarant/Petitioner

**Pulacharke Prison, Kabul, Islamic Republic of Afghanistan: ss.**
1.  I am a Petitioner in the §2241 Case of Idema, *et al.*, v. Rice, *et al.*, *SDNY*,
2.  I declare under the penalties of perjury as follows, but expressly not limited thereto:
3.  The facts stated in Petitioners Application and Motion For a Writ of habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4.  Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this
___ Day of March 2005, in the Islamic State of Afghanistan.

_____S_____
Brent Bennett, Declarant/Petitioner

**Pulacharke Prison, Kabul, Islamic Republic of Afghanistan: ss.**
1.  I am a Petitioner in the §2241 Case of Idema, *et al.*, v. Rice, *et al.*, *SDNY*,
2.  I declare under the penalties of perjury as follows, but expressly not limited thereto:
3.  The facts stated in Petitioners Application and Motion For a Writ of habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4.  Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this
___ Day of March 2005, in the Islamic State of Afghanistan.

_____S_____
Ed Caraballo, Declarant/Petitioner

**Pulacharke Prison, Kabul, Islamic Republic of Afghanistan: ss.**
1.  I am a Petitioner in the §2241 Case of Idema, *et al.*, v. Rice, *et al.*, *SDNY*,
2.  I declare under the penalties of perjury as follows, but expressly not limited thereto:
3.  The facts stated in Petitioners Application and Motion For a Writ of habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
4.  Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this
___ Day of March 2005, in the Islamic State of Afghanistan.

_____S_____
Zorro Rasuli Banderas, Declarant/Petitioner

- 75 -

Mar-28-05 01:32pm From-Department of State I/LEI 2026474802 T-249 P.82/083 F-440

## VERIFICATIONS OF PETITIONERS

**Petitioner Prince Kabul, Islamic Republic of Afghanistan: as**

I am a Petitioner in the 2224 Case of Idema et al. v. Kizr, et al. SUNY.

I declare under the penalties of perjury as follows, that I am competent to testify.

The facts stated in Petitioner's Application and Motion For a Writ of Habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except as to those facts stated under information and belief, which I believe to be true.

Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this ___ day of March 2005, in the Islamic State of Afghanistan.

_____
Declarant/Petitioner

**Petitioner Prince Kabul, Islamic Republic of Afghanistan: as**

I am a Petitioner in the 2224 Case of Idema et al. v. Kizr, et al. SUNY.

I declare under the penalties of perjury as follows, that I am competent to testify.

The facts stated in Petitioner's Application and Motion For a Writ of Habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except as to those facts stated under information and belief, which I believe to be true.

Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this ___ day of March 2005, in the Islamic State of Afghanistan.

_____
Declarant/Petitioner

**Petitioner Prince, Kabul, Islamic Republic of Afghanistan: as**

I am a Petitioner in the 2224 Case of Idema et al. v. Kizr, et al. SUNY.

I declare under the penalties of perjury as follows, that I am competent to testify.

The facts stated in Petitioner's Application and Motion For a Writ of Habeas Corpus under 28 U.S.C. §2241, are personally known to me and, if called as a witness, I could testify competently thereto, except as to those facts stated under information and belief, which I believe to be true.

Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this ___ day of March 2005, in the Islamic State of Afghanistan.

_____
Declarant/Petitioner

MAR-28-2005 13:01 2026474802 96% P.82

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing Application for Writ of Habeas Corpus § 2241 has been duly served upon the below named Respondents by depositing the Writ in the mail in the U.S. Post Office, *via* next day air mail, addressed as follows;

> Robert S. Mueller
> Director
> Federal Bureau of Investigation
> J. Edgar Hoover Building
> 935 Pennsylvania Avenue, NW
> Washington, DC  20535
>
> Condoleezza Rice
> Secretary of State
> US Department of State
> 2201 C Street NW
> Washington, DC  20520
>
> Zalmay Khalilzad
> Ambassador
> US Department of State
> 6180 Kabul Place
> Dulles, VA  20189

This 17 day of March 2005.

John Edwards Tiffany

- 76 -