# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J. K. Idema, Brent Bennett, Edward Caraballo, and, Zorro Rasuli Banderas, <br> *Petitioners,* <br><br> *vs.* <br><br> Zalmay Khalilzad, Ambassador, *and,* Robert S. Mueller, Director of the FBI, <br> *Respondents.* | **MEMORANDUM OF LAW** <br><br> **PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER, RULE 60 MOTION, and OTHER RELIEF** <br><br> **Case # 05 CV 2064 (EGS)** <br><br> **Assigned Judge:** Hon. Emmet G. Sullivan, US District Judge |

---

**NOW COMES,** Petitioner, J. K. Idema, through counsel, and Petitioners Brent Bennett, Zorro Banderas, joining through their *next friend*, and submit this Memorandum of Law, Points, and Authorities in Support of their previously filed Motion and Supplemental Facts. In support thereof, Petitioners respectfully show unto this Court the following:

Petitioners request this Honorable Court also review their contemporaneously filed Affidavit of Supplemental Facts to their original motion which occurred or came to light after the government was served with Petitioners' Motion.

In filing this Memorandum of Law, Petitioners vigorously assert that day to day custodial control over Petitioners is exercised by U.S. citizens outside the territorial jurisdiction of any court who are illegally denying the liberty interests of US citizens also outside the territorial jurisdiction of any US district Court. That alone, among other factors, completely distinguishes this case from *Gherebi v. Bush*, 374 F.3d 727, 739 (9th Cir. 2004) and *Rumsfeld v. Padilla*, 124 S. Ct. 2711-27 (2004) in every manner addressed in those cases by the U.S. Supreme Court. Habeas corpus is far reaching, and by no means as limited as Respondents claim. That being said, set forth below are points and authorities supporting each of Petitioners' requests for relief in the previously filed motion.

# TABLE OF CONTENTS

**RELEVANT FACTS OF THE CASE**                                         *See Motion*

**RESPONDENTS' RELATIONS TO PETITION AND SDNY JURISDICTION**          3

**ISSUES OF LAW- POINTS AND AUTHORITIES**                             5

    I.      Rule 60 Provides For Reconsideration Based On Mistakes          5

    II.     The SDNY Court Has Territorial Jurisdiction Over Respondents     7

    III.    The SDNY Court Has Subject Matter Jurisdiction Over Respondents   14

    IV.    Petition Should Be Transferred Back To The SDNY                  23
             In the Alternative—
             All District Courts Have the Right to Review a Detainer

    V.     Petitioners Have a Right To, But should Not Be Forced To Amend     27

    VI.    Petitioners Should Be Granted A Temporary Restraining Order       29

    VII.   Respondents' Should Be Barred From Further Dispositive Motions    33

**CONCLUSION**                                                        34

## RESPONDENTS' RELATIONS TO PETITION AND SDNY JURISDICTION

It is important that the Court realize that unlike most §2241 petitions, this petition clearly IS unique. There are multiple Petitioners, citizens of two different countries, one of which is the United States. There are multiple Respondents and distinctly different causes of action relating to completely different liberty interests denied by completely separate persons exercising separate control over separate and distinct issues. An overview of these separate issues and Respondents, or their agents, combined into one *habeas corpus* includes:

    a.  **Respondent Khalilzad-** who is outside the territorial jurisdiction of any U.S. Court, and not a resident of any U.S. District.

        i.  Khalilzad denies mail, familial relationships, water, medicine, and access to Afghan and U.S. courts.

       ii.  Khalilzad continues to be included because, although he is the current Ambassador to Iraq, he continues to exercise clear control over Hamid Karzai and ongoing liberty deprivations outlined in the Petition.

    b.  **Ronald Neumann-** who is outside the territorial jurisdiction of any U.S. Court, and not a resident of any U.S. District.

        i.  Neumann continues to deny mail, familial relationships, water, medicine, and access to Afghan and U.S. courts, on behalf, and as successor of, Khalilzad. Petitioners assert he is added, not substituted for Khalilzad.

    c.  **Russel Brown-** who worked at the direction of Khalilzad, and is a resident of Montana, not the District of Columbia.

        i.  Brown was the ministerial officer who exercised day to day control over Petitioners' mail, and violated their liberty interest as set forth in the Petition.

       ii.  When Khalilzad was transferred to Iraq, Russel Brown continued to exercise day to day control over Petitioners in Afghanistan.

      iii.  Russel Brown still continues to exercise control and direction over Petitioners through his replacement, Adrianne Harchick.

3

d. **Adrianne Harchick**- who works at the direction of Neumann, and is a resident of New Jersey, not the District of Columbia.

   i. Petitioners' claim against Harchick is that she is the ministerial officer who exercises day to day control over Petitioners' mail, and violates their liberty interests through illegal search and seizures, and denial of medical care, relief parcels, water, access to the Courts, and financial resources.

   ii. Harchick exercises day to day control over Petitioners in Afghanistan.

   iii. Harchick, as US Consul, is the most recent US official that stopped Petitioners release by the Afghan government after they were found innocent by an appeals court, and, upon information and belief, she did this at the direct request of Khalilzad and Neumann.

e. **Robert Mueller**- who is a resident of Virginia and outside the District of Columbia.

   i. Petitioners' claim against Mueller is for the rendition of Petitioners, illegal search and seizure, and the intentional withholding of exculpatory evidence belonging to Petitioners and held at the FBI office in Kabul and New York.

f. **Pasquale J. Damuro**- ASD in charge of the FBI's NY Office, is a resident of NY.

   i. Petitioners believe that Damuro now has the missing evidence in his control.

   ii. Upon information and belief, Damuro has sealed indictments and/or warrants against at least one Petitioner, brought in the SDNY.

g. **Kevin Thuman**- Special Agent with the FBI Afghanistan Task Force, believed to be a resident of NY, and attached to the FBI's office in NY, NY.

   i. Petitioners have *prima facie* evidence that Thuman has property and evidence in his possession which is the rightful property of Petitioners and is highly exculpatory in nature.  That the illegal search and seizure of this evidence was in violation of Petitioners' liberty interests and that this evidence, or at least some of this evidence is in New York, NY.

## I.  RULE 60 PROVIDES FOR RECONSIDERATION BASED ON MISTAKES

The SDNY Court entered its Order Denying Respondents' Motion to Dismiss and transferring Petitioners' application for writ of *habeas corpus* to the District of Columbia on May 18, 2005, prior to receiving Petitioners' response.

Additionally, this Court stayed the Governments' response, ordered an amended petition filed, threatened to dismiss the Petition for failure to comply with the rules of a "complaint," and improperly circumvented § 2243, which requires an answer "within three days unless for good cause additional time, not exceeding twenty days, is allowed."

As stated in the text of the motion, Rule 60 of the Federal Rules of Civil Procedure provides for the relief from a judgment or order based upon clerical mistakes, or errors arising from an oversight or omission by the court upon the motion of any party.

Additionally, Rule 60(b) allows for an order to be amended or reversed based on mistakes, such as inadvertence or excusable neglect.  On motion and upon such terms as are just, the court may relieve a party from a final judgment, order, or proceeding.

Petitioners respectfully request this Honorable Court either render a decision on the merits and applicable law quoted in their Petition, or, in the alternative, treat this Response as a Rule 60 Motion, amend its Order of January 19, 2006,  and transfer this case back to the SDNY.  If treated as a Rule 60 Motion, Petitioners respectfully refer the Court to:

> **Rule 60-- Relief From Judgment or Order**
>
> (a) Clerical Mistakes.  Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders.  During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.
>
> (b) Mistakes; Inadvertence; Excusable Neglect [ ]… etc.  On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:
>
> > (1) mistake, inadvertence, surprise, or excusable neglect; …
> >
> > (6) any other reason justifying relief from the operation of the judgment.

This case clearly warrants expediting by this Court and the appointment of counsel for the unrepresented Petitioners to assist with that directive.  The 16 month delay in the case has and continues to oppress and prejudice Petitioners, subjecting them to repeated daily violations of their Constitutional rights by US officials, or Afghan officials acting solely on behalf of Respondents.  *O'Sullivan v. Boerckel* 526 U.S. 479; 119 S.Ct 1728, 1732-33 (1999); *Cater v. Estelle* 677 F.2d 427, 449 (5th Cir 1982) cert. denied 460 U.S. 1056 (1983) (holding petitioner's constitutional rights are violated [when] the state and the courts have been given their "fair opportunity" to resolve and rectify the delays, protect petitioner's constitutional rights, apply the law as written and decided and/or act in the interest of justice, but is allowed to languish in perpetual in action).  *Montgomery v. Meloy,* 90 F.3d 1200, 1205, 1206 (7th Cir 1996); *Carter v. Estelle, supra,* 677 F.2d at 440 and 449 n.16 & n.15 (futility exists when the prejudicial attitude of the court to petitioner's claims is a foregone conclusion).  *O'Sullivan, supra,* at 1732 citing: *Wilwording v. Swenson*, 404 U.S. 249, 240-250; 92 S.Ct. 407 (____) (a petitioner shouldn't even have to invoke these extraordinary remedies and writs to the standard review process), *Lowe v. Duckworth*, 663 F.2d 42, 43 (7th Cir 1981) (over 17 months w/ no ruling).  *Harris v. Champion (aka Harris I)*, 938 F.2d 1062, 1065 (10th Cir 1994) (cannot penalize petitioner when delays are not caused or condoned by petitioner).

Petitioners have alleged *due process* violations and have asserted a separate violation of denial of equal protection of law.   This also includes Respondents' refusal to treat these US citizens incarcerated abroad as is required under Respondents' own DOS regulations, and comparable to how other US citizens incarcerated abroad are treated.  *Montgomery v. Meloy,* 90 F.3d 1200, 1205-06, *cert. denied* 117 S.Ct. 266 (1996) (held that inordinate delays open door to equal protection violations).  *Chitwood v. Dowd,* 889 F.2d 781, 785 (8th Cir 1989) *cert. denied* 495 U.S. 953 (1990) (where Petitioner "has made a continual good faith effort to bring his petition before the proper forum and has faced roadblocks at every turn" while the "actual time" of sentence rapidly elapsed thereby "potentially mooting his claim", officials "disregarded" petitioner's rights).

6

## II.    THIS SDNY COURT HAS TERRITORIAL JURISDICTION OVER RESPONDENTS

Where American citizens confined overseas (and thus outside the territory of any district court) have sought relief in *habeas corpus*, the courts have held, if only implicitly, that the petitioners' absence from the district does not present a jurisdictional obstacle to the consideration of the claim. *Burns v. Wilson*, 346 U.S. 137 (1953), rehearing denied, 346 U.S. 844, 851 -852 (opinion of Frankfurter, J.); *cf. Toth v. Quarles*, 350 U.S. 11 (1955); *Hirota v. MacArthur*, 338 U.S. 197, 199 (1948) (Douglas, J., concurring (1949)).

The instant case is infinitely distinguishable from *Padilla, supra*. In *Padilla*, the petitioner was held in the SDNY under a material witness warrant, then transferred[1] to South Carolina after being re-designated as an illegal combatant. At all times, Jose Padilla was in the continental United States, held in direct custody of the United States, and had a US government custodian/warden, Commander Maar, in control of his day-to-day custody and control. The enforcement of the court's writ was directly imputable to Commander Maar and hence the Supreme Court found that South Carolina was the proper jurisdiction because all parties, most witnesses, and the custodian were in South Carolina. Here, the persons to whom the alleged violations are imputable are those US citizens living in Afghanistan, and various members of the FBI, living in NY, Afghanistan, and Virginia.[2]

Petitioners in the instant case are both US and Afghan citizens, held extraterritorially in an occupied foreign country under the direct control of Respondents and other US citizens in Afghanistan.[3] Their day-to-day liberty restraints <u>are</u> imposed solely by persons outside the District of Columbia.

_____

[1] Padilla's transfer occurred two days before Padilla's counsel filed the petition, but counsel filed the writ in NY because she had no positive confirmation of where Padilla actually was; only news reports as to his location which were unconfirmed by any official source.

[2] Condoleezza Rice was dismissed as a Respondent, and two FBI agents in control of Petitioners' property and believed to be attempting extradition to NY, are added by reference, until a motion can be filed, along with US Consul Adrianne Harchick, and Ambassador Ronald Neumann.

[3] This is a critical factor when considering Petitioners' Geneva Convention Status, and actual custodian, *see*, *Prosecutor v. Dusko Tadic*, [1999] ICTY 2(15 July 1999)(Judge Antonio Cassese).

At the forefront of this question is the final statement of Justice Scalia, with whom the Chief Justice and Justice Thomas joined, dissenting, in the April 2004 decision of the Supreme Court in *Rasul vs. Bush*;

> "[W]hereas under today's strange holding Guantanamo Bay detainees can petition in any of the 94 federal judicial districts. **The fact that extraterritorially located detainees lack the district of detention that the statute requires has been converted from a factor that precludes their ability to bring a petition at all into a factor that frees them to petition wherever they wish**…" *Shafiq Rasul, et al., vs. George W. Bush, President of the United States, et al,* 03 S.Ct. 334 (2004) [emphasis added].

We think that the Supreme Court's decision is far from strange; it is a logical progression and development of *habeas corpus* law in these changing times where the war on terror is fluid, where the battlefront reaches to the four corners of the world, and where American officials (such as FBI agents, US Consuls, and Ambassadors) seek to impose their own ministerial rule and tyrannical decisions in quest of their particular beliefs or goals, rather than those of their country.

Whether or not habeas corpus reaches to these particular prisoners, and is appropriate in the federal courts, is not a subject of debate or speculation. Justice Scalia made it infinitely clear in his dissent in the *Rasul* case;

> "[T]oday, **the Court springs a trap on the Executive**… In abandoning the venerable statutory line drawn in *Eisentrager*,[4] **the Court boldly extends the scope of the habeas statute to the four corners of the earth.** [Emphasis added] Part III of its opinion asserts that *Braden*[5] stands for the proposition that "a district court acts 'within [its] respective jurisdiction' within the meaning of §2241 as long as 'the custodian can be reached by service of process." *Ante*, at 10. Endorsement of that proposition is repeated in Part IV. *Ante*, at 16 ("Section 2241, by its terms, requires nothing more [than the District Court's jurisdiction over petitioners' custodians]")." *Shafiq Rasul, et al., vs. George W. Bush, et al,* 124 S.Ct. 2686 (2004).

---

[4] *Eisentrager v. Forrestal*, 174 F. 2d 961, 966 (CADC 1949)

[5] *Braden v. 30th Judicial Circuit Court of Ky.,* 410 U.S. 484, 494-495 (1973).

Respondents have, in their prior SDNY motion, tactfully attempted to avoid this pitfall by claiming that the *Rasul* "scenario is completely distinct from the one presented here, where Petitioners are confined by Afghan authorities abroad following conviction by an Afghan court," (Respondents' April 28, 2005 Motion; pg. 7, fn 6). But the facts are quite different.[6] The charges were brought at the request of the United States, after a warrant and wanted poster was issued by the FBI, they were tried by a judge who was "former" Taliban who operated at the exclusive direction of the United States,[7] and Petitioners were found innocent by five Appeals Court judges, who ordered Petitioners released and who would have been released, except for the direct orders of Respondents who blocked the release.[8] Without opposing affidavits signed under oath, Petitioners' assertions in the application for writ must be accepted as true. Therefore, contrary to unsworn allegedly "factual" statements by Respondents' counsel, the facts upon which this case currently rests are the verified facts in the writ; that Petitioners liberty restraints are imposed at the sole direction and pleasure of US officials and no others.

Contrary to Respondents' claim of "unfounded assertions" and "no evidence" (Opposition, pg. 6, ¶ II) the Verified Petition <u>is</u> the evidence. There is no sworn affidavit or actual evidence submitted by Respondents to contradict any claim before this Court, and, as previously stated in Petitioners' Motion and Statement of Additional Facts, newspaper articles do not constitute evidence under any Rule of Evidence that Petitioners are aware of, unless of course Mr. Lev is practicing under the rules of a Taliban court. For purposes of this action, prior to Respondents filing a responsive pleading and opposing affidavits, **all allegations in the petition must be taken as true.** *Simmons v. Abruzzo*, 49 F.3d 83 (2d Cir. 02/24/1995). The courts have repeatedly found that the complaint's

---

[6] The facts supporting this are laid out in a detailed list on page 16 of Petitioners' Motion.

[7] The US State Department later issued a memo and press release applauding Taliban Judge Bakhtyari for finding Petitioners guilty, further showing US involvement and control of the case. Bakhtyari was to be flown to the US for an all expense paid trip by the Department of Justice, but was on the US suspected terrorist list and could not obtain a visa.

[8] Petitioners submit that this was in effect an FBI detainer initiated from the SDNY's jurisdiction.

allegations must of course be taken as true, and the "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). Additionally, F.R.Civ.P. Rule 8(f) provides that "[all] pleadings shall be so construed as to do substantial justice," *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, and all reasonable inferences which can be drawn from the complaint must be accepted as true. *Oshiver v. Levine, Fishbein,* 38 F.3d 1380, 1384 (3rd Cir. 1994). This is of particular importance in the instant case because extraordinary events are described and sworn to under oath by the Petitioners.[9] One of these events is the recent discovery that U.S. officials are now attempting to extradite Petitioners into the jurisdiction of this particular court.[10]

This case is further distinguished from *Eisentrager* in that the Supreme Court rejected Respondents' April 2005 assertion that this case is controlled by *Eisentrage'*s holding that a District Court lacked authority to grant habeas relief to German citizens captured by U.S. forces in China, tried and convicted of war crimes by an American military commission headquartered in Nanking, and incarcerated in occupied Germany. Reversing a Court of Appeals judgment finding jurisdiction, the *Eisentrager* Court found six critical facts: The German prisoners were (a) enemy aliens who (b) had never been or resided in the United States, (c) were captured outside U.S. territory and there held in military custody, (d) were there tried and convicted by the military (e) for offenses committed there, and (f) were imprisoned there at all times. 339 U. S., at 777.

---

[9] Petitioners' Motion is also verified, assuming the evidentiary weight of an Affidavit of Facts.

[10] It is alleged, that faced with Afghan government refusals to hold these Petitioners in custody any longer, the FBI has been attempting to effect a transfer into US custody and extradition of Petitioners to the Southern District of New York. Upon information and belief, these charges may be brought under the Patriot Act. There is NO extradition treaty between the United States and Afghanistan and this transfer of custody or extradition to New York would be illegal under US, Afghan, and international law. Therefore, based upon these events, Petitioners have a legal right to address this petition in the SDNY. *See*: *Braden* v. *30th Judicial Circuit Court of Ky.,* 410 U. S. 484, 494-495.

Petitioners here **differ from the *Eisentrager* detainees in every important respect:** They are <u>not</u> nationals of countries at war with the United States, three <u>are</u> American citizens by birth, and one is an Afghan[11] national, and they have <u>not</u> engaged in or plotted acts of aggression against this country; they have <u>never</u> been afforded access to any tribunal acting in accordance with Afghan law, no less international law, they have been <u>found innocent</u> of all wrongdoing by an Afghan appeals court; and finally, they were arrested <u>solely</u> at the request of the FBI, were tortured[12] at the direction of American FBI agents, and have been held for almost two years imprisoned in a country over which the United States exercises exclusive jurisdiction and control, and in which its president is a United States citizen and also subject to the jurisdiction of this Court.

The *Eisentrager* Court also made clear that all six of the noted critical facts were relevant only to the question of the prisoners' *constitutional* entitlement to habeas review. *Ibid.* The Court's only statement on their *statutory* entitlement was a passing reference to its absence. *Id.,* at 768. This cursory treatment was explained by the Supreme Court's then-recent decision in *Ahrens* v. *Clark,* 335 U.S. 188, in which it held that the District Court for the District of Columbia lacked jurisdiction to entertain the habeas claims of aliens detained at Ellis Island because the habeas statute's phrase "within their respective jurisdictions" required the petitioners' presence within the court's territorial jurisdiction, *id.,* at 192. However, the Court later held, in *Braden* v. *30th Judicial Circuit Court of Ky.,* 410 U.S. 484, 494-495, that such presence is not "an invariable prerequisite" to the exercise of §2241 jurisdiction because habeas acts upon the person holding the prisoner,

---

[11] As to Banderas, the courts of the United States have traditionally been open to nonresident aliens. *Cf. Disconto Gesellschaft v. Umbreit*, 208 U.S. 570, 578, 52 L. Ed. 625, 28 S. Ct. 337 (1908) ("Alien citizens, by the policy and practice of the courts of this country, are ordinarily permitted to resort to the courts for the redress of wrongs and the protection of their rights").

[12] In order to constitute torture, an act must only be inflicted with the specific intent to cause severe physical or mental pain and suffering, the standard understood as applying when the United States ratified the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Apr. 18, 1988, 1465 U.N.T.S. 85, G.A. Res. 39/46, 39th Sess., U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/39/51. (*See* petition at pg. 3 ¶2, pg. 4 ¶7, pg. 8 ¶19, pg. 18 ¶16, 17 pg. 20 ¶21, pg. 21 ¶24, pg. 32 ¶50).

not the prisoner himself, so that the court acts "within [its] respective jurisdiction" if the custodian can be reached by service of process.  Because *Braden* overruled the statutory predicate to *Eisentrager*'s holding, *Eisentrager* does not preclude the exercise of §2241 jurisdiction over petitioners' claims. Pp. 6-11.

Nor is Respondents' past reliance on *Schlanger* persuasive.  That case holds no weight in the instant case in light of the Supreme Court's ruling in *Rasul, supra*.  Nor did *Schlanger* stand for the preposition that a respondent's absence from the district is always "fatal to habeas jurisdiction."[13]  Schlanger was in the United States; Petitioners in the instant case are in Afghanistan. **The controlling case is the 2004 decision in *Rasul*,** not the 1971 decision in *Schlanger.  See*: *Schlanger v. Seamans*, 401 U.S. 487 (1971).

Petitioners' allegations— that they have in effect been held in Executive detention by officials of the Department of State, and/or FBI, for almost two years in a territory subject to the *de facto* control of the United States, that they have been denied both *due process* and right to counsel, **and subjected to repeated illegal searches and seizures,** among other things— unquestionably describes "custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §2241(c)(3) [28 USCS §2241(c)(3)]. *Cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 277-278, 108 L. Ed. 2d 222, 110 S. Ct. 1056 (1990) (Kennedy, J., concurring), and cases cited therein.

In the end, the answer to the question presented is clear.  Petitioners contend that they are being subjected to a wide range of liberty deprivations, in violation of the laws of the United States under color of law at the direction of Respondents and their agents.  Clearly the United States District Courts have jurisdiction over petitioners' custodians. *Cf. Braden*, 410 U.S., at 495, 35 L. Ed. 2d 443, 93 S. Ct. 1123.  "Section §2241, by its terms, requires nothing [**563] more."  Which is precisely why the *Rasul* court held that §2241 confers on the District Court jurisdiction to hear petitioners' *habeas corpus* challenges to the legality of their detention at the Guantanamo Bay Naval Base.  *Shafiq Rasul, et al., vs. George W. Bush, President of the United States, et al,* 124 S.Ct. 2686 (2004).

---

[13] Respondents' April 28, 2005 Motion at page 6, ¶ 1.

Of considerable consequence is the identity of those who exercise custody and control over Petitioners and are responsible for their various liberty deprivations. Those persons are US Ambassadors and Consuls, who, like the Petitioners, are located outside the formal borders of the United States and are subject to the jurisdiction of any district court.

In *Rasul v. Bush*, the Supreme Court very clearly stated the effect of their decision upon Petitioner Banderas, who has so far been ignored by the Court in this case:

> "The reality is this…today's opinion, and today's opinion alone, extends the habeas statue, for the first time, to aliens held beyond the sovereign territory of the United States and beyond the territorial jurisdiction of its courts."

There is no doubt, that where the Court has expanded the reach and protection of *habeas corpus* to aliens such as Banderas, so too has it extended its force to American citizens. And, the Supreme Court has fully acknowledged the ramifications in *Rasul* by stating:

> "[p]etitioners' allegations . . . unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States.' *Ante*, at 15, n. 15 (citing *United* States *v. Verdugo-Urquidez*, 494 U. S. 259, 277-278 (1990) (*Kennedy*, J., concurring)). **From this point forward,** federal courts **will entertain** petitions from these prisoners, and others like them around the world, challenging actions and events far away, and forcing the courts to oversee one aspect of the Executive's conduct of a foreign war."[Emphasis Added]

In their dissent in *Rasul*, Justices Scalia, Justice Thomas, and the Chief Justice, expressed a concurring position with Petitioners on the matter of a US court's jurisdiction in Afghanistan. They stated; "[s]ince 'jurisdiction and control' obtained through a lease is no different in effect from 'jurisdiction and control' acquired by lawful force of arms, parts of Afghanistan and Iraq should logically be regarded as subject to our domestic laws." **And it should,** because the United States Executive does in fact "control" Afghanistan. *See also*: *Prosecutor v. Dusko Tadic*, [1999] ICTY 2 (15 July 1999) (Judge Antonio Cassese).

Without such protection by the courts, ministerial appointees and employees of the United States can commit virtually any crime against a US citizen or engage in liberty deprivations outlined in the instant case, with virtual impunity. This would never have been tolerated by the framers of our Constitution, and should not be tolerated now.

### III.     THE SDNY COURT HAS SUBJECT MATTER JURISDICTION OVER RESPONDENTS

While subject matter jurisdiction exists in all US District Courts, it is most appropriate in the SDNY.  Therefore, Respondents must be directed to answer the writ, and there is just cause to transfer the writ back to New York where it can be heard without extensive hardship foisted upon Petitioners.  The DCDC apparently does not have the legal resources to provide *pro bono* aid to the indigent unrepresented Petitioners, and the SDNY Court does.  Respondents' counsel can walk to either  SDNY courthouse, while Petitioner Idema's counsel, and Caraballo's *next friend* and brother, must consume two days and limited, almost non-existent financial resources, to travel the DCDC.  Petitioners are also concerned about the ability of the District of Columbia to administer fair, impartial, and expedient justice in this case.  That was made clear when the Court considered form over substance at the January 19, 2006 hearing, and threatened dismissal for the Petition's failure to follow undisclosed rules in a district to which it was involuntarily transferred to.  If jurisdiction and conformance attached when the petition was filed in the SDNY, it is difficult to understand how it can be undermined and usurped upon an involuntary transfer.  The bottom line is that after one year, Respondents have never had to file any answer.

The core of this case goes to the very basis and foundation of *habeas corpus* law.  28 U. S. C. §§2241(a), (c)(3) traces its ancestry to the very first grant of federal court jurisdiction: Section 14 of the Judiciary Act of 1789 authorized federal courts to issue the writ of *habeas corpus* to prisoners "in custody, under or by colour of the authority of the United States, or committed for trial before some court of the same."  Act of Sept. 24, 1789, ch. 20, §14, 1 Stat. 82.  In 1867, Congress extended the protections of the writ to "all cases where any person may be restrained of his or her liberty in violation of the constitution, or of **any** treaty or law of the United States." Act of Feb. 5, 1867, ch. 28, 14 Stat. 385.  <u>See</u>: *Felker v. Turpin,* 518 U. S. 651, 659-660 (1996). [Emphasis added]

There is **no evidence in front of this Court to undermine or impugn Petitioners' claim** that they are being denied their liberty interests by US officials, or their agents under color of authority of the United States.

14

"At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of **Executive** detention, and it is **in that context that its protections have been strongest**." *INS v. St. Cyr,* 533 U. S. 289, 301 (2001) (emphasis added). <u>*See also*</u>: *Brown v. Allen,* 344 U. S. 443, 533 (1953) (Jackson, J., concurring in result) ("The historic purpose of the writ has been to relieve detention by executive authorities without judicial trial"). As Justice Jackson wrote in an opinion respecting the availability of *habeas corpus* to aliens held in U.S. custody, such as Lieutenant Banderas:

> "Executive imprisonment has been considered oppressive and lawless since John, at Runnymede, pledged that no free man should be imprisoned, dispossessed, outlawed, or exiled save by the judgment of his peers or by the law of the land. The judges of England developed the writ of habeas corpus largely to preserve these immunities from executive restraint." *Shaughnessy v. United States ex rel. Mezei,* 345 U. S. 206, 218-219 (1953) (dissenting opinion).

Consistent with the historic purpose of the writ, the Courts have recognized the federal courts' power to review applications for habeas relief in a wide variety of cases involving Executive detention, in wartime as well as in times of peace. The court has, for example, entertained the habeas petitions of an American citizen who plotted an attack on military installations during the Civil War, *Ex parte Milligan,* 4 Wall. 2 (1866), and of admitted enemy aliens convicted of war crimes during a declared war and held in the United States, *Ex parte Quirin,* 317 U. S. 1 (1942), and its insular possessions, *In re Yamashita,* 327 U. S. 1 (1946).

The question is whether the habeas statute confers a right to judicial review of the legality of Executive detention of American citizens and aliens in a territory over which the United States exercises plenary and practical jurisdiction, but not "ultimate sovereignty." It does. *Rasul vs. Bush, supra.* Further, persons detained outside the territorial jurisdiction of any federal district court need not rely on the Constitution as the source of their right to federal habeas review. *Rasul vs. Bush, supra.*

Because of this, it was a fundamental core violation to fail to compel Respondents to comply with § 2243, and "forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, **within three days unless**

15

**for good cause additional time, not exceeding twenty days, is allowed"** [emphasis added]. Yet it is one year later, and no answer has ever been filed. This case must be heard on the merits, and the historical precedents are far too vast to ignore.

At common law, courts have exercised habeas jurisdiction over the claims of aliens detained within sovereign territory of the realm,[14] as well as the claims of persons detained in the so-called "exempt jurisdictions," where ordinary writs did not run,[15] and all other dominions under the sovereign's control.[16] As Lord Mansfield wrote in 1759, even if a territory was "no part of the realm," there was "no doubt" as to the court's power to issue writs of *habeas corpus* if the territory was "under the subjection of the Crown." *King* v.

---

[14] See, *e.g.,* King v. *Schiever,* 2 Burr. 765, 97 Eng. Rep. 551 (K. B. 1759) (a prisoner of war captured aboard an enemy French privateer during a war between England and France); Sommersett v. Stewart, 20 How. St. Tr. 1, 79-82 (K. B. 1772) (releasing an African slave purchased in Virginia and detained on a ship docked in England and bound for Jamaica); *Case of the Hottentot Venus,* 13 East 195, 104 Eng. Rep. 344 (K. B. 1810) (habeas petition of a "native of *South Africa*" allegedly held in private custody). American courts followed a similar practice in the early years of the Republic. *See, e.g., United States v. Villato,* 2 Dall. 370 (CC Pa. 1797) (granting habeas relief to Spanish-born prisoner charged with treason); *Ex parte D'Olivera,* 7 F. Cas. 853 (No, 3,967) (CC Mass. 1813) (Story, J., on circuit) (ordering the release of Portuguese sailors arrested for deserting their ship); *Wilson v. Izard,* 30 F. Cas. 131 (No. 17,810) (CC NY 1815) (Livingston, J., on circuit) (habeas petition of enlistees who claimed that they were entitled to discharge because of their status as enemy aliens).

[15] *See, e.g., Bourn's Case,* Cro. Jac. 543, 79 Eng. Rep. 465 (K. B. 1619) (writ issued to the Cinque-Ports town of Dover); *Alder* v. *Puisy,* 1 Freeman 12, 89 Eng. Rep. 10 (K. B. 1671) (same); *Jobson's Case,* Latch 160, 82 Eng. Rep. 325 (K. B. 1626) (entertaining habeas petition of a prisoner held in the County Palatine of Durham). *See also* 3 W. Blackstone, Commentaries on the Laws of England 79 (1769) ("[A]ll prerogative writs (as those of *habeas corpus*, prohibition, *certiorari,* and *mandamus*) may issue ... to all these exempt jurisdictions; because the privilege, that the king's writ runs not, must be intended between party and party, for there can be no such privilege against the king" (footnotes omitted)); R. Sharpe, Law of Habeas Corpus 188-189 (2d ed. 1989) (describing the "extraordinary territorial ambit" of the writ at common law).

[16] *See, e.g., King v. Overton,* 1 Sid. 387, 82 Eng. Rep. 1173 (K. B. 1668) (writ issued to Isle of Jersey); *King v. Salmon,* 2 Keble 450, 84 Eng. Rep. 282 (K. B. 1669) (same). *See also* 3 Blackstone 131 (habeas corpus "run[s] into all parts of the king's dominions: for the king is at all times [e]ntitled to have an account, why the liberty of any of his subjects is restrained, wherever that restraint may be inflicted" (footnotes omitted)); M. Hale, History of the Common Law 120-121 (C. Gray ed. 1971) (writ runs to the Channel Islands, even though "they are not Parcel of the Realm of England").

*Cowle,* 2 Burr. 834, 854-855, 97 Eng. Rep. 587, 598-599 (K. B.).  Later cases confirmed that the reach of the writ depended not on formal notions of territorial sovereignty, but rather on the practical question of "the exact extent and nature of the jurisdiction or dominion exercised in fact by the Crown." *Ex parte Mwenya,* [1960] 1 Q. B. 241, 303 (C. A.) (Lord Evershed, M. R.).[17]

In Respondents' previous SDNY memorandum of law, opposing counsel cited *Rumsfeld v. Padilla*, 124 S.Ct. at 2717-18, 2723, but failed to point out that *Justice Stevens*, with whom *Justice Souter, Justice Ginsburg,* and *Justice Breyer* joined dissenting, stated; "We have long implicitly recognized an exception to the immediate custodian rule in the military context **where an American citizen is detained outside the territorial jurisdiction of any district court.**  [Emphasis added]  *See*: *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 498 (1973) (discussing the exception); *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955) (court-martial convict detained in Korea named Secretary of the Air Force as respondent); *Burns v. Wilson*, 346 U.S. 137 (1953) (court-martial convicts detained in Guam named Secretary of Defense as respondent)."

Respondents then made a futile attempt to distinguish the instant case, by stating that the "Americans confined overseas referenced in *Padilla* were all confined by American authorities abroad.  See *Padilla*, 124 S.Ct. at 2726 n.16" (citing *Burns v. Wilson*, 346 U.S. 137 (1953) and other cases), and that in the instant case, Petitioners are confined by a foreign government.[18]  However, these Petitioners clearly allege that it is American

---

[17] *Ex parte Mwenya* held that the writ ran to a territory described as a "foreign country within which [the Crown] ha[d] power and jurisdiction by treaty, grant, usage, sufferance, and other lawful means." *Ex parte Mwenya,* 1 Q. B., at 265 (internal quotation marks omitted).  *See also King v. The Earl of Crewe ex parte Sekgome,* [1910] 2 K. B. 576, 606 (C. A.) (Williams, L. J.) (concluding that the writ would run to such a territory); *id.,* at 618 (Farwell, L. J.) (same).  As Lord Justice Sellers explained:

"Lord Mansfield gave the writ the greatest breadth of application which in the then circumstances could well be conceived... . 'Subjection' is fully appropriate to the powers exercised or exercisable by this country irrespective of territorial sovereignty or dominion, and it embraces in outlook the power of the Crown in the place concerned.' " 1 Q. B., at 310.

[18] Respondents' Motion, Footnote #6, page 7.

authorities that have confined Petitioners overseas (*see* verified petition at ¶4, pg. 25 ¶33, pg. 29 ¶43, pg. 30 ¶46, pg. 38 ¶73).  While there was only limited and verbal hearsay evidence of this before, since the filing of the petition new evidence has arisen.  That evidence includes the facts set forth in Petitioners concomitant motion, but also additional facts now set forth in a contemporaneously filed *Affidavit of Supplemental Facts*.

On February 28, 2005, the Court of Appeals of Afghanistan, consisting of a five judge panel, declared all Petitioners innocent of all charges and directed their release.  The US Embassy interceded and stopped that release for the third time as set forth Petitioner's *Affidavit of Supplemental Facts*.  These events and conversations were documented by Afghan officials and can be made available to the Court at a hearing, *in camera* to prevent retaliation against cooperating witnesses by the FBI and US State Department.

Subsequently, new evidence has also been obtained proving Sandra Ingram and Russel Brown directly stopped Petitioners' release at the request of Ambassador Khalilzad through coercion and bribes.  Based on the facts alleged, the actions of Ingram, Brown, and Khalilzad constitute a violation of 18 USC § 201 (b)(1-2) Bribery of public officials and witnesses.  Afghan government officials have provided Petitioner's counsel with clear and convincing evidence of these events.  That evidence, which is admissible in this case under 28 U.S.C. § 2245, can be provided to this court *in camera*, and completely belies any assertion by Respondents and by the US government that Petitioners are not in the actual custody and control of the United States and that Respondent Khalilzad was not the *de facto* warden and his successors continue in that capacity.  Therefore, Respondents' continued assertion that "Petitioners are confined by Afghan authorities abroad following conviction by an Afghan court," may have been acceptable on its face prior to the filing of this *habeas corpus* petition, but is completely disingenuous at this time.

At the January 19, 2006 hearing, Respondents' counsel again asserted the comical notion that this was a purely Afghan matter.  Compare Respondents' statements to the new evidence set forth the Petitioners' *Affidavit of Supplemental Facts*.  For purposes of *habeas corpus*, the prisoner's "custodian" is the individual making the decision to keep the petitioner in custody. *See*: *Procacci v. Sigler*, D.C.D.C. 1973, 61 F.R.D. 5.

*Habeas corpus* also allows the challenge of future liberty deprivations. The FBI claims to have "pending" charges against at least one Petitioner, and that threat of future liberty restraints, along with what is effectively a detainer by US Ambassadors and the FBI, opens the door for the writ. <u>See</u>: *Schoffs v. Warden, FCI, Lexington*, D.C.Ky 1981, 509 F.Supp. 78; *Braden v 30th Judicial Circuit Court of Kentucky*, Ky. 1973, 93 S.Ct. 1123, 410 U.S. 484, 35 L.Ed.2d 443; *Fore v. U.S.*, D.C.Tenn. 1977, 436 F.Supp. 769; *King v. Lynaugh*, W.D.Tex. 1990, 729 F.Supp. 57. These charges are alleged to be issued out of the FBI's NY office within the SDNY. The issuance of the Wanted Poster by the FBI is *prima facie* evidence of these pending charges, and of the root and genesis of the original arrest of Petitioners in Afghanistan (*see* Exhibit B, Petitioners' Motion). Despite Respondents' assertions to the contrary, the FBI, in the words of the Afghan Appeals Court and its prosecutor, "remains behind the curtain," pulling the strings and ordering the continued incarceration of Petitioners.

One of the grounds Respondents are using to stop the Petitioners' release, are "future" charges by the US government. This constitutes a detainer and this threat of unresolved charges, and/or a future indictment, which has yet to materialize on paper, is a violation of Petitioners' Sixth Amendment rights to a speedy trial, *Smith v. Hooey*, 393 U.S. 374, 89 S.Ct. 575, 21 L Ed 2d. The use of these grounds by Respondents to influence and direct the actions of the Afghan judiciary is illegal. Furthermore, the FBI's attempt to extradite Petitioners back to New York is clearly a violation of international law and treaties because no extradition treaty exists between the United States and Afghanistan. Nor does the United States have jurisdiction to bring charges against Petitioners for alleged crimes that occurred on Afghan soil, notwithstanding the fact that the Appeals Court declared all Petitioners innocent of all crimes previously charged.[19]

In one conversation, a US Consul told Richard Caraballo, that if there were not charges in the Afghan court, there could be none in a US court. This is reliable evidence that Respondents <u>were</u> and <u>are</u> using the Afghan government to render Petitioners. <u>*See*</u>

---

[19] Irrefutable evidence of this can be supplied to the Court *in camera* during the hearing.

*Walberg v Israel* 776 F 2d 134, 136 [7th cir 1985] [dicta] "unconditional release [is appropriate if] there is no jurisdiction to detain the applicant."

The evidence removed from the Afghan Court by the FBI would have been completely and overwhelmingly exculpatory during the trials of Petitioners. It is clear from the FBI's seizure of evidence from Afghan authorities that this was a retaliatory prosecution which unconstitutionally impinged on Petitioners' right of access to the courts.[20] Most importantly, it denies Petitioners' right to be free from illegal search and seizure by the FBI. <u>See</u> *Harris v. Champion* (aka *Harris I*) 938 F.2d 1062, 1066-67 (10th Cir 1991) Id. at 1070 n.8 (holding this extensive egregious conduct of the state, in and **of itself**, is sufficient to require outright acquittal and discharge).

The original search and seizure by the FBI violated Petitioners' Fourth Amendment rights, and it was clearly the intention of the FBI, by removing the evidence during the first trial and on the eve of the second trial, to deny Petitioners *due process* in perpetuity. In our view, the First Amendment prohibits such targeted prosecutions, just as it prohibits legislation aimed at punishing free speech. Prosecutorial discretion is a "core executive constitutional function," *United States v. Armstrong*, 517 U.S. 456, 465, 134 L. Ed. 2d 687, 116 S. Ct. 1480 (1996), but as the Supreme Court has made clear, "the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, [*880] including the exercise of protected statutory and constitutional rights."[21] *Wayte v. United States*, 470 U.S. 598, 608, 84 L. Ed. 2d 547, 105 S. Ct. 1524 (1985).

While the FBI and US State Department have continually stated that no evidence was removed by the US government, the facts and evidence are quite different. On July 24, 2004, New York FBI agent Kevin Thuman signed a receipt for the missing evidence

---

[20] Petitioners refer to access to US Courts based on the preposition that if this evidence had not been illegally seized by the FBI the Petitioners they would be able to prove all of their allegations of events prior to July 5, 2004.

[21] The FBI and Khalilzad did NOT want those evidence tapes released to the press corps because they had also contained evidence of US government involvement with Petitioners, and evidence that the 2004 Afghan presidential vote would "rigged."

(*see* Exhibit F, Petitioners' Motion).  On or about August 16, 2004, the FBI returned some of the evidence (*See* petition at pg. 23 ¶29, pg. 33 ¶53), but much of the evidence was either destroyed, erased, or still missing (*see* petition at pg. 23 ¶29, pg. 33 ¶53, 54, pg. 34 ¶55, pg. 40 ¶77, pgs. 48, 51-54, 59).  On or about November 28, 2004, just one week before Petitioners' trial *de novo* in the Appeals Court, the FBI again removed all of the evidence, leaving the Petitioners without any physical evidence to defend themselves.  On May  10, 2005, the United States Department of State, for fifth time, denied that any evidence existed proving the United States government had ever removed evidence in the case in an email from the DOS to Petitioner Caraballo's brother:

> ----- Original Message -----
> From: Kirincich, Elizabeth A [US Department of State]
> To: Richard Caraballo
> Cc: Foo, Jenny J
> Sent: Tuesday, May 10, 2005 4:07 PM
> Subject: Edward Caraballo
> Mr. Caraballo:
>
> … I …have spoken with Russel Brown via email.
>
> Russel explained that there is no political angle to your brother's case. Unfortunately, Mr Idema has indicated that there is a conspiracy against him by the FBI.  There is however, no evidence of this.
>
> …[ ]…
>
> Finally, in answer to your question about evidence being confiscated, the embassy is not aware that the FBI "confiscated" evidence as Mr Idema and his lawyers claim.
>
> …Betty                                  (Full Text in Exhibit D to Motion)

After filing the petition, counsel for Petitioners obtained a translated copy of an official Afghan document, which was an evidence receipt signed by FBI Agent Kevin Thuman, believed to be an agent assigned to the SDNY FBI office, or working out of or with the FBI's NY office on the Counter-Terrorist Task Force.  He is, upon information and belief, in custody, or possession of Petitioners' exculpatory evidence.

*Prima facie* evidence of bad motive triggers an obligation on the government's part to show that permissible considerations supported its action. *Moore v. Hartman*, 388 F.3d 871, 879 (DC Cir. 2004), *see also*: *Beckett v. Airline Pilots Ass'n*, 313 U.S. App. D.C. 288, 59 F.3d 1276, 1278 (D.C. Cir. 1995). *Compare*: *Mozzochi v. Borden*, 959 F.2d 1174, 1180 (2d Cir. 1992).

Agent Thuman was also one of the two FBI Agents that repeatedly interrogated each of the Petitioners at Hamid Karzai's NDS *Saderat* Torture Facility in Kabul.[22] Additionally, Agent Thuman was present during an interrogation of known terrorist Ghulamsaki, the brother-in-law of Osama bin Laden's Chief of Bodyguards and bin Laden's son-in-law (known as "Daoud"), (*See* petition at pg. 3 ¶2, pg. 28 ¶40). During this non-aggressive interrogation, conducted by Petitioner Idema, with FBI agents present, Ghulamsaki admitted that their plan was to "blow up Bagram" airbase with fuel tankers and expected to kill more than 500 American soldiers, (*See* petition at pg. 28 ¶40, compare, pg. 16 ¶10) and kill the current Prime Minister of Afghanistan, Yunis Qanooni, a staunch and outspoken rival of Khalilzad and Karzai.

Petitioners' exculpatory evidence is currently held in both Kabul and New York (*see* petition at pg. 52). The courts have clear and present jurisdiction over these liberty restraints and over Respondents and evidence located in New York and Afghanistan. Respondents in Afghanistan can be reached just as easily from the Southern District of New York, as they can be from the District of Columbia. As such, the SDNY Court has subject matter and territorial jurisdiction over this petition and this case.[23]

───────────────────────

[22] As a matter of law, the District Courts have the legal authority to hear any and all allegations of torture or abuse. *See*: *Mu-Xing Wang v. John Ashcroft, et al*, #02-2045 (2nd Cir. 2002)(Errata Filed April 2, 2003), specifically finding that "federal courts have jurisdiction to consider CAT claims raised in §2241 petitions. CAT- referring to Article 3 of the *United Nations Convention Against Torture*, as implemented by the Foreign Affairs Reform and Restructuring Act of 1988.

[23] While Petitioners seek a return of this case to New York, these facts, points, and authorities, also support the fact that <u>any</u> district court has jurisdiction to hear this case, and contradict Respondents' claims that no court has the power to hear the case at bar. Therefore, in the alternative, this Court should render a decision based upon the merits.

## IV.   PETITION SHOULD BE TRANSFERRED TO THE SOUTHERN DISTRICT OF NY
### (IN THE ALTERNATIVE—ALL DISTRICT COURTS HAVE THE RIGHT TO REVIEW A DETAINER)

Respondents previously stated that "the forum 'with the most immediate connection' to each of the Respondents is Washington D.C.," and that "only the district court in the District of Columbia may hear a *habeas* petition against them," citing *Padilla*, 124 S.Ct. at 2828.

Petitioners also allege that the FBI has a warrant for at least one Petitioner in the Southern District of New York, and are seeking extradition of all Petitioners should the Afghan government refuse to continue what is clearly a rendition by the FBI.  Curiously enough, Respondents do not deny this, and have never denied this.

The overruling of *McNally* v. *Hill,* 293 U. S. 131 (1934), made it possible for prisoners in custody under one sentence to attack a sentence which they had not yet begun to serve.  And it also enabled a petitioner held in one State to attack a detainer lodged against him by another State.  In such a case, the State holding the prisoner in immediate confinement acts as agent for the demanding State, and the custodian State is presumably indifferent to the resolution of the prisoner's attack on the detainer.

Here, for example, the Petitioners are confined in Afghanistan, but their dispute is with the NY FBI Office, not the State of Afghanistan.  *Under these circumstances*, it serves no useful purpose to require that the action be brought in Afghanistan, or conducted in the District of Columbia.  *Braden v. 30th Judicial Circuit Court of Ky.,* 410 U. S., at 498-499 (1973) (citations and footnotes omitted; emphases added).

Thus, *Braden* stands for the proposition that a Petitioner may seek a writ of *habeas corpus* in a jurisdiction in which he suffers legal confinement, though not physical confinement, if his challenge is to that legal confinement.  This is precisely the case here where Petitioners suffer liberty deprivations from the actions relating to the illegal search and seizure of property, the denial of mail, and with that denial, the deprivation of familial and attorney relationships, and a pending warrant and potential extradition or future incarceration.

Similar to *Braden*, these Petitioners are held in Afghanistan,[24] but have invoked their right to a writ of federal *habeas corpus*, alleging denial of their constitutional right to a speedy trial, *Smith v. Hooey*, 393 U.S. 374 (1969), and to be free from extradition and rendition.  This can also be considered prayer that an order issue directing the appropriate respondent to afford them an immediate trial on the alleged sealed indictment and/or arrest warrant believed to be located in the Southern District of New York.

In *Braden*, the court held that petitioner had been denied a speedy trial and ordered respondent either to secure his presence in Kentucky for trial within 60 days or to dismiss the indictment, finding that Kentucky must,

> "attempt to effect the return of a prisoner from a foreign jurisdiction for trial
> on pending state charges when such prisoner so demands . . . Since it is the
> State of Kentucky which must take action, it follows that jurisdiction rests in
> this district which has jurisdiction over the necessary state officials."

That they may not be involuntarily held through rendition, then involuntarily extradited contrary to law and without a specific extradition treaty,[25] is a claim "which [they are] legally entitled to assert at this time under *Peyton v. Rowe*, 391 U.S. 54 (1968)." *Braden, supra*, 454 F.2d, at 146.

Under *Braden*, Petitioners can also raise claims that future liberty interests are deprived when US government agents obtain statements, information, documents, videotapes, and evidence in violation of the Fourth, Fifth and Fourteenth Amendments, including the initial illegal arrest and torture of Petitioners.[26]

---

[24] For the purposes of a speedy trial claim return of exculpatory evidence claim and/or detainer claim, whose physical custody they are actually in is insignificant and irrelevant.

[25] 28 U.S.C. §2241(c)(3) authorizes a district court to grant writ of habeas corpus whenever a petitioner is "in custody in violation of the Constitution or laws or treaties of the United States."

[26] The illegal arrest and subsequent search gave the FBI access to the evidence, and although the torture yielded no result from Idema and Bennett, it did from Banderas.

The governments' use and possession of illegally seized materials without allowing access by Petitioners, is being used as a double-edged sword—as evidence against them in future proceedings and as the denial of access to exculpatory evidence which could ultimately release them from their current situation.

In quoting *Schlanger* in their April 2005 motion,[27] **Respondents erroneously attempted to assert the fatality of this Petition,** but failed to point out the very foundation of the *Schlanger* decision; the Great Writ "is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrongful restraints upon the liberty. *Schlanger v. Seamans*, 401 U.S. 487, 493 (1971)

In addition to violating liberty interests and constitutional protections outlined in the Petition for *habeas corpus,* such as the right to be free from illegal search and seizure, Respondents have engaged in criminal acts such as obstruction of justice in their seizure and concealment of exculpatory evidence.

Furthermore, by doing so, the FBI, and under the venerable doctrine of *respondent superior*, the Respondents, have concealed and withheld information related to capital crimes by admitted and known terrorists, thereby violating 18 USC § 4 Misprision of felony.[28]  By removing this evidence, the FBI agents involved, including the FBI agents working out of the NYC FBI Office, have violated 18 USC § 2071 Concealment, removal, or mutilation generally.  By refusing to allow Petitioners access to their property and exculpatory evidence Respondents have not only violated the Constitutional liberty interests of Petitioners, they have committed a felony by violating 18 USC § 654 Officer or employee of United States converting property of another.[29]

---

[27] And incorporated through an exhibit to their current Memorandum of Law
[28] They have also failed to prosecute terrorists which attempted to murder US citizens—the attacks on Idema, Bennett, and Caraballo which have left so many innocent Afghans dead and wounded.

[29] Although these specific Title 18 offenses are listed, they are by no means the entire gamut of offenses committed or imputable to Respondents or their agents under a variety of statutes, including the Patriot Act, such as, but not limited to; obstruction of justice, witness tampering, suborning of perjury, and a wide range of criminal conduct, much of which occurred on US soil.

Each of these acts are curable under *habeas corpus*, and relief is clearly sought in the writ filed.[30]

These illegal actions by Respondents are clearly within the realm of *habeas corpus*, as Justice Brewer and the Supreme Court stated one hundred years ago,

> "I do not believe it within the power of congress to give ministerial officers a final adjudication of the right to liberty…" *United States v. Williams*, 194 U.S. 279, 295 (1904)

Petitioners' right to invoke a federal writ of *habeas corpus* in relation to liberty deprivations outside their actual confinement, such as those imposed by Respondents, is grounded in their right to invoke the writ even if they are not "physically detained in jail or [a] prisoner; it is only necessary to show that there are impediments significantly restraining [their] liberty to do those things free men are entitled to do." *Walker v. State of N.C.*, D.C.D.C. 1966, 262 F.Supp. 102, affirmed 372 F.2d 129.

---

[30] Other acts are not curable at all; such as, upon information and belief, Khalilzad contacting Shinwari in May 2005 and requesting Shinwari's assistance on behalf of the U.S. government to release additional known terrorists. On or about May 19, 2005, Shinwari, at the request of Khalilzad, ordered the release of al-Qaida terrorist Mohammed Aziz, "Mahmood" and four others. Aziz, Mamood, and the others, had attempted to murder Petitioners on December 17, 2004 in a bloody assault on their quarters which resulted in four Afghan officers killed and five officers wounded protecting Petitioners, while four terrorists were killed, Aziz critically wounded, and four other terrorists unharmed. Aziz and Iraqi terrorist Bokan (killed that day), had been originally captured by Idema in Northern Afghanistan during the 2001 war against al-Qaida and the Taliban and, upon information and belief, their orders to kill Idema had come directly from Osama bin Laden's al-Qaida network. During the February/March 2006 Pulacharke Prison siege Mahmood was killed and Aziz wounded again by one of Idema's soldiers.

### V.    PETITIONERS HAVE A RIGHT TO, BUT SHOULD NOT BE FORCED TO AMEND

The Government continues to state that it does not concede that these Respondents are "proper respondents" and hopes "to dismiss the Petition for failure to name proper respondents." This is wishful thinking at best. It is long established that failure to name the proper Respondent[31] is not fatal to a *habeas corpus* petition.

Respondents admitted in their prior motion that dismissal was not an option (*see* Respondents' April 2005 Motion, page 6-7, citing *Gherebi v. Bush*, 374 F.3d 727, 739 (9th Cir. 2004) (ordering transfer to District of Columbia of habeas action filed against, among others, the president…). However, this is also distinguished from the instant case in that the *Gherebi* case applied to foreign nationals, imprisoned within the formal territories of the United States (at GITMO). *See*: *Shafiq Rasul, et al., vs. George W. Bush, President of the United States, et al,* 124 S.Ct. 2686 (2004).

Further, Petitioner Idema's father is a New York resident, and this is relevant in that his liberty interests are being restrained by the illegal ban on mail which has been imposed by Respondents. If retained in the DCDC, John Idema, a petitioner's father, can still file a separate action as a petitioner based on Respondents' denial of liberty interests—the right to communicate with his son and access to the United States postal system.[32] "*Habeas corpus* tests not only the fact, but the form of detention and lawfulness of restrictions placed upon personal freedom," *Bland v. Rodgers*, D.C.D.C. 1971, 332 F.Supp. 989.

Amending *habeas* petitions to add new claims for declaratory, injunctive, and mandatory relief, or to substitute respondents, add petitioners, or address new liberty deprivations, is not an anomaly, but rather, where appropriate, a preferred solution. *Jean v. Meissner*, D.C. Fla. 1981, 90 F.R.D. 658. But, that solution should only be ordered when the petition is fatally deficient, NOT for the purposes of delay. While the statute is quite

---

[31] Be that as it may, Petitioners dismissed Condoleezza Rice as a named Respondent and may seek to file a motion to add additional Respondents based on newly obtained evidence.

[32] Petitions "may be amended or supplemented as provided in the rules of procedure applicable to civil actions," 28 U.S.C. § 2242. Further, that leave to amend "shall be freely given when justice so requires," F.R.Civ.P., Rule 15(a). But there is no requirement, unless it is meritless on its face.

explicit that petitions "may be amended or supplemented as provided in the rules of procedure applicable to civil actions," there is no precedent to force a petition to be amended because of format, involuntary transfer to a jurisdiction with different rules, or when the original petition is no facially deficient.  *See* 28 U.S.C. § 2242.  While the Federal Rules state that leave to amend pleadings "shall be freely given when justice so requires."  F.R.Civ.P., Rule 15(a), in this case, Petitioners did not request leave to amend; they requested that the Petition be heard forthwith and a response be ordered.

The Court's comments at the January 19, 2006 hearing fly in the face of reality, practicality, and law.  Habeas petitions <u>must</u> be construed as liberally as possible.  *See*: *Holiday v. Johnston*, 313 U.S. 342, 350 (1941), *Pyle v. Kansas*, 317 U.S. 213, 216 (1942), *Williams v. Kaiser*, 323 U.S. 471, 475 (1945), *Dorsey v. Gill*, 148 F.2d 857, 865 (D.C. Cir. 1945), *Clark v. Warden*, 293 F.2d 479 (4th Cir. 1961), *Turner v. Maryland*, 303 F.2d 507 (4th Cir. 1962), *Tyler v. Harris*, 226 F.Supp. 852, 855 (W.D.Mo. 1964), *Killgore v. Blackwell*, 332 F.2d 585 (3d Cir. 1964).

Respondents think the law is a straight jacket, and that every case fits into a neat little package of past case law, but the law is not so inflexible and in no area of law should this be more true that in the consideration of *habeas corpus* petitions.[33]  *Habeas corpus* cases are not simply meant to "produce the body."  They cut across all branches of law, but are particularly important in cases where deprivations of liberty are imposed by non-judicial or ministerial appointees.  The common theme is that flexibility and "grease at the joints" is essential and that this thesis would appear to a sound and healthy one.[34]  Petitioners' petition and motion addresses facts which support this action being heard on the merits as quickly as possible.  They also support a prompt and efficacious remedy for "whatever society deems to intolerable restraints upon ones liberty."  *Bland v. Rodgers*, D.C.D.C. 1971, 332 F.Supp. 989.

---

[33] Sokol, FEDERAL HABEAS CORPUS (Michie Co. 1968), pg. 105.

[34] *See*: *Berman v. United States*, 378 US 530, 537-38 (1964); Justice Black on the suffering of men at the expense of legal systems which worshipped rigid formalities at the expense of justice.

## VI.  PETITIONERS SHOULD BE GRANTED A TEMPORARY RESTRAINING ORDER

The Supreme Court has consistently found that the Constitution protects "certain kinds of highly personal relationships," *Roberts v. United States Jaycees*, 468 U. S. 609, 618, 619-620 (1984).  This includes a right to maintain certain familial relationships, including association among members of an immediate family and association between grandchildren and grandparents.[35]  *See*: *Moore v. East Cleveland*, 431 U. S. 494 (1977) (plurality opinion); *Meyer v. Nebraska*, 262 U. S. 390 (1923).

Prison [even Afghan prison] walls do not form a barrier separating inmates from the protections of the Constitution.  Hence, prisoners retain the constitutional right to petition the government for the redress of grievances, *Johnson v. Avery*, 393 U.S. 483 [21 L. Ed. 2d 718, 89 S. Ct. 747] (1969); they [*138]  are protected against invidious racial [denial of Christmas mail by Respondents] discrimination by the Equal Protection Clause of the Fourteenth Amendment, *Lee v. Washington*, 390 U.S. 333 [19 L. Ed. 2d 1212, 88 S. Ct. 994] (1968); and they enjoy the protections of due process, *Wolff v. McDonnell*, 418 U.S. 539 [41 L. Ed. 2d 935, 94 S. Ct. 2963] (1974); *Haines v. Kerner*, 404 U.S. 519 [30 L. Ed. 2d 652, 92 S. Ct. 594] (1972).  [**2171]  Because prisoners retain these rights, 'when a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights' *Procunier v. Martinez*, 416 U.S. 396, 405-406 [40 L. Ed. 2d 224, 94 S. Ct. 1800]."  Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution.

To state a claim for denial of access to the courts - in this case due to interference with legal mail - a petitioner must allege that the Respondent "took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'" *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997) (citing *Lewis v. Casey*, 518 U.S. 343, 351, 116 S. Ct. 2174, 2180, 135 L. Ed. 2d 606 (1996)); *see also*: *Cancel v. Goord*, 2001 U.S. Dist. LEXIS

---

[35] Respondents' have stopped mail to and from Petitioners, denied John Idema's right to correspond with his son, and prevented Petitioners from corresponding with attorneys and family.

3440, No. 00 Civ. 2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) ("In order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct [**7] was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim.") (citing *Lewis*, 518 U.S. at 353, 116 S. Ct. at 2181). *Davis v. Goord*, 320 F.3d 346, (2nd Cir. 2003); 2003 U.S. App. LEXIS 2405 September 4, 2002, Argued  February 11, 2003, Decided 2003.

In addition to the right of access to the courts, a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment.  *See*: *Heimerle v. Attorney General*, 753 F.2d 10, 12-13 (2d Cir. 1985); *Hudson v. Greiner*, 2000 U.S. Dist. LEXIS 17913, No. 99 Civ. 12339, 2000 WL 1838324, at * 5 (S.D.N.Y. Dec. 13, 2000). Restrictions on prisoners' mail are justified only if they "further[] one or more of the substantial governmental interests of security, order, and rehabilitation . . .[and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved."  *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986).  In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater [**8]  protection to outgoing mail than to incoming mail.  *See*: *Thornburgh v. Abbott*, 490 U.S. 401, 413, 109 S. Ct. 1874, 1881-82, 104 L. Ed. 2d 459 (1989); Washington, 782 F.2d at 1138-39; *Davidson v. Scully*, 694 F.2d 50, 53 (2d Cir. 1982).

While a prisoner has a right to be present when his legal mail is opened, *Wolff v. McDonnell*, 418 U.S. 539, 574-76, 94 S. Ct. 2963, 2983-85, 41 L. Ed. 2d 935 (1974), an isolated incident of mail tampering is usually insufficient to establish a constitutional violation.  *See*: *Morgan v. Montanye*, 516 F.2d 1367, 1371 (2d Cir. 1975); *Washington*, 782 F.2d at 1139.  Rather, the inmate must show that prison officials "regularly and unjustifiably interfered with the incoming legal mail." *Cancel*, 2001 U.S. Dist. LEXIS 3440, 2001 WL 303713 at *6 (citing Washington, 782 F.2d at 1139).

In *Washington*, the court determined that as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice

of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled [**9] the prisoner's right of access to the courts or impaired the legal representation received. 782 F.2d at 1139. Following Washington, district courts have generally required specific allegations of invidious intent or of actual harm where the incidents of tampering are few and thus the implication of an actionable violation is not obvious on its face. *See*, e.g., *Cancel*, 2001 U.S. Dist. LEXIS 3440, 2001 WL 303713 at *6 (dismissing claim where only two incidents of tampering alleged and no other indications of a continuing practice); *John v. N.Y.C. Dep't of Corrections*, 183 F. Supp. 2d 619, 629 (S.D.N.Y. 2002) (requiring plaintiff to allege facts that show defendants acted with invidious intent and plaintiff was harmed by the interference); *Hudson*, 2000 U.S. Dist. LEXIS 17913, 2000 WL 1838324 at *5 (same); [*352] *Johnson v. Morton*, 1996 U.S. Dist. LEXIS 22612, No. 95 Civ. 949, 1996 WL 518078, at *1 (E.D.N.Y. Aug. 26, 1996) (noting that "courts have consistently applied *Morgan v. Montanye* to dismiss suits by inmates alleging unconstitutional opening of their legal mail without any showing of damages"); *see also*: *Lewis*, 518 U.S. at 351, 116 S. Ct. at 2180 (holding [**10] that inmate must establish actual injury, rather than "theoretical deficiency" to state constitutional claim for interference with access to courts).

Petitioners' allegations of repeated instances of mail interference, and a complete blockade on mail for 16 months, are more than sufficient to state a claim for denial of access to the courts because Petitioners have alleged that the interference with their mail constitutes an ongoing practice of unjustified censorship and causes them to be denied access to the courts prejudicing their legal actions.

By blocking relief parcels Respondents adversely affect the physical and mental health of Petitioners. By blocking family mail Respondents affect the physical, mental, and financial health of petitioners and their families. By blocking legal mail Respondents impose a complete denial of due process and access to the courts. At the same time Respondents engage in this diabolically nefarious conduct, this Honorable Court threatens dismissals and sanctions when Petitioners fail to respond to the Court's deadlines.

31

A petitioner cannot lose his rights to federal *habeas corpus* [and *factual determinations* of claimed *errors* and constitutional violations on procedural grounds] because he was obstructed by the *"arbitrary and lawless"* actions of the state. *Cooper v. Taylor,* 70 F.3d 1454, 1470 (4th Cir 1995). Because "[t]here is no higher duty of a court than the careful processing and adjudication of petitions for…habeas corpus…for it is in…[this]…a prisoner charges error, neglect, or evil purpose…resulting in his unlawful confinement and that he is deprived of his freedom contrary to law." Id. at 1470, quoting: *Harris v. Nelson* 394 U.S. at 290-91; 89 S.Ct. at 1086-87 (1969).

Nor can Petitioners be denied water, medicine, or financial aid from their families for any reason, no less for retaliatory purposes. A recent statement by US Consul Adrianne Harchick makes clear the degree of vindictive retaliation rendered by Respondents. During the Pulacharke Prison siege, Richard Caraballo requested information about his brother's physical condition after his beating. Harchick stated to Caraballo, "I can no longer talk to you or give you information." When Richard Caraballo asked why, Harchick responded, "Because you sued us."

It is critical remind the Court, that this alleged interference is NOT precipitated by ANY Afghan authority, only by US Citizen employees of the United States government (*see Motion,* **Exhibit C**, samples of returned mail and relief packages- there are more than 150 known of at this time).[36] The duty of the court is to uphold the Constitution of the U.S. over an oppressor's actions to arbitrarily and lawlessly deny equal protection of it under color of comity to a prisoner. *See*: *Harris I*, supra, 938 F.2d at 1070 n.8

Therefore, a temporary restraining order is not only warranted and justified, but supported by law. Petitioners respectfully request this Honorable Court intercede to protect this valued liberty interest from being further usurped by Respondents.

---

[36] Some names and addresses have been redacted to protect individuals from further intimidation tactics of the FBI, including but not limited to, surprise visits and interviews, 24 hour surveillance, and coercive interrogation methods. Many of the people that have attempted to mail or contact Petitioners has been contacted or interrogated or and in some cases, arrested by the FBI or threatened with arrest by members of the FBI's CT Task Force.

## VII.  RESPONDENTS SHOULD BE BARRED FROM FURTHER DISPOSITIVE MOTIONS

Motions to Dismiss cannot be made piecemeal hoping that a Court will adopt one argument, and holding back another for a later day.  The government must bring its grounds for dismissal at once and if denied, then answer the merits of the case.

Rule 12(b) allows that certain defenses may at the option of the pleader be made by motion, such as (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, and (5) insufficiency of service of process.  However, Rule 12 (g) Consolidation of Defenses in Motion, states that if "a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted, except a motion as provided in subdivision (h)(2) hereof on any of the grounds there stated."  Rule 12(h) Waiver or Preservation of Certain Defenses, states:

> "(1) A defense of lack of jurisdiction over the person, improper venue,
>      insufficiency of process, or insufficiency of service of process is waived
>      (A) if omitted from a motion in the circumstances described in subdivision (g)"

Respondents' should be denied, leave to file any dispositive motion again,[37] and Respondents should be precluded from bringing further defenses under this rule, or relating to any matters designated in Rule 12(h), as they are waived for failure to bring them all at one time.

---

[37] *See* F.R.Civ.P. "**Rule 12 (g) Consolidation of Defenses in Motion.**  If a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted, except a motion as provided in subdivision (h)(2) hereof on any of the grounds there stated."

*See also*: "**Rule 12 (h) Waiver or Preservation of Certain Defenses.**

(1) A defense of lack of jurisdiction over the person, improper venue, insufficiency of process, or insufficiency of service of process is waived

(A) if omitted from a motion in the circumstances described in subdivision (g)…"

# CONCLUSION

Respondents' position in this case is simply for the purposes of an unwarranted and capricious delay. As this court is well aware, *res judicata* does not apply to *habeas corpus*, and as such, just as this Court stated in its May 18, 2005 Order, dismissal is totally senseless. *Salinger v. Loisel*, 265 U.S. 224, 230 (1924); *Wong Doo v. U.S.*, 265 U.S. 239 (1924). That a country which stands upon the proposition that "above all else, liberty…"[38] would take the position that US Attorneys are currently adopting in the current wave of *habeas corpus* actions remains disturbing at best.

Contrary to Respondents continued assertions that *habeas corpus* serves no other purpose other than the release of an individual from custody, the courts have held that the writ of *habeas corpus* is the most "fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action," *Cooper v .Taylor*, 70 F.3d 1454, 1456 [12], [13], 1470 (4th Cir 1995) and cited cases.

Finally, Respondents' reliance upon Webster's dictionary interpretation of the Latin phrase over rulings of the United States Supreme Court to support that assertion and convince this Honorable Court that no relief can be granted outside of "producing the body" is unavailing, and simply wrong and the Supreme Court has consistently said so. *Cooper v .Taylor* 70 F.3d 1454-1470 (4th Cir 1995) citing *Harris v. Nelson* 394 U.S. 286, 290-91; 89 S.Ct. 1082, 1086:

> "After all, the "principle aim of the writ is to provide for swift judicial review of alleged unlawful restraint on [any] liberty."
>
> *Peyton v. Rowe*, 391 U.S. 54 (1968)."

**WHEREFORE,** Petitioner requests this Honorable Court grant the relief requested as set forth in Petitioners' previously filed Petition and motions.

---

[38] Thomas Jefferson.

This 3rd Day of May 2006.

_____*S/*_____
John Edward Tiffany,
Attorney (JT7322)
*For Petitioners*
PO Box 190
55 Washington Street
Bloomfield, NJ  07003
Ph:   973/566-9300
Fax: 973/566-0007

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing Memorandum of Law, Points, and Authorities, has been duly served upon the below named Respondents on May 4, 2006, through the ECF filing system to;

ORI LEV, DC # 452565
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
Mail: P.O. Box 883, Washington, DC 20044
Delivery: 20 Massachusetts Ave., NW, Rm 7330
Washington, DC 20001
Tel: (202) 514-2395
Fax: (202) 318-7589

This 3rd day of May 2006.

_____*S/*_____
John Edwards Tiffany