UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| J.K. Idema, *et al.*,<br>  *Petitioners*, | )<br>)<br>)<br>) | |
| v. | )<br>)<br>) | No. 05 CV 2064 (EGS) |
| United States Department of State, *et al.*,<br>  *Respondents*. | )<br>)<br>)<br>)<br>) | ECF Case |

**PETITIONER CARABALLO'S RESPONSE TO
SUPPLEMENTAL BRIEF IN OPPOSITION TO PETITIONERS' MOTION FOR
TEMPORARY RESTRAINING ORDER ADDRESSING MOOTNESS OF
PETITIONER CARABALLO'S CLAIM.**

   NOW COMES, Petitioner Edward Caraballo, *pro se*, and respectfully responds to Respondents' above cited submission. Petitioner Caraballo contests Respondents' motion to moot his claim on the following grounds:

   The Supreme Court has recognized that where "collateral consequences" of a conviction persist post-incarceration, release from custody does not automatically moot a habeas claim.

   This petitioner respectfully asserts that the wrongful conviction that we have petitioned this Honorable Court to review has ongoing collateral consequences. In CARAFAS v. LAVALLEE, 391 U.S. 234 (1968), the Supreme Court ruled that,

> [b]ecause of these "disabilities or burdens [which] may flow from" petitioner's conviction, he has "a substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed on him." Fiswick v. United States, 329 U.S. 211, 222 (1946).
>
> On account of these "collateral consequences," 8 the case is [391 U.S. 234, 238] not moot. Ginsberg v. New York, 390 U.S. 629, 633 -634, n. 2 (1968); Fiswick v. United States, supra, at 222, n. 10; United States v. Morgan, 346 U.S. 502, 512 -513 (1954).
>
> [ Footnote 8 ] Undoubtedly there are others. See generally Note, Civil Disabilities of Felons, 53 Va. L. Rev. 403 (1967).

> [The Habeas Writ's] province, shaped to guarantee the most fundamental of all rights, 11 is to provide an effective and speedy instrument by which judicial inquiry may be had into the legality of the detention of a person. See Peyton v. Rowe, ante, p. 54. 12 [391 U.S. 234, 239]
>
> [ Footnote 11 ] E. g., Article 39 of the Magna Carta (see 9 W. Holdsworth, at 112-125). The federal habeas corpus statute grants jurisdiction to inquire into violations of the United States Constitution.

Hence, the High Court concluded,

> "Though the federal habeas corpus statute requires that the applicant be 'in custody' when the habeas corpus application is filed, the relief that may be granted is not limited to discharging the applicant from physical custody, the statute providing that "the court shall . . . dispose of the matter as law and justice require." 28 U.S.C. 2243. Parker v. Ellis, 362 U.S. 574 (1960), overruled. Pp. 238-240."

In SPENCER v. KEMNA, the High Court cited Carafas in observing that the Collateral Consequence doctrine obliges that,

> Once the convict's sentence has expired, however, some concrete and continuing injury other than the now-ended incarceration or parole–some "collateral consequence" of the conviction–must exist if the suit is to be maintained. See, e.g., Carafas, supra, at 237-238. [SPENCER v. KEMNA (96-7171) (1998)

Here, Petitioner Caraballo, an Emmy award winning investigative journalist, was never accused of anything more than merely operating various types of digital video cameras and tape recorders. Respondents were fully aware of this fact:

> "[...]The letter from Emma that Ed is referring to is something that might be helpful in Ed's making a plea to the president of Afghanistan, Hamid Karzai, to let Ed out of jail on humanitarian grounds. This is something that we are going to try, given that Ed was never accused of actually engaging in torture or kidnapping or any of the other allegations made against [others]."
>
> E-mail excerpt from US Consul Russell Brown to Caraballo family, (November 9, 2004)

Throughout this petitioner's twenty five years in broadcast news, Petitioner Caraballo has produced, photographed and/or edited documentaries and news programs for CBS, CNN, ABC, as well as local stations in several markets around the US. His specialty is undercover and hidden camera work.

The US War on Terror is the most important news story of the past 5 years. This petitioner was in the process of completing a documentary on this topic when he went to Afghanistan to film the counter terrorism activities of Petitioner Idema. Petitioner Idema had served both the Afghan government and the US military as a civilian military consultant during the 10-month war that liberated Afghanistan from Taliban rule after the September 11, 2001 terrorism attacks.

The documentary was to focus both on Mr. Idema's counter terrorism activities and the larger CT story unfolding in Afghanistan.

Once in Afghanistan, Petitioner Caraballo spent almost three months documenting Petitioner Idema's activities. Over this period, this petitioner documented Petitioner Idema working with US military, ISAF, several Afghan law enforcement agencies, as well as high-level Afghan government officials. The senior Afghan officials included then Vice President/Defense Minister Muhammad Qasim Fahim and Karzai Administration Special Security Advisor Yunis Qanooni. Mr. Qanooni is currently the head of the main Afghan Parliament.

As documented in the over 100 hours of video footage produced for the project, the expertise and service provided by Mr. Idema and his group was welcomed and deemed so useful by the US military and multiple Afghan and ISAF security agencies that these entities actively responded with substantive manpower resources and other material assistance right up until the days immediately preceding July 5, 2004.

In fact, scores of servicemen from multiple Afghan security agencies participated in the final two terror suspect interdictions that all Petitioners would later be arrested for. Notably, each official contingent was led by senior officers who were on scene and could independently assess terror suspects and evidence and make their own independent determinations. The ISAF contingents also included trained Explosives Ordinance Removal experts. The conclusion reached by all those on scene, including the senior officials and the experts, was that the terror suspects were dangerous and should be arrested.

On July 5, 2004, at the behest of and under the effective direction of Respondents, this petitioner was arrested along with co-petitioners and "put on trial" by a foreign government for several serious charges.

The news media's accounts which form the public record of the case confirms that the Afghan proceedings lacked virtually all the requisites of due process, including (a) competent translation, (b) more than nominal evidence access, (c) protection from evidence tampering by external interests, (d) access to defense witnesses and (e) ability to cross examine prosecution witnesses.

Further, although the news media was not aware, proceedings were also subject to extraordinary interference from both the FBI, the agency that apparently initiated proceedings, and the State Department, including a highly irregular and damaging reported intervention by Embassy Kabul's second in command. Yet, despite the extraordinary authority that the FBI exercised during proceedings, this Respondent filed no official documentation at the time nor has any been subsequently produced to rationalize or legally justify FBI acts which caused the Constitutional and due process violations which nearly cost this petitioner his life.

At the conclusion of the trial, this petitioner, the 4-time Emmy winning journalist, was unjustly given an 8 year conviction.

After the wrongful conviction, facts compelled Afghan appellate judges to admit that certain charges – such as "illegal entry" – were unfounded. Post conviction, the State Department itself would acknowledge that the other charges had nothing to do with this petitioner's activities.

Accordingly, the State Department even began efforts to have the Afghan government pardon Petitioner Caraballo two months after the wrongful sentence began. The efforts were shelved without explanation for almost two years shortly after the November 2004 evidence disappearance detailed in this petitioner's main September 11, 2006 submission.

Since the accusations leveled against this petitioner were the same ones that were leveled against the four Afghan citizens in this case, another noteworthy fact is that the

Afghans were quietly exonerated and released in December 2004.

Petitioner Caraballo has not been exonerated. He was forced to serve over 90% of his appeal-adjusted wrongful conviction.

## THE POST-INCARCERATION COLLATERAL CONSEQUENCES OF PETITIONER CARABALLO'S WRONGFUL CONVICTION.

Beyond the seemingly interminable two year incarceration that this petitioner was forced to suffer through, he continues to live with the substantive collateral consequences of the unjust conviction that resulted in large part from a number of highly irregular acts by Respondents' agents. Specifically, the wrongful conviction has directly caused (a.) an effective termination of this petitioner's broadcast news career and (b.) a potentially permanent termination of his right to be a father to his young daughter and only child.

## COLLATERAL CONSEQUENCE ONE: RUINED EMPLOYMENT PROSPECTS.

Petitioner Caraballo has returned to the United States to find his professional reputation utterly destroyed. Significantly, most of what was written and broadcast about the so-called "foreign tribunal" that this petitioner suffered through was derived primarily from three sources: (a.) press statements by Respondents' spokespeople, (b.) press statements by Afghan authorities whose comments frequently echoed those of Respondents' spokespeople and (c.) the news media's observations of the "chaotic" Afghan court proceedings.

Notably, Respondents' spokespeople were the primary information source in much of the coverage that forms the public record of the "foreign tribunal." In addition, coverage of this case frequently featured comments by US and Afghan government officials who readily provided false and prejudicial remarks, yet refused to allow their own names to be associated with them. Some examples:

> "An unnamed Afghan official said that after the shootout with Idema and his men, the prisoners were found in a house that had been turned into a makeshift jail. They were hanging upside down and had been beaten."
>
> From "US mercenary 'dangled Afghans upside down in private Kabul jail'" By Nick Meo, Time magazine (7/9/04)

> "An unnamed Afghan official said that after the shootout with Idema and his men, the prisoners were found in a house that had been turned into a makeshift jail. They were hanging upside down and had been beaten."
>
> From "Mercenary Held in Kabul Over `Torture' at Private Jail" From The Independent, London (UK) (7/09/2004)

At an August 23, 2004 hearing, this petitioner was forced to attend on crutches due to painful, swollen reddish purple contusions at the soles of his feet. Although the contusions were the result of prison abuse, Respondents insisted in the news media that he and co-petitioners were being "treated fairly":

> The United States Embassy here is closely monitoring the trial of three Americans accused of kidnapping, detaining and torturing Afghans to ensure that the men are treated fairly, an American official said Tuesday.
>
> But the official also said that the United States believed that the Afghan authorities had not mistreated the men in custody -- Jonathan K. Idema, Brent Bennett and Edward Caraballo -- and that the government had the right to try them.
>
> "The charges leveled are very serious charges, so it's appropriate that the Afghan government would want to pursue them," said the official, who spoke on the condition of anonymity.
>
> From "3 Accused Americans Not Mistreated by Afghans, U.S. Official Says." By Amy Waldman, New York Times (8/25/04).

**INABILITY TO REFUTE FALSEHOODS WHILE WRONGFULLY INCARCERATED.**

Because of the hard realities of imprisonment in a war-torn, impoverished nation on the other side of the world, this petitioner had no ability to refute any of the misinformation and resulting speculation that eclipsed his 25-year journalism career and replaced his good name with a false public record of disrepute. Further, during his wrongful two year incarceration, the well-publicized misrepresentations and outright falsehoods have ossified into hard misperceptions about this petitioner.

Consequently, upon his return to the US, this petitioner has found an insurmountable barrier to employment. Even news industry colleagues who have known Petitioner Caraballo for years, and should know better, have expressed doubts about his character based upon the half-facts, speculation and inferences that now constitute the public's impression of this case

and the unearned and false negative reputation that this petitioner has been saddled with.

Not surprisingly, the end result is that, despite ongoing efforts to find work and this petitioner's considerable expertise and experience, it has not been possible to find gainful and sorely needed employment in his chosen field since his return to the United States in May 2006.

**COLLATERAL CONSEQUENCE TWO: DENIAL OF CORE PARENTAL RIGHTS.**

On June 28, 2006, this petitioner attended a family court hearing in New York in an attempt to reestablish his parental visitation rights with his little girl. Due to a contentious divorce, relations with the child's mother, this petitioner's estranged former wife, are anything but friendly.

In family court, the estranged ex-wife's attorney easily turned the Afghan case's unproven and unfounded accusations into a denial of visitation with the child.

To produce this result in family court, the attorney merely stated (a.) that Petitioner Caraballo had "apparently" been charged with "torturing people", (b.) that Afghan court's had convicted him and (c.) that Respondent's had publicly endorsed the wrongful conviction.

Any State Department public endorsement is directly contradicted by both the State Department's and the Afghan appeal court's own private acknowledgments that this petitioner's conviction was flawed and wrong.

Nonetheless, by the conclusion of the June 28 hearing, this petitioner's estranged ex-wife's attorney was able to block visitation through October 2006. (See Exhibit 1: Family Court Order)

It remains to be seen whether Petitioner Caraballo can keep the forced separation with his child, now over two years, from becoming a permanent and painful lifetime disability. A scheduled October 2006 hearing may decide this question.

Both of the above instances are a direct collateral consequence of this petitioner's wrongful incarceration.

In SPENCER v. KEMNA (96-7171), the Supreme Court held that a habeas petitioner's conviction challenge

> "[...]had not become moot despite the expiration of his sentence and despite the fact that "his civil rights, including suffrage and the right to hold public office, [had been] restored," id., at 391, n. 4. [...] Since he had not been pardoned, we said, "some collateral consequences of his conviction remain, including the possibility that the conviction would be used to impeach testimony he might give in a future proceeding and the possibility that it would be used to subject him to persistent felony offender prosecution if he should go to trial on any other felony charges in the future." Ibid. SPENCER v. KEMNA (96-7171)]

For this petitioner, denial of his fundamental right to visit with his beloved and only child represents an especially cruel and unusually punishing collateral consequence. And unless Petitioner Caraballo can rectify the false public record now associated with his name, he may face recurring negative collateral consequences for the rest of his life.

> In SIBRON v. NEW YORK, 392 U.S. 40 (1968), the Supreme Court said:
> A confession of error, though entitled to great weight, does not relieve this Court from making its own examination of the record of a case where a conviction has been erroneously obtained, <u>particularly where a judgment</u> of the State's highest court interpreting a state statute <u>is challenged on constitutional grounds</u> [...]. Pp. 58-59. [392 U.S. 40, 42] SIBRON v. NEW YORK, 392 U.S. 40 (1968) [Emphasis added.]

Hence, Petitioner Caraballo appeals to this Honorable Court in an effort to reestablish his good name. As the Supreme Court noted in Sibron v. New York:

> Many deep and abiding constitutional problems are encountered primarily at a level of "low visibility" in the criminal process - in the context of prosecutions for "minor" offenses which carry only short sentences. 12
>
> We do not believe that the Constitution contemplates that [392 U.S. 40, 53] people deprived of constitutional rights at this level should be left utterly remediless and defenseless against repetitions of unconstitutional conduct.

The High Court also noted in Sibron that:

> "[I]t is far better to eliminate the source of a potential legal disability than to require the citizen to suffer the possibly unjustified consequences of the disability itself for an indefinite period of time before he can secure adjudication of the State's right to impose it on the basis of some past action. Cf. Peyton v. Rowe, 391 U.S. 54, 64 (1968). 18
>
> [ Footnote 18 ] This factor has clearly been considered relevant by the Court in the past in determining the issue of mootness. See Fiswick v. United States, 329 U.S. 211, 221 -222 (1946).

**ULTIMATE REMEDY SOUGHT: RECLAMATION OF PETITIONER CARABALLO'S GOOD NAME.**

The very purpose of the Great Writ, as the Supreme Court said in Carafas, is to "inquire into the legality of the detention of a person" and "dispose of the matter as law and justice require."

It is true that this petitioner has already served the sentence that was imposed upon him by the so-called "foreign tribunal," wrongful though it was.

The existing controversy pertains to the legality of the Respondents' acts which directly resulted in the "foreign conviction" and the hard collateral consequences that this petitioner will, unless corrected, be unjustly forced to live with for the rest of his natural life.

As discussed in detail in this petitioner's related September 11, 2006 submissions, Petitioner Caraballo respectfully submits that this Honorable Court has clear authority to hear this case and in the process compel truthful discovery, something that was so easily denied to Petitioners in Afghanistan's troubled court system, where accusations, once lodged, typically end in conviction regardless of facts or case merits.

An effective inquiry by this Honorable Court into Respondent's actions here would go a long way toward correcting the wrongful collateral consequences that will otherwise substantively impact Petitioner Caraballo and his family indefinitely.

Obviously, since the Executive branch has expended billions of US taxpayer dollars in Afghanistan since 2001, Respondents place considerable value in promoting their public contention that Petitioners were jailed by a functional, competent and just legal system.

Unfortunately, two years later, things have not improved in that poor country. And there is no escaping the fact that Afghanistan's institutional deficiencies are now a matter of generally recognized public knowledge:

> "Most galling to average people is the corruption of judges, which makes redress nearly impossible. There have been virtually no prosecutions of corrupt high-level or local officials. Corrupt police chiefs and governors remain in their positions or, if complaints grow too loud, are rotated to other jobs, said Mr. Hakim, of the human rights commission."

FROM "Nation Faltering, Afghans' Leader Draws Criticism" By CARLOTTA GALL, New York Times (8/23/06)

In closing, Petitioner Caraballo respectfully implores this Honorable Court to permit this petitioner to retain his active standing in this matter and to promptly move forward with this and the crucial related FOIA proceedings.

> The 1966 amendments to the habeas corpus statute seem specifically to contemplate the possibility of relief other than immediate release from physical custody. Petitioner is entitled to consideration of his application for relief on its merits. He is suffering, and will continue to suffer, serious disabilities because of the law's complexities and not because of his fault, if his claim that he has been illegally convicted is meritorious.
>
> There is no need in the statute, the Constitution, or sound jurisprudence for denying to petitioner his ultimate day in court. CARAFAS v. LAVALLEE, 391 U.S. 234 (1968)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 11, 2006.

Respectfully submitted,

\_\_\_\_\_/S/_____

Edward Caraballo
c/o Richard Caraballo
60 Erie Street, #103
Jersey City, New Jersey 07302

Case 1:05-cv-02064-EGS    Document 24    Filed 09/11/2006    Page 11 of 12

Case 1:05-cv-02064-EGS Document 24 Filed 09/11/2006 Page 12 of 12