## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J. K. IDEMA, et al | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) |
| | ) |
| | )       No. 05 CV 2064 (EGS) |
| RICE, et al., | ) |
| | ) |
| Respondents. | ) |
| | ) |
| | ) |

### PETITIONER CARABALLO'S REPLY MEMORANDUM
### TO RESPONDENTS' OPPOSITION TO PETITIONERS' MOTION
### FOR TEMPORARY RESTRAINING ORDER

Petitioner Caraballo respectfully responds to Respondents' above cited submission wherein Respondents offer the following as justifications for dismisssal of this Habeas application: (1) Petitioners are not in U.S. custody,  (2.) Petitioners were convicted "by Afghan authorities", (3) "act of state" doctrine and (4) "international  comity" preclude the Court's jurisdiction.

Petitioner Caraballo contests Respondents' motion for dismissal  and the premises upon which it is based on the following grounds:

28 U.S.C. § 2241 (c)(1) provides that the writ of habeas corpus shall extend a prisoner if he "is in custody under or  by color of the authority of the United States."

28 U.S.C. § 2241 (c)(3) provides that the writ shall extend a prisoner  if he "is in custody in violation of the Constitution or laws or treaties of the United States . . . · ."

In the instant case, agents of the Executive branch exercise extraordinary authority during a "foreign tribunal" while ignoring virtually all Constitutional due process rights and legal rights under both Afghan and US law.

Sitting en banc in Weinberger v. Ramirez de Arellano, 471 U.S. 1113 (1985), the D.C. Circuit explained:

> "[...]It is highly questionable whether officials of the Executive are entitled to raise the act of state defense to prevent the Judiciary from exercising its role in the tripartite system of government to remedy injuries to United States citizens caused by unconstitutional activities of the United States Executive Branch." 745 F.2d at 1542 (emphasis in original). "A teaming up with foreign agents," the D.C. Circuit explained, "cannot exculpate officials of the United States from liability to United States citizens for the United States official's unlawful acts." Id. (emphasis in original).

The remainder of this document develops Petitioner Caraballo's argument.

**TABLE OF EXHIBITS:**
- Exhibit 1: Memorandum Opinion - 04-1258 (JDB)
  [Source reference for habeas statute jurisdiction analysis]
- Exhibit 2: Zalmay Khalizad – Career Overview
- Exhibit 3: Zalmay Khalizad – Source Articles
- Exhibit 4: A Quick Guide to relevant Afghan due process law.

---

**TABLE OF CONTENTS:**

TABLE OF EXHIBITS: ............................................................................ 2

**I. Overview. ........................................................................................ 6**

Afghanistan's aspirational due process protections............................................. 6

Lack of factual rebuttal from Respondents. ......................................................... 7

Executives' extraordinary actions in the "foreign tribunal" triggers
this Court's jurisdiction. ................................................................................. 7

The timing of both evidence obstruction events is telling. .................................... 7

Assuming the tribunal's intent was a fair trial on merits,  evidence
availability could have produced a release within days. ...................................... 8

Of 5,000 Afghan judges, both primary and appeals judges receive
invitations to the US.......................................................................................... 9

The surprise from America: upheld convictions. .................................................. 9

Extraordinary Executive branch participation in foreign tribunal
triggers the Court's jurisdiction under 2241 (c)(1) and 2241 (c)(3)....................... 9

The Supreme Court: the habeas statute's constitutional component
and liberal construction ensures US citizens redress............................................ 10

Respondents' agents were not benign witnesses to Petitioners' due
process and Constitutional rights violations. ...................................................... 10

Section 2241(c)(3) encompasses any individual who is in custody in
violation of the Constitution or laws or treaties of the United States. ................... 11

The Collateral Consequences to Caraballo's wrongful conviction.......................... 11

**II. Summary of the "Foreign Tribunal"
and Executive's observable involvement. ...................................................... 12**

FAM: State Department comprehensive reference of laws and regulations. ........... 12

US law recognizes Respondent Khalilzad's authority over
Executive Branch personnel at post, including the FBI........................................ 12

The Chief of Mission's statutory authority over FBI agents at post....................... 13

Conclusory support: "the effective ruler of Afghanistan." .................................. 13

Ambassador Khalilzad's 2004 calendar. ........................................................... 14

August 2004:.............................................................................................. 14

September 2004: ........................................................................................ 14

October 2004: ............................................................................................ 14

The United States' unique role in Afghanistan. ................................................. 15

A pattern of behavior is not an indictment. ....................................................... 15

Arrested US citizens and State Department regulations. ..................................... 15

    7 FAM 412 POLICY (CT:CON-87; 09-01-2004) ........................................... 16

    7 FAM 413.1 The Vienna Consular Convention ............................................ 16

    7 FAM 415.1 Be Informed (CT:CON-87; 09-01-2004) .................................. 16

    7 FAM 911 CONSULAR ROLE (TL:CON-60; 6-17-94) [...] ............................. 16

    7 FAM 453 PROTESTING JUDICIAL DISCRIMINATION  ............................... 16

    7 FAM 451.2 When Consular Attendance  Is Mandatory................................ 16

The realities of Petitioners Afghan cases were
a stark contrast from published regulations. ..................................................... 17

    July 5, 2004: "If there were no Afghan charges,
    there were no American charges." ............................................................. 17

    July 6, 2004: "After Idema's arrest, heavily armed
    American officials sealed off his house."..................................................... 19

    July 9, 2004: "[T]he three Americans had been
    visited by U.S. officials."............................................................................ 19

    July 14, 2004: "It will be a public trial." ..................................................... 19

    July 19, 2004: Judge Abdul Baset Bakhtiari
    "handed out a list of the charges." ............................................................. 19

    July 20, 2004: "The men […] made no special requests
    of the embassy." ..................................................................................... 19

    July 22, 2004: "US admits 'bounty hunter' contact"..................................... 20

    July 23, 2004: U.S. military "held an Afghan prisoner
    for two months." ..................................................................................... 20

    July 24, 2004: FBI's leverages it's "non-official" authority
    to obstruct access to case evidence for three weeks. ................................... 20

    August 11-13, 2004: The "Deputy Ambassador" reportedly
    invites Afghan judge to Embassy. .............................................................. 21

    August 16, 2004: Evidence and Translations. ............................................. 22

    August 25, 2004: "[T]he front office [is] concerned
    that criminal code is not being.... followed."............................................... 23

    September 2, 2004: Permission to "drop charges." ...................................... 23

    December 2nd, 2004: Second and conclusive
    disappearance of evidence........................................................................ 23

    January 2005: "In my opinion, Jack was trying to help
    against Al Qaeda and terrorism," said Judge Abid. ...................................... 24

    Subverting US citizens' consular protections:
    The Consul as 'virtual' FBI agent................................................................ 24

## III. RESPONDENTS' OPPOSITION TO PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER AND OTHER RELIEF AND RULE 60 MOTION

**III. RESPONDENTS' OPPOSITION TO PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER AND OTHER RELIEF AND RULE 60 MOTION**............................................................................... **26**

"This court lacks Jurisdiction over the [Petitioners'] petition" ..................................... 26

"Petitioners are not in custody of the United States."................................................ 27

Habeas law recognizes an exception in cases where
American citizens are confined overseas............................................................. 27

Teaming up with foreign agents cannot exculpate US officials
from liability to US citizens for unlawful official acts. ........................................... 27

Courts have universally held that actual physical custody of an individual
by the respondent is unnecessary for habeas jurisdiction to exist. ....................... 28

Supreme Court:  Habeas' constitutional component may fill gaps
that would otherwise leave a US citizen's unconstitutional detention
without any redress...................................................................................... 28

"Petitioners are serving prison sentences in Afghanistan imposed
by an Afghan court after a criminal trial and appeal." .............................................. 29

July 5, 2004: "If there were no Afghan charges,
there were no American charges."................................................................... 29

July 6, 2004: "After Idema's arrest, heavily armed
American officials sealed off his house." ........................................................... 29

July 20, 2004: "The men [...] made no special requests
of the embassy.".......................................................................................... 29

July 23, 2004: U.S. military "held an Afghan prisoner
for two months."........................................................................................... 29

July 24, 2004: The FBI's "Kevin Thuman" signs out all case evidence
for three weeks. ........................................................................................... 29

August 11, 2004: "Give the harshest possible sentence
to the Americans in this case."........................................................................ 30

August 25, 2004: "[T]he front office [is] concerned
that criminal code is not being .... followed." ..................................................... 30

September 2, 2004: Embassy permission to "drop charges" denied. .................... 30

November 23, 2004: The second and
definitive disappearance of evidence................................................................ 30

February 2005: Timing, selection and provenance of Afghan judges'
"exchange junket" raises serious conflict of interest questions............................ 30

March 30, 2005: The surprise from America: upheld convictions......................... 30

Case events show extraordinary Executive agent involvement
in the "foreign tribunal", triggering Constitutional obligations
and this Court's jurisdiction................................................................................ 30

Evaluating the relevance of Hirota and Keefe in this case. ........................................ 31

Cited precedents are not relevant..................................................................... 31

Aliens and US citizens have different legal and Constitutional rights. .................... 31

Hirota's Article III issues are not relevant.......................................................... 32

Keefe does not prove there can never be constructive custody. ........................... 32

More than five decades of intervening law has transpired
since Hirota and Keefe. ................................................................. 32

"The Petition should be dismissed pursuant to the act of state doctrine." ................... 33

Petitioners challenge alleged Executive violations of their legal
and Constitutional rights, not the Executive's conduct of foreign policy. ............... 33

Liability for constitutional violations cannot be evaded
by collaborating with a foreign government. ..................................... 33

Teaming up with foreign agents cannot exculpate US officials
from liability for unlawful acts. .................................................. 34

At issue: Whether the United States ran afoul of its constitutional
obligations in "obtaining" the detention from the foreign government. ................. 34

In order to maintain a habeas corpus action, it is enough
that the imprisoning sovereign is the respondent's agent. ................................. 35

The relevance of the act of state doctrine diminishes when invoked
as a shield from judicial inquiry into allegedly unconstitutional acts. ..................... 35

A sufficiently close nexus between the State and
the challenged action may be treated as a State act. ......................................... 36

The Supreme Court has very liberally construed
the 'in custody' requirement. ........................................................... 36

Habeas jurisdiction exists in all circumstances in which "federal
adjudication is necessary to guard against governmental abuse ......................... 36

Jurisdictional dismissal is proper only if plaintiff can prove no facts. ..................... 37

Separation of powers doctrine counsels for habeas jurisdiction here. ................... 37

This habeas petition focuses its challenge on the legality of
a domestic third party's actions to procure the conduct of
a foreign government, not the foreign government's conduct. ............................ 37

Federal courts have never seen the lawfulness of a
U.S. citizen's executive detention as anything but a judicial question. ................. 38

The most fundamental liberty rights of US citizens,
such as Due Process Clauses of the Fifth Amendment,
are 'justiciable, even if they implicate foreign policy decisions. ........................... 38

Political question doctrine in foreign affairs has not led courts to
surrender their power to protect individuals against government action. .............. 38

"The Petition should be dismissed as a matter of international comity." ..................... 39

The pervasive influence of political question doctrine in foreign affairs
has not led courts to surrender their power
to protect individuals against government action. ............................................. 39

The question of standing is related only to whether the dispute
is in a form historically viewed as capable of judicial resolution. ......................... 39

**IV. Summation.** ............................................................................... **40**

The Collateral Consequences of Petitioner Caraballo's
Wrongful Incarceration. ................................................................. 40

The role of the news media in evaluating
this Court's Habeas jurisdiction. ...................................................... 41

**I. Overview.**

Over 14 months ago, Petitioners filed for the District Court's habeas review. In our filings to date, we have detailed in sworn accounts our interactions with Executive branch officials as we endeavored to defend ourselves against grave accusations  and assert our due process rights under Afghan and US law in proceedings before Afghan tribunals.

In our past filings, Petitioners have asserted that we were arrested and wrongfully convicted to long prison terms by a foreign tribunal. We have provided multiple examples where agents of the Executive exercised a form of "high authority" that clearly indicates active participation in the tribunal. The public record confirms close Executive participation, as well.

The Afghan proceedings lasted over a year. To date, the process has included primary, appeal and what has been represented to us by the State Department as a "review" by Afghanistan's Supreme Court.

**Afghanistan's aspirational due process protections.**

Since its emancipation by the U.S.-led coalition forces, the laws and constitution of the 4-year-old Islamic State of Afghanistan offer defendants virtually all the key due process protections that US law provides. In addition, the close involvement of US officials in proceedings should have brought an extra measure of diligence. One would presume that FBI agents serving abroad are experienced professionals who understand their obligations under our laws to protect the legal and Constitutional rights of fellow US citizens.

Yet, such was not the case here. In the two weeks between the arrest and when the Afghans were persuaded to press charges[1], both the US State Department and the FBI were regularly on site at the jail run by the so-called Afghan "Intelligence Service".

Petitioners assert that the Bureau agents came to observe, supervise and participate in the interrogation process. Interrogations were moving forward without legally required impartial translators, access to counsel and other due process protections under Afghan and US law.

From such interrogations, Afghan prosecutors would later claim that various "confessions" were culled. The "confessions" were quoted in the prosecutor's charging statement and quoted by the deciding judge when he convicted Petitioner Caraballo to 8 years of prison.

Following the Afghan conviction, Federal and State Department agents continued to actively participate in the "foreign tribunal's" review of the case in ways that go beyond careless negligence. Petitioners assert that a number of acts are serious violations to their legal and Constitutional rights and, coincidentally, may also prove to be serious violations of law.

---

[1]   Michael Skibbie: [U.S. Consul Sandra Ingram] told me that between the time of the arrest and the time the charges were brought, and indeed within hours of the arrest, that the US government was asked to take custody of them, of all the Americans. The US government declined. "

Q: Did she say why?

MS: She said that it was because there was nothing … there was no legal basis for them to be held by the Americans. And she also said that there was a concern that Idema would simply head right back to the house and there was still a lot of people there searching it. So it certainly was within hours. [...] They said that there was no legal basis to take custody of him. That if there were no Afghan charges, there were no American charges to hold him.

[Excerpt from video interview conducted on October 2, 2004 in New Hampshire by Richard Caraballo.]

**Lack of factual rebuttal from Respondents.**

Although our petition for habeas review has been proceeding for nearly a year and a half, Respondents have yet to submit any factual rebuttal in response to petitioners' factual allegations. Habeas rules say that factual allegations must be taken as true, with all reasonable inferences drawn in petitioners' favor.

In addition to Petitioners' allegations, there were a number of events that undeniably took place which raise serious legal and ethical questions that cannot be answered in a void.

In view of the lack of response to related FOIA requests, one can only conclude that no testimony or evidence useful to determining the merits of Petitioners' claims will be forthcoming from Respondents unless the Court expressly compels it.

In their March 9 filing, Respondents held out the idea that the Executive's authority to conduct our nation's foreign affairs denies this Court jurisdiction to judicially review Petitioners' Afghan imprisonment under habeas statutes.

**Executives' extraordinary actions in the "foreign tribunal" triggers this Court's jurisdiction.**

In response, Petitioner Caraballo asserts that the Executives' active participation in the "foreign tribunal" -- as an unofficial "high authority" who ignored his and fellow Petitioners' Constitutional rights -- triggers this Court's jurisdiction.

For example, individuals representing the FBI were able to supercede Caraballo's legal rights and urgent need for case evidence not once but twice during the "foreign tribunal".[2]

If the Afghan primary court ever had any plans to try Petitioners on case merits, the two evidence obstruction episodes severely crippled Petitioners' chances of success.

**The timing of both evidence obstruction events is telling.**

Putting aside the key issues of a domestic US law enforcement agency obstructing evidence access in a case to which they are not parties on the far side of the world and their virtually paperless methodology, the timing of the obstructions are especially telling. In both cases, the obstructions occurred at the points in the primary and appellate process when they appear clearly intended to cause the most damage to any possibility of a successful defense.

In the first instance, the Afghan prosecutors had custody of the evidence for 19 days (July 5 to July 24). Through this period of interrogation without defense counsel or impartial translators,[3]  the FBI appears to have exhibited no interest in the evidentiary materials.

_____

[2]  To better understand the Section 2241, Plaintiff Caraballo has referred extensively to an extended analysis of the statue prepared by USDC Judge John D. Bates for his December 16, 2004 Memorandum Opinion in Abu Ali v. Ashcroft, a case that dealt in its early stages with many analogous legal and jurisdictional questions. (See Exhibit 1) Judge Bates analysis observes in relevant part:

> This Court simply cannot agree that under our constitutional system of government the executive retains such power free from judicial scrutiny when the fundamental rights of citizens have allegedly been violated. As the Supreme Court stated in Reid v. Covert, 354 U.S. 1, 6 (1957), "we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights. . . . When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land." [Exhibit 1, Pg. 19, para 2]

On July 21, Michael Skibbie joined the case as Petitioner Caraballo's attorney.

That the FBI suddenly takes an interest in removing the items from the Afghan prosecutor's custody just at the point when an American lawyer has joined the case and is asking to review them does not suggest chance.

Nor does the second episode. The second and final disappearance of case evidence reportedly occurred on November 23, 2004, the week prior to the hearing where the four Afghan defendants were exonerated and released.

Here, again, the act of removing the evidence a second time and the timing of it appears to have no logical investigatory purpose.

Assuming the evidence set had any important, lawful FBI purpose, it would likely have been duplicated the first time it was in their custody. Hence, removing it from Afghan custody just the week before the US defendants appear before a "foreign tribunal" has no rational legal purpose.

If, for whatever reason, agents chose not to duplicate the materials the first time around, then we should note that the same individuals who took the case evidence set on November 23rd could very well have reviewed the materials at their pleasure and repeatedly for the two full months prior to November 23rd. (Petitioners have not seen the materials since, incidentally.)

In both instances, the timing of events strongly suggests deliberate tactical obstruction. Here's why: There is no other logical urgency for the interventions to occur <u>when</u> they did from the Executive's standpoint. After all, as Respondent's frequently note, these were "foreign tribunals". The FBI could have satisfied whatever legal claim they may have had on the materials – <u>after</u> Petitioners had met their urgent need to defend their case before the "foreign tribunal."

**Assuming the tribunal's intent was a fair trial on merits, evidence availability could have produced a release within days.**

Conversely, Petitioner access to these materials could have made a decisive difference in whether or not Petitioner Caraballo would have had to suffer additional time incarcerated in Afghan prisons, assuming, of course, that whoever directed the tribunal, had intended try the case on its own merits.

According to reports from Afghanistan, including those from Embassy Kabul to Caraballo's family, on December 2nd, 2004, proceedings were pointing toward a release within days.

Embassy Kabul Vice Consul Dawn Schrapel sent an E-mail to Plaintiff Caraballo's family on December 8, 2004. It read in part:

> "I have been working with Mr. Brown for several months on this case and had the opportunity to meet your brother in early November, so am very familiar <u>with the complexities associated with his imprisonment</u> and steps toward release.  As you may know, the Appeals Judge agreed to release three of the four Afghan employees, sentenced at the same time as your brother, last week during the ongoing appeals

---

[3]    See Karake, 281 F. Supp. 2d at 308 ("A defendant may move to suppress statements made to agents of foreign governments when the conduct of foreign law enforcement officials renders them agents, or virtual agents, of United States officials."); United States v. Yousef, 327 F.3d 56,  145 (2d Cir. 2003) ("statements elicited during overseas interrogation by foreign police in the absence of Miranda warnings must be suppressed whenever United States law enforcement agents actively participate in questioning conducted by foreign authorities"). [Exhibit 1, Pg. 57, para 1]

hearings. We remain <u>hopeful that this is a possibility for Mr. Caraballo as well (in the very near future)</u> -- we anticipate additional news from the Judge before the end of this week and then will make a determination on the next steps of recommended action. I am committed to keeping you informed every step of the way." [Emphasis supplied.]

Yet, hearings scheduled for mid-December, were unexpectedly cancelled. Then inexplicable delays persisted throughout three subsequent months.

### Of 5,000 Afghan judges, both primary and appeals judges receive invitations to the US.

Petitioners learned in January 2005 that one cause of the proceeding delays is the selection of deciding appellate judge Ismail Abid for a three-week "educational" trip to the United States. He was to be a guest of the US Justice and State Department.

Let us put aside the extraordinary odds [5] of <u>both</u> Judge Abid and the Judge Bakhtiari both being selected for the US junket and its timing. From early December to late March 2005, Judge Abid would not attend additional hearings. Meanwhile, hearings restarted in late January 2005. "Counsel" Idema pressed the appeal on behalf of all three Americans before a panel of six Afghan judges subordinate to Judge Abid.

At the conclusion of these hearings in February 2005, the judge's panel indicated that they planned to release the Americans but could not do so until Judge Abid "returned from America." In status checks via phone throughout his three month physical absence from hearings, Judge Abid himself repeatedly reassured the Americans that they "shouldn't worry" because they would be "going home soon."

### The surprise from America: upheld convictions.

After weeks of post-trip hearing delays, on March 31, 2005, Judge Abid suddenly convened the Appellate panel judges and Petitioners to convey his decision to them. Judge Abid had heard or seen none of the testimony or documentation that the Americans had presented to the panel while he was away. As is typical of Afghanistan, a court stenographer did not play a part in proceedings involving Petitioners.

To the apparent surprise of the Appellate panel and the shock of the American defendants, in the end Judge Abid opted to uphold their conviction but lower their sentences.

### Extraordinary Executive branch participation in foreign tribunal triggers the Court's jurisdiction under 2241 (c)(1) and 2241 (c)(3).

In asserting that this Court does have jurisdiction in this case, Petitioner Caraballo respectfully draws the Court's attention to the relevant sections of the habeas statute.

For purposes of determining jurisdiction and the authority of the district courts to issue the writ, we refer to Section 2241, which provides, in relevant part:

(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. [...]

(c) The writ of habeas corpus shall not extend to a prisoner unless --

---

[5]  In an April 2005 article, Afghan Minister of Justice Ghulam Sarwar Danish notes that "We have nearly 5,000 judges in the entire country." (Citation source: "Minister calls on donors to coordinate legal reform" published by IRIN/Afghan News Network, April 11, 2005)

(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

(3) He is in custody in violation of the Constitution or laws or treaties of the United States . . . .  28 U.S.C. § 2241.

**The Supreme Court: the habeas statute's constitutional component and liberal construction ensures US citizens redress.**

Petitioner Caraballo submits that the extraordinary Executive branch participation in the "foreign tribunal" triggers jurisdiction under 2241 (c)(1) and 2241 (c)(3)

A section from a relevant analysis of 2241 by United States District Judge John D. Bates focuses on the Constitutional Considerations. Here he observes:

> [T]he Supreme Court has identified a constitutional component to the right of a United States citizen to file a habeas petition, one that favors a liberal construction of the habeas statute to avoid constitutional doubt, and one that might even in certain circumstances fill any gaps in the habeas statute that would leave an unconstitutional detention of a United States citizen without any redress. Were there any ambiguity as to the habeas jurisdiction of this Court here, these constitutional considerations would also weigh strongly in favor of jurisdiction.

**Respondents' agents were not benign witnesses to Petitioners' due process and Constitutional rights violations.**

On September 15, 2005, Petitioner Caraballo was wrongfully convicted to 8 years in an Afghan prison merely for his efforts to produce a documentary on American efforts in Afghanistan to combat terrorism.

Rather than being benign observers, there is strong evidence to support Petitioners' allegations that Executive branch agents worked actively behind the scenes in highly questionable ways and may indeed have directed the Constitutional and due process violations that lead to this result.

There was the reported "Deputy Ambassador's" consultation with the Afghan judge. There was the FBI's close involvement in the arrest, the interrogations, evidence manipulation and other matters. In short, the Executive exercised the maximum authority possible.

Even on the surface, US Consul Sandra Ingram acknowledged to Caraballo's family on August 25, 2004 that the proceedings had been "flawed" and that the Embassy were "concerned" that Caraballo and the other Petitioners weren't getting a "fair trial". But Consul Ingram indicated that only after the Afghans had cast a verdict, would the State Department "weigh in."

By that point, the case was in its 8th week of extensive, sensationalized news coverage.

Weeks later, following a meeting between Petitioners US attorneys and Afghan prosecutors, an agreement was reached that would have enabled the Americans to leave Afghanistan. The Afghan prosecutors one condition was a letter from the US Embassy indicating that it had no objections to the agreement. The Embassy refused to provide it.

Against the above scenario, Respondents say that (a) this Court lacks the authority to move forward with this habeas case,  (b) if the Court does have authority, this habeas case should not proceed and (c.) if this habeas case proceeds, Petitioner Caraballo has no claim in it.

**Section 2241(c)(3) encompasses any individual who is in custody in violation of the Constitution or laws or treaties of the United States.**

In response, we refer the Court's attention to a relevant passage of Judge Bates' analysis of Section 2241, which says in relevant part:

> [T]he United States appears to contend that the statutory phrase "in custody" only encompasses cases where the individual is in the actual physical custody of a United States official. See Resp. Show Cause at 3, 7 n.5. The text of the statute, however, is not nearly so limiting. Section 2241(c)(1) expressly expands the compass of habeas jurisdiction to any petitioner who is "in custody under or by color of the authority of the United States," not just to those strictly in the custody of the United States. 28 U.S.C. § 2241(c)(1) (emphasis added). Section 2241(c)(3) sweeps even more broadly, encompassing any individual who is "in custody" -- without the limitation of "under or by color of the authority of the United States" -- so long as the custody is "in violation of the Constitution or laws or treaties of the United States." 28 14 U.S.C. § 2241(c)(3). No one doubts that there must be some involvement of United States officials under either provision to satisfy the "in custody" requirement. However, any attempt to read a requirement that the individual be in the actual physical custody of the United States does not find footing in the text of the statute itself." [Exhibit 1, Pg. 29, para 3, line 2]

Further, the Supreme Court has recognized that where "collateral consequences" of a conviction persist post-incarceration, release from custody does not moot a habeas claim.

**The Collateral Consequences to Caraballo's wrongful conviction.**

Petitioner Caraballo hereby applies to the Court to remain an active Petitioner in this proceeding due to the collateral consequences of his wrongful incarceration.

Petitioner Caraballo has returned to the United States to find his reputation completely destroyed. As a collateral consequence of his wrongful incarceration in Afghanistan, he has been completely denied any and all forms of contact with his 4-year-old daughter. Neither supervised visits nor so much as a birthday card is allowed.

The remainder of this document provides supporting argument.

---

In SPENCER v. KEMNA (96-7171), the petitioner filed a petition for a writ of habeas corpus, alleging that he had not received due process in the parole revocation proceedings. After overruling a lower court's mootness ruling the Supreme Court that the "District Court's conclusion that Spencer's release from prison caused his petition to be moot because it no longer satisfied the 'in custody' requirement of the habeas statute was in error." [SPENCER v. KEMNA (96-7171) "Opinion of the Court", Sec II, para 1] [Emphasis supplied.]

[I]n Evitts v. Lucey, 469 U.S. 387 (1985), [the Supreme Court] held that respondent's habeas challenge had not become moot despite the expiration of his sentence and despite the fact that "his civil rights, including suffrage and the right to hold public office, [had been] restored," id., at 391, n. 4. Since he had not been pardoned, we said, "some collateral consequences of his conviction remain, including the possibility that the conviction would be used to impeach testimony he might give in a future proceeding and the possibility that it would be used to subject him to persistent felony offender prosecution if he should go to trial on any other felony charges in the future." Ibid. [Emphasis supplied.]

[I]n Carafas v. LaVallee, [the Supreme Court] permitted an individual to continue his challenge to a criminal conviction only after identifying specific, concrete collateral consequences that attached to the conviction as a matter of law: "It is clear that petitioner's cause is not moot. In consequence of his conviction, he cannot engage in certain businesses; he cannot serve as an official of a labor union for a specified period of time; he cannot vote in any election held in New York State; he cannot serve as a juror." Carafas, 391 U.S., at 237 (footnotes and citation omitted). [Emphasis supplied.]

## II. Summary of the "Foreign Tribunal" and Executive's observable involvement.

Respondents' March 9 brief contend that Petitioners assertions are "conclusory" in regard to the influence and authority of the United States, Ambassador Khalilzad and other matters.

Petitioner Caraballo hereby asserts that he does not represent to know or allege anything more or less about Mr. Khalilzad than what publicly available information as can be gathered and presented to this Court and the interactions that he and his family members had with those under his authority.

Petitioner Caraballo freely concedes that at this time, there is no way for him to certify for the Court that the Ambassador had anything at all to do with the Constitutional rights violations that he suffered and resulted in almost two years in an Afghan prison. Conversely, logic dictates that the activities conducted by fairly senior State Department and FBI officials relating to this petition were not random acts of chance. They had to have been directed and authorized by someone.

Although Respondents brief does not recognize the very real authority that Respondent Khalilzad held in Afghanistan, US law does. The public record regarding the Ambassador's time in Afghanistan also points indisputably to a simple fact: Ambassador and Special Envoy Khalilzad wielded unprecedented authority during his posting to the country of his birth. Analysis of this authority should begin with his statutory authority.

### FAM: State Department comprehensive reference of laws and regulations.

Laws and regulations which to govern the State Department are summarized in a comprehensive reference volume known as the Foreign Affairs Manual (FAM).

The FAM is designed to serve as a definitive resource for State Department personnel.

> **2 FAM 1111.1 Policy**
>
> It is the policy of the Department of State to articulate its official policies and procedures in a uniform, consistent, and single program.

> **2 FAM 1115.1 The Foreign Affairs Manual (FAM)**
>
> The Foreign Affairs Manual is the official code of policies, operations, and conduct that apply to activities of the Department of State and the Foreign Service

### US law recognizes Respondent Khalilzad's authority over Executive Branch personnel at post, including the FBI.

FAM citing the Foreign Affairs Act of 1980 describes the chain of authority that US Embassies share in common around the world. The 1980 act vests the Chief of Mission (COM) with ultimate authority in a given country:

> **2 FAM 111.3 Authorities (TL:GEN-296; 10-01-1999) (State Only)**
>
> a. Foreign Service Act of 1980 (Pub. L. 96-465) Section 207 (U.S.C. 3927) defines COM authority over Executive Branch personnel in their countries, as well as the basic relationships between the Department of State and other departments, agencies, and offices of the U.S. Government. All executive branch personnel in country account to the Chief of Mission (COM)

The FBI is the investigative arm of the Department of Justice and a component of the Executive Branch. In Afghanistan, the Chief of Mission (COM) is the US Ambassador.

**The Chief of Mission's statutory authority over FBI agents at post.**

The Ambassador has the statutory authority to order FBI employees under his supervision to comply with US law in the event that they are violating the Constitutional rights of US citizens. Assuming he is aware of the violations, does law warrant him to take action?

FAM indicates that it should:

> **7 FAM 412 POLICY (CT:CON-87; 09-01-2004)**
>
> Our most important function as consular officers is to protect and assist private U.S. citizens or nationals traveling or residing abroad.
>
> Few of our citizens need that assistance more than those who have been arrested in a foreign country or imprisoned in a foreign jail.
>
> (1) Neither arrest nor conviction deprives a U.S. citizen of the right to the consular officer's best efforts in protecting the citizen's legal and human rights.

In actual practice, Mr. Khalilzad demonstrated very little of the spirit or meaning of the above official policy.

**Conclusory support: "the effective ruler of Afghanistan."**

However, to fully understand the context of this case, it is important to understand the unique background of the COM in charge of the Executive branch agents stationed in Kabul, Afghanistan during the time period concerning this case.

> "Petitioners' outlandish and unsupported conclusory assertions that the United States – and, specifically, Ambassador Khalilzad – is the effective ruler of Afghanistan does not change the underlying facts or the concomitant legal conclusion that this Court lacks habeas jurisdiction. – (Respondents. (3/9/06) pg 9, para. 1)

In reply to Respondents' remarks, Petitioner Caraballo notes that, by necessity, conclusions have been drawn. But this Petitioner's conclusions are not without firm support from public facts. [7]

Petitioners have prepared a quick summary of Ambassador Khalilzad's background and time in Afghanistan. (See Exhibit 2.)

---

[7] Judge Bates offers a standard of Review for habeas jurisdiction which notes in part:

> "On a motion to dismiss for lack of jurisdiction, the petitioner bears the burden of establishing the jurisdiction of the Court. See Dist. of Columbia Ret. Bd. v. United States, 657 F. Supp. 428, 431 (D.D.C. 1987); Gordon v. Ashcroft, 283 F. Supp. 2d 435, 437 (D. Mass. 2003).
>
> Where, as here, the respondents challenge only the legal sufficiency of the petitioners' jurisdictional allegations, the district court should take the petitioners' factual allegations as true, and draw all reasonable inferences in the petitioners' favor. See Hawk v. Olson, 326 U.S. 271, 272 (1945); Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 39 (D.C. Cir. 2000).
>
> The court need not limit itself to the allegations of the petition. See Hohri v. United States, 782 F.2d 227, 241 (D.C. Cir. 1986), vacated on other grounds, 482 U.S. 64 (1987). Instead, the court may consider any materials outside the pleadings as it deems appropriate to determine whether it has jurisdiction over the case. See Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992)." [Exhibit 1, Pg. 21, para 1]

"I didn't come here to be a flower pot. Our goal is to make sure problems are solved and I will not sit still if I see a problem. If that means that I personally or as a representative of the U.S. -- we will do what is necessary." From "US Ambassador to Afghanistan: 'I Didn't Come Here to Be a Flower Pot'"

An exclusive interview with Afghan Pajhwok News Agency's Lailuma Sadid (November 8, 2004)

The above statement is emblematic of Ambassador Khalilzad's approach to his job. As the attached career summary shows, Mr. Khalilzad is anything but an average diplomat. He has an extensive background in the Republican administrations going back to the 1980's. As a dual US-Afghan citizen, he was uniquely qualified to exercise muscular stewardship during his posting in Afghanistan, which spanned from September 2003 to June 2005.

As the public record shows, Ambassador Khalilzad was instrumental in selecting his one-time high school classmate Hamid Karzai as interim and now elected President of Afghanistan.

**Ambassador Khalilzad's 2004 calendar.**

To better understand the extraordinary degree of influence and authority that the top US official operated in Afghanistan during the time period that Petitioners were on trial in Afghanistan, a few key events should be considered:

**August 2004:**

Ambassador Khalilzad "publicly brokered a truce between rival militia commanders after fighting in western Herat city in August and was seen as key in sidelining warlord Ismael Khan, who stepped down as the provincial governor in September."

Excerpt from "US envoy to Afghanistan offers amnesty to Taliban" by Agence France Presse (December 2, 2004)

**September 2004:**

Afghan presidential candidate "Mohammed Mohaqiq says that he was getting prepared to participate in the October 9 presidential election when U.S. Ambassador Zalmay Khalilzad offered him a deal.

"He told me to drop out of the elections, but not in a way to put pressure," Mohaqiq said. "It was like a request."

"He left, and then called my most loyal men, and the most educated people in my party or campaign, to the presidential palace and told them to make me - or request me - to resign the nomination. And he told my men to ask me what I need in return." Mohaqiq added."

Excerpt from "Candidates: U.S. hands seen in Afghan elections" by Al Jazeera Publishing, Dubai, United Arab Emirates (9/23/2004)

**October 2004:**

Ambassador Khalilzad "smoothe[s] the path to almost certain victory for Afghanistan's President Hamid Karzai after meeting his chief rival. The historic election on Saturday was nearly derailed when Karzai's 15 opponents threatened to boycott over suspicion of irregularities, but soon most of his main challengers had fallen into line and promised to respect the result -- thanks to a little word in their ear from the U.S. envoy."

Excerpt from "U.S. Envoy Smoothes Way for Karzai Win in Afghan Poll" By Simon Cameron-Moore, Reuters (Oct 12, 2004)

**The United States' unique role in Afghanistan.**

In completing a contextual overview of the time period in question, one should consider the great nation that the Ambassador represented. It is public knowledge that the United States plays a unique role in the desperately needed international Afghan nation-building efforts. These efforts are now four years old.

One can poll a journalist or citizen on the street. No one with any appreciable knowledge of the Afghan situation would question the fact that the United States -- through its disproportionate financial, military, social and diplomatic presence  -- wields unequaled influence in that country.

American influence in the struggling country is pervasive. Just as it was in the "foreign tribunal" that brought this case to bar. The hundreds of articles that were written about Petitioners' appearance before the Afghan court, at least at the primary level, also documented the US government's involvement.

**A pattern of behavior is not an indictment.**

Petitioner Caraballo freely acknowledges that the above referenced muscular interventions in the internal affairs of Afghanistan by an extraordinarily influential diplomat operating in the country of his birth are not an indictment.

Admittedly, a pattern of behavior exhibited elsewhere is not "evidence" that the Ambassador did anything improper in this case. At this time, Petitioner Caraballo has no way of knowing who personally ordered the civil and Constitutional rights violations that he suffered while trying to exercise his due process rights under Afghan and US law. May the Court note that Respondents have yet provide any of the documents we've requested under FOIA (1:05-cv-01334-EGS). This petitioner respectfully requests that the Court give this issue some consideration during the September 20 hearing.

However we would submit that the Ambassador's public pattern of assumptive authority is consistent with the behind-the-scenes behavior exhibited by the Ambassador's subordinates.

Again, Petitioners have no recorded evidence to offer the Court of Ambassador Khalilzad ordering the reported meeting between the Deputy Ambassador and the Afghan judge.

Nor, can Petitioners produce any evidence confirming (or denying) whether the Ambassador had anything to do with the selection of both the Afghan judges who presided over Petitioner Caraballo's wrongful incarceration.

**Arrested US citizens and State Department regulations.**

FAM has several sections dealing with arrested US citizens, as the Petitioners were on July 5, 2004. Certainly this Petitioner would have had no complaints had this involvement been of a positive nature, as State Department regulations require. For example:

**7 FAM 412 POLICY (CT:CON-87; 09-01-2004)**

Our most important function as consular officers is to protect and assist private U.S. citizens or nationals traveling or residing abroad.

Few of our citizens need that assistance more than those who have been arrested in a foreign country or imprisoned in a foreign jail.

(1) Neither arrest nor conviction deprives a U.S. citizen of the right to the consular officer's best efforts in protecting the citizen's legal and human rights.

As consular officers we must assist arrested or imprisoned U.S. citizens with dedicated professionalism, regardless of any private views as to their guilt or the heinousness of the crime.

(2) You must also remember that there are potential flaws in any judicial system, and must remain alert for them. [...]

**7 FAM 413.1 The Vienna Consular Convention (CT:CON-87; 09-01-2004)**

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. [...]

**7 FAM 415.1 Be Informed (CT:CON-87; 09-01-2004)**

Ensure that you, and all other consular officers at post are familiar with: [...]

(3). Details of pertinent local laws, penal structure and judicial procedures; NB: If necessary, consider retaining a local attorney or jurist to provide information to post on local laws and judicial procedures. Follow the procedures outlined in 2 FAM 283; particularly the information required under 283.4. Include CA/OCS/ACS in the Principal officer's cable to L/DL so CA can monitor and support the request. [...]

**7 FAM 900 JUDICIAL ASSISTANCE ABROAD**
**7 FAM 911 CONSULAR ROLE (TL:CON-60; 6-17-94) [...]**

b. Judicial assistance is one of the many consular functions that demand rapid action and close attention to detail. Such action may be related to litigation, investigation, evidence gathering, and legal discovery on behalf of parties in the United States. [...]

**7 FAM 453 PROTESTING JUDICIAL DISCRIMINATION**
**(CT:CON-092; 10-28-2004)**

Whenever you encounter discrimination against U.S. citizen or national prisoners in the judicial system, you should take immediate action to counter this discrimination at whatever level appears most effective. [...]

**7 FAM 451.2 When Consular Attendance**
**Is Mandatory (CT:CON-092; 10-28-2004)**

There are indications of discrimination against the U.S. citizen or national on the basis of U.S. nationality, race, religion or ethnicity either in procedure or sentence. Such indications could include, but are not limited to:

(1) Past history of discriminatory treatment of other U.S. citizen or national prisoners;

(2) Treating an U.S. citizen or national prisoner of one race, religious or ethnic background differently than an U.S. citizen or national prisoner of another racial, religious or ethnic background;

(3) Refusal to provide the U.S. citizen or national with translation facilities when proceedings are in a language the prisoner does not understand;

(4) Slanted pre-trial publicity, particularly where the press is government-controlled, or it is clear the host government is "leaking" the information;

(5) Proposed sentences or fines that clearly exceed those normally accorded local nationals or third country nationals convicted of similar crimes;

(6) The charges are political in nature, or the trial is expected to have political overtones;

(7) The charges and/or the trial are a pertinent factor in the bilateral relationship with the host government;

(8) The prisoner or his family has specifically requested your presence at the trial, and it is reasonably feasible for you to do so; and

(9) You are instructed to do so by the Department.

**The realities of Petitioners Afghan cases were a stark contrast from published regulations.**

Although Respondents claim that Petitioners are held as a result of a foreign tribunal, both the DOS and DOJ exercised broad participation and extraordinary authority in proceedings since before Petitioners July 5, 2004 arrest. [8]

Petitioners have catalogued in previous filings their knowledge of the Executive's activities beginning July 5, 2004 that violated their Constitutional rights [9] to due process. Here is a summary of previous accounts:

**July 5, 2004: "If there were no Afghan charges, there were no American charges."**

Prior to being arrested on July 5, 2004 -- initially Afghan officials said that they were there to facilitate communication between Plaintiff Idema and the FBI -- Plaintiff Caraballo specifically recalls Afghan officials saying repeatedly that they had come at the request of the FBI and that they wanted to speak to Petitioner Idema. An Afghan National Police Chief named Baba Jan said at one point that Plaintiffs Caraballo and Bennett "did not need to come in." The FBI wanted only to speak to Plaintiff Idema.

Petitioner Caraballo recalls that Petititioner Idema specifically asked the Afghans, "Well where are they (the FBI). we can speak here." With visual cues, the Afghan officials indicated that the FBI were indeed on site by pointing in the direction a group of vehicles in front of the compound.

Baba Jan's arrest scene translator was an Afghan national, whose appearances, over

---

[8]   745 F.2d at 1542 "A teaming up with foreign agents," the D.C. Circuit explained, "cannot exculpate officials of the United States from liability to United States citizens for the United States official's unlawful acts." Id. [Exhibit 1, Pg. 53, para 2]

See Karake, 281 F. Supp. 2d at 308 ("A defendant may move to suppress statements made to agents of foreign governments when the conduct of foreign law enforcement officials renders them agents, or virtual agents, of United States officials."); United States v. Yousef, 327 F.3d 56, 145 (2d Cir. 2003) ("statements elicited during overseas interrogation by foreign police in the absence of Miranda warnings must be suppressed whenever United States law enforcement agents actively participate in questioning conducted by foreign authorities"). [Exhibit 1, Pg. 57, para 1]

[9]   During Hirota's examination of the habeas jurisdictional question, Supreme Court Justice Douglas, noted that "a District Court of the United States does have jurisdiction" to entertain a petition from an Allied tribunal because: If an American General holds a prisoner, our process can reach him wherever he is. To that extent at least the Constitution follows the flag. It is no defense for him to say that he acts for the Allied Powers. He is an American citizen who is performing functions for our government. It is our Constitution which he supports and defends.  See Hirota, 338 U.S. at 204 (Douglas, J., concurring). [Emphasis supplied.]

subsequent weeks, clearly seemed to indicate that he worked as some sort of liason with the FBI. For instance, during a August 16, 2004 court hearing, it was this individual who appeared at the courtroom to drop off a box of video evidence. Plaintiff Caraballo believes this person was NDS employee. Attorney Michael Skibbie describes what happened next:

Michael Skibbie: "[US Consul Ingram] told me that between the time of the arrest and the time the charges were brought, and indeed within hours of the arrest, that the US government was asked to take custody of them, of all the Americans. The US government declined."

Q: Did she say why?

MS: "She said that it was because there was nothing … there was no legal basis for them to be held by the Americans. And she also said that there was a concern that Idema would simply head right back to the house and there was still a lot of people there searching it. So it certainly was within hours. There was a concern that there would be a confrontation and perhaps armed violence if Idema was released while they were still processing his house."

Q: You meant that the US didn't have staff to take custody of Idema?

MS: "No, no. They said that there was no legal basis to take custody of him. That if there were no Afghan charges, there were no American charges to hold him."[10]

Note: Mr. Skibbie provided the above remarks during a video interview that Richard Caraballo conducted on October 2, 2004 in New Hampshire.

**July 6, 2004: "After Idema's arrest, heavily armed American officials sealed off his house."**

"After Idema's arrest, heavily armed American officials sealed off his house, which also served as the private jail. They searched the house and carted off weapons, videotapes, documents and other items."

From " American accused of running private prison faces trial in Afghanistan" By Mark McDonald, Knight Ridder (7/20/04)

---

[10] As the D.C. Circuit explained sitting en banc, "teaming up with foreign agents cannot exculpate officials of the United States from liability to United States citizens for the United States officials' unlawful acts." Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1506-09 (D.C. Cir. 1984) (en banc) (emphasis in original), rev'd on other grounds, 471 U.S. 1113 (1985).

See also Reid, 354 U.S. at 6 (Fifth and Sixth Amendments protect United States citizens abroad); United States v. Maturo, 982 F.2d 57, 61 (2d Cir. 1992) ("constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials"); United States v. Karake, 281 F. Supp. 2d 302, 308 (D.D.C. 2003) ("A defendant may move to suppress statements made to agents of foreign governments when the conduct of foreign law enforcement officials renders them agents, or virtual agents, of United States officials."); Berlin Democratic Club v. Rumsfeld, 410 F. Supp. 144, 155 (D.D.C. 1976) (holding that involvement of United States officials in the electronic surveillance by German officials of United States citizens in Germany raises constitutional concerns). [Exhibit 1, Pg. 57, para 1]

### July 9, 2004: "[T]he three Americans had been visited by U.S. officials."

"U.S. Embassy spokeswoman Beth Lee said yesterday the three Americans had been visited by U.S. officials. She had no information on whether the United States had sought to take them into custody." From "Three Americans held in abuse at private jail in Afghanistan" By AMIR SHAH, Associated Press (7/9/04)

[White House Spokesman Richard] "Boucher said officials from U.S. consular offices in Kabul visited the Americans on Tuesday and Thursday. When asked if they were being treated fairly, he responded 'we're monitoring their welfare.'"

From "Afghans held in fake prison." By CNN (7/9/04)

### July 14, 2004: "It will be a public trial."

[T]he charges raised against the Americans, as well as four Afghans arrested along with them, <u>carry jail terms of 16-20 years</u>. Abdul Baset Bakhtyari, a senior judge at Kabul's lower court, said it received the case Wednesday and it would be several days before a trial begins. "It will be a public trial," Bakhtyari said. "They can bring lawyers from whichever country they want. "

From " Bogus Afghan Jailers May Face Prison Time." By AMIR SHAH, Associated Press, (7/14/04) [Emphasis supplied.]

### July 19, 2004: Judge Abdul Baset Bakhtiari "handed out a list of the charges."

"In front of three judges and three prosecutors, sitting on sofas in the small room, Judge Abdul Baset Bakhtiari asked the Americans if they wanted to defend themselves and how long they would need to prepare their defense. He handed out a list of the charges, saying the <u>Americans would have time to translate it</u> to English and read it. The trial was set for Wednesday."

From " 3 From U.S. in Afghan Court, Accused of Running a Jail." By Carlotta Gall, New York Times, (7/19/04) [Emphasis supplied.]

### July 20, 2004: "The men [...] made no special requests of the embassy."

"An American diplomat, speaking on condition of anonymity, said privately that the men were in good health and had made no special requests of the embassy."

From "American accused of running private prison faces trial in Afghanistan" By Mark McDonald, Knight Ridder (7/20/04)

"Our consular officials have visited them on July 6, July 8, July 11, July 19 and July 21." From "State Department Daily Press Briefing" Transcript, Richard Boucher, (7/21/04)

### July 22, 2004: "US admits 'bounty hunter' contact"

"The U.S. military says the men were freelancers operating outside the law and without their knowledge."

From "Idema's day in court" By Stephen Graham, Associated Press (7/22/04)

The US military has admitted it detained an Afghan man handed over by a US citizen accused of running a freelance counter-terrorism operation. A military spokesman said the prisoner was handed over by the American, Jonathan K Idema, in May. [...]

"We did receive a detainee from Mr Idema or his party," said Major Jon Siepmann, spokesman for the coalition forces. "The reason we received this person was that we believed that he was someone that we had identified as a potential terrorist and we wanted him for questioning," he said.

From ""US admits 'bounty hunter' contact" By BBC News (7/22/04)

**July 23, 2004: U.S. military "held an Afghan prisoner for two months."**

"The U.S. military said Thursday it held an Afghan prisoner for two months after receiving him from three Americans who have been charged with torturing detainees at a private jail. The admission followed claims by the group's leader that it had ties to the Defense Department -- which the Pentagon denies -- and was another embarrassment for U.S. officials[...] [A military spokesman] said the man was released after a month, but a U.S. military statement issued later Thursday said he was freed only in the first week of July. "

From "U.S. Admits Afghanistan Vigilante Ties." By ASSOCIATED PRESS (via the New York Times) (7/23/04)

**July 24, 2004: FBI's leverages it's "non-official" authority to obstruct access to case evidence for three weeks.**

Despite the Bureau's codified Chain of Custody procedures, the only documentation of their presence in this domestic Afghan case was a brief voucher note in Dari, signed on behalf of the Bureau by someone named Kevin Thuman.

The voucher is dated July 24, 2004, four days after the American defense counsel joined the case, and after Mr. Skibbie had made the first of many written and verbal evidence discovery requests to the Afghan court.

FBI involvement in the remains as unexplainable as the fact that the domestic US agency filed no official notice of any kind that the three defense lawyers working on the case are aware of.

Yet, despite the lack of documented legal authority, domestic US agents were free to remove from Afghan jurisdiction the entire evidence set before it had been seen or cataloged by any party that could certify the integrity of the materials this "backdoor" entity would return three weeks later.

**August 11-13, 2004: The "Deputy Ambassador" reportedly invites Afghan judge to Embassy.**

Michael Skibbie: So what happened was…I was away from the office viewing something, and I don't remember what…but I got a call from Natalie Rea, who was my supervisor who runs the Legal Aid Afghanistan project and was in Afghanistan for a couple of weeks in early August.

Michael Skibbie: She called me. She had something important to talk to me about and so we made arrangements to meet back at the hotel at the end of the day. We did that and she told me that she had learned from…let me put it this way… she had learned that the judge had told the two Afghan lawyers on the case, Aminat and Najiba, that he had

been summoned to the Embassy and had a meeting with the Deputy United States Ambassador who urged him to give the harshest possible sentence to the Americans in this case. [...]

Michael Skibbie: The judge apparently warned Najiba and Aminat not to mention the US government or the FBI and I don't know really what that means. I think that what that means is that the judge was concerned about the ramifications of us talking publicly about the misconduct of the government and the FBI.

In evaluating the Executive's involvement in Afghan proceedings and whether it triggers this Court's jurisdiction, the above Deputy Ambassador [11] account should be carefully considered.

The account shows efforts by Respondent Khalilzad's Deputy to influence Afghan Primary court Judge Bakhtiari's verdict in the case.

While the account involves intermediaries, it should be noted that all intermediaries are Officers of Court.

Michael Skibbie, Caraballo's then defense counsel, is a New Hampshire attorney. Natalie Rea, Director of Legal Aid Afghanistan, is a New York attorney.

For his part, Afghan Judge Bakhtiari, who relayed that he had been summoned to the US Embassy by the "Deputy Ambassador" to give to the Americans the "harshest possible sentence" had no logical motive to represent that such an event had taken place.

The Afghan lawyers, Najiba and Aminat, also hadn't any motive to fabricate what they had been told by Judge Bakhtiari. Indeed, they did not want to divulge to their American co-counsel what the Afghan judge had told them and did so only at the urging of Mr. Khoram, the director of LAA's Kabul office.

Finally, the provenance of the account of the above was from a video disposition of the Afghan case that Richard Caraballo, Petitioner Caraballo's brother, recorded of Attorney Skibbie on October 2, 2004, after Mr. Skibbie had returned to the United States.

**August 16, 2004: Evidence and Translations.**

"Kabul's trial of the year has resumed. [...] [T]he key question for this next stage is this: Will Mr Idema produce any evidence for the sensational claims he made at the first hearing three weeks ago? "[…] " In a BBC interview, [Judge Bakhtiari] admitted the first hearing in this "very unusual case" had not been perfect. "We had some problems with translation," he said, "and there was some disorder." But he blamed this on the behavior of journalists. "That doesn't mean the Afghan legal system is weak," he said. "

From "Round two for Kabul's trial of year" By Andrew North, BBC News (8/15/04)

---

[11]  According to FAM, the Deputy Ambassador is considered "front office"; the second most senior position at post:

**2 FAM 113.2 Deputy Chief of Mission (TL:GEN-296; 10-01-1999))**

The deputy chief of mission generally serves as alter ego to the chief of mission, including assisting in defining broad program needs in the country or with respect to the international organization and developing plans by which the total coordinated United States activity will most effectively meet those needs. [Emphasis supplied.]

"Caraballo's American lawyer, Michael Skibbie, described his protracted and unsuccessful efforts to obtain the documents and other evidence taken by the FBI. He said the evidence might have been tampered with or lost in the agency's custody, and he called its actions "insulting to this court."

From " Trial on Private Prison in Afghanistan Is Underway" By Pamela Constable, Washington Post (8/1604)


"The former US soldier said all the evidence he needs is being kept away from him. He said there are hundreds of photos, videos and documents that were at the house in Kabul where he was arrested in early July. He says this has been handed over to the FBI."

Mr. Idema also complained about the quality of the translation. This was a frequent source of confusion for others too, with many Afghans in the audience who speak English shaking their heads in surprise at some of the translations that were being made."

From "Pomp and farce at Kabul trial"
By Andrew North BBC correspondent in (8/16/04)


Skibbie also showed a subsequent video of Qanooni congratulating Idema for thwarting the assassination plot and offering him additional Afghan government help to arrest other terrorists.

Bizarrely, the judge presiding over the case, Abdel Basit Bakhtiari, then publicly conceded that Idema was indeed saving the lives of important Afghan officials. "You have saved the life of Minister Qanooni, and the people you have arrested were terrorists and Al Qaeda," the judge said.

"But what we want you to prove first is the legitimacy of your operation in Afghanistan."

During the trial it was also revealed that the FBI had taken a substantial number of documents and videotapes from Idema's Kabul house after his arrest last July and that the bureau withheld these materials from defense lawyers without explanation for three weeks.

In a case that was supposed to be about the need for Afghanistan to uphold its own laws, this was curious, since the FBI has no jurisdiction in the Afghan legal system.

From "The Shadow Warrior" By PETER BERGEN, CNN Terrorism Analyst (Published in Rolling Stone, May 2005)

**August 25, 2004: "[T]he front office [is] concerned that criminal code is not being…. followed."**

The case was all but over and only one more public court date was planned. Behind the scenes, Petitioner Caraballo's brother Richard lobbied the State Department to do something about patent unfairness of trial proceedings. During an August 25 phone call, Sandra Ingram told him that Embassy Management had concerns about the trial's fairness, too.

Consul Sandra Ingram: "Let me just assure you that the front office, which means the Ambassador, our Deputy Chief of Mission to the Ambassador, are briefed on this case every time I come out of court."

"They know what's going on. They are actively involved.[...] We have several concerns that are probably the same ones, if not more or, are very similar to the ones that Skibbie raised."

"We have raised those and have made it known to the Afghan government that we are concerned about aspects of the trial, so far. It isn't over yet, but we are concerned about the way things have gone, that criminal code is not being .... followed."

Consul Sandra Ingram: "It's all going to depend upon what happens. [That's h]ow we're going to determine it. If they, say, find all four of the guilty of everything, or they find them all guilty of every charge and they say 'Fine them $500. each compensation to the victims and then deport them or give them 15 years and decide to deport them immediately, then are we going to PROTEST?"

"It depends on the totality of the situation. If they find that everybody's guilty of everything then, and they're going to get 15 years, then we've got to start talking about what's wrong here. Was this a fair trial or not. And defense counsel's going to have their weigh in but part of it is us say 'What issues have we been tracking all along.'"

**September 2, 2004: Permission to "drop charges."**

As September 2004 began, attorneys for the Petitioners, John Tiffany and Robert Fogelnest, met with Afghan prosecutors. An agreement was reached at this meeting wherein the Afghan prosecutors agreed to drop the charges against Caraballo and the other two American defendants. The Afghans had a single condition for the case dismissal to take place. The prosecutors said that they would only drop the charges if the defense attorneys could produce a letter from Ambassador Khalilzad indicating that the US government had no objection to the prosecutor's dropping of charges.

Attorney Fogelnest lodged a formal request for the requisite Embassy letter was via Consular Officer Russell Brown on September 2, 2004. Although Petitioner Caraballo's relatives made repeated efforts for action on the request, now, almost two years later, an official response has yet to be received.

**December 2nd, 2004: Second and conclusive disappearance of evidence.**

Four Afghan defendants in the very same case, who had originally been convicted in the same rite as Caraballo, are exonerated and released by the Afghan appellate court.

That same day, after the Afghan defendants had been sent home, Petitioners proceeded to prepare their case so that the Court could review their evidence. The expectation was that they would be exonerated and released soon as well. Petitioners were allowed to go to the Afghan evidence room in the prosecutor's section of the court building, to retrieve the case evidence. The evidence custodian informed the Petitioner, and subsequently, the Afghan court that the materials in question had been turned over to FBI authorities, the previous week of November 23, 2004. This was now the second occurrence of the FBI interference in regard to evidence.

No paperwork was filed that would demonstrate official FBI authority, compliance with any recognizable legal procedure or justify why they had taken custody yet again of evidence pertaining to an Afghan tribunal.

Had they cared to follow proper procedure, they could easily filed something with the Afghan court that would record the transaction and give authority to what now seems not only unprofessional, but flagrant interference with core due process rights under Afghan and US law.

**January 2005: "In my opinion, Jack was trying to help against Al Qaeda and terrorism," said Judge Abid.**

After Idema's arrest, Afghan officials told reporters that he'd had only the most casual of contacts with the Afghan government, yet the record shows that he had a wide range of dealings with Afghan cabinet officials, diplomats and army officers. [...]

I traveled back to Kabul in January to interview the three judges who were hearing the appeals of the members of Task Force Saber 7. Sitting in their office in the Supreme Court, we all huddled around a wood stove that was barely warding off the intense chill of Kabul's winter.

The chief judge, Mohammed Ismail Abid, explained that the whole Idema affair had mushroomed needlessly out of control because of all the attention it had received in the media. "In my opinion, Jack was trying to help against Al Qaeda and terrorism," said the judge.

"We did not want to make this a big case. We wanted to deal with it diplomatically." It seemed to me that the judges were broadly sympathetic to Task Force Saber 7's case and were keeping an open mind about the evidence.

The judges said that they had recently ordered the release of four Afghans who had been helping Idema, all of whom were employees of Afghanistan's Ministry of Defense and one of whom was a major.

This admission established that the Afghan government had given some kind of official sanction to Idema's activities.

One of the judges also conceded that one of the people Task Force Saber 7 had detained, a man named Sher Jan, was concealing explosives when he was picked up, an indicator that Idema's terrorist-busting operation had met with some success.

From "The Shadow Warrior" By PETER BERGEN, CNN Terrorism Analyst (Published in Rolling Stone, May 2005) [Emphasis supplied.]

**Subverting US citizens' consular protections: The Consul as 'virtual' FBI agent.**

Throughout Caraballo's two year imprisonment in the Afghan system, he was approached on numerous occasions by Consular Officer Russell Brown. Brown offered incentives to him, apparently on behalf of the DOJ, to encourage Caraballo to "testify" against his co-defendants for unspecified crimes.

Meanwhile, over several phone calls to Afghanistan with Richard Caraballo in early 2005, Consul Brown insisted that evidence for the case "is" and "always was" available to the American defendants for use in their Afghan court appeal. Yet, when Caraballo pressed Brown for official documentation that would enable formal verification that Edward Caraballo's constitutional and Afghan due process rights were being observed, Consul Brown declined to provide any. Brown claimed that the Embassy could not allow itself to be involved in foreign (Afghan) legal matter.

These two events create a puzzling picture of the Executive in action: a picture whose Constitutional irony should not be lost on observers.

On the one hand, a consular officer claims that the State Department can not "get involved" in a US citizen's legal Afghan matter when he is asked to simply procure documentation confirming that a US citizen are receiving due process before a foreign tribunal.

On the other, the very same consular officer (Russell Brown) is acting as a "virtual" FBI

agent who would "reward" Caraballo to testify against fellow Americans.

What would the Constitution's framers think of the Executive's use of rules in this situation? On the one hand, to thwart a US citizen's ability to get a fair day in court before a foreign tribunal, and then using their authority to try to turn one imprisoned citizen against another.

### III. RESPONDENTS' OPPOSITION TO PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER AND OTHER RELIEF AND RULE 60 MOTION

In their most recent filings, Respondents have moved to have the Court dismiss the habeas application filed on behalf of Petitioners Caraballo, Idema, Bennett and Banderas. Respondents have cited several reasons for their motion. Subsequent to their March 9 motion to dismiss the entire case, Respondents filed a June 9 supplemental motion to dismiss Petitioner Caraballo on the grounds that since his release, his dispute is moot.

This section presents Petitioner Caraballo's response to the respective points raised by Respondents in their motions.

As the record will confirm, this Petitioner is now representing himself pro se by necessity. Petitioner Caraballo is not a lawyer. However, a memorandum opinion issued by United States District Judge John D. Bates in Abu Ali v. Ashcroft dealt with many of the same jurisdictional questions that this case now presents.

Hence, where relevant, we've cited Judge Bates' analyses as they relate in this case and where we felt they would be useful to the Court's decision-making process. The original opinion is included for reference purposes as Exhibit 1.

### "This court lacks jurisdiction over the [Petitioners'] petition."

Petitioner Caraballo respectfully submits that Respondents' view that the Court's lack of jurisdiction is premised on facts that sidestep the realities of the situation. Respondents premise their dismissal motion on the following general points:

Petitioners are not in custody of the United States.

Petitioners are serving prison sentences in Afghanistan imposed by an Afghan court after a criminal trial and appeal.

The Petition should be dismissed pursuant to the act of state doctrine.

The Petition should be dismissed as a matter of international comity.

The Petitioners' Motion should be denied and the Petition should be dismissed.

### "Petitioners are not in custody of the United States."

Respondents argue that the Court has no jurisdiction here and that there is an "implicit territorial limitation" to Section 2241 in this case.

Citing a dictionary definition, they argue that a citizen's habeas petition must name as a respondent the immediate custodian who is exercising physical control over the petitioner, and that this immediate custodian must be within the respective jurisdiction" of the District Court. Petitioner Caraballo respectfully submits that the literal "have body" interpretation is not appropriate in this case for several reason.

Firstly, this Petitioner asserts that he was wrongfully incarcerated in violation of his United States civil and Constitutional rights. These facts trigger this Courts jurisdiction under Section 2241 (c)(1)and 2241 (c)(3) for the following reasons:

**Habeas law recognizes an exception in cases where American citizens are confined overseas.**

In Rumsfeld v. Padilla, 124 S. Ct. 2711 (2004), the Court noted that

 [T]here is a "recognized" exception to these rules in cases where "American[] citizens confined overseas (and thus outside the territory of any district court) have sought relief in habeas corpus." Braden [v. 30th Judicial Circuit Court of Ky., 410 U.S. 484, 498 (1973)] (citing cases). In such cases, we have allowed the petitioner to name as respondent a supervisory official and file the petition in the district where the respondent resides. [Exhibit 1, Pg. 23, para 2] [Emphasis supplied.]

Judge Bates' analysis further notes:

[...] [T]he Supreme Court held in Rasul v. Bush that this Court -- the United States District Court for the District of Columbia -- had jurisdiction to entertain the habeas petition of a non-resident alien detained at Guantanamo Bay, Cuba. 124 S. Ct. at 2698. In reaching that conclusion, the Supreme Court was required to consider whether the presence of the petitioner outside the jurisdiction of any district court divested the federal district courts of jurisdiction. As it had done in Padilla, the Court read Braden v. 30th Judicial Circuit Court of Ky. to hold that the presence of the petitioner in the territorial jurisdiction of the district court is not "'an invariable prerequisite'" to habeas jurisdiction. Rasul, 124 S. Ct. at 2695 (quoting Braden, 410 U.S. at 495). [From Exb. 1, pg. 24, para. 1] [Emphasis added.]

**Teaming up with foreign agents cannot exculpate US officials from liability to US citizens for unlawful official acts.**

The "implicit territorial limitation" also does not take into account the fact that Respondent Mueller's agents fully participated in the foreign tribunal in roles of authority. Such authority carries with it a commensurate responsibility to protect US citizens, their civil and Constitutional rights.

As the D.C. Circuit explained sitting en banc,

"teaming up with foreign agents cannot exculpate officials of the United States from liability to United States citizens for the United States officials' unlawful acts." Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1506-09 (D.C. Cir. 1984) (en banc) (emphasis in original), rev'd on other grounds, 471 U.S. 1113 (1985). [From Exb. 1, pg. 36, para. 1] [Emphasis supplied.]

===

[T]hat reasoning can only apply with far greater force to a case implicating the fundamental due process rights of a citizen to be free from arbitrary and indefinite detention without charge at the direction of his own government. See Immigration and Naturalization Service v. St. Cyr, 533 U.S. 289, 301 (2001) ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest"). [Exhibit 1, Pg. 54, para 1] [Emphasis supplied.]

===

See also Reid, 354 U.S. at 6 (Fifth and Sixth Amendments protect United States citizens abroad); United States v. Maturo, 982 F.2d 57, 61 (2d Cir. 1992) ("constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials"); United States v. Karake, 281 F. Supp. 2d 302, 308 (D.D.C. 2003)

("A defendant may move to suppress statements made to agents of foreign governments when the conduct of foreign law enforcement officials renders them agents, or virtual agents, of United States officials."); Berlin Democratic Club v. Rumsfeld, 410 F. Supp. 144, 155 (D.D.C. 1976) (holding that involvement of United States officials in the electronic surveillance by German officials of United States citizens in Germany raises constitutional concerns). [From Exb. 1, pg. 36, Footnote 21] [Emphasis supplied.]

**Courts have universally held that actual physical custody of an individual by the respondent is unnecessary for habeas jurisdiction to exist.**

Indeed, consistent with the broad language in the statute, courts have universally held that actual physical custody of an individual by the respondent is unnecessary for habeas jurisdiction to exist. See Justices of Boston Municipal Ct. v. Lydon, 466 U.S. 294, 300 (1984) ("Our cases make clear that the use of habeas corpus has not been restricted to situations in which the applicant is in actual, physical custody.") (quotation omitted); Galaviz-Medina v. Wooten, 27 F.3d 487, 492 (10th Cir. 1994) (the custody concept "includes many situations where the petitioner is not in actual physical custody").

Courts instead have read the language of the statute to provide for habeas jurisdiction where the official possesses either actual or "constructive" custody of the petitioner. See LoBue v. Christopher, 82 F.3d 1081, 1082 (D.C. Cir. 1996) (individual released on bail pending his challenge to the federal extradition statute was "in the constructive custody of the U.S. Marshal for the Northern District of Illinois" and therefore could "challenge the statute through a petition for habeas corpus there"); [Exhibit 1, Pg. 30, Para. 2] [Emphasis supplied.]

**Supreme Court: Habeas' constitutional component may fill gaps that would otherwise leave a US citizen's unconstitutional detention without any redress.**

Petitioners submit that in this case, the evaded "constitutional requirements" that give this Court jurisdiction are the due process protections that were virtually non-existent despite the close supervision of proceedings by both State Department and FBI officials. Respondents' agents were not uninformed bystanders. They fully participated in roles of authority in the foreign tribunal from before the arrest.

[T]he Supreme Court has identified a constitutional component to the right of a United States citizen to file a habeas petition, one that favors a liberal construction of the habeas statute to avoid constitutional doubt, and one that might even in certain circumstances fill any gaps in the habeas statute that would leave an unconstitutional detention of a United States citizen without any redress. Were there any ambiguity as to the habeas jurisdiction of this Court here, these constitutional considerations would also weigh strongly in favor of jurisdiction. [Exhibit 1, Pg. 37, Para. 2] [Emphasis supplied.]

**"Petitioners are serving prison sentences in Afghanistan imposed by an Afghan court after a criminal trial and appeal."**

Although Respondents insist that Petitioners are "serving prison sentences in Afghanistan imposed by an Afghan court after a criminal trial and appeal," a examination of actual case events raises serious questions as to <u>who</u> actually did impose this "foreign" conviction:

- **July 5, 2004: "If there were no Afghan charges, there were no American charges."**

  From the very beginning, Afghan officials indicated that they had come at the behest of the FBI and indeed alluded to their presence just outside the compound. Later that day, according to Michael Skibbie's account, US Consul Ingram said that within hours of the arrest, that the US government was asked to take custody of all the Americans and that the US government declined because , as the US Consul told him, that if "there were no Afghan charges, there were no American charges to hold him."

- **July 6, 2004: "After Idema's arrest, heavily armed American officials sealed off his house."**

  In one news report, Knight Ridder noted that "heavily armed American officials" sealed off Idema's house. "They searched the house and carted off weapons, videotapes, documents and other items."

- **July 20, 2004: "The men [...] made no special requests of the embassy."**

  Although, the daily official State Department briefing notes that US "consular officials visited Petitioners on "July 6, July 8, July 11, July 19 and July 21" in a separate report, an "American diplomat, speaking on condition of anonymity, said privately that the men were in good health and had made no special requests of the embassy."

- **July 23, 2004: U.S. military "held an Afghan prisoner for two months."**

  Although U.S. military says Idema was a "freelancer" operating "without their knowledge", they "did receive a detainee from Mr Idema" [...] and "that we believed that he [the detainee] was someone that we had identified as a potential terrorist" No explanation, logical or otherwise, was given for why the "potential terrorist" was held "for two months after [they received] him from three Americans who have been charged with torturing detainees at a private jail."

- **July 24, 2004: The FBI's "Kevin Thuman" signs out all case evidence for three weeks.**

  Although, the FBI exhibited no interest in the case's evidentiary materials for 19 days, they suddenly take an interest in removing the items from the Afghan prosecutor's custody just at the point when an American lawyer has joined the case and is asking to review them.

- **August 11, 2004: "The documentary film of Ed's was seized (with camera), and all film has apparently been forwarded to authorities in the U.S."**

  In an attempt to reach out to someone who might offer helpful legal advice on the chaotic situation unfolding in Afghanistan, Richard Caraballo reaches out to a New

York lawyer, who in turn calls on a Washington colleague, William Reynolds, a litigation partner at  the law firm of Howrey Simon Arnold & White, LLP.

According Mr. Reynolds online bio, he has "[s]upervised and managed all aspects of the Civil Rights Division activities in the Justice Department; supervising some 165 lawyers and 265 support staff."

Hence, an August 11, 2004 E-mail response that Richard Caraballo recieved from Mr. Reynolds via the intermediary offered no comfort.

In his E-mail, Mr. Reynolds noted that he had made "inquiries" at the Justice Department and that the "news was not at all welcome". The Reynolds E-mail noted that "[t]he documentary film of Ed's was siezed (with camera), and all film has apparently been forwarded to authorities in the U.S." In closing, Mr. Reynolds said that "[i]t presently looks highly unlikely that Ed Caraballo will be returning to the U.S. anytime soon."

- **August 11, 2004: "Give the harshest possible sentence to the Americans in this case."**

Michael Skibbie learns from Legal Aid Afghanistan Director Natalie Rea that Judge Bakhtiari "had told the two Afghan lawyers on the case, Aminat and Najiba, that he had been summoned to the Embassy and had a meeting with the Deputy United States Ambassador who urged him to give the harshest possible sentence to the Americans in this case."

- **August 25, 2004: "[T]he front office [is] concerned that criminal code is not being .... followed."**

Consul Sandra Ingram: "Let me just assure you that the front office, which means the Ambassador, our Deputy Chief of Mission to the Ambassador, are briefed on this case every time I come out of court.[...] we are concerned about the way things have gone, that criminal code is not being .... followed."

- **September 2, 2004: Embassy permission to "drop charges" denied.**

An agreement to drop the charges is reached between Afghan prosecutors and attorneys for the Petitioners. However, the Afghan prosecutors' have a single condition. The Americans' attorneys must produce a US Embassy letter indicating that it had no objection to the agreement. The attorney's requested the letter from the Embassy. The request is ignored.

- **November 23, 2004: The second and definitive disappearance of evidence.**

Individuals acting in the name of the FBI remove case evidence the week before Appellate proceedings are to begin. 18 months later, the items remain unaccounted for.

- **February 2005: Timing, selection and provenance of Afghan judges' "exchange junket" raises serious conflict of interest questions.**

- **March 30, 2005: The surprise from America: upheld convictions.**

**Case events show extraordinary Executive agent involvement in the "foreign tribunal", triggering Constitutional obligations and this Court's jurisdiction.**

A reasoned analysis of the above series of events emphatically refutes the premise that "chance" governed the Executive branch's peculiar actions in the "foreign tribunal" process.

A number of the above listed acts go well beyond dereliction of oversight responsibilities of executive branch officials in an extraordinary "authority role" in a proceeding overseas. Several of the acts that occurred in the FBI's name (a.) do not comply with recognized U.S. court procedures and worse, (b) appear designed to abuse the FBI's authority role in proceeding in a ways US rules would simply never allow.

If field investigators in the United States could be sent to withdraw evidence in a case without inventory or oversight, whenever they want, for as long as they want, it's hard to imagine how any defendant in any case involving documentary evidence could ever prevail in a legal proceeding. No wonder the law provides rules, procedures, penalties and the Court's oversight.

> As the D.C. Circuit explained sitting en banc, "teaming up with foreign agents cannot exculpate officials of the United States from liability to United States citizens for the United States officials' unlawful acts."

> See also Reid, 354 U.S. at 6 (Fifth and Sixth Amendments protect United States citizens abroad); United States v. Maturo, 982 F.2d 57, 61 (2d Cir. 1992) ("constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials"); United States v. Karake, 281 F. Supp. 2d 302, 308 (D.D.C. 2003)

> ("A defendant may move to suppress statements made to agents of foreign governments when the conduct of foreign law enforcement officials renders them agents, or virtual agents, of United States officials."); Berlin Democratic Club v. Rumsfeld, 410 F. Supp. 144, 155 (D.D.C. 1976) (holding that involvement of United States officials in the electronic surveillance by German officials of United States citizens in Germany raises constitutional concerns). [Exhibit 1, Pg. 36, Footnote. 21]

**Evaluating the relevance of Hirota and Keefe in this case.**

Respondents claim that two cases are the binding precedents that deny this Court jurisdiction in this case: Hirota v. General of the Army MacArthur, 338 U.S. 197 (1948) (per curiam), and Keefe v. Dulles, 222 F.2d 390 (D.C. Cir. 1954).

Petitioner Caraballo respectfully submits that these two cases do not control here for the following reasons:

- **Cited precedents are not relevant.**

> When a similar argument was proffered in Abu Ali v. Ashcroft, the Court's analysis cogently explained why it wasn't so there and it isn't so here. The Court's explained in brief:

> > [The Hirota and Keefe] decisions, however, do not remotely stand for the proposition that a United States citizen in the hands of a foreign government

has no right to file a petition for habeas corpus regardless of the involvement of the United States in his ongoing detention. [Exhibit 1, Pg. 44, Para. 2]

- **Aliens and US citizens have different legal and Constitutional rights.**

Respondents can hardly rely on a Hirota, decision involving non-resident aliens challenging the sentence of a foreign military tribunal, as the precedent that proves American citizens lack any rights in habeas in situations where they challenge their detention by a foreign government allegedly at the behest of the United States.

> 339 U.S. at 768; see also Hamdi, 124 S. Ct. at 2647 ("We reaffirm today the fundamental nature of a citizen's right to be free from involuntary confinement by his own government without due process of law . . . ."); Rasul, 124 S. Ct. at 2705 (Kennedy, J., concurring) (Eisentrager recognized an "ascending scale of rights" with "[c]itizenship provid[ing] a longstanding basis for jurisdiction") (quotation omitted); id. at 2706 (Scalia, J., dissenting)

> ---

> As the Court explained in Eisentrager fewer than two years after its decision in Hirota: With the citizen we are now little concerned, except to set his case apart as untouched by this decision and to take measure of the difference between his status and that of all categories of aliens. Citizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar. The years have not destroyed nor diminished the importance of citizenship nor have they sapped the vitality of a citizen's claims upon his government for protection. 339 U.S. at 768; [Emphasis supplied.]

> see also Hamdi, 124 S. Ct. at 2647 ("We reaffirm today the fundamental nature of a citizen's right to be free from involuntary confinement by his own government without due process of law . . . ."); Rasul, 124 S. Ct. at 2705 (Kennedy, J., concurring) [Exhibit 1, Pg. 45, Para. 3]

- **Hirota's Article III issues are not relevant.**

Hirota v. MacArthur stands for a limited proposition about the Supreme Court's Article III jurisdiction:

> Hirota's holding concerns the scope of Supreme Court jurisdiction under Article III of the Constitution. The Hirota petitions were rejected because they could not be reviewed under either the Supreme Court's original or appellate jurisdiction. This simply has no bearing on the District Court's power to adjudicate challenges to executive detention of American citizens.

- **Keefe does not prove there can never be constructive custody.**

In Keefe, the United States was not involved in the detention at all.

> The holding in Keefe that there was no "custody or constructive custody" where the only involvement of the United States is assumed to be its refusal to intervene on behalf of a citizen held by a foreign government can hardly be read as precedent for the notion that there can never be "custody or constructive custody" even if [as petitioners allege here] the United States is actively involved in arranging the arrest and ongoing detention of a citizen. [Exhibit 1, Pg. 46, Para. 3]

- **More than five decades of intervening law has transpired since Hirota and Keefe.**

     The cursory analysis in Hirota and Keefe simply cannot sustain the broad immunity the United States seeks here from habeas actions filed by citizens. It is worth adding that to the extent Hirota and Keefe provide even marginal support for the position advanced by the United States, more than five decades of intervening law has transpired since those cases were decided, during a time of great change in habeas jurisprudence. Hirota not only pre-dated Eisentrager, but both Hirota and Keefe also pre-date Braden and Rasul and the narrowing of the "immediate custodian" rule. Hirota and Keefe arose at a time when, as the Supreme Court explained in Rasul, the prisoner's presence in the territorial jurisdiction of the district court was an "invariable prerequisite" to the exercise of district court jurisdiction. Rasul, 124 S.Ct. at 2694-95 (quotation omitted). The point is not so much that interceding cases have overruled Hirota and Keefe, but rather that any attempt to tease a broad jurisdictional bar out of the brief discussion and narrow facts of either decision must account for the jurisdictional backdrop against which they were decided. [Exhibit 1, Pg. 47, Para. 2] [Emphasis supplied.]

**"The Petition should be dismissed pursuant to the act of state doctrine."**

Further seeking to deny this Court's proper exercise of its proper habeas jurisdiction, respondents also cite inquiry non-inquiry "doctrines" which include "act of state" and "international comity". Again, Petitioner Caraballo respectfully submits that these are not relevant in the instant case. A serious examination of this case's circumstances do not support the invocation of the "act of state" doctrine as a basis for denying this Court's jurisdiction for several reasons:

- **Petitioners challenge alleged Executive violations of their legal and Constitutional rights, not the Executive's conduct of foreign policy.**

     Petitioners do not challenge the Executive's ability to conduct foreign policy in Afghanistan. Instead, the claim is focused elsewhere. This complaint's focus is on the legal and Constitutional violations that we suffered. Therefore, we submit that this Court has proper jurisdiction:

     While separation of powers concerns may outweigh judicial adjudication in the typical case involving a foreign act of state, the prudential balance may shift decidedly when United States citizens assert constitutional violations by United States officials.

     Respondents' reliance on the act of state and separation of powers doctrines would conceivably have greater force were it not for the fact that the inquiry to be undertaken here […] is precisely the inquiry that federal courts conduct in any criminal case where a defendant alleges that evidence the United States intends to use against him was obtained by foreign governments at the behest of the United States in violation of his constitutional rights. [Emphasis added] [Exhibit 1, Pg. 57, Para. 4] [Emphasis supplied.]

-

**Liability for constitutional violations cannot be evaded by collaborating with a foreign government.**

> [T]he Court since 1949 has confirmed that constitutional norms apply to non-government actors who act jointly with the government. Cf. The Civil Rights Cases, 109 U.S. 3, 17 (1883) (narrow application of "state action" doctrine).
>
> <u>When federal officials act jointly with a multinational force, they do not escape constitutional scrutiny as respondents suggest</u>. Cf. Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 392-93 (1995) ("<u>The Constitution constrains governmental action 'by whatever instruments or in whatever modes that action may be taken.</u>'"); San Francisco Arts & Athletics Inc. v. U.S. Olympic Comm., 483 U.S. 522, 542 n.21 (1987) (describing federal action); Barr v. U.S. Dep't of Justice, 819 F.2d 25, 27-28 (2d Cir. 1987) (finding "federal action" in Swiss government's freezing of bank deposits at U.S. request); Abu Ali v. Aschroft, 350 F. Supp. 2d 28, 59-61 - 36 - (D.D.C. 2004) (U.S. does not evade liability for constitutional violations by collaborating with foreign government). [Emphasis supplied.]

- **Teaming up with foreign agents cannot exculpate US officials from liability for unlawful acts.**

> The <u>Supreme Court has never applied the act of state doctrine to bar adjudication of constitutional claims by a United States citizen against officials of the United States government</u>. . . . It is highly questionable whether officials of the Executive are entitled to raise the act of state defense to prevent the Judiciary from exercising its role in the tripartite system of government to remedy injuries to United States citizens caused by unconstitutional activities of the United States Executive Branch.
>
> 745 F.2d at 1542 (emphasis in original). "A teaming up with foreign agents," the D.C. Circuit explained, "cannot exculpate officials of the United States from liability to United States citizens for the United States official's unlawful acts." Id.
>
> ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest"). [Exhibit 1, Pg. 53, Para. 1]
>
> [...]There is simply no authority or precedent, however, for respondents' suggestion that the executive's prerogative over foreign affairs can overwhelm to the point of extinction the basic constitutional rights of citizens of the United States to freedom from unlawful detention by the executive. [Exhibit 1, Pg. 55, Para. 2] [Emphasis supplied.]

- **At issue: Whether the United States ran afoul of its constitutional obligations in "obtaining" the detention from the foreign government.**

> In its present posture, this case maps onto Kirkpatrick. <u>Petitioners are not challenging the legality of the actions of the</u> [foreign] government in tort or otherwise, see Underhill, <u>but rather are suing non-foreign entities</u> -- here, United States officials -- <u>for the role they allegedly played in obtaining the actions of the [foreign] government</u>, see Kirkpatrick. <u>The "validity" or "legality"</u>

of the [foreign] detention is not at issue; rather, the issue is whether the United States ran afoul of its constitutional obligations to [Plaintiff] in "obtaining" the detention from the [foreign government]. This inquiry might cast doubt on the integrity of the acts of [foreign] officials, but that does not require the Court to declare invalid or illegal any such act. [Emphasis supplied.]

See also 28 Lamb v. Philip Morris, Inc., 915 F.2d 1024, 1026 (6th Cir. 1990) (reading Kirkpatrick to hold that "the act of state doctrine does not bar a court in the United States from entertaining a cause of action that . . . requires imputing to foreign officials an unlawful motivation (the obtaining of bribes) in the performance of . . . an official act") (quotation and alteration omitted). [Exhibit 1, Pg. 51, Para. 2]

===

See Karake, 281 F. Supp. 2d at 308 ("A defendant may move to suppress statements made to  agents of foreign governments when the conduct of foreign law enforcement officials renders them agents, or virtual agents, of United States officials."); United States v. Yousef, 327 F.3d 56,  145 (2d Cir. 2003) ("statements elicited during overseas interrogation by foreign police in the  absence of Miranda warnings must be suppressed whenever United States law enforcement agents  actively participate in questioning conducted by foreign authorities"). [Exhibit 1, Pg. 57, Para. 2] [Emphasis supplied.]

- **In order to maintain a habeas corpus action, it is enough that the imprisoning sovereign is the respondent's agent.**

  The Sixth Circuit has described the concept of constructive custody as follows:

  In order to maintain a habeas corpus action, the petitioner must be "in custody." His custody must be the result of the respondent's action from which he seeks habeas corpus relief. However, the Supreme Court has given the custody requirement a liberal construction, and it is not necessary that the petitioner be in physical control of the respondent. It is enough that the imprisoning sovereign is the respondent's agent; that his liberty is restrained by the respondent's parole conditions; or that he can point to some continuing collateral disability which is the result of the respondent's action. [Exhibit 1, Pg. 31, Para. 2] [Emphasis supplied.]

- **The relevance of the act of state doctrine diminishes when invoked as a shield from judicial inquiry into allegedly unconstitutional acts.**

  Whatever limited bearing the act of state doctrine has on this case in light of the above analysis is only diminished further by the fact that the doctrine is being invoked here by the  United States in an attempt to shield itself from judicial inquiry for its own allegedly unconstitutional acts against one of its citizens. [Exhibit 1, Pg. 52, Para. 3]

  ---

  Respondents' position impermissibly "serves … to condense power into a single branch of government." Hamdi, 542 U.S. at 536 (plurality op.).

  But "unless Congress acts to suspend it, the Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining th[e] delicate balance of governance, serving as an important judicial check on the

Executive's discretion in the realm of detentions." Id.; accord id. at 545 (opinion of Souter, J.); id. at 562 (Scalia, J., dissenting); Rasul, 542 U.S. at 485 ("[If Congress does not suspend the Writ,] the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing."); Ex parte Yamashita, 327 U.S. 1, 9 (1946) (noting that "the Executive branch of the government could not … withdraw from the courts the duty and power to make such inquiry into the authority of the commission as may be made by habeas corpus."). [Emphasis supplied.]

- **A sufficiently close nexus between the State and the challenged action may be treated as a State act.**

    Skelton v. Pri-Cor, Inc., 963 F.2d 100, 102 (6th Cir. 1991) ("To act 'under color' of law does not require that the accused be an officer of the State. . . . There is a sufficiently close nexus between the State and the challenged action of [the private prison] so that the action of the latter may be fairly treated as that of the State itself.") (quotation and alteration omitted).

- **The Supreme Court has very liberally construed the 'in custody' requirement.**

    The statute provides specifically that a district court cannot issue a writ of habeas corpus to an individual unless the individual "is in custody" either "under or by color of the authority of the United States" or "in violation of the Constitution or laws or treaties of the United States" 28 U.S.C. § 2241(c).

    An analysis of the "in custody" language of the habeas statute must start with the proposition that the Supreme Court has "very liberally construed the 'in custody' requirement for purposes of federal habeas." Maleng, 490 U.S. at 492; see also Peyton v. Rowe, 391 U.S. 54, 64 (1968) (holding that the "in custody" requirement of the habeas statute "should be liberally construed" because of the remedial goals of the statute).

    When determining whether a petition falls within the "in custody" language of the habeas statute, courts must avoid "legalistic" and "formalistic" distinctions and honor the "breadth and flexibility of the Great Writ." Morgan, 346 U.S. at 506 n.3 (quotation omitted); Chatman-Bey, 864 F.2d at 807.

    Section 2241(c)(1) expressly expands the compass of habeas jurisdiction to any petitioner who is "in custody under or by color of the authority of the United States," not just to those strictly in the custody of the United States. 28 U.S.C. § 2241(c)(1) (emphasis added).

    Section 2241(c)(3) sweeps even more broadly, encompassing any individual who is "in custody" - - without the limitation of "under or by color of the authority of the United States" -- so long as the custody is "in violation of the Constitution or laws or treaties of the United States." [Emphasis supplied.]

- **Habeas jurisdiction exists in all circumstances in which "federal adjudication is necessary to guard against governmental abuse**

    Nevertheless, in all of these decisions, the petitioner was found to be in the actual or constructive custody of the respondent within the meaning of the habeas statute because the respondent was responsible for significant restraints on the petitioner's liberty. See Hensley, 411 U.S. at 351 ("The

custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty."); Poodry, 85 F.3d at 894 (habeas jurisdiction exists not just in physical custody by the executive but in all circumstances in which "federal adjudication is necessary to guard against governmental abuse in the imposition of severe restraints on individual liberty.") (quotation omitted). [Exhibit 1, Pg. 33, Para. 1]

- **Jurisdictional dismissal is proper only if plaintiff can prove no facts.**

    Dismissal for lack of jurisdiction is proper only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Sinclair v. Kleindienst, 711 F.2d 291, 293 (D.C. Cir. 1983) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)); Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) (allegations of non-moving party are "construed liberally").

- **Separation of powers doctrine counsels for habeas jurisdiction here.**

    The goal of separation of powers is preventing "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands." The Federalist No. 47 (James Madison), at 301 (Clinton Rossiter, ed., 1961). As the Hamdi Court recently held, the political question doctrine cannot block judicial review of a citizen's detention in American custody.

    The "threat of tangible harm to the petitioner resulting from the court's failure to act outweighs any potential harm to the Executive's exercise of its war powers," and "the public interest strongly favors vigorous application of the writ of habeas corpus on behalf of United States citizens."

    Each is an important consideration in this case. None, however, extinguishes the fundamental right of a citizen to challenge his detention colorably alleged to be at the behest of the executive.

    ---

    Separation of powers principles prohibit the executive from usurping a unilateral detention power. The Founders spied "the very definition of tyranny" in the "accumulation of all powers, legislative, executive, and judiciary, in the same hands." The Federalist, supra, at 301. [Emphasis supplied.]

- **This habeas petition focuses its challenge on the legality of a domestic third party's actions to procure the conduct of a foreign government, not the foreign government's conduct.**

At minimum, this Court has the right to inquire about the legal authorities that enables Respondents' agents to toss aside proper procedure and Petitioners' due process rights.

    By contrast, Kirkpatrick explained, the plaintiff in the case before it was not attacking the legality of the conduct of a foreign government, but instead was challenging the acts of a third party in  "obtaining" or "procur[ing]" the conduct. See Kirkpatrick, 493 U.S. at 406-07.

    Likewise, Kirkpatrick explained, the plaintiff in the case before it was challenging the defendants' actions in procuring certain conduct by a foreign government, not the conduct of the foreign government itself. Id. At most, such

a suit "may cast doubt upon the validity of foreign sovereign acts," but it would not require the court to hold those acts invalid.  Id. at 406-07. [Exhibit 1, Pg. 50, Para. 2] [Emphasis supplied.]

---

See also Lamb v. Philip Morris, Inc., 915 F.2d 1024, 1026 (6th Cir. 1990) (reading Kirkpatrick to hold that  "the act of state doctrine does not bar a court in the United States from entertaining a cause of action that . . . requires imputing to foreign officials an unlawful motivation (the obtaining of bribes) in the performance of . . . an official act") (quotation and alteration omitted).

---

There is simply no warrant for respondents' suggestion that every instance in which the United States is discovered to have worked with another country is so embarrassing to the other country that litigation is barred under the act of state doctrine. See Ramirez de Arellano, 745 F.2d at 1542  (holding that a joint venture with foreign agents will not shield officials of the United States under the act of state doctrine from liability to citizens for the officials' acts). [Exhibit 1, Pg. 52, Para. 2]

- **Federal courts have never seen the lawfulness of a U.S. citizen's executive detention as anything but a judicial question.**

  Indeed, there has never been a case in which a federal court has ranked the lawfulness of executive detention of a U.S. citizen as anything other than a judicial question.

- **The most fundamental liberty rights of US citizens, such as Due Process Clauses of the Fifth Amendment, are 'justiciable, even if they implicate foreign policy decisions.**

  This Court recently confirmed that "claims based on 'the most fundamental liberty and property rights of this country's citizenry,' such as the Takings and Due Process Clauses of the Fifth Amendment, are 'justiciable, even if they implicate foreign policy decisions.'" Bancoult v. McNamara, 445 F.3d 427, 435 (D.C. Cir. 2006) (quoting CUCLN, 859 F.2d at 935);11 13A Charles Wright et al., Federal 11  [Emphasis supplied.]

- **Political question doctrine in foreign affairs has not led courts to surrender their power to protect individuals against government action.**

  This case, like any habeas action that tests the legality and factual basis of detention, does not lack judicially manageable standards.

  Practice and Procedure § 3534.2, at 504 (2d ed. 1984) ("[T]he pervasive influence of political question doctrine in fields touching on foreign affairs has not led courts to surrender their power to protect individuals against government action."); Abu Ali, 350 F. Supp 2d at 64 (same).

  When respondents seek radical restructuring of the separation of powers, courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404 (1821). [Exhibit 1, Pg. 59, Para. 2]

**"The Petition should be dismissed as a matter of international comity."**

The issue at bar is constitutional violations, not "comity." The Petitioners do not challenge the Executive's ability to conduct foreign policy in Afghanistan. Instead, the claim was narrowly focused. Therefore:

- **The pervasive influence of political question doctrine in foreign affairs has not led courts to surrender their power to protect individuals against government action.**

  The argument respondents raise is essentially the same as their separation of powers argument, and it is met with the same answer.

  As one treatise explains, "the pervasive influence of political question doctrine in fields touching on foreign affairs has not led courts to surrender their power to protect individuals against government action. To the contrary, individual rights are protected carefully, although within a framework that takes account of the broad substantive powers of other branches." 13A Wright et al., supra, § 3534.2 at 504.

- **The question of standing is related only to whether the dispute is in a form historically viewed as capable of judicial resolution.**

  Flast v. Cohen, 392 U.S. 83 (1968) said: "The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of the Federal Government. Such problems arise, if at all, only from the substantive issues the individual seeks to have adjudicated. Thus, in terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." Id., at 100-101. [Emphasis supplied.]

Petitioner Caraballo respectfully submits that the facts and law cited above establishes that the Court has proper jurisdiction and authority in this case.

This is a case that -- like any habeas action -- tests legality and factual basis of detention. It does have judicially manageable standards. And it has wise and just remedies.

Just as the Executive intervened last April on behalf of a foreign citizen, an Afghan who converted to Christianity, a severe in violation Afghan law, then surely there must be something to be done for two patriotic Americans and their young Afghan colleague who remain in a terrible Afghan prison.

When there's a desire to achieve a result, results can be achieved. International comity or not.

If a US citizen is wrongly incarcerated, if his Constitutional rights are severely violated, even if the violations were ordered by the President of the United States himself, if it's illegal and wrong, it's hard to imagine that US law cannot provide a proper remedy.

**IV. Summation.**

At this key juncture, with the Court weighing whether it will hear our dispute at all, Petitioners are left only with public facts and our own testimony. We do not make our assertions lightly and offer informed analyses only by necessity.

Obviously, none of the Petitioners were present when the reported meeting between the "Deputy Ambassador" and Judge Bakhtiari took place. They were not present when the Ambassador discussed strategy with his subordinates on the handling of the very sensationalized case that Petitioners were subjected to while it passed through the Afghan system.

We still lack, among other things, the records that have been requested (some multiple times) under FOIA. They have been suspended in a state of inactivity and are now litigating before this court.

In its assessment, we hope the Court will evaluate if such delays would be consistent with the scenario Respondents represent: That Petitioners were properly "tried by a foreign tribunal" and that Respondents' agents acted in compliance with the law.

Petitioners submit that had this been the case, Respondents would simply produce the requested materials. It should not take generations to photocopy and release such requested items as consular records, records illustrating that the selection of those two particular judges for the Visitor Program was a remarkable coincidence, etc. If there were nothing to hide, they would have simply processed the records and have been done with it.

Hence, we bring to the Court our testimony of what we observed and heard from our own painful vantage points and that which we were able to discern from the public record. Is the Ambassador a great man? A bad man? Or something in between? Did the detrimental strategy for how the Executive would deal with this case originate from him?

Without the production of Respondent records and sworn testimony, which only the discovery phase of this habeas review will produce, we freely concede that we cannot say. At this point in time, Petitioners can only attest to the painful results of Respondents' collective actions. Assuming Respondents acted lawfully throughout, they have absolutely nothing to fear from this Court's review.

While Petitioners cannot at this time certify who the ultimate "decider" was who ordered the colorable offense that we claim, we can certify that Petitioners Idema, Bennett and Bandaras continue to suffer incarceration in a terrible prison in one of the poorest countries in the world. A country that, incidentally, is daily rising toward a full-fledged hot war. For his part, Petitioner Caraballo can attest to the collateral consequences of his wrongful incarceration.

**The Collateral Consequences of Petitioner Caraballo's Wrongful Incarceration.**

Petitioner Caraballo has returned to the United States to find his reputation completely destroyed. As a collateral consequence of his wrongful incarceration in Afghanistan, he has been completely denied any and all forms of contact with his 4-year-old daughter. Neithersupervised visits nor so much as a birthday card is allowed.

On June 28, 2006, a lawyer for Petitioner Caraballo's estranged ex-wife was able to make "skillful" use of misperceptions about the Afghan case to effect this result in a New York family court.

In all Petitioner Caraballo's time in Afghanistan prior to being arrested, he was never accused -- much less guilty -- of anything more than wielding various types of digital video and still cameras and tape recorders.

**The role of the news media in evaluating this Court's Habeas jurisdiction.**

Since Respondents have to date relied so heavily on news clippings to buttress their positions, Petitioner Caraballo wishes to speak to the media's role.

The Afghan proceedings cited here have demonstrated that Constitutional rights violations, a near fatal absence of due process and a US news cameraman receiving an eight-year prison term when he was merely operating video and tape recorders apparently do not make sensational enough subjects for articles and evening news segments. More interesting, and what was published around the world, were the myriad charges that officials were able to freely hurl hither and yon in the summer of 2004.

The news media does not have the legal authority of a Court to compel truthful testimony from anyone under penalty of perjury. In any given story, news organizations do not have any legal requirement to report one set of facts (i.e., that US citizens are being "tried" virtually without any of their legal rights being observed) over another set of facts (i.e., that they've accused of sensational charges.)

The news media is composed of commercial enterprises, all with a commercial profit motive. As has been demonstrated in this case, the news media simply does not care if 3 Americans are victimized under the supervision of their own government in a foreign court.

Even colleagues within the news industry who've known Petitioner Caraballo for years, and should have known better, have expressed doubts about his character based on the half-facts, speculation and inferences that constituted the news coverage of the case. Despite the fact that he's a 4-time Emmy award winner and has shot for all the major networks, case coverage was such that very few former colleagues volunteered even one-paragraph notes to verify that they had worked with him in years past when Caraballo's brother came calling.

Moreover, press conference representations by an official spokesperson do not come with "truth" guarantees. False Public Affairs statements carry no significant personal liability for the spokesperson nor the senior officials who give orders to disseminate representations to buttress one "position" or another. If falsehoods are later found, officials need only  – and frequently do – claim that "bad sources" or subordinates erred.

Petitioner Caraballo calls the above realities to the Court's attention particularly because so much of what was written and broadcast about the "foreign tribunal" that he suffered through was derived primarily from two sources: what the news media chose to see in the Afghan courtroom and press statements by various Karzai and Bush administration spokespeople.

Although Respondents have almost exclusively relied on such materials, we respectfully submit that the Court's critical decisions – such as the current pending one regarding proceeding at all – are much too important to rest just on Respondents' or Petitioners' news clippings. Only affidavits, evidence and live testimony from all the parties involved can enable the Court to establish true case merits.

To summarize on the subject of the news media: Often, the key facts of a situation aren't as sensational as what gets published and broadcast by the media.  The news media has considered the essential facts of THIS case of no moment.

During the concurrent period that the Petitioners have been incarcerated, hundreds of Al Qaeda terrorists have been detained at Guantanamo Bay. In contrast to Petitioners, Guantanamo detainees have been the focus of an enormous amount of concern and substantive material help from US citizens, attorneys and the Judiciary. The aid from US legal professionals has been substantial. It includes thousands of hours of free legal expertise from advocates in the "four corners" of our nation.

Our Supreme Court only weeks ago ruled in a landmark decision that reaffirms our great nation's commitment to fairness and due processes, EVEN for those who would seek to cause grave harm to our nation. In Hamdan v. Rumsfeld, No. 05-184, The Supreme Court repudiated the Executive's plan to put Guantánamo detainees on trial before military commissions. The Court ruled broadly that the commissions were unauthorized by federal statute and violated international law.

> "The executive is bound to comply with the rule of law that prevails in this jurisdiction," Justice John Paul Stevens, writing for the 5-to-3 majority, said at the end of a 73-page opinion that in sober tones shredded each of the administration's arguments, including the assertion that Congress had stripped the court of jurisdiction to decide the case. From " Justices, 5-3, Broadly Reject Bush Plan to Try Detainees" By Linda Greenhouse, New York Times (6/30/06)

In short, the US District Court and the Supreme Court has directed a great deal of attention to questions of aliens.

Petitioners are US citizens. Over the past two years in Afghanistan, they've been denied all semblance of due process under the close supervision of agents of the Executive. We are now knocking on the door of America's justice. We implore the Court to hear us. And lend us the attention and fairness that appears to be so freely given to alien criminal suspects.

When Petitioner Caraballo went to Afghanistan, he was merely pursuing a news story. He had done no more, no less for the prior 25 years of his professional life.

Following his July 5 2004 arrest, Petitioner Caraballo was interrogated in violation of his Afghan legal and US Constitutional rights. He was cut off from the outside world. He could speak to neither family nor legal counsel. Meanwhile, spokesmen for two governments set to work on his reputation. Through their accusations, inferences and the power of the media, a private person developed a very public persona almost overnight. The resulting news coverage portrayed him as a "vigilante" and "mercenary" who "claims to be a journalist."

Notable early references to him included a NY Daily News headline (8/22/04) referred to him as "Reporter or Fiend."

A New York Times subhead (7/19/04) claimed that he was among those who are charged with "robbery, beating and torture". The "robbery and beating" were fictitious add-ons of an overzealous newsroom editor. The Times would never again repeat such "creative license" after receiving an irate call from Caraballo's next of kin.

Even the "torture" allegation always remained an allegation. That the Afghan judge convicted Caraballo based on unsworn accusations did not seem to matter. At least not to others.

In some quarters, the lazy logic of public opinion has never been too concerned with details of tragic events on the other side of the world. "An Afghan judge sent Caraballo to an awful Afghanistan prison for two years. He must have done something."

The Petitioners are American citizens who are asking no less than that which has been freely accorded to alien criminal suspects.

Ultimately, we simply ask the Court to give us the fairness, the due process, the justice that has eluded us till now. And to reassert the Constitutional protections that Americans frequently take for granted, but which we have learned in the most intimately painful way in their absence, that they are so very, very precious.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 11, 2006.

Respectfully submitted,

        /s/

_____

Edward Caraballo, Petitioner
c/o Richard Caraballo
60 Erie Street, Apt 103
Jersey City, NJ 07302
201-420-0055


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 11, 2006.

Respectfully submitted,

        /s/

_____

Richard Caraballo, Brother, Witness and
Next Friend of Edward Caraballo, Petitioner
60 Erie Street, Apt 103
Jersey City, NJ 07302
201-420-0055


Dated September 11, 2006