UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.K. IDEMA, et al., )<br>)<br>    Petitioners, )<br>)<br>v. )<br>)<br>RONALD NEUMANN, et al., )<br>)<br>    Respondents. ) | No. 05 CV 2064 (EGS) |

### DECLARATION OF EDWARD P. BIRSNER

I, Edward P. Birsner, hereby make the following declaration with respect to the above-captioned matter:

1. I am the Consul at the U.S. Embassy in Kabul, Afghanistan. I assumed this position on August 17, 2006. As a consular officer and the head of the consular section, my responsibilities include providing assistance to U.S. national prisoners who are incarcerated in my consular district in accordance with Department of State regulations and guidance. I take these responsibilities, as I take all my consular responsibilities, very seriously.

2. I have reviewed petitioners' Emergency Motion for Temporary Restraining Order (TRO Motion), which was filed in this action on September 28, 2006. I make this declaration based upon my personal knowledge and information made available to me in the performance of my official duties. If called as a witness, I could competently testify to the facts set forth herein.

3. Petitioners Jonathan Keith Idema and Brent Bennett are U.S. nationals and have been incarcerated in the Pol-e-Charkhi prison in my consular district pursuant to criminal convictions by an Afghan court. I understand from conversations with various Afghan government officials that recently, on the occasion of Afghan Independence Day, the Government of Afghanistan issued an amnesty releasing all prisoners with sentences of less than 5 years who have served more than one-quarter or one-half of their sentences. Several Afghan officials independently confirmed that Petitioner Bennett was included in this group of prisoners and was therefore considered to have been released under the amnesty.

4. On September 3, 2006, my assistant and I tried to visit Mr. Bennett in the prison. The purpose of our visit was to facilitate his likely departure from Afghanistan. We wanted to provide him an opportunity to sign an application for a replacement passport (his previous one, now expired, having gone missing in prison) as well as an application for a loan to repatriate him (in the event he otherwise lacked the financial resources to return to the U.S.). We were kept waiting in the prison warden's office for over an hour by Mr. Bennett, who apparently refused to see us. While en route to the prison, we had missed a VBIED (Vehicle-Born Improvised Explosive Device) attack by about five minutes; in this attack, a British soldier was killed.

5. Contrary to the allegations in the TRO Motion, the U.S. Embassy has expressly told Afghan government officials that we are not in a position to take custody of Mr. Bennett upon his release. We have also reminded them that, if they wish Mr. Bennett to leave Afghanistan, he would likely need a new passport, and possibly financial assistance to buy a

plane ticket home. In this regard, we advised the Afghan officials that our only role in any deportation proceedings would be to assist Mr. Bennett in these two specific matters.

6. On Thursday, September 28, 2006, prison officials called the Embassy to say that they had removed Mr. Bennett from the cell he shared with Mr. Idema (one or both of them had apparently refused such separation in the past), as a result of which Mr. Idema for unexplained reasons had reportedly locked himself in his cell. Prison officials indicated during this call that they intended to bring Mr. Bennett to the Embassy the following morning to have him sign all necessary documentation for a passport and/or financial assistance, after which the prison officials were to return him to the prison until they were ready to deport him.

7. On the morning of September 29, officials from the prison did as they said, escorting Mr. Bennett to the Embassy where he willingly completed an application for a replacement U.S. passport and an application for a repatriation loan and its associated promissory note. This office is now in the process of obtaining an air ticket for his return to the U.S.

8. The Embassy has no intentions of taking Mr. Bennett into custody. Our sole role is to provide him whatever consular services he may need at this time.

9. Contrary to the allegations set forth in the TRO Motion, I did not order the Pol-e-Charkhi Commandant to use deadly force to seize Mr. Bennett and deliver him into U.S. custody

3

(nor could I do so, since I have no authority over the prison.) Indeed, on several occasions this office conveyed to Afghan officials our desire that prison authorities not use force on Mr. Bennett solely to compel him to meet with us. Neither have I ever asked anyone to deliver Mr. Bennett or Mr. Idema to U.S. custody. Similarly, there are no forces under my control or command at Pol-e-Charkhi prison and I have not ordered Afghan forces loyal to President Karzai (or any other group or individual) to "subdue Idema dead or alive." Nor, to my knowledge, are there any "United States agents" at Pol-e-Charkhi.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 29th day of September, 2006 in Kabul, Afghanistan.

_____
EDWARD P. BIRSNER