<pre>
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
_____
                                           )
J.K. IDEMA, et al.,                        )
                                           )
            Petitioners,                   )   No. 05 CV 2064 (EGS)
                                           )
     v.                                    )
                                           )
RONALD NEUMANN, et al.,                    )
                                           )
            Respondents.                   )
_____)
</pre>

### SUPPLEMENTAL BRIEF ADDRESSING JURISDICTION

Pursuant to the Court's November 6, 2006, Minute Order, respondents hereby file this supplemental brief as to the Court's lack of jurisdiction in this habeas case. Pursuant to the Court's instructions, respondents do not repeat herein the arguments regarding jurisdiction made in prior filings, but instead rely upon those filings.[1] For the reasons set forth in those prior filings, as well as the additional reasons set forth below, this Court lacks jurisdiction over this habeas petition, which challenges petitioners' incarceration in Afghanistan pursuant to a criminal conviction entered by an Afghan court for crimes committed in Afghanistan.

    1.    <u>Mootness.</u>  Petitioners Bennett's and Caraballo's habeas claims are moot, as they are no longer incarcerated in Afghanistan. As the Court is aware, petitioner Caraballo was released from prison and attended the last status hearing in this case. Since that time, petitioner Bennett has likewise been released; although his current whereabouts are unknown, his own

---

[1] Respondents respectfully refer the court to: (1) Resp'ts' Opp'n to Pet'rs' Mot. for TRO and Other Relief and Rule 60 Mot. ("TRO Opp'n") (docket no. 14); (2) Supp. Br. in Opp'n to Pet'rs' Mot. for TRO Addressing Mootness of Pet'r Caraballo's Claim ("Caraballo Mootness Br.") (docket no. 20); and (3) Resp's' Further Filing in Opp'n to Pet'rs' Emergency Mot. for TRO (docket no. 34), where respondents have set forth their jurisdictional arguments to date.

affidavit establishes that he is no longer incarcerated.  See Aff. of Brent Bennett (docket no. 33).

As a general matter, release from custody moots a habeas claim.  See generally Spencer v. Kemna, 523 U.S. 1, 7 (1998).  The Supreme Court, however, has recognized that where "collateral consequences" of a conviction persist post-incarceration, release from custody does not necessarily moot such a claim.  Id at 7.  The burden is on petitioner to establish the existence of such collateral consequences.  See Caraballo Mootness Br. (docket no. 20) at 4 n.2 (citing cases).  Petitioner Caraballo identifies two alleged collateral consequences of his conviction and incarceration in Afghanistan: his alleged inability to find employment and the alleged impact his conviction has had on his visitation rights with his daughter.  See Pet'r Caraballo's Resp. to Supp. Br. in Opp'n to Pet'rs' Mot. for TRO Addressing Mootness of Pet'r Caraballo's Claim ("Caraballo Mootness Opp'n") (docket no. 24) at 5-7.  Neither of these alleged collateral consequences suffices to keep Caraballo's claim alive.

First, there is no relief that this Court could order to undo these alleged collateral consequences, for the Court cannot reverse Caraballo's conviction by an Afghan court.  Unlike a domestic conviction, where a habeas court can declare the underlying criminal conviction null and void, and thus remedy the legal consequences flowing from such a conviction, this Court lacks the power to overturn the underlying Afghan judgment.  Nor can the Court "exonerate" Caraballo or restore his "good name" – the relief he identifies as available to him.  Id. at 5, 9.[2]  For this reason alone, Caraballo's "collateral consequences" argument should be rejected.

---

[2] The relief sought in the Petition itself – an injunction against further U.S. communications with Afghanistan related to petitioners' case "intended to obstruct justice," and removing the restrictions on petitioners' liberty imposed by respondents "through the use of rendition," Pet. at 73 – could clearly no longer be applicable to Bennett and Caraballo.

In addition, Caraballo has failed to establish – as an evidentiary matter – that either his unemployment or the restrictions on his visitation are a result of his conviction and incarceration, such that a finding of his "innocence" would remedy these problems. With respect to his unemployment, he does no more than assert that it is a consequence of his conviction and concomitant bad press, offering no evidence whatsoever to support this claim. With respect to visitation rights, he submits an order of a New York family court limiting his visitation rights until October 5, 2006. Id., Exh. 1. Not only has that order expired, but Caraballo provides no evidence to support his contention that it was based on his conviction and incarceration.[3]

In any event, the Supreme Court has expressly foreclosed reliance on "nonstatutory consequences" such as lack of employment or possible future sentencing enhancements as judicially cognizable "collateral consequences," noting that such consequences are "dependent upon '[t]he discretionary decisions – made by an employer or a sentencing judge,'" and are not necessary, legally prescribed consequences to incarceration. Spencer, 523 U.S. at 13-14 (quoting Lane v. Williams, 455 U.S. 624, 632-33 (1982), and "adher[ing] to its principles"). Caraballo's alleged collateral consequences are thus not only irremediable and unsupported, but also deficient as a matter of law.[4]

---

[3] Indeed, Caraballo himself describes his divorce as "contentious" and his relations with his ex-wife as "anything but friendly." Caraballo Mootness Opp'n (docket no. 24) at 7.

[4] That Caraballo and Bennett's claims are moot is further supported by Caraballo's own filing in further support of petitioners' first TRO motion. There, Caraballo (who had been released at the time of his filing) argues that "surely there must be something to be done for two patriotic Americans [i.e., Idema and Bennett] . . . who remain in a terrible Afghan prison." Pet'r Caraballo's Reply Mem. to Resp'ts' Opp. to Pet'rs' Mot. for TRO ("Caraballo Reply") (docket no. 25) at 39. Caraballo's focus on the petitioners then still being incarcerated strongly suggests that he himself no longer has any viable habeas claim.

2.      Mohammed v. Harvey.  As set forth in respondents' prior filings, this court lacks jurisdiction over the petition in this case because it seeks to challenge petitioners' detention by the sovereign state of Afghanistan following a criminal conviction entered by an Afghan court and upheld on appeal in Afghanistan.  See generally TRO Opp'n (docket no. 14).  Judge Lamberth's recent opinion in Mohammed v. Harvey, __ F. Supp. 2d __, 2006 WL 2971926, No. 06-1455 (RCL) (D.D.C. Oct. 19, 2006), further supports this conclusion.  Mohammed involved a habeas petition filed on behalf of a U.S. citizen, Mohammad Munaf, who was indisputably in the physical custody of the U.S. military in Iraq, acting as part of the U.N.-authorized Multi-National Force-Iraq ("MNF-I"), at the request of the Iraqi government.  Id. at *1-*3.  Munaf had been tried, convicted and sentenced to death by an Iraqi criminal court, and was in MNF-I custody pending transfer to Iraqi custody.  Id.

On petitioners' motion for a temporary restraining order seeking to enjoin the respondents from transferring Munaf to Iraqi custody, the court dismissed the petition for lack of jurisdiction. Recognizing that "[a] central prerequisite for habeas relief is that the court must have the ability to force compliance by the petitioner's custodian," the court held that "if the petitioner is in custody under some authority other than the United States, there is no habeas jurisdiction."  Id. at *5, citing Keefe v. Dulles, 222 F.2d 390 (D.C. Cir. 1954).  The court went on to note that Munaf "voluntarily entered the sovereign country of Iraq and has been convicted by the courts of that country for a violation of Iraqi law.  The writ of habeas corpus will not reach to a foreign sovereign."  Mohammed, 2006 WL 2971926 at *6.

In reaching these conclusions, the Mohammed court rejected many of the same arguments put forth by petitioner Caraballo in his reply memorandum in support of petitioners' original TRO

motion.  See Caraballo Reply (docket no. 25).  First, the court rejected Munaf's U.S. citizenship as a basis for habeas jurisdiction: "while citizenship may be a head of jurisdiction, it does not justify jurisdiction when the citizen is not held by the United States; the only remedies are diplomatic, not judicial."  Mohammed, 2006 WL 2971926 at *9.[5]  Second, the Mohammed court distinguished Abu Ali v. Ashcroft, 350 F. Supp. 2d 28 (D.D.C. 2004), upon which Caraballo heavily relies, noting that "[i]n Abu Ali the petitioner presented . . . *substantial evidence* that . . . America controlled [petitioner's] ultimate disposition and that his immediate custodians had *no* independent interest in detaining him."  Mohammed, 2006 WL 2971926 at *10 (emphasis added).  As discussed further below, no such evidence (as opposed to conclusory allegations) has been presented here.  Mohammed also noted the circumscribed nature of the Abu Ali opinion: "'[t]he instances where the United States is correctly deemed to be operating through a foreign ally as an intermediary for purposes of habeas jurisdictional will be *exceptional*, and a federal court's inquiry in such cases will be *substantially circumscribed* by the separation of powers.'"  Id. (emphasis added), quoting Abu Ali, 350 F. Supp. 2d at 41; see also Mohammed, 2006 WL 2971926 at *11 (facts alleged "fall far short" of an "exceptional" case such as Abu Ali).  Third, Mohammed rejected outright the primary nature of petitioners' allegations in this case – that alleged American interference with a foreign criminal trial suffices to establish habeas jurisdiction: "[t]o the extent petitioner claims that the Americans interfered with the fairness of his trial, *his remedies lie in the Iraqi courts*."  Id. (emphasis added).  In conclusion, the court noted that Munaf is "in a foreign

---

[5] Again, Caraballo's own filing suggests as much, noting that "Executive" (i.e., diplomatic) action had helped secure the release of an Afghan convert to Christianity, and suggesting that the same should be done for those petitioners still incarcerated.  Caraballo Reply (docket no. 25) at 39.

5

country and in the custody of MNF-I, not the United States, and he is therefore beyond the habeas jurisdiction of this Court." Id. at *12.[6]

The same reasoning and conclusions apply to the case at bar. Indeed, petitioners' claim to jurisdiction is far weaker than that of the petitioners in Mohammed. In that case, Munaf was admittedly in the physical custody of the U.S. Armed Forces, albeit acting in their capacity as part of MNF-I. Here, by contrast, petitioner Idema is undisputably in the custody of Afghan prison authorities. Because, like Munaf, all of the petitioners voluntarily entered a foreign country and were tried and convicted by that country's courts for violations of that country's laws, the courts of this country – including this Court – lack habeas jurisdiction over their claims.

3.  Abu Ali distinguished.  Petitioner Caraballo relies heavily on Judge Bates' opinion in Abu Ali in arguing in favor of jurisdiction. See generally Caraballo Reply (docket no. 25). Several critical factors distinguish this case from Abu Ali. As noted by Judge Lamberth in Mohammed, Judge Bates found that the petitioners in Abu Ali had presented substantial evidence supporting their contention that the Saudi government was holding Abu Ali at the request of the United States and had no independent interest in his continued detention. See, e.g., Abu Ali, 350 F. Supp. 2d at 30-36 (discussing evidence supporting factual allegations), 67-68 (characterizing evidence as "considerable"). By contrast, petitioners here have offered myriad *allegations* regarding U.S. control over Afghanistan, the Afghan criminal justice system and Pol-e-Charkhi prison, but have presented virtually no evidence to substantiate any of these allegations. Thus, for

---

[6] Petitioners in Munaf have appealed the dismissal of the petition. See Munaf v. Harvey, No. 06-5324 (D.C. Cir). They also sought an emergency injunction against the transfer of Munaf from MNF-I custody from both the Court of Appeals and the Supreme Court. Both courts rejected this request. See Exhibit A hereto (orders of Court of Appeals and Supreme Court).

example, in his latest filing petitioner Caraballo claims that the Deputy Chief of Mission ("DCM") at the U.S. Embassy requested the presiding judge to give petitioners the "harshest sentence possible." Caraballo Reply (docket no. 25) at 20-21.  Setting aside the quadruple hearsay nature of the allegation,[7] Caraballo fails to offer any *evidence* whatsoever in support of this contention, notwithstanding that one of the individuals allegedly told about the comments was his former defense counsel whom Caraballo allegedly interviewed upon his return to the U.S.  Similarly, the allegation that Afghan prosecutors would drop the charges if the U.S. Embassy agreed, id. at 23, is unsupported by any evidence, notwithstanding that John Tiffany, counsel for petitioner Idema, was allegedly at the meeting where this offer was made.[8]  Petitioners' failure to adduce evidence in support of these and their other allegations a year and a half after the Petition was first filed both undermines their claims and substantially distinguishes this case from Abu Ali.  For it was only the presence of such evidence that led Judge Bates to conclude that Abu Ali might be in the "constructive custody" of the United States.

An additional important distinction between Abu Ali and the case at bar is the fact that petitioners here were *tried and convicted by an Afghan court*, unlike Mr. Abu Ali, who had been

---

[7] According to Caraballo, the judge allegedly described the DCM's comments to two Afghan lawyers, who in turn told Natalie Rea, who in turn told Michael Skibbie, Caraballo's defense counsel in Afghanistan.  Id.

[8] Respondents do not concede that either of these facts, even if substantiated, would suffice to establish habeas jurisdiction.  With respect to the alleged statement of the DCM, as Judge Lamberth noted, "[t]o the extent petitioner claims that the Americans interfered with the fairness of his trial, his remedies lie in the [Afghan] courts." Mohammed, 2006 WL 2971926 at *11.  With respect to the alleged "deal" offered by Afghan prosecutors, the U.S. Embassy's unwillingness to concur in such an arrangement, even if true, would hardly mean that petitioners were detained, tried and convicted at the behest of the United States.  Respondents cite these examples merely because they represent allegations for which one would have expected petitioners to adduce *some* evidence, given the identity of the individuals allegedly involved.

detained without charges in Saudi Arabia for over a year. The fact of petitioners' conviction is relevant for several reasons. First, it places this case squarely in the line of precedent, including Hirota v. General of the Army MacArthur, 338 U.S. 197 (1948), Keefe, and Mohammed, holding that U.S. courts lack jurisdiction to entertain habeas claims from petitioners (including U.S. citizens) convicted by foreign tribunals. Indeed, even Abu Ali recognized this distinction, and relied upon it in distinguishing Abu Ali's case from Hirota and Keefe:

> In both Hirota and Keefe, there was a judgment and sentence by a foreign tribunal. As Hirota explained, a United States court has "no power or authority to review, to affirm, set aside or annul the judgments and sentences imposed" by a foreign tribunal. . . *The act of a foreign state in arresting an individual, entering judgment against him, and sentencing him in a court of law* is of a different order altogether than the decision by the executive to hold him through the intercession of another country. *The former acts require the United States courts to sit as a court of appeals over the court of [another] country.*

Abu Ali, 350 F. Supp. 2d at 57 n.26 (emphasis added) (internal citation omitted), quoting Hirota, 338 U.S. at 198.

Second, the Afghan convictions serve to distinguish Abu Ali because they mean that issuance of the writ by this Court would run afoul of both the act of state and international comity doctrines, as it would require the Court to find invalid an official act – a criminal conviction – of a foreign sovereign. See TRO Opp'n (docket no. 14) at 17-22. The only foreign act at issue in Abu Ali was the Saudi decision to detain Abu Ali; thus, Judge Bates rejected the applicability of the act of state doctrine because issuance of the writ would not require invalidation of an official Saudi Act. See Abu Ali, 350 F. Supp. 2d at 59 n.27 (no violation of Saudi law to detain Abu Ali at behest of United States). Here, by contrast, issuance of the writ – which would entail a finding that the Afghan courts were merely doing the bidding of the United States in convicting

petitioners – would necessarily effectively invalidate the Afghan convictions, which were predicated on a finding of guilt. Put another way, pursuant to the act of state doctrine the criminal convictions serve as a rule of decision for this court, and that rule of decision – i.e., acceptance of petitioners' guilt, as a legal matter – necessitates dismissal of the writ. Similarly, international comity principles – which were not at issue in Abu Ali – support dismissal of the writ, as its consideration or issuance necessarily calls into question the valid sovereign acts of the Afghan courts.[9]

Finally, the procedural posture of this case also serves to distinguish it from Abu Ali. In that case, the court had directed the Government to respond to the petition, and the court's decision regarding the necessity for jurisdictional discovery was based on the government's response (which did not contest any of petitioners' factual allegations). See Abu Ali, 350 F. Supp. 2d at 37. Here, by contrast, no such response has been required. See 28 U.S.C. § 2243 (Court shall not issue writ or direct a response to Petition "if it appear from the application that

---

[9] Respondents note that petitioners' claims are based, at least in part, on the alleged infirmities in their Afghan criminal trial. See TRO Opp'n (docket no. 14) at 22 (citing record); see also Caraballo Reply (docket no. 25) at 28 (complaining that "due process protections were virtually non-existent" at the trial); id., Exh. 4(due process guide to Afghan law). That petitioners make these claims – which were not at issue in Abu Ali – further demonstrates the applicability of the act of state and international comity doctrines to the case at bar. Holmes v. Laird, 459 F.2d 1211,1212 (D.C. Cir. 1972), is instructive in this regard. In that case, the D.C. Circuit held that a federal court is not "empowered to entertain a claim of illegality in the conviction of two American soldiers in the Federal Republic of Germany with a view to enjoining their surrender for service of their sentences." 459 F.2d at 1212. In so holding, the Court rejected arguments very similar to those made by petitioners here, such as the claim that the translation at their trial was poor and that they were unable to confront key witnesses. Id. at 1214; compare Petition at 24 (¶ 30), 27 (¶ 37). Holmes involved petitioners in the physical custody of the United States seeking to enjoin their transfer to German custody, and the court found no jurisdiction. *A fortiori*, where, as here, the respondents are already serving, of have served, their foreign sentence, the alleged improprieties of their foreign trial cannot afford a basis for federal habeas jurisdiction. See also Neely v. Henkel, 180 U.S. 109, 122-23 (1901).

the applicant or person detained is not entitled" to the writ; otherwise, Court shall either issue writ or enter order to show cause why writ should not be granted). See also TRO Opp'n (docket no. 14) at 4. Rather, respondents' arguments regarding the Court's lack of jurisdiction have been set forth in response to petitioners' two motions for preliminary injunctive relief. As set forth in those filings, and for the additional reasons discussed herein, this Court lacks jurisdiction over this habeas corpus petition. In the event that the Court determines that it cannot reach this conclusion based on the record before it, the Government's factual silence should not be a basis for a finding of jurisdiction. Instead, respondents should be afforded an opportunity to respond to the petition before the Court takes any other actions.

## CONCLUSION

For the reasons set forth above and in respondents' prior submissions, the petition should be dismissed.

Dated: November 17, 2006.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

___/s/_____
ORI LEV, DC # 452565
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883, Washington, DC  20044
Tel:  (202) 514-2395; Fax:  (202) 318-7589
Email:  ori.lev@usdoj.gov

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that he has, this 17th day of November 2006, caused a copy of the foregoing **SUPPLEMENTAL BRIEF RESPECTING JURISDICTION** to be to be served to be served, via U.S. mail, postage prepaid, upon the following persons at the following addresses:

      Edward Caraballo
      60 Erie Street
      Jersey City, NJ 07302

John Tiffany, attorney for Petitioner Idema, will be served via the Court's ECF system.

The undersigned has no current address for Petitioner Brent Bennett.


                                          _____/s/_____
                                          Ori Lev