UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| J.K. Idema, et al.,<br>　　　　Petitioners,<br><br>　　　　v.<br><br>United States Department of State, et al.,<br>　　　　Respondents. | No. 05 CV 2064 (EGS)<br>ECF Case |

**PETITIONER CARABALLO'S RESPONSE TO
RESPONDENTS BRIEF ADDRESSING JURISDICTION**

Pursuant to the Court's November 6, 2006 minute order, petitioner Caraballo hereby files this response to Respondents' November 17, 2006 supplemental brief. As per the Court's order, this filing is limited to addressing specific points made in that filing.

**Mootness.** Generally, Respondents' filing reprises their previously stated position that this Petitioner should be dismissed from this proceeding. It also restates their position that this proceeding should be dismissed before this Honorable Court has heard rebuttal or anything else from individuals who could credibly explain the government's close involvement in the "foreign tribunal" and its curious handling.

　　Respondents filing also suggests that even if a senior diplomat had improperly met with a foreign judge at the US Embassy and interfered with proceedings that resulted in a U.S. citizen's wrongful long-term incarceration, such interference requires no accountability and hence does not justify inquiry by this Honorable Court.

　　This Petitioner respectfully submits that his position, as detailed in his September 11, 2006 filing, remains unchanged and valid: The Executive branch's extraordinary involvement in

the "foreign tribunal" triggers this Court's jurisdiction.

Respondents' filing also seeks to nullify this Petitioner's standing in this matter by dismissively minimizing the damage that this petitioner's wrongful incarceration has caused and continues to cause. It is hard to imagine two more fundamental collateral consequences than the threatened loss of parental rights and employment. Yet, Respondents' propose that "neither of the alleged collateral consequence suffices to keep Caraballo claim alive." The filing goes on to suggest "requirements" to certify with evidence every aspect of this Petitioner's account of the proceedings that caused this matter to come to bar. It's not clear what volume of evidence would satisfy the high threshold that Respondents now seek to impose across the board in order to simply allow this Petitioner to retain his standing in this Petition and a fair hearing to proceed, if the Court sees fit to do so.

With regard to "evidence" of collateral consequences, it would surely be easier to provide documentation of the employment one has – i.e., with pay stubs, memos, etc. -- than it is to document non-employment. While unable at this time to document the void of professional opportunity that his wrongful incarceration has created, this petitioner respectfully points to CARAFAS v. LAVALLEE, 391 U.S. 234 (1968) to illustrate the extent of the wrongful incarceration's impact.

> In consequence of his conviction, he cannot engage in certain businesses; 4 he cannot serve as an official of a labor union for a specified period of time; 5 he cannot vote in any election held in New York State; 6 he cannot serve as a juror. 7
>
> [4] E. g., New York Education Law 6502, 6702; New York General Business Law 74, subd. 2; New York Real Property Law 440-a; New York Alcoholic Beverage Control Law 126.
> [5] 73 Stat. 536, 29 U.S.C. 504.
> [6] New York Election Law 152, subd. 2.
> [7] New York Judiciary Law 596, 662.

In addition to the above, an uncorrected record of a wrongful incarceration also stands to impact this petitioner's standing in any future legal proceeding.

**Mohammed v. Harvey**. Respondents' filing also introduces a recent habeas case, Mohammed v. Harvey, as support for their view that American citizens are stripped of the Constitution's

protections and powerless to challenge their foreign incarceration in a U.S. court even when the incarceration is the apparent result of highly questionable -- and possibly even illegal activities -- by Executive branch employees.

They cite select details from the Mohammed case and see that court's rulings as support for their positions here. However, the global legal and factual issues in the two cases are substantially different.

One key difference is the fact that the Mohammed court was able to properly decide case merits based on sworn affidavits from responding individuals with first-hand personal knowledge of case events. Case outcomes directly resulted from a proper judicial inquiry wherein respondents offered affidavits and other evidence of their proper compliance with US and International laws and procedures. At the end of a proper inquiry, the Mohammad court ruled that the case essentially involved third parties (an Iraqi court and Romanian government and civilian plaintiffs). The U.S. government's role in that case was limited [1], custodial [2] and legally subordinate to an international entity. [3]

In contrast, Respondents here have yet to produce any statement from any individual with first-hand personal knowledge who could rationalize, let alone legally justify, the Executive branch's long pattern of curious involvement in the "foreign tribunal" that took place in Afghanistan.

Meanwhile, Respondents seek to dismiss all Petitioners' personal knowledge accounts of Respondents' suspicious involvement in the "foreign tribunal." This petitioner and next friend Richard Caraballo have been extremely careful to accurately document and attribute the few sources of information that have been available.

In our accounts, we have pieced together -- from our own detailed logs, news reporting of

---

[1] Petitioner was a Romanian/American/Iraqi citizen whose U.S. government interference claim was founded on a single appearance by a US government lawyer who was conveying the Romanian government's position to the Iraqi tribunal. The appearance was fully documented, explained and justified in sworn affidavits.

[2] In response to the Iraqi government's inability to detain suspects, the US military held the petitioner at a Baghdad "Green Zone" facility.

[3] The Court's considered legal analysis traced the legal authority under which the petitioner was held not to a U.S. authority but a multinational international entity, "MNF-1".

the case and accounts from credible on-scene third parties -- a long-term pattern of conduct over two years. Rather than casting baseless accusations, this petitioner has made every human effort to convey to the Court an accurate picture of the events, facts, and third party observations that created the need for this proceeding.

For instance, in presenting the reported "deputy ambassador" incident, we readily acknowledged the hearsay aspect of the account. It should be noted, however, that just because a piece of information is hearsay doesn't automatically make it false. [4]

As the Supreme Court has noted, "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it." From the back-door authority that the FBI exercised over petitioners and evidence throughout the Afghan tribunal, to the reported "Deputy Ambassador" incident, to the selection of the two particular (primary and appeal court) Afghan judges (out of 5,000) for a U.S. junket, the cumulative effect of multiple events adds up to a questionable pattern of improper behavior. And this pattern belies the premise that the outcome of the "foreign tribunal" was decided in Afghanistan.

In contrast to the Mohammad case, where US Executive branch involvement was brief and subordinate, yet legally documented and justified by those with first-hand personal

---

[4] In BOURJAILY v. UNITED STATES, 483 U.S. 171 (1987) 483 U.S. 171, the Supreme Court noted:

> Petitioner's theory ignores two simple facts of evidentiary life. <u>First, out-of-court statements are only presumed unreliable</u>. The presumption may be rebutted by appropriate proof. See Fed. Rule Evid. 803(24) (otherwise inadmissible hearsay may be admitted if circumstantial guarantees of trustworthiness demonstrated). Second, <u>individual pieces of [483 U.S. 171, 180] evidence, insufficient in themselves to prove a point, may in cumulation prove it.</u>
>
> <u>The sum of an evidentiary presentation may well be greater than its constituent parts. Taken together, these two propositions demonstrate that a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence</u>. A per se rule barring consideration of these hearsay statements during preliminary factfinding is not therefore required. <u>Even if out-of-court declarations by co-conspirators are presumptively unreliable, trial courts must be permitted to evaluate these statements for their evidentiary worth as revealed by the particular circumstances of the case. Courts often act as factfinders, and there is no reason to believe that courts are any less able to properly recognize the probative value of evidence in this particular area.</u>  [Emphasis supplied]

knowledge of case events, the long pattern of Executive branch activities in Afghanistan remains undocumented in the instant case despite petitioner's best efforts to obtain case-related documentation under FOIA.

Clearly, had there been FOIA compliance, there would be no need for this petitioner to state his case relying only on sworn testimony, news articles, third party "hearsay" and a State Department International Visitors Program flyer.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 22, 2006.

Respectfully submitted,

_____/S/_____

Edward Caraballo

c/o Richard Caraballo
60 Erie Street, #103
Jersey City, New Jersey 07302