**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| J.K. IDEMA, <u>et al.</u>, | ) |
| | ) |
| Petitioners, | )    No. 05 CV 2064 (EGS) |
| | ) |
| v. | ) |
| | ) |
| RONALD NEUMANN, <u>et al.</u>, | ) |
| | ) |
| Respondents. | ) |

_____)

<u>**RESPONDENTS' MOTION TO DISMISS ON GROUNDS OF MOOTNESS**</u>

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, respondents respectfully move the Court to dismiss the habeas claims of petitioner Idema on the ground that such claims are now moot in light of the commutation of Mr. Idema's Afghan prison sentence pursuant to a general amnesty order issued by Afghan President Hamid Karzai. The accompanying Memorandum of Points and Authorities more fully sets forth the reasons that support Respondents' Motion to Dismiss on Grounds of Mootness.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

  s/ Marcia Berman
MARCIA BERMAN
Trial Attorney
(PA Bar No. 66168)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7204

Washington, D.C.  20530
Tel.: (202) 514-3330
Fax: (202) 616-8470
Email:  marcia.berman@usdoj.gov

Attorneys for Respondents.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————————————
J.K. IDEMA, et al.,                                         )
                                                           )
                    Petitioners,                           )          No. 05 CV 2064 (EGS)
                                                           )
             v.                                            )
                                                           )
RONALD NEUMANN,  et al.,                                   )
                                                           )
                    Respondents.                           )
———————————————————————————)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
RESPONDENTS' MOTION TO DISMISS ON GROUNDS OF MOOTNESS**

Respondents hereby move to dismiss the habeas claims of petitioner Idema on the ground

that such claims are now moot in light of the commutation of Mr. Idema's Afghan prison

sentence pursuant to a general amnesty order issued by Afghan President Hamid Karzai.  In light

of the amnesty order, Afghan authorities have signed the paperwork authorizing Mr. Idema's

release from custody based on his criminal conviction by an Afghan court.  Mr. Idema is

currently being detained by Afghan authorities pending his deportation from Afghanistan.  As

soon as the travel  arrangements for Mr. Idema's departure from the country are made, his

release and deportation should follow imminently.  Indeed, as of the time of this filing, it is our

understanding that Mr. Idema's release is imminent.  Because the basis for detention challenged

in the Petition – Mr. Idema's conviction – is no longer the basis for his continued detention by

Afghan authorities, because Mr. Idema essentially holds the keys to his cell and can effectuate

his release from his current custody by making travel arrangements to leave the country, and

because Mr. Idema's release is in fact imminent, his habeas claim is now moot.

## **BACKGOUND**

Unbeknownst at the time to the Court, the parties, or U.S. Embassy officials in Kabul, on or about December 27, 2006, on the occasion of the holiday Adza Eid, Afghan President Hamid Karzai issued a decree "regarding Amnesty and Commutation of Sentences of Prisoners and Detainees." Exhibit 1 to Declaration of Edward P. Birsner, itself attached hereto as Exhibit A.[1] The decree directed the release or reduction of sentences of various classes of inmates. Id. Among other groups, the decree provided for the release of those male inmates who had been sentenced to periods of imprisonment for "more than three years up to five years" who had served half their sentence. Id., Art. 4(1). Following the amnesty decree, on March 13, 2007, the Commander of the Prison issued a release order for Mr. Idema which indicated that "[i]n accordance with Article 4 of the Decree No. 83 . . . he is considered eligible for release." Exhibit 2 to Birsner Decl.[2]

Beginning in February 2007, U.S. Embassy officials were informed by various Afghan government officials and others that the Government of Afghanistan had issued an amnesty decree that applied to Mr. Idema and that he was to be released from prison imminently. Birsner Decl., ¶ 3. At that time, Embassy officials were informed that upon his release, Mr. Idema would be transferred to the temporary custody of the Afghan National Directorate of Security (NDS) pending his deportation from Afghanistan. Id. The Embassy was also informed that the Afghan government did not have the means to pay for Mr. Idema's transportation out of the

---

[1] The decree itself (Birsner Exhibit 1) indicates that it is effective as of December 30, 2006, but the paper authorizing Mr. Idema's release references an issuance date of December 27, 2006.

[2] The release order incorrectly spells Mr. Idema's name as "Adema." Id.

country.  Id.[3]

In response to this information, U.S. Embassy officials stressed to their Afghan colleagues that the decision as to whether or not Mr. Idema should be deported from Afghanistan is one for Afghan authorities to make.  Id., ¶ 4.  They also informed the Afghan officials that in the event that Mr. Idema is deported, Embassy personnel were ready to assist him by issuing him a passport and/or making travel arrangements for him.  Id.  In this regard, the Embassy informed the Afghan officials that the Embassy could only make travel arrangements for Mr. Idema if Mr. Idema provided funding for such travel or signed a loan agreement to pay for such travel.  Id. Embassy officials also inquired of the Afghan officials as to what would be done with Mr. Idema's possessions, and were informed that Mr. Idema would be free to take his possessions with him or dispose of them locally.  Id.  Embassy officials repeatedly stressed to their Afghan colleagues that they should do everything possible to ensure Mr. Idema's safety.  Id.

On Thursday, March 15, 2007 – prior to this Court's issuance of the Order to Show Cause in this matter – the Embassy was informed that the paper authorizing Mr. Idema's release from custody had been signed by all the members of the review panel responsible for determining whether the amnesty decree applied to particular prisoners.  Id., ¶ 5.  In accordance with the information previously provided by Afghan officials, the Embassy was also informed that Mr. Idema would be transferred from Pol-e-Charkhi prison, where he had served his criminal sentence, to NDS custody pending his deportation.  Id.  The Embassy again reiterated its request that the Afghan authorities do everything possible to ensure Mr. Idema's safety.  Id.

---

[3] Petitioners Brent Bennett and Edward Caraballo were released from custody pursuant to similar prior amnesty decrees.  See, e.g., Resp. Opp. to Pet. Emergency Mot. for TRO (docket 29) at 3 and attached declaration of Edward P. Birsner.

The next day, Friday, March 16, 2007, Mr. Idema telephoned the U.S. Consul in Kabul and told the Consul that Mr. Idema understood that the U.S. Embassy was directing Afghan officials to attack him and either kill him or transfer him to NDS custody, and that his attorney would be filing a motion for a temporary restraining order in this case. Id., ¶ 6. The Consul informed Mr. Idema that this was incorrect and that Embassy personnel had no role in directing any actions regarding his release or deportation, let alone any alleged measures that would place him in physical danger. Id. The Consul also explained to him that the Embassy would be able to assist Mr. Idema in procuring a passport and making travel arrangements. Id.

In the course of this conversation, Mr. Idema indicated that he feared for his safety and his life in the event he was transferred to NDS custody. Id., ¶ 7. Mr. Idema also stated that he would be willing to cooperate with his release so long as he was allowed to stay at Pol-e-Charkhi prison pending his deportation and allowed to take his belongings with him. Id. Mr. Idema stated that he had the funds with which to pay for a passport and a plane ticket, as well as the transportation of his personal effects. Id. The U.S. Consul offered to convey Mr. Idema's requests to the Afghan authorities on Mr. Idema's behalf. Id.

Following this conversation, Embassy staff spoke with Afghan authorities and conveyed Mr. Idema's requests as described above. Id., ¶ 8. The Afghan authorities indicated that they were amenable to these requests and indicated that the prison director should write a letter to the NDS requesting that Mr. Idema stay at the prison pending his deportation. Id. The Afghan authorities also indicated, as they had before, that Mr. Idema would be permitted to take his possessions with him. Id. The U.S. Consul informed Mr. Idema of this conversation with Afghan authorities, and asked him to make a list of his possessions that he wishes to take with

4

him for transfer to the Afghan authorities for their consideration.  Id.

That same day, Mr. Idema's counsel, John Tiffany, sent counsel for the government a letter threatening the filing of an emergency TRO based on the "attack" that the U.S. Embassy was allegedly planning in order to effectuate Mr. Idema's transfer to NDS custody.  See Letter from John E. Tiffany to Ori Lev, March 16, 2007, attached hereto as Exhibit B.[4]  Mr. Tiffany's letter attached two additional letters - one from Mr. Tiffany to the Afghan Ambassador to the United States and one from Mr. Idema to the office of Senator Elizabeth Dole.  Id.  Mr. Tiffany's letter to the Ambassador notes that "Jack Idema was released from his illegal imprisonment" and Mr. Idema's letter similarly states that he "was released from Pulacharke Prison."  Id.  Presumably, these are references to Mr. Idema's release from his criminal sentence.

In light of the U.S. Consul's conversation with Mr. Idema, and the Afghan authorities' agreement to allow Mr. Idema to remain at Pol-e-Charkhi pending his deportation, counsel for the Government sent Mr. Tiffany a responsive letter on the afternoon of March 16 informing him that (i) Embassy personnel had been informed by Afghan authorities that Mr. Idema's release from Pol-e-Charkhi was imminent and that they intend to deport Mr. Idema, (ii) the Embassy offered to assist Mr. Idema in obtaining a passport and in making travel arrangements, and has also repeatedly stressed to the Afghan authorities that they should do everything possible to ensure Mr. Idema's safety, and (iii) of the substance of the Consul's conversation with Mr. Idema and the Afghan authorities' subsequent agreement to allow Mr. Idema to remain at Pol-e-Charkhi pending his deportation.  See Letter from Ori Lev to John E. Tiffany, March 16, 2007,

---

[4] The letter is incorrectly dated March 17, 2007.  The fax header makes clear that it was sent the morning of March 16.

5

attached hereto as Exhibit C.

The following Tuesday, March 20, the U.S. Consul phoned Mr. Idema to ascertain his situation. Birsner Decl., ¶ 9. Mr. Idema informed the Consul that Afghan authorities had not attempted to transfer him to NDS custody. Id. Mr. Idema also confirmed that he could not locate his passport, and the Consul again reiterated to him the Embassy's ability to help Mr. Idema procure a replacement passport. Id. In light of Mr. Idema's refusal to allow Afghan authorities to bring him to the Embassy for this purpose, and the security situation preventing the Consul from traveling to the prison, the Consul offered to assist Mr. Idema with his passport application on his way to the airport, with the understanding that, given the extremely short time frame contemplated, he could not guarantee that Mr. Idema's replacement passport would be available in time for his flight. Id. Mr. Idema also indicated that he may need assistance booking a ticket to Dubai. Id. The Consul reiterated that the Embassy could assist him in booking such a ticket once Mr. Idema provided funds, as he had indicated he could do. Id. In response to an inquiry from Mr. Idema, the Consul also indicated that he would attempt to procure information regarding how Mr. Idema might ship his possessions, as well as a dog belonging to Brent Bennett, to the United States. Id. Finally, the Consul asked Mr. Idema if he had prepared the list of belongings that he wished to take with him, which the Consul had offered to pass along to the Afghan authorities. Id. Mr. Idema stated that he had not yet done so, but that he would prepare such a list and e-mail it in the next day or two. Id. In this regard, Mr. Idema stated that he did not expect the Afghan authorities to give him back certain firearms belonging to him and that he would not insist on that. Id. It is the Embassy's understanding that the possessions that Mr. Idema wishes to ship to the United States include computer equipment

as well as at least one vehicle.  Id.

The next day, the Court – unaware of these developments – issued its order to show cause why a writ of habeas corpus should not issue to petitioner Idema.  Order, March 21, 2007.  The Opinion accompanying the Order made clear that the Order was based on the allegations in the Petition regarding alleged "U.S. control over petitioners' arrest, conviction, appeal, and [subsequent] confinement."  March 21 Slip Op. at 9.  That is, the order to show cause was based on allegations that respondents had interfered with petitioners' criminal trial and conviction and were therefore responsible for petitioner Idema's incarceration.

On March 27, 2007, the U.S. Consul telephoned Mr. Idema to inquire as to the status of his departure plans.  Birsner Decl., ¶ 11.  Mr. Idema stated that he had been waiting for information from the Consul about transporting Mr. Bennett's dog out of the country.  Id.  The Consul advised Mr. Idema that according to the information the Consul had obtained about shipping an animal from Afghanistan, it could be a rather time-consuming process that could take up to a month or more.  Id.  Accordingly, the Consul recommended to Mr. Idema that he consider alternate arrangements for shipping both the dog and his other belongings in the event that the Afghan government decided to deport Mr. Idema sooner than that.  Id.  Mr. Idema replied with words to the effect that he had made a promise to Mr. Bennett on his life that he would take the dog with him when he went, and that the only way he would leave Afghanistan without the dog was if they carried out his dead body.  Id.

The Consul and Mr. Idema also discussed Mr. Idema's passport application and Mr. Idema's refusal to allow prison authorities to bring him to the Embassy for purposes of processing such an application in advance of Mr. Idema's departure.  Id., ¶ 12.  In this regard, the

Consul noted that if the Afghan government decided to deport Mr. Idema on short notice, the

Embassy might have to document Mr. Idema with a direct-return-only passport without Mr.

Idema's signature on the application.  Id.

 Mr. Idema also inquired as to whether the Embassy we would be able to mail Mr.

Bennett's effects to the United States via APO mail or diplomatic pouch, which Mr. Bennett had

also requested in a separate e-mail to the Consul.  Id., ¶ 13.  The Consul replied that the Embassy

is not authorized to use the APO mail or diplomatic pouch for this purpose and that both Mr.

Bennett's and Mr. Idema's belongings would have to be shipped via private means.  Id.  The

Consul reminded Mr. Idema that the Embassy was expecting Mr. Idema to forward a list of his

possessions that the Embassy could share with the appropriate Afghan authorities, who would

make any final decisions regarding this matter.  Id.  The Consul also agreed to provide Mr.

Idema with a list of commercial shipping companies in Kabul, which he did via e-mail to Brent

Bennett on March 29, 2007, to be forwarded to Mr. Idema.  Id.[5]

 The U.S. Embassy in Kabul stands ready to assist Mr. Idema in making travel

arrangements for his departure from Afghanistan, including providing Mr. Idema a loan for

purposes of purchasing an airline ticket to the United States in the event that Mr. Idema cannot

procure private funds for this purpose.  Id., ¶ 15.  The Embassy also stands ready to assist in

processing a passport application for Mr. Idema, either for a full-validity U.S. passport, or, in the

event that Mr. Idema either will not or cannot sign a passport application or needs a loan from

the Department of State, a return-only passport that would allow Mr. Idema to return to the

---

[5] The Consul had earlier, on March 27, with Mr. Idema's concurrence, used this same
channel to forward to Mr. Idema guidance on shipping pets from Afghanistan.

United States.  Id.  The Embassy will also continue to provide appropriate assistance to Mr.

Idema with respect to arranging for the shipment of his belongings and Mr. Bennett's dog.  Id.

On April 4, 2007, Embassy staff was informed by the Warden of the Pol-e-Charkhi

prison that Mr. Idema's release is imminent.  Id., ¶ 16.

## ARGUMENT

As this Court has recognized in dismissing the habeas claims of petitioners Bennett and

Caraballo, "[a]fter a habeas petitioner's sentence expires," a habeas claim becomes moot absent

the existence of collateral consequences.  March 21 Slip Op. at 6.  As discussed above, petitioner

Idema's sentence has now "expired" as a result of the amnesty decree issued by President Karzai

last December.  Accordingly, his habeas claim – which was predicated on respondents' alleged

interference with the criminal process that resulted in his conviction – is now moot.  Nor does his

continued detention pending deportation keep his current habeas claim alive.  First, that custody

is not based upon the allegedly tainted conviction, but rather upon a separate Afghan government

determination to deport Mr. Idema.  Indeed, none of the allegations of the Petition relate to the

circumstances of Mr. Idema's current detention and the relief sought in the Petition relating to

the fact (as opposed to the conditions) of petitioner's confinement all relate to the criminal trial

and respondents' alleged interference therewith.  See Petition at 73.  Second, Mr. Idema's

continued detention is, at this point, solely a function of his refusal to take the necessary steps to

make travel arrangements to leave Afghanistan.  Accordingly, Mr. Idema's habeas claim – the

sole claim still pending before the Court – should be dismissed as moot.

Article III of the Constitution defines the outer bounds of the constitutional jurisdiction

of federal courts by restricting the exercise of judicial power only to "Cases" or "Controversies."

U.S. Const., art. III, § 2.  As the Supreme Court has explained in applying this constitutional

limitation to a habeas case:

> This case-or-controversy requirement subsists through all stages of federal
> judicial proceedings, trial and appellate . . . .  The parties must continue to have a
> stake in the outcome of the lawsuit.  This means that, throughout the litigation,
> the plaintiff must have suffered, or be threatened with, an actual injury *traceable
> to the defendant and likely to be redressed by a favorable judicial decision*.

Spencer v. Kemna, 523 U.S. 1, 7 (1998) (emphasis added) (internal citations and quotation

marks omitted).  See also Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997).

Thus, "*[o]nce the convict's sentence has expired*, . . . some concrete and continuing

injury – other than the now-ended incarceration or parole . . . must exist if the suit is to be

maintained."  Spencer, 523 U.S. at 7 (emphasis added).  See also March 21 Slip Op. at 6.

Mr. Idema's habeas claim is predicated entirely on the allegations that respondents were

responsible for his arrest by Afghan authorities and interfered with his criminal trial and appeal

resulting in his conviction.  March 21 Slip Op. at 3-5, 9-10 (summarizing allegations).  All of

these allegations relate to Mr. Idema's conviction by an Afghan court and his concomitant

incarceration in Pol-e-Charkhi prison where he served the sentence imposed as a result of that

conviction.  See also Petition at 29-30 ¶ 41 (conviction and sentence), 36 ¶ 61 (appeal).

Likewise, the relief sought in the Petition – to the extent that it relates to the fact of confinement,

as opposed to the conditions of confinement – relates to Mr. Idema's criminal trial.  Thus, the

Petition seeks an order from the Court directing respondents to "cease all communication,

intended to obstruct justice, with the government of Afghanistan *related to the Petitioners'

criminal case in Afghanistan*" and "removing all restrictions on liberty which Respondents have

imposed on Petitioners through their agents, through the use of rendition."  Petition at 73 (prayer

for relief).  See also id. (seeking order directing respondents to return "exculpatory evidence"
allegedly seized by FBI).

As set forth above, pursuant to the amnesty decree signed by President Karzai last
December and the release authorization approved on March 13 of this year, Mr. Idema's
sentence was effectively commuted, and he was ordered released from his incarceration related
to that sentence.  See Birsner Decl., Exhibits 1, 2.  That is, in the words of the Supreme Court,
petitioner Idema's "sentence has expired."  Spencer, 523 U.S. at 7.  Indeed, Mr. Idema and his
counsel both recognized this fact before the Court issued its March 21 Order.  In the letters
attached to Mr. Tiffany's March 16 correspondence to Government counsel, Mr. Tiffany asserts
that "Jack Idema was released" from his imprisonment and Mr. Idema himself states that "he
was released from Pulacharke Prison."  See Exhibit B.  Both of these letters were sent, however,
when Mr. Idema was indisputably still physically present at Pol-e-Charkhi; indeed, they were
intended to prevent Mr. Idema's transfer from that facility to an NDS detention center pending
his deportation.  Thus, petitioner himself recognized that notwithstanding his continued physical
detention, he has been "released" from his criminal sentence.  Accordingly, the factual premise
for Mr. Idema's habeas claim no longer exists and that claim is moot.

That Mr. Idema's claim is mooted by the termination of his criminal sentence is also
evident from the nature of the relief sought in the Petition. Setting aside the question of whether
the Court has the power to grant that relief, it is clear that, in the words of Spencer, Mr. Idema's
ongoing incarceration pending deportation is not "likely to be redressed" by the relief sought in
the Petition, as such relief is focused on matters relating to "petitioners' criminal case in

Afghanistan," which no longer provides the basis for Mr. Idema's incarceration.[6]  Because the basis for incarceration challenged in the Petition (Mr. Idema's criminal conviction) no longer provides the basis for Mr. Idema's continued detention, his habeas claim is moot.

In analogous contexts, courts have held that when the legal basis for detention challenged in a habeas petition no longer provides the legal basis for continued detention, habeas claims are moot notwithstanding the petitioners' continued detention.  Thus, for example, the Supreme Court has held that a habeas petition predicated on the alleged improper denial of bail pending trial is rendered moot by the petitioner's subsequent plea or conviction.  Murphy v. Hunt, 455 U.S. 478, 481-82 (1982).  This is because the question presented by the petition – the propriety of the bail decision – is no longer a "live" question after conviction.  Id.  This is so notwithstanding the petitioner's continued incarceration, because the continued incarceration is no longer predicated on the challenged action (denial of bail), but rather on an entirely new and independent legal basis not addressed in the petition (criminal conviction).

Similarly here, the question presented by the Petition – respondents' responsibility for petitioner Idema's conviction, sentence and related incarceration – is no longer a "live" question once the sentence has "expired."   And this is so notwithstanding Mr. Idema's continued detention because that continued detention is no longer predicated on the challenged action (the allegedly improper conviction resulting from respondents' alleged interference with the criminal trial), but rather on an entirely new and independent legal basis not addressed in the Petition (the Afghan government's decision to deport Mr. Idema).  See also Hernandez v. Brooks, No. 98-

---

[6] Thus, any response by respondents to the factual allegations of the Petition – all of which relate to Mr. Idema's arrest, trial, conviction and appeal – would have no bearing upon his continued detention.

1358, 1999 WL 298094, at *1 (10th Cir. 1999) (habeas petition predicated on denial of release

pending parole revocation proceeding rendered moot when proceeding occurs) (unpublished);

Bilal v. Hadi, No. 3:06CV224/LAC/MD, 2006 WL 3201324, at * 2-3 (N.D. Fla. Nov. 2, 2006)

(habeas petition challenging excessive pre-trial bail rendered moot by plea, notwithstanding

petitioners' continued incarceration) (citing cases); Johnson v. Glover, No. 1:04-CV-413-

WKW(WO), 2006 WL 1008986, at *1-2 (M.D. Ala. April 18, 2006) (petitioner's "claim

regarding pre-trial bail became moot upon either his conviction of the underlying offense and/or

his transfer to state custody for service of sentences imposed for various felony convictions");

Posada-Carriles v. Campos, No. 3:06-cv-130-PRM (W.D. Tex. Feb 21, 2007), slip op. at 2

(dismissing as moot habeas petition challenging detention pending deportation after petitioner

was indicted and held pursuant to criminal detention order) (attached hereto as Exhibit D).  All

of these cases stand for the same principle:  once the challenged basis of a petitioner's detention

no longer constitutes the basis for continued detention, a habeas petition is moot.  Application of

that principle to the case at bar leads to but one conclusion – Mr. Idema's habeas claim is moot.

Nor does the mere fact that Mr. Idema remains at Pol-e-Charkhi prison change this

analysis.  For it is the legal basis for detention – and not the location of detention or the identity

of the custodian – that is relevant.  Moreover, as discussed above, the only reason Mr. Idema has

remained at Pol-e-Charkhi is that he requested to remain there in lieu of being transferred to

NDS custody.  See Birsner Decl., ¶¶ 7-9; Exhibit C.  Had the Afghan authorities not acceded to

Mr. Idema's request, and physically transferred Mr. Idema to NDS custody pending his

deportation, it would be clear that his current custody is legally distinct from the custody he

challenges in the Petition.  The mere fact that the Afghan authorities chose to honor Mr. Idema's

wishes, however, should not and does not affect the legal analysis.  The fact remains that Mr. Idema is no longer in custody pursuant to the criminal sentence he challenges in his Petition. And that fact alone - regardless of the physical location of his detention – renders his habeas claim moot.

Moreover, because Mr. Idema effectively controls his own freedom at this point – and could effectuate his release by arranging for his travel out of Afghanistan – his continued detention pending deportation should not provide the basis for continued habeas jurisdiction.[7] As set forth above, the Afghan authorities have indicated that while they intend to deport Mr. Idema, they expect him to make his own travel arrangements.  Birsner Decl., ¶ 3.  And the U.S. Embassy in Kabul is prepared to assist Mr. Idema in making such arrangements, including assisting with procuring Mr. Idema a passport, making flight arrangements, and even providing Mr. Idema a loan in the event that he cannot pay for a flight himself.  Id., ¶¶ 4, 9, 15.[8]  All that it would take for Mr. Idema to be released from custody, therefore, is his taking the necessary steps to get a passport and a plane ticket out of Afghanistan.  Id., ¶ 16.

Mr. Idema, however, seems more concerned with arranging for the shipment of his possessions and Brent Bennett's dog back to the United States than with securing his speedy release from Afghan custody.  Id., ¶¶ 9, 11, 16.  Indeed, when he was told that it may take as

---

[7] Respondents do not concede that the Court ever had jurisdiction.  See March 21 Slip. Op. at 9 (noting "case law suggesting that [the Court] does not have jurisdiction over a habeas petition stemming from a foreign conviction and sentence").  The Court need not reach that question, however, for the reasons discussed herein.

[8] The Embassy provided just such assistance to petitioner Brent Bennett prior to his deportation from Afghanistan after he was released from prison pursuant to an earlier amnesty. See, e.g., Resp. Opp. to Pet. Emergency Mot. for TRO (docket 29) at 3 & attached declaration of Edward P. Birsner.

14

long as a month to arrange for the shipment of the dog and that he may wish to make alternate

arrangements for that to happen in his absence in the event that the Afghan authorities decide to

deport him before then by some other means, Mr. Idema indicated that he would not leave

Afghanistan alive without the dog. Id., ¶¶ 11, 16. This is certainly Mr. Idema's prerogative, and

as long as the Afghan authorities are willing abide his continued presence, there is nothing

keeping him from making such arrangements with respect to his goods and the dog as he deems

appropriate. But Mr. Idema's choice to remain in Afghanistan in order to attend to these matters

does not provide the basis for continued federal court jurisdiction over his habeas petition. As

one court has put it in denying a habeas petition in an analogous context, Mr. Idema "can end[]

his detention immediately. He has the keys in his pocket." Parra v. Perryman, 172 F.3d 954,

958 (7th Cir. 1999).

In Parra, the court considered a habeas petition filed by an alien who was being detained

by the federal government "pending the conclusion of removal proceedings" intended to result in

his deportation. Id. at 955. The court dismissed the petition, noting that the petitioner could end

his detention by simply "withdraw[ing] his defense of the removal proceedings," which would

result in his deportation (and freedom). Id. at 958. In so holding, the court noted that the interest

the petitioner was seeking to vindicate was "not liberty in the abstract, but liberty *in the United

States*." Id. (emphasis in the original). Similarly, here, the sole interest petitioner Idema could

possibly seek to vindicate by the continued pendency of this case is "not liberty in the abstract" –

which he could achieve in a matter of days by arranging for a plane ticket and passport – but

liberty with a dog and possessions. Habeas corpus, however, does not encompass the right to

secure one's possessions from a foreign government, or the right to transport animals

15

internationally.  Because Mr. Idema could effectuate his freedom by taking a few simple steps to

make his travel arrangements, his continued detention pending deportation while he refuses to

take these steps does not provide a basis for continued habeas jurisdiction.  See also

Archibald v. I.N.S., No. 02-0722, 2002 WL 1434391, at * (E.D. Pa. July 1, 2002) (denying

habeas where sole reason for continued custody was petitioner's decision to fight deportation)

(citing cases).

Indeed, domestic law regarding deportation recognizes that an alien facing an order for

removal – akin to Mr. Idema's status in Afghanistan – has an obligation "to make timely

application in good faith for travel or other documents necessary to the alien's departure."  8

U.S.C. § 1231(a)(1)(C).[9]  Thus, while domestic law generally requires removal within 90 days of

a removal order, 8 U.S.C. § 1231(a)(1)(A), and requires the alien to be detained pending

removal, id., § 1231(a)(2), the law expressly provides that the 90-day period "shall be extended"

and "the alien may remain in detention during such extended period"  if the alien "fails or

refuses to make timely application in good faith for travel or other documents necessary to the

alien's departure or conspires or acts to prevent the alien's removal subject to an order of

removal," id., § 1231(a)(1)(C).[10]

In light of this statutory provision, courts have held it appropriate to deny habeas

---

[9] Although the United States does not require an alien subject to removal to pay the expenses of removal, the law does provide an incentive for aliens to do so.  An alien who elects to depart voluntarily at the alien's own expense in lieu of ordered removed is not subject to the bar on re-entry applicable to aliens who have previously been ordered removed.  See 8 U.S.C. § 1229c (providing for voluntary departure); 8 U.S.C. § 1182(a)(9) (bar on re-entry for aliens previously removed).

[10] Another provision of the law makes failure to so act a felony.  8 U.S.C. § 1253(a)(1)(B),(C).

petitions of aliens who have been detained in excess of 90 days as a result of their failure to take steps to procure travel documents.  For example, in <u>Pelich v. INS</u>, 329 F.3d 1057 (9th Cir. 2003), the Ninth Circuit denied a habeas claim where it found that petitioner "himself is responsible for his plight" because he "steadfastly refused to fill out a Polish passport application."  <u>Id.</u> at 1059. <u>See also</u> <u>id.</u> at 1060 (citing cases).  <u>Pelich</u> thus concluded that the petitioner's continued detention did not raise constitutional concerns "where the length of the detention is in direct proportion to the detainee's recalcitrant refusal to cooperate in effectuating his removal."  <u>Id.</u> at 1062.  <u>See also</u> <u>Benn v. Bureau of Immigration and Customs Enforcement</u>, 82 Fed. Appx. 139, 139-140, 2003 WL 22880781, at *1 (5th Cir. 2003).

The same reasoning that underlies section 1231(a)(1)(C) and the cases cited above supports dismissal of Mr. Idema's Petition as moot.  Mr. Idema has, to date, not taken steps to either procure a passport or purchase a plane ticket out of Afghanistan.[11]  To the contrary, he has indicated that he does not intend to leave Afghanistan until he can arrange for the transport of Mr. Bennett's dog to the United States.  His continued detention pending deportation, therefore, is of his own making.  Accordingly, that continued detention cannot provide a basis for the Court to retain jurisdiction over a habeas petition that is otherwise moot.

## <u>CONCLUSION</u>

For the reasons discussed above, Mr. Idema's habeas claim should be dismissed as moot.

Dated: April 5, 2007.          Respectfully submitted,

PETER D. KEISLER

---

[11] Mr. Idema has indicated that he has the funds to purchase such a ticket.  Birsner Decl., ¶ 7.  In any event, if he does not have such funds, he can borrow them from the Department of State.  <u>Id.</u> at ¶ 4.

Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

 s/ Marcia Berman
MARCIA BERMAN
Trial Attorney
(PA Bar No. 66168)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7204
Washington, D.C.  20530
Tel.: (202) 514-3330
Fax: (202) 616-8470
Email:  marcia.berman@usdoj.gov

Attorneys for Respondents.

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that she has, this 5th day of April 2007, caused a copy of the foregoing **RESPONDENTS' MOTION TO DISMISS ON GROUNDS OF MOOTNESS** to be filed via the Court's ECF system and that John Tiffany, attorney for Petitioner Idema, will be served via that system.


                                        _s/ Marcia Berman_____
                                        MARCIA BERMAN