# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

J.K. IDEMA, et al.,                    )
                                       )
      Petitioners,                )          No. 05 CV 2064 (EGS)
                                       )
      v.                          )
                                       )
RONALD NEUMANN, et al.,                )
                                       )
      Respondents.                )
                                       )

## DECLARATION OF EDWARD P. BIRSNER

I, Edward P. Birsner, hereby make the following declaration with respect to the above-captioned matter:

1.     I am the Consul at the U.S. Embassy in Kabul, Afghanistan. I assumed this position on August 17, 2006. As a consular officer and the head of the consular section, my responsibilities include providing assistance to U.S. national prisoners who are incarcerated in my consular district in accordance with Department of State regulations and guidance. I take these responsibilities, as I take all my consular responsibilities, very seriously.

2.     I make this declaration based upon my personal knowledge and information made available to me in the performance of my official duties. If called as a witness, I could competently testify to the facts set forth herein.

3.      Petitioner Jonathan Keith Idema is a U.S. national who has been incarcerated in the Pol-e-Charkhi prison in my consular district pursuant to criminal convictions by an Afghan court. Beginning in February 2007, my staff and I were informed by various Afghan government officials and others that the Government of Afghanistan had issued an amnesty that applied to Mr. Idema and that he was to be released from prison imminently. Afghan officials informed me and my staff that upon his release Mr. Idema would be transferred to the temporary custody of the Afghan National Directorate of Security (NDS) pending his deportation from Afghanistan. We were also informed that the Afghan government did not have the means to pay for Mr. Idema's transportation out of the country.

4.      In conversations with Afghan officials, we have stressed that the decision as to whether or not Mr. Idema should be deported from Afghanistan is one for Afghan authorities to make. We have also informed the Afghan officials that in the event that Mr. Idema is deported, we stand ready to assist him by issuing him a passport and/or making travel arrangements, but that we could only make travel arrangements if Mr. Idema provided funding for such travel or signed a loan agreement to pay for such travel. We also inquired of the Afghan officials as to what would be done with Mr. Idema's possessions, and were informed that Mr. Idema would be free to take his possessions with him or dispose of them locally. We have also repeatedly stressed to Afghan officials that they should do everything possible to ensure Mr. Idema's safety.

5.    On Thursday, March 15, 2007, we were informed that the paper authorizing Mr. Idema's

release from custody had been signed by all the members of the review panel responsible for

determining whether the amnesty decree applied to particular prisoners. Accordingly, we were

informed that Mr. Idema would be transferred from Pol-e-Charkhi prison, where he had served

his criminal sentence, to NDS custody pending his deportation. We reiterated our request that

the Afghan authorities do everything possible to ensure Mr. Idema's safety.

6.    On Friday, March 16, 2007, Mr. Idema phoned me and told me that he understood that

the U.S. Embassy was directing Afghan officials to attack him and either kill him or transfer him

to NDS custody, and that his attorney would be filing a motion for a temporary restraining order

in this case. I informed Mr. Idema that this was incorrect and that Embassy personnel had no

role in directing any actions regarding his release or deportation, let alone any alleged measures

that would place him in physical danger. I also explained to him that the Embassy would be able

to assist him in procuring a passport and making travel arrangements, as described above.

7.    In the course of our conversation, Mr. Idema indicated that he feared for his safety and

his life in the event he was transferred to NDS custody. Mr. Idema also stated that he would be

willing to co-operate with his release so long as he was allowed to stay at Pol-e-Charkhi prison

pending his deportation and allowed to take his belongings with him. Mr. Idema stated that he

had the funds with which to pay for a passport and a plane ticket, as well as the transportation of

3

his personal effects. I offered to convey Mr. Idema's requests to the Afghan authorities on Mr. Idema's behalf.

8.    Following my conversation with Mr. Idema, a member of my staff spoke with Afghan authorities and conveyed Mr. Idema's requests as described in the prior paragraph. The Afghan authorities indicated that they were amenable to these requests and indicated that the prison director should write a letter to the NDS requesting that Mr. Idema stay at the prison pending his deportation. The Afghan authorities also indicated, as they have before, that Mr. Idema would be permitted to take his possessions with him. On March 16, I informed Mr. Idema of this conversation with Afghan authorities, asked him to make a list of his possessions that he wishes to take with him, and asked him to call me immediately in the event that the Afghan authorities nonetheless seek to transfer him to NDS custody.

9.    I heard nothing further from Mr. Idema until March 20, when I phoned him to ascertain his situation. Mr. Idema informed me that Afghan authorities had not attempted to transfer him to NDS custody. In the course of the conversation, Mr. Idema confirmed that he could not locate his passport and I again reiterated to him our ability to help him procure a replacement passport. In light of Mr. Idema's refusal to allow Afghan authorities to bring him to the Embassy for this purpose, and the security situation preventing me from traveling to the prison, I offered to assist Mr. Idema with his passport application on his way to the airport, with the understanding that, given the extremely short time frame contemplated, I could not guarantee that his replacement passport would be available in time for his flight. Mr. Idema and I also discussed his travel

4

plans, and he indicated that he may need assistance booking a ticket to Dubai. I reiterated that

the Embassy could assist him in booking such a ticket once Mr. Idema provided funds, as he had

indicated he could do. In response to his request, I also indicated that I would attempt to procure

information regarding how Mr. Idema might ship his possessions, as well as a dog belonging to

Brent Bennett, to the United States. (Brent Bennett was an original petitioner in this case. His

habeas claim was dismissed as moot after he was released from prison and deported from

Afghanistan.) Finally, I asked Mr. Idema if he had prepared the list of belongings that he wished

to take with him, which I had offered to pass along to the Afghan authorities. Mr. Idema stated

that he had not yet done so, but that he would prepare such a list and e-mail it to me in the next

day or two. In this regard, Mr. Idema stated that he did not expect the Afghan authorities to give

him back certain firearms belonging to him, and that he would not insist on the return of those

firearms. It is the Embassy's understanding that the possessions that Mr. Idema wishes to ship to

the United States include computer equipment as well as at least one vehicle.


10.    Subsequent to the issuance of the Court's March 21, 2007 order, I inquired of Afghan

authorities as to their plans with respect to the timing of Mr. Idema's deportation, noting that I

would be out of the country beginning April 5, 2007 and that to the extent that the Embassy's

assistance will be needed in arranging for a passport and/or transportation for Mr. Idema, it

would be preferable that that assistance be procured prior to that date. The authorities informed

me that they had no specific timeline in mind for his deportation and were essentially waiting for

Mr. Idema to make his travel arrangements.

5

11.    On March 27, 2007, I telephoned Mr. Idema to inquire as to the status of his departure

plans. Mr. Idema stated that he had been waiting for information from me about transporting

Mr. Bennett's dog. I advised him that according to the guidance I obtained about shipping an

animal from Afghanistan, it could be a rather time-consuming process that could take up to a

month or more, and recommended to Mr. Idema that he consider alternate arrangements for

shipping both the dog and his belongings in the event that the Afghan government decided to

deport him sooner than that. Mr. Idema replied with words to the effect that he had made a

promise to Mr. Bennett on his life that he would take the dog with him when he went; therefore,

the only way he'd leave Afghanistan without the dog was if they carried out his dead body.


12.    Mr. Idema and I also discussed his passport application and Mr. Idema's refusal to allow

prison authorities to bring him to the Embassy for purposes of processing such an application in

advance of Mr. Idema's departure. In this regard, I noted that if the Afghan government decided

to deport him on short notice, we may have to document him with a direct-return-only passport

without his signature on the application.


13.    Mr. Idema also inquired as to whether we would be able to mail Mr. Bennett's effects to

the U.S. via APO mail or diplomatic pouch, which Mr. Bennett also had requested in a separate

e-mail to me. I replied that we are not authorized to use the APO mail or diplomatic pouch for

this purpose and that both Mr. Bennett's and Mr. Idema's belongings would have to be shipped

via private means. I reminded Mr. Idema that we were expecting him to forward a list of his

possessions that we could share with the appropriate Afghan authorities, who would make any

6

final decisions regarding this matter. I also promised Mr. Idema that I would provide him with a list of commercial shipping companies in Kabul, and did so via e-mail to Brent Bennett on March 29, 2007, to be forwarded to Mr. Idema. I had earlier on March 27, with Mr. Idema's concurrence, used this same channel to forward to Mr. Idema guidance on shipping pets from Afghanistan.

14.    Following the issuance of the Court's March 21, 2007 order in this case, a member of my staff sought and obtained copies of both President Karzai's amnesty decree and the release paper affirming the applicability of that decree to Mr. Idema and directing his release. Copies of those documents as received from the Afghan authorities, as well as translations of them, are attached hereto as Exhibits 1 and 2.

15.    The Embassy stands ready to assist Mr. Idema in making travel arrangements for his departure from Afghanistan, including providing Mr. Idema a loan for purposes of purchasing an airline ticket to the United States in the event that Mr. Idema cannot procure private funds for this purpose. The Embassy also stands ready to assist in processing a passport application for Mr. Idema, either for a full-validity U.S. passport, or, in the event that Mr. Idema either will not or cannot sign a passport application or needs a loan from the Department of State for his return ticket, a return-only passport or other travel document that would allow Mr. Idema to return to the United States. The Embassy will also continue to provide appropriate assistance to Mr. Idema with respect to arranging for the shipment of his belongings and Mr. Bennett's dog.

7

16.    It had been my understanding, based on my conversations with Afghan authorities as described above, that Mr. Idema would be released from custody as soon as he was willing to leave peacefully and cooperate in his deportation (including making arrangements for his travel out of Afghanistan).  Mr. Idema insisted upon arranging for the shipment of his (as yet unspecified) possessions as well as Mr. Bennett's dog before agreeing to leave the country, and the Afghan authorities agreed to that request.  However, on April 4, 2007, my assistant Bashir Mamnoon was informed by the Warden of the Pol-e-Charkhi prison that Mr. Idema's release is imminent, but we have no further information at this time.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on this 4th day of April, 2007 in Kabul, Afghanistan.


EDWARD P. BIRSNER

8

# EXHIBIT 1



سماره: ۸۴

۱۳۸۵/۱۰/۹

# فرمان

## رئيس جمهوری اسلامی افغانستان

### در مورد عفو و تخفيف مجازات محبوسين و محجوزين

بمناسبت حلول عيد سعيد اضحى، عفو و تخفيف مجازات
محبوسين و محجوزين را حسب ذيل منظور مينمايم:

ماده اول:

(۱)   محبوسين و محجوزين اناثيکه به حکم قطعى و نهايى محکمه به
حبس يا حجز بحکوم شده اند، از حبس يا حجز رها گردند، حالات
ذيل از اين حکم مستثنى است:

۱. مرتکبين جرايم عليه امنيت داخلى و خارجى و قاچاق مواد
مخدر، مگر اينکه نصف مدت حبس محکوم بها را سپرى نموده
باشند.

۲. مرتکبين جرايم قتل، مگر اينکه ورثه مقتول ابراء نموده و دوثلث
مدت حبس محکوم بها را سپرى کرده باشند.

(۲)   مرتکبين جرايم قطاع الطريقى، سرقت هاى مسلحانه، گروگان
گيرى و اختطاف از مزاياى احکام مندرج فقره (۱) اين ماده مستفيد
شده نميتوانند.



ماده دوم:

(۱)  محبوسین ذکوریکه سن (۶۵) سالگی را تکمیل نموده و به حکم
قطعی و نهایی محکمه به مدت الی پنج سال حبس محکوم شده
باشند، بدون نظر داشت میعاد باقیمانده از حبس رها گردند.

(۲)  محبوسین و محجوزین مصاب به امراض صعب العلاج که به حکم
قطعی و نهایی محکمه به حبس یا حجز الی مدت دو سال محکوم
شده اند، به اساس نظر کمیسیون موظف صحی بدون نظر داشت
میعاد باقیمانده از حبس یا حجز رها گردند.

(۳)  وزارت صحت عامه مکلف است به منظور تثبیت مصاب بودن به
امراض صعب العلاج محبوسین و محجوزین مندرج فقره (۲) این
ماده، کمیسیون های صحی را در مرکز و ولایات ایجاد نماید.

ماده سوم:

(۱)  محبوسین و محجوزین ذکوریکه به حکم قطعی و نهایی محکمه به
مدت الی یک سال حبس یا حجز محکوم گردیده باشند بدون نظر
داشت مدت حبس سپری شده، از حبس یا حجز رها گردند.

(۲)  محبوسین و محجوزین ذکوریکه به حکم قطعی و نهایی محکمه به
بیش از یک الی سه سال حبس یا حجز محکوم گردیده اند، در
صورتیکه ثلث حبس یا حجز محکوم بها را سپری نموده باشند، از
حبس یا حجز رها گردند.

ماده چهارم:

(۱)  محبوسین و محجوزین ذکوریکه بحکم قطعی و نهایی محکمه به
حبس یا حجز بیش از سه الی پنج سال محکوم گردیده اند،
مشروط بر اینکه نصف مدت حبس یا حجز محکوم بها را سپری
نموده باشند، از حبس یا حجز رها گردند.

مرتکبین جرایم قتل، در صورتی از این حکم مستفید میگردند که ورثه مقتول ابراء نموده و دو ثلث مدت حبس محکوم بها را سپری نموده باشند.

مرتکبین جرایم قطاع الطریقی اختطاف طی سرقتها، گروگان گیری و اختطاف از مزایای احکام مندرج فقره (۱) این ماده مستفید شده نمیتوانند.

ماده پنجم:

(۱)   محبوسین و محجوزینکه به حکم قطعی و نهایی محکمه به حبس بیش از پنج سال الی بیست سال محکوم گردیده و از مزایای احکام مندرج مواد (۱ و ۴) این فرمان مستفید نمیگردند، مدت مجازات آنها ذیلاً تخفیف می یابد.

۱- محکومین به حبس یا حجز الی مدت پنج سال، شش ماه.

۲- محکومین به حبس یا حجز بیشتر از پنج سال الی ده سال، مدت یکسال.

۳- محکومین به حبس بیشتر از ده سال الی پانزده سال، مدت یکسال و ششماه.

۴- محکومین به حبس بیشتر از پانزده سال الی بیست سال، مدت دو سال.

(۲)   محکومینیکه بالاثر فرامین عفو و تخفیف قبلی رئیس جمهوری اسلامی افغانستان در میعاد حبس یا حجز آنها تخفیف بعمل آمده باشد، از مزایای حکم مندرج فقره (۱) این ماده مستفید شده نمیتوانند.

ماده ششم:

محبوسین و محجوزین به اساس احکام این فرمان از حبس یا حجز نمیگردند، در صورتیکه به پرداخت جریمه نقدی یا جبران خساره نیز محکوم گردیده باشند، قبل از رهایی مکلف به تادیه وجوه محکوم بها یا تضمین معادل آن میباشند.

ماده هفتم:

احکام این فرمان، دعوی حق العبدی اشخاص را اخلال نمی نماید.

ماده هشتم:

وزارت امور زنان مکلف است برای آنعده محبوسین و محجوزین اناثیکه مطابق احکام این فرمان از حبس یا حجز رها میگردند، الی پیدا شدن محرم شرعی آنها، محل مناسب رهایشی را در مرکز و ولایات تدارک نماید.

ماده نهم:

(۱) به منظور تطبیق احکام این فرمان در مرکز کمیسیونی متشکل از نماینده گان لوی څارنوالی، وزارت های صحت عامه، امور زنان، کمیسیون مستقل حقوق بشر، رئیس مرکز اصلاح و تربیت اطفال، آمر محبس تحت نظر نماینده با صلاحیت ستره محکمه و در ولایات کمیسیون متشکل از څارنوال ولایت، روسای صحت عامه، امور زنان، نماینده ریاست عمومی امنیت ملی، آمر حبس، آمر مرکز اصلاح و تربیت اطفال، نماینده کمیسیون مستقل حقوق بشر (در صورت موجودیت) تحت ریاست رئیس محکمه مرافعه ولایت تشکیل میگردد.

(۲) روسای کمیسیون های مندرج فقره (۱) این ماده مکلف اند از تطبیق این فرمان بریاست عمومی اداره امور و دارالانشای شورای وزیران گزارش دهند.

ماده دهم:

این فرمان از تاریخ (۹) جدی سال ۱۳۸۵ نافذ میباشد.

حامد کرزی

رئیس جمهوری اسلامی افغانستان



U.S. Department of State
Office of Language Services
Translating Division

LS No. 03-2007-0401
Dari/English
SM/MF

---

### Translation

No. 83
Date: 6/10/1385 (12/27/2006)

## DECREE
## President of the Islamic Republic of Afghanistan
## Regarding Amnesty and Commutation of Sentences of
## Prisoners and Detainees

On the occasion of the auspicious anniversary of *Eid Sayeed Adha [Translator's note: a religious holiday]*, I am approving the amnesty and commutation of sentences of prisoners and detainees as follows:

## Article One:

(1) Female prisoners and detainees who have been sentenced to definite imprisonment or detention shall be released, except under the following situations:

    1. Those who have committed crimes against the internal or external security and smuggling of narcotics, unless they have served half of their prison sentence.

    2. Those who have committed such crimes as murder, unless the victim's heirs have acquitted them and they have spent two-thirds of the prison sentence term.

    *[Translator's note: In Islamic law, in cases involving murder or any crime, there are two concepts at play: Haq-ul Allah and Haq-ul Abd, which literally mean "right of God" and "right of human (victim)". The government can forgive or decide on Haq-ul Allah but it cannot make any decision on behalf of Haq-ul Abd, which has to be made by the victim's heirs or family (next of kin).]*

1

(2)  Those who have committed such crimes as highway banditry, armed robbery, hostage taking and kidnapping cannot benefit from the provisions of the sentences cited under Article (1).

## Article Two:

(1)  Male prisoners and detainees who have completed the age of 65 and have been sentenced to imprisonment for up to five years by definite court order shall be released without regard to the length of time served in prison.

(2)  Prisoners and detainees who have been afflicted with hard-to-treat diseases and are sentenced by the court to definite imprisonment or detention of up to ten years, shall be released based on the opinion of the authoritative health commission without regard to the length of time remaining in their prison or detention term.

(3)  The Ministry of Public Health is required to create Health Commissions in the capital and Provinces in order to determine affliction of prisoners and detainees with hard-to-treat disease a provided under Clause 2 of this Article.

## Article Three:

(1)  Male prisoners and detainees who have been sentenced to up to one year definite imprisonment or detention shall be released from the prison or detention, regardless of the length of time served in prison.

(2)  Male prisoners and detainees who have definitely been sentenced to more than one year and up to three years of imprisonment or detention shall be released from the prison or detention if one-third of the time of imprisonment or detention has been served.

2

**Article Four:**

(1)   Male prisoners and detainees who have been definitely sentenced by a court to an imprisonment or detention of more than three years up to five years, shall be released from prison or detention provided they have spend half of the imprisonment or detention sentence.

(2)   Those who have committed crimes of murder can benefit from this provision only if the victim's heir/family have absolved [forgiven] them and if they have served two thirds of their sentences.

(3)   Those who have committed such crimes as highway banditry, armed robberies, hostage taking and kidnapping cannot benefit from the provision mentioned under Clause (1) of this Article.

**Article Five:**

(1)   Prisoners and detainees who have been definitely sentenced by the court to imprisonment of more than five years and up to twenty years cannot benefit from the provisions mentioned under Articles (1) and (4) of this Decree, but their sentences are commuted as follows:

  1.   Those sentenced to imprisonment or detention up to five years shall receive a six-month reduction of sentence.

  2.   Those sentenced to imprisonment or detention of more than five years, and up to ten years, shall receive a one-year reduction of sentence.

  3.   Those convicted and sentenced to more than fifteen years and up to twenty years of imprisonment, shall receive a two-year reduction of sentence.

(2)   Those convicts who have benefited from prior Decrees of Amnesty and Sentence Reduction by the President of the

3

Islamic Republic of Afghanistan cannot benefit from the provision of Clause (1) of this Article.

**Article Six:**

Prisoners and detainees who are released from prison or detention based on this Decree and who are also sentenced to pay cash fines or reparations are required to pay the indicated amount or its equivalent.

**Article Seven:**

The provisions of this Decree shall not in any way interfere with the *'Haq-ul Abd'* claims of the heir(s) of the victims.

**Article Eight:**

The Ministry of Women's Affairs is required to provide proper residential facilities, in the capital and Provinces, for those female prisoners and detainees who are being released from prison or detention pursuant to this Decree, up until such time as their legal next of kin [*mahram sharaee*] appears.

**Article Nine:**

(1)    For the implementation of the provisions of this Decree, a Commission is to be established in the capital, consisting of the representatives of the Attorney General, the Ministries of Public Health and of the Women's Affairs, the head of the Independent Commission of Human Rights, the Directorate of the Center for the Reform and Rehabilitation of Children, and the Director of Prisons, under the supervision of the appropriate representative of the Supreme Court; in the Provinces, the Commission shall consist of [the representatives of] the Attorney

4

General of each Province, Directors of Public Health and Women's Affairs, the representative of the General Directorate of National Security, the Director of Prisons, and the Head of the Center for the Reform and Rehabilitation of Children, and the representative of the Independent Commission for Human Rights (if it exists), chaired by the President of the Court of Appeals of the Province.

(2)    The Directors of the Commissions mentioned under Clause (1) of this Article are required to report compliance with this Decree to the Director General of the Management Agency and also to the Secretariat of the Council of Ministers.

**Article Ten:**

This Decree shall take effect as of the date of 9th day of the month of Jadi of year 1385 (December 30, 2006).

Hamid Karzai
President of the Islamic Republic of Afghanistan

[Signature]

5

# EXHIBIT 2

22/12/85 (03-13-2007)

The table of the record of the accused in accordance with the conditions upon which he has been recognized as eligible for release pursuant to the Decree No. 83 dated 6/10/85 (12-27-2006) issued by the President of the Islamic Republic of Afghanistan.

Name:          Mr. Jack

Last Name:      Adema

Province:

Type of Crime:  Illegal entry and establishment of illegal prison

Date Detained:  16/4/84  (07-07-2005)

Number of Final Decision:    No. 39 Public Security Court
                             26/9/84 (12-17-2005)

Length of Prison Sentence:    Five years

Term Served:    Two years, 11 months and 23 days, including the
                envisaged 6-months' reduction of term.

Remaining Sentence Time:    Two years and 7 days

Remarks:  In accordance with Article 4 of the Decree No. 83 dated 6/10/85 (12-27-2006) he is considered eligible for release.

The above named individual, Mr. Jack Adema, a citizen of the United States of America, who was detained on 16/4/83 (07-07-2004) and was convicted and sentenced to five years' imprisonment, based on Decision No. 6, dated 8/1/84

6

(03-28-2005) of the Appeals Court of National Security and the judicial confirmation No. 39, dated 26/9/84 (12-17-2005), of the Public Security Branch of the Supreme Court for the crimes of illegal entry, illegal arrests and illegal formation of prisons. In accordance with Decree No. 6, dated 30/1/85 (04-19-2006), of the esteemed Office of President of the Islamic Republic of Afghanistan, a 6-month reduction was applied to the term served in prison by the convicted person in accordance with the Decree No. 83 dated 6/10/85 (12/27/2006) of the Office of the President of the Islamic Republic of Afghanistan; thus, the convict has served two years, 11 months, and 23 days of his sentence, inclusive of the 6 months reduction. The remaining two years and 7 days makes him, in accordance with Article 4 of the Decree No. 83 dated 6/10/85 (12/27/2006), eligible for release. Since, in the investigation, the issue of the victims was not ascertained, and the original decision of the Order No. 39 dated 26/9/84 (12-17-2005) of Public Security Court of the Supreme Court did not exist in the case file, a copy of the final decision of the esteemed Chief Attorney for National Security, in the inquiry dated 8/11/85 (01-28-2007), was officially considered.

The esteemed Attorney for National Security, in his response to the inquiry of the Commander of the Central Prison, has written that Mr. Jack is convicted of illegally detaining and torturing people, and is therefore sentenced to five years' imprisonment from the date he was detained, based on the Order No. 6 dated 8/1/84 (03-28-2005), which received the final confirmation No. 39 dated 26/9/84 (12-17-2005) of the Public Security Court of the Supreme Court.

Because the aforementioned person is a foreign citizen, his case has been referred to the Office of the esteemed Attorney of the National Security Directorate. If the convict does not have any other obligation under any another case, please take the necessary

7

action with regard to the issue of victim's heir/family suit on which the esteemed Office has the final decision.

Signed by:
Commander of the Prison,
Representative of Ministry of Women's Affairs,
Representative of the Attorney General,
Representative of Supreme Court
[Last signature illegible]

CERTIFICATION OF TRANSLATION

I hereby certify that the above translation bearing LS No. 03.2007 0401 was prepared by the Office of Language Services of the Department of State and that it is a correct translation to the best of my knowledge and belief.

4 Apr 2007

# EXHIBIT B

# Fax

| | | | |
|---|---|---|---|
| **Date:** | 3/17/07 | **Origin Fax:** | _212 874-6018_ |
| **To:** | Or. Lev | **From:** | Law offices of John E Tiffany, P.C. |
| **Of:** | U.S. Dop't of Justice | **Phone:** | 973-242-3700 |
| **Fax:** | 202-318-7589 | **Pages:** | 50 _(including cover sheet)_ |
| **Phone:** | 202-514-2395 | **CC:** | |
| **Re:** | Jack Ilunia | | |

☑ **Urgent**    ☐ **For Review**    ☐ **Please Comment**    ☐ **Please Reply**    ☐ **Please Recycle**

**Special Instructions:**

**If there is any problem with this transmission, notify the fax operator at 212 595-5353.**

## Law Offices of John E. Tiffany P.C.
The Robert Treat Center
50 Park Place, 10th Floor, Newark, New Jersey 07102
Tel: (973) 242-3700 ● Fax: (973) 242-3799

**URGENT LEGAL COMMUNICATION**          March 17, 2007
Mr. Ori Lev , Senior Trial Counsel              Tel: (202) 514-2395
United States Department of Justice          Fax: (202) 318-7589
Civil Division, Federal Programs Branch    Email: ori.lev@usdoj.gov
P.O. Box 883, Washington, DC 20044
20 Massachusetts Ave., NW, Rm 7330
Washington, DC 20001

Dear Ori,

Attached are two self-explanatory letters. We have sworn statements, tapes, and evidence that the US Embassy in Kabul precipitated the previous attacks against Brent Bennett and Jack Idema. We have the same evidence that the US Embassy is preparing to attack Jack Idema on Saturday and illegally transfer him in custody and hold him at the NDS torture center.

Make no mistake about it; I am convinced that Jack Idema will fight to the death against the US Embassy's illegal assaults. You are now on notice and bear the responsibility for any injury that occurs, and on behalf of his father, I will also sue each official involved personally for any injury or wrongful death.

Your clients' actions are illegal, you have prior notice of future illegal acts, and you have a duty to prevent them.

For the record, again, Jack Idema does not want the US Embassy's help or interference (called "assistance" by Birsner). Unless you have a federal warrant for him, then you and your clients need to back off. If your only defense is that he is a US Citizen and you have the right to intercede in his life, then he is prepared to renounce his US Citizenship if you force him to under threat of torture and death to stop the Embassy's illegal actions against him and prevent his assassination by your proxy agents at the NDS. This would be a vicious act by your clients, and one which for I would seek relief from the Senate and Congress.

Unless I have a guarantee in writing that no attack will occur against him, and that he property will not be seized, I am filing for an Emergency TRO before the close of business on Friday.

As you no doubt know, the Economic Law[1] of Afghanistan forbids the seizure of American property, assets, personal property and finances without a legal court hearing and court order. President Karzai (at the request of the United States Ambassador) is violating both Afghan and international law. Idema has a right to protect his property and the property of Brent Bennett, including their dog.

Sincerely

John Edwards Tiffany
Attorney at Law

Cc: Amnesty International
United Nations Office of High Commissioner for Human Rights

---

[1] **LAW ON DOMESTIC AND FOREIGN PRIVATE INVESTMENT IN AFGHANISTAN Chapter Four: SEIZURE AND CONFISCATION Article Twenty-Two:**
The State [shall not have the right to confiscate or seize domestic or foreign investment without due process of law and the order of a court with the appropriate level of jurisdiction.

**Law Offices of John E. Tiffany P.C.**
The Robert Treat Center
50 Park Place, 10ᵗʰ Floor, Newark, New Jersey 07102
Tel: (973) 242-3700 ● Fax: (973) 242-3799

## URGENT LEGAL COMMUNICATION

March 17, 2007

His Excellency Ambassador Said Tayeb Jawad
Embassy of the Islamic State of Afghanistan
2341 Wyoming Avenue NW, Washington, DC 20008
Phone: 202 483 6410    Fax: 202 483 6488

Ref:            *Jack Idema* – Litigation Against Afghanistan, *et al.*
Subject:        *Request for an Immediate Meeting and Discussion*

Dear Ambassador Jawad:

As you know, I am an attorney involved in the case of the Americans that were and are held at Pulacharke Prison, in spite of their being found innocent of all charges by the Afghan Appeals court (in September 2006, you were personally handed a tape recording of each of the Second Court Judges saying as much and saying it very clearly). I have repeatedly requested a meeting with the Afghan Consul in New York City but have received no response.

Not only has Brent Bennett had his property illegally confiscated and detained by the Afghan government, and individuals in Afghanistan in violation of law, <ins>but we are now advised that **Afghan NDS, at the direction of the US Embassy in Kabul, intends to attack Jack Idema with weapons, rockets, and "poison gas."**</ins> This attack is to occur on Saturday morning. I will personally sue President Karzai if he allows this attack to occur.

The Economic Law[1] of Afghanistan forbids the seizure of American property, assets, personal property and finances without a legal court hearing and court order. President Karzai is violating both Afghan and international law. Idema has a right to protect his property and the property of Brent Bennett, which I have previously informed you of. They have property in Afghanistan, which consists of a vehicle, computer, clothes, personal property, and a dog. In fact, all of the Bennett's and Idema's possessions are in Afghanistan; everything else they owned, including Bennett's house, was lost while they were illegally imprisoned by your President.

---

[1] LAW ON DOMESTIC AND FOREIGN PRIVATE INVESTMENT IN AFGHANISTAN
**Chapter Four:** Miscellaneous Articles; SEIZURE AND CONFISCATION

<u>Article Twenty-Two:</u>
The State [shall not have the right to confiscate or seize domestic or foreign investment without due process of law and the order of a court with the appropriate level of jurisdiction.
<u>Article Twenty-Three:</u>
Confiscation of foreign and domestic investment is only authorized for the purpose of safeguarding the public interest. In such, prior to confiscation, the State shall pay the just compensation for sale investment on the basis of an assessment of any internationally respected form.
<u>Article Twenty-Four:</u>
Private investors may transfer any funds received from the Government as result of confiscation out of Afghan without the payment of taxes.

www.JohnTiffanyLaw.com ● email: Jet@Jet4Law.com
Admitted to: New Jersey, New York, SDNY, EDNY, DCDC, NJDC

Jack Idema was released from his illegal imprisonment and you must allow Jack Idema to peacefully leave your country with his possessions, and to insure this I am filing a lawsuit in the US Federal Court seeking an Emergency Restraining Order against Hamid Karzai.

I am in New York City and look forward to hearing from you. Again, if your country has legal representation in America, I suggest you forward my information to them. The same would apply to Dr. Spanta's legal representation as his legal violations are personal in nature and were not made under color of law. You can reach me anytime day or night in NYC on my **mobile phone at 973-454-9633**.

Respectfully,

John Edwards Tiffany
Attorney at Law

Copied to:
H. E. Dr. Rangin Dadfar Spanta
Ministry of Foreign Affairs of Afghanistan
Malak Azghar Road, Kabul, Afghanistan
Via Facsimile:     0093-20-2100-360
                   0093-20-2100-361
And Via Email:   contact@mfa.gov.af

2



**JACK IDEMA**
SPECIAL ADVISOR, UFMF

Carol Armstrong                              15 March 2007
Immigration Counsel                          (919) 856-4630 (telephone)
Office of Senator Elizabeth Dole             (919) 856-4053 (telefax)
310 New Bern Avenue, Suite 122
Raleigh, North Carolina  27601

Subject: Denial of Passport and Planned Assault by the US Department of State

Dear Ms. Armstrong,

Thank you so much for speaking with me today.

To recap our discussion. I was released from Pulacharke Prison. The US State Department has refused to give me a passport for three years, and refused to return my confiscated passport.

The Embassy wants to put me in the National Security Interrogation Center in Kabul where myself and all of my men were viciously tortured.

They have told Afghan authorities that the US insists I leave the country. They want to place me in a position where I lose all of my property, and Brent's dog. I am to be forced to leave with only the clothes on my back and forced to sign a loan for a ticket which I already have under threat of torture.

If the US issues me a one year passport. I am happy to pack my things and return. If the US will not, than I must renounce my US Citizenship and apply for asylum in another country. I am requesting assistance from my Senator with these matters.

As I said the US State Department is preparing to use Afghan security force to attack my prison area, and have threatened to use weapons, rockets, and "poison gas" to subdue me. Therefore, I believe they want to me renounce my US Citizenship; and I am prepared to do that immediately rather than fight my own country.

I can be reached at 011.93.70.054.200. Or by fax 480.247.0082 and you may also contact my attorney, John Tiffany.

Sincerely,

Jack Idema

Cc:
John Edwards Tiffany, Attorney at Law – 973-454-9633

1

# EXHIBIT C



**U.S. Department of Justice**
Civil Division
Federal Programs Branch
P.O. Box 883
Ben Franklin Station
Washington, D.C. 20044

Ori Lev
Senior Trial Counsel

Tel: (202) 514-2395
Fax: (202) 318-7589

March 16, 2007

**Via Email and Facsimile 973-242-3799**
John E. Tiffany
Law Offices of John E. Tiffany, P.C.
The Robert Treat Center
50 Park Place
10th Floor
Newark, NJ 07102

Re:    **Idema v. Neumann, 05-2064 (D.D.C)**

Dear Mr. Tiffany:

I write in response to your letter from this morning, in which you threaten to file an "Emergency TRO" before the end of the day relating to Mr. Idema's forthcoming release from Pol-e-Charkhi prison. Your allegation that the U.S. Embassy is preparing to attack Mr. Idema and transfer him to NDS custody is incorrect. The U.S. Embassy is not preparing to attack Mr. Idema, has not ordered anyone else to do so, and has no authority to direct the nature or location of Mr. Idema's confinement. Embassy personnel have been informed by Afghan authorities that Mr. Idema's release from Pol-e-Charkhi is imminent and that they intend to deport Mr. Idema. In response, the Embassy has offered to assist Mr. Idema in obtaining a passport and in making travel arrangements, and has also repeatedly stressed to the Afghan authorities that they should do everything possible to ensure Mr. Idema's safety.

It is my understanding that Mr. Idema spoke with the U.S. Consul in Kabul, Edward Birsner, earlier today regarding this matter. In that conversation, Mr. Idema apparently expressed his willingness to cooperate with his release and deportation, but asked that he be allowed to remain in Pol-e-Charkhi pending his deportation. Mr. Idema also asked that he be allowed to take his possessions with him. Mr. Birsner's staff conveyed these requests to the Afghan authorities, who indicated that they were amenable to Mr. Idema's request to remain at Pol-e-Charkhi pending his deportation and that they would allow Mr. Idema to take his personal possessions with him. This information was then relayed to Mr. Idema. To the best of our knowledge, therefore, no action to remove Mr. Idema from Pol-e-Charkhi is imminent at this time. I urge you to contact Mr. Idema to confirm these events.

John E. Tiffany
March 16, 2007
Page 2

_____

    I trust that the above resolves this matter at this time, and that you will not be filing any emergency motions today.  Please let me know if this is incorrect.

                              Sincerely,

                                Ori Lev
                                Attorney for Defendants

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

FILED

FEB 2 1 2007

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY CLERK

| | | |
|---|---|---|
| LUIS POSADA-CARRILES, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | EP-06-CV-130-PRM |
| | § | |
| ALFREDO CAMPOS et al., | § | |
| Respondents. | § | |

### ORDER OF DISMISSAL

On this day, the Court considered Petitioner Luis Posada-Carriles's "Petition for Writ of Habeas Corpus," filed on April 6, 2006, and Respondents Alfredo Campos et al.'s "Motion to Dismiss the Habeas Petition as Moot," filed on January 31, 2007, in the above-captioned cause. After due consideration, the Court is of the opinion that Respondents' Motion to Dismiss should be granted.[1]

In his petition, Petitioner challenges his "continued detention by the Department of Homeland Security" pending removal from the United States. Petr.'s Pet. 2. Respondents ask that the Court dismiss Petitioner's habeas petition because the Court cannot provide Petitioner with the sought-after relief, as Petitioner is no longer in the custody of the Department of Homeland Security.[2]

----

[1] Pursuant to Local Court Rule CV-7(d) of the United States District Court for the Western District of Texas ("Local Rule CV-7(d)"), a party must file any response in opposition to a motion within eleven days of service of the motion. Therefore, if Petitioner opposes Respondents' Motion to Dismiss, he should have filed a response on or before February 15, 2007. As of the date of this order, Petitioner has not done so. Therefore, under the provisions of Local Rule CV-7(d), the Court may grant the Motion to Dismiss as unopposed.

[2] Respondents also ask the Court to vacate the order, issued on November 2, 2006, requiring Respondents to show cause in writing by no later than February 1, 2007, as to why relief should not be granted in this cause. The Court finds that the instant Motion to Dismiss satisfies the letter, if not the spirit, of that order, as Respondents have claimed that relief should not be granted because the Court lacks jurisdiction to grant relief. However, the Court's show cause order also specifically directed Respondents to determine the applicability of 8 C.F.R.

Resps.' Mot. to Dismiss at 2. Respondents have informed the Court that Petitioner was committed

to the custody of the Attorney General pursuant to a detention order issued on January 22, 2007, in

criminal cause number EP-07-CR-087-KC. *Id.*, Ex. B. In that cause, an indictment was filed on

January 11, 2007, charging Petitioner with one count of naturalization fraud in violation of 18 U.S.C.

§ 1425(a) and six counts of false statement in a naturalization proceeding in violation of 18 U.S.C.

§ 1015(a).

The Court finds that it cannot grant Petitioner his requested relief, as Petitioner is no longer

in the custody of the Department of Homeland Security. *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998)

(stating that the case-or-controversy requirement in Article III of the Constitution "means that,

throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury

traceable to the defendant and likely to be redressed by a favorable judicial decision'" (quoting *Lewis

v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990))). Because Petitioner challenges only his continued

detention by the Department of Homeland Security, the Court is of the opinion that Petitioner's

petition should be dismissed without prejudice as moot. *Cf. Zalawadia v. Ashcroft*, 371 F.3d 292,

297 (5th Cir. 2004) (holding that a petition challenging a removal order "presents a live case or

controversy," even when the petitioner is deported during the litigation, because of the penalties

---

§ 241.14(c), which authorizes the continued detention of an alien whose release will have "serious adverse foreign policy questions," even where there is no significant likelihood of the alien's removal. 8 C.F.R. § 241.14(c). Respondents now claim that they lack the authority to make such a determination. Resps.' Mot. to Dismiss 3. However, the Department of Homeland Security informed Petitioner in a letter dated October 5, 2006, that it had decided to begin the review process to determine whether further detention of Petitioner was justified pursuant to 8 C.F.R. § 241.14. Resps.' Objections, Attach. A. Petitioner was not committed to the custody of the Attorney General until January 22, 2007, over three months later. Resps.' Mot. to Dismiss, Ex. B. The Court is mindful that Respondents had over three months to consider the applicability of 8 C.F.R. § 241.14(c), and have elected to forgo the opportunity to inform the Court in an appropriate pleading.

resulting from the removal order).

Accordingly, **IT IS ORDERED** that Respondents' "Motion to Dismiss the Habeas Petition as Moot" (Docket No. 46) is **GRANTED**.

**IT IS FURTHER ORDERED** that Petitioner's "Petition for Writ of Habeas Corpus" is **DISMISSED WITHOUT PREJUDICE**.

SIGNED this 21st day of **February, 2007**.

PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE

3