# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

J. K. Idema, Brent Bennett,

*Petitioners,*

*vs.*

Zalmay Khalilzad, Ambassador, *and,*
Robert S. Mueller, Director of the FBI,

*Respondents.*

**PETITIONER'S RESPONSE IN PART AND REQUEST FOR RECONSIDERATION**

**Case # 05 CV 2064 (EGS)**

**Assigned Judge:** Hon. Emmet G. Sullivan,
US District Judge

---

**NOW COMES,** Petitioner, J. K. Idema, through counsel, and Petitioner Brent Bennett joining *pro se*,[1] and responds in part to Respondents' Motion to Dismiss and this Court's directive to Petitioner to show cause.

Respondents' Motion to Dismiss, as filed by opposing counsel is disingenuous and misleading at best. Many of the Respondents' unsworn, unverified facts asserted by opposing counsel in their pleadings are not addressed herein as they are unavailing at best and carry no weight in this matter absent a sworn affidavit or verification by an actual witness. As examples, Mr. Lev has no personal knowledge of any facts in Afghanistan, or surrounding Petitioners' incarceration, or whether or not Jack Idema "holds the keys to his incarceration."[2] Respondents' motion, based on "imminent release" is nothing more than misdirection, smoke, and mirrors, filed for the sole purpose of delaying the Court's order to answer.

**The only question** for this Court is whether or not Jack Idema is still incarcerated, and is he suffering liberty deprivations at the hand of the Respondents.

---

[1] Bennett has also requested Counsel for Idema to inform the Court that he wishes to file a Motion to Reconsider based on his petition surviving dismissal as a result of Respondents' refusing to allow him re-entry to Afghanistan to recover his property and based on his denial of property rights and illegal seizure of exculpatory evidence by Respondents.

[2] In the interest of time, Mr. Idema has verified all facts herein and is attempting to get an affidavit to counsel with supporting audiotapes and evidence. Counsel apologizes in advance for not filing all affidavits with this response, but in the interest of time, and because events in Afghanistan are moving quickly and dangerously, counsel will supplement this response as each affidavit, audiotape, or document is received.

The answer to that threshold question is an adamant and fully supported YES.

### THE REALITY OF IT

Respondents as much admit in the affidavit of Edward Birsner that, even if Idema was incarcerated by the Afghan government (which is absolutely not the case – *see* Affidavit of Judge Rahim Ahmadzai – Petitioners' **Exhibit A**) according to Afghan law, Jack Idema should have been released last year (*id.* Birsner Aff. ¶3, dated September 29, 2006).  Birsner skillfully stated:

> "I understand from conversations with various Afghan government officials [unnamed which seems to be the procedure with all Embassy documents] that recently…. an amnesty released all prisoners with sentences of less than five years who have served more than one-quarter or one-half of their sentences."

Birsner intentionally mislead this Court as to the scope of the Amnesty Order- it was for sentences of 5 years <u>or</u> under, for persons who had served more than 25% of their sentences,[3] and Idema was effectively released by the Afghan government then, as he had been released time and again.  This put the Embassy and the palace in a quandary— how do you release the Taliban terrorists, but exclude Idema.  The palace elected to forgo upsetting the Taliban, and release them all.  Unfortunately, the US Embassy was able to block that release at a lower level.[4]  Respondents successfully argued to the Afghan commission that if all three were to be released at the same time (Banderas, Bennett, Idema) it would appear (and rightly so) that it was because they were innocent, and that would cause the US "problems."[5]

In early January 2007, as the result of certain United Front Military Forces commanders having renewed influence, Idema was again set free, this time in a specific

---

[3] Hundreds of Taliban terrorists were released under that order and allowed to walk straight out the Pulacharke Gates.

[4] In all fairness to the truth, Idema had repeatedly told the Afghan government he would not accept or sign an amnesty agreement for a crime he did not commit.  Be that as it may, when the Afghan government lifted the requirement of his signature and statement, he was then completely free of both legal and illegal "Afghan" custody.  This made it even clearer, that his custody and incarceration was solely controlled by the United States.

[5] Affidavits supporting this are being drafted now and will be filed within days.

written order.[6]  It was widely acknowledged inside the Northern Alliance government, that Idema was held not by the Afghans, but under the orders of the US Embassy and their National Security Directorate proxies.

However, this time the release was done secretly and very privately, with a plan to covertly take Jack Idema out of Pulacharke Prison under cover of darkness and to a waiting Afghan Northern Alliance controlled aircraft. Unfortunately, while the plan remained clandestine for several months, it was discovered by the Embassy.

On March 25, 2007, Amrullah Saleh, Director of the National Security Directorate (NDS *aka* NSD), under considerable pressure from senior Afghan government officials and diplomats, signed an order returning Jack Idema's property and "especially his passport." That Order is attached as **Exhibit A-1** to the Affidavit of Supreme Court member, Judge Rahim Ahmadzai.  The translation is also attached to the Affidavit of Afghan national John Doe[7] **Exhibit B** as **Exhibit B-1 and B-2**. Judge Ahmadzai and Afghan John Doe lay out an extraordinarily nefarious chain of events in their affidavits.

Idema had been previously warned that any attempt to cross borders with a passport other than a US passport would be a violation of the Patriot Act, even if he attempted to return to his own country.[8]

On March 26, 2007 the "Saleh Order" was sent down to the 19th Division of NDS by General Mustamandi for forwarding to the 17th Division evidence room.  There, an agent of the United States Embassy, Investigator Modafi, immediately contacted the US Consul and told him that Idema's property and passport had been ordered returned. The Embassy moved swiftly, establishing that the Afghan Ministry of Justice was

---

[6] Not the Order translated and provided to this Court previously with Respondents' Motion to Dismiss. However, the details are such that they can only be provided *in camera* as they would divulge both parties subject to retaliation, and classified information.

[7] As John Doe states in his sworn statement, he fears for the life of himself and family. We are prepared to disclose his identity to the Court *in camera*, along with a signed thumb printed affidavit as to his real identity.  Counsel, having been to Afghanistan, and seen how NDS and the US DOS operates there, cannot overemphasize that for the protection of his family, and him, this man's identity must never be disclosed to either government.

[8] Idema is also an Italian citizen by *jure sanguinis* and has applied to the Italian Embassy for a passport. He also holds citizenship under the former American allied *Jamiat* government of Afghanistan, but that citizenship is not recognized by the Karzai government (although Hamid Karzai possess the same dual citizenship).

refusing to illegally hold Idema any longer, and that the Northern Alliance plan was to return his property and covertly take him out of the country without the US Embassy knowing. Using all of the force and influence they illegally wield in Afghanistan, the Department of State, US Embassy Kabul, and others both known and unknown, were able to block the return of Idema's property and the passport.

Why? It is our position, and my firm belief, that Respondents needed to stop Idema from four things: 1) ever being released and in a position to tell his story or testify to Congress and the Senate about what happened; 2) ever being able to appear in this Court and testify under oath as to what happened, 3) covertly removing evidence from Afghanistan which implicates numerous US officials in serious felony crimes, not the least of which include, but are not limited to; suborning perjury, perjury, torture, authorization of the torture of American citizens, withholding evidence, bribery, witness tampering, obstruction of justice, and pre-existing knowledge of the planned assassinations of "former" US allies—including Yunis Qanooni, elected Chief of the Parliament, General Mohammed Fahim, then Minister of Defense, now Parliament member, and others such as Ambassador Wali Massoud, brother to assassinated leader Commander Ahmad Shah Massoud, and 4) prevent Idema from testifying at the Grand Jury (Case #2005R00044) secretly convened by Respondents[9] for purely retaliatory purposes.[10]

On March 27th, 2007, the US Embassy sent Bashir Mamoon, the US Consul's representative and the person that has been the primary harbinger of disaster in the Idema case, to Pulacharke Prison. It was Mamoon who tried to force Idema to sign documents against former Northern Alliance commanders to remove them from the

---

[9] Although the Grand Jury is being run by AUSA James Candelmo of the EDNC US Attorneys Office, in Raleigh, NC, the case comes out of the Washington DC FBI Field Office, and is being conducted by FBI Special Agent William Barnett believed to be working at the FBI's Counter-terrorism Task Force (202-278-4325), an FBI task force that previously worked with Idema on Counter-Terrorist issues. Documents and evidence supporting this are being assembled now for this Court and for the Grand Jury. Almost all of Idema's conversations with the FBI Counter-Terrorist Task Force and Counter-Terrorist Watch Command were tape-recorded and hidden in the United States, although only Idema has access to these tapes upon his return. Another reason why the US does NOT want him returning.

Karzai government in exchange for his freedom. It was Mamoon who did the translations, now exposed in an Afghan documentary set to be released in weeks, between the previous US Consuls and the Afghan Courts, demanding they find Jack Idema and his men guilty and give them "the longest possible sentence," and it was Mamoon, who was caught on speaker phone translating for someone at the Embassy, requesting the use of force to remove Idema from Pulacharke and transfer him back to the Saderat Extreme Interrogation Facility. While the US government has repeatedly denied that any torture of Idema occurred, and that these men were treated "humanely" at Saderat, just this morning, as I worked on this pleading, an article came out about torture at NDS. The article is attached hereto as Canadian News Article - **Exhibit C**. It is not intended as evidence, but it does provide background into the veracity of the repeated sworn affidavits filed in this Court outlining Idema and Bennett's torture.[11]

Since March 27th, the US Embassy has been caught time and again lying, concealing the true purposes of sending US Embassy employees into Pulacharke Prison, working at various levels to stop Idema from leaving, and authorizing the NDS to use "rockets, weapons, and gas" to gain access to Idema's compound at Pulacharke and seize evidence they naively think is still there and the only copy. Contrary to Edward Birsner's affidavit, *id.,* ¶¶ 3, 4, 6, 7, the Embassy only withdrew this plan after it was exposed to Idema and he called the Embassy stating he was aware of the plan and prepared to "defend."

Having learned of the Afghan plan to covertly release Idema, the Embassy moved quickly, arriving at Pulacharke Prison, under the auspices of "helping an American citizen" and delivering mail. The mail included a Federal Express legal document,

---

[10] Upon information and belief, Respondents impaneled a Grand Jury just months after this *habeas corpus* case was filed. In spite of repeated letters demanding Jack Idema be allowed to testify, not one has ever been answered, nor has the government admitted the existence of the Grand Jury investigation into Idema.
[11] Idema having been read the article, does clarify that they have it somewhat backwards. According to Idema, the NDS is run by the former Communist Regime, the Taliban are the guards and orderlies. The Taliban pay large bribes for good treatment. The primary target of the torture is NOT the Taliban, but the Mujahadeen of the Northern Alliance who are arrested for any transgression, including free speech, against the Karzai government. And, while the American response is torture allegations are baseless, Idema possesses photographs, tapes, and other evidence of extensive torture, including US sponsored extreme torture at NDS—evidence the State Department has a vested interest in permanently burying.

which had been held since January 2007, and a care package sent from Marine Charles Hubble. Interestingly enough, the Hubble box was accepted and mailed by the US Postal Service for free under Article 110 of the Geneva Prisoner of War Conventions and the Universal Postal Convention, showing that once again, as hundreds of times before, the US Postal Service has recognized Idema's Prisoner of War status based on his 2004 Geneva Convention Tribunal Request for official status. *See* **Exhibit D-** Hubble package, Embassy Document.  Although the Embassy policy is to return these hundreds of packages a year from around the world at taxpayer expense, this time, because it allowed them an excuse to investigate Idema's release, they delivered the package in an obvious misdirection as to their true intention—find out if the Afghans really were going secretly release Idema without Embassy approval or knowledge, and stop that release at all costs.

On or before March 28th, 2007, apparently in response to this Court's Order, and just days after this Court issued its March 21, 2007 Order stating the Court had serious concerns, Respondents started issuing new Grand Jury subpoenas in a desperate attempt to indict Idema (not the first time this tactic has been used by the government in this very Court).  Counsel sent new letters to the Grand Jury Foreman, but has no indication that AUSA James A. Candelmo has allowed those letters to reach the Grand Jury, or will allow the Grand Jury to ever see Idema's exculpatory evidence.  *See* **Exhibit E-** Grand Jury Letter.

On or about April 10, 2007, after repeatedly stating they would not come to Pulacharke Prison, the Vice Consul showed up with a large armed force, posted heavily armed commandoes between Idema and the Vice Consul, and even stood heavily armed Special Operations soldiers inside the Commandant's office at Pulacharke.  At first, Idema refused to leave his barricaded position.  He had been repeatedly warned by numerous Afghan officials, that the Embassy's "plan" was to take him into NDS custody by force where he would lose his passport, his property, and probably his life. The exact quote from palace level official was; "*Please, please, tell Jack he cannot go*

*to NDS where there will no more be his property, his passport, or his life.*" (*See* Affidavit of Afghan John Doe).

The Commandant, a Major General, first sent his deputy and several of Jack's friends to ask him to come to his office. Eventually, for the first time in Pulacharke history, and probably the last time such a thing will occur, the general personally went to Jack with his entire force of personal bodyguards, promised him that he would be safe by the general's personal guarantee, promised that he and his bodyguards would use their machineguns to protect Jack from the Embassy to their last drop of blood, and took Jack by the hand to his office.[12]

At the Commandant's office, the Vice Consul insisted that the original passport could not be ordered returned from NDS, and that Idema had to sign a new passport application. Under considerable pressure from his general friends to get a passport and allow them to get him out of Pulacharke, Idema signed the application, making considerable notes on the application to insure there was no mistake as to the events or circumstances. He also paid the fee with money borrowed from several Afghan Colonels. The Vice Consul agree that they would not issue a new passport until such time as Idema had authorized them to do such, as he was still seeking the return of his original passport which is of HIGH exculpatory value on a variety of issues, including it holding special military attaché visas issued by the Afghan government. In spite of that, the following day the Embassy cancelled Idema's original passport and informed him that they had taken the liberty of issuing a new one.[13]

As to Edward Birsner's affidavit: Idema never stated he wanted to go to Dubai (Brisner Affidavit ¶9), he never stated he could not locate his passport, *id.*, in fact, he stated he located it with just a few simple phone calls. The Consul did ask for a list of belongings, a list which I believe was refused as no consequence to a government that takes the position they have no involvement in the incarceration. Idema never said he

---

[12] This was the same general who had previously refused to use force against Idema, and had been transferred just prior to the Bennett incident by the Embassy (done "behind the curtain" of course).

[13] It should be noted that this unannounced mysterious visit and offer of a passport ONLY occurred after the Italian Ambassador contacted the US Embassy the night before after Idema requested the Italian government issue him a passport.

would email a list to the Consul, the only time email came up was when Idema said they could email shipping information to Captain Bennett for him.[14]  Idema never said anything about firearms belonging to him, in fact he said the military weapons his team had were all government property and so he did not expect or want them back.  Birsner never recommended making "alternative arrangements for shipping both the dog and his belongings," *id.* ¶11.  Birsner told Idema to leave his property and dog because his life was not worth risking for them.  Idema did, quite strongly, and at least twice, state that he made a promise on his life to protect and return the dog to Bennett in the United States and that either he and the dog would fly together or they [the Embassy] could make arrangements to ship their dead bodies back together and that he was prepared to fully defend against an attack of even a Marine Rifle Company was sent by the Embassy.[15]  That appears to be one of the few accurate statements in Birsner's affidavit.  We do advise the Court that the phone conversation was taped-recorded and can be provided to the Court, and we expect to provide it to this Court and to a Grand Jury in the future (once we get it out of Afghanistan).[16]

Respondents' position is: case closed, Idema is released; a passport is issued.  Not so.  The Embassy has not given Idema a passport, which means they and they alone are

---

[14] The Embassy refuses to allow Bennett's property to be shipped back to him through the US Post Office. Instead, the Embassy supplied air freight contacts which will charge more than $10,000 to send Bennett's property back to him making it cost prohibitive, and completing the Embassy's forced forfeiture of property by Bennett.

[15] Obviously no defamatory intent is implied towards the US Marines.  Although he has not reviewed the tape again, Idema believes he also said that he did not think US Marines, or any other Americans would fire upon a US citizen, but cannot specifically say that was the exact comment without reviewing the tape. It was meant to emphasize the point that Idema was prepared to meet Embassy force with force to protect his rights and the life of the dog and his men with him at Pulacharke.

[16] Although Jack Idema has never admitted it previously, he is now advising this Court that almost every conversation and meeting with US government officials/employees over the past three years has been either covertly audio-taped or video-taped.  This includes the conversations with Consuls Brown, Harchick, Vice Consuls, Bashir Mamoon, DOS Security agents, the Regional Security Officer, the FBI, and others, including intelligence agencies.  We had hoped that Respondents would be ordered to answer the allegations and then use the tapes for impeachment purposes; however, it is now more important that the tapes reach the US Senate, US Congress, and the North Carolina Grand Jury.  The government will most likely consider this a bluff.  Therefore, US Army Special Forces soldiers at Bagram Airbase, who are in custody of several copies of tapes, are placing one innocuous sample US Embassy video on the internet for viewing by the Court on Monday at www.superpatriots.us/05CV2064 in the hopes that the Department of State will consider cutting their losses now, release Idema, be truthful with this Court, and stop blocking Idema's testimony at the EDNC Grand Jury.

restricting his travel and liberty, a claim that has already been made in this *habeas corpus* case.  They have blocked his Afghan citizenship, his Afghan visa to remain and deal with his property issues (the Northern Alliance Minster of Foreign Affairs was removed after a dispute with Secretary of State Condoleezza Rice, and has been replaced by Dr. Spanta, an anti-Northern Alliance foreign minister), and lied about obtaining his Indian visa. For weeks now, the Embassy has refused to actually give this alleged new passport to Idema. The Embassy has also refused to give it to Judge Rahim Ahmadzai on behalf of Idema, or allow one of Idema's representatives to pick it up, lamely claiming "privacy issues."  Ahmadzai carries Ministry of Justice authorization/power of attorney to act as Jack Idema's agent endorsed by the Supreme Court.  He carries a handwritten note by Jack Idema, and Idema has repeatedly notified the Embassy that Ahmadzai represents his interests.  Yet the Embassy, through Bashir Mamoon, continues to refuse to discuss the case with Ahmadzai or give him Idema's passport.  Again, smoke and mirrors—*hey, he's free to go, we issued a passport (its in our desk) the case is moot.*

Interestingly enough, Judge Ahamdzai had a wonderful relationship with the United States government before he took on the cause of Jack Idema, Brent Bennett, and Nina the dog. *See* **Exhibit A-2** to the Affidavit of Judge Rahim Ahmadzai- numerous certificates of Supreme Court judicial courses administered by the US government or US government sponsored programs (as recently as a few months ago). However, since he began interceding in the Idema case, he has now become a pariah, with the Embassy directing not just their compound to deny him access to US officials, but directing the NDS to threaten him and deny him access to the Courts.[17]

Between April 27th and May 1st, 2007, the special advisor to the Vice-President, the advisor to the Minister of Justice, five generals, and several Afghan diplomats have attempted to force the return of Idema's passport and property from NDS.  As of today, the last word was that the United States Embassy has ordered NDS to retain all property and Idema's passport and block his release "no matter what you have do."

The entire budget of the NDS is administered by the United States government. The NDS is literally at the US Embassy's beck and call.  Until such time as the NDS receives a written order from the United States Ambassador releasing Idema and his property, Jack Idema will remain in Afghanistan as a prisoner of war held by his own country, as rendered political detainee.

PETITIONERS ADD THE FOLLOWING MATERIAL FACTS:

In answer to Respondents' assertions that Idema has taken up **voluntary residence** at Pulacharke Prison, here are basic facts at this particular moment:

1. Jack Idema has been without power for five weeks now living in the dark.[18]

2. Jack Idema has been without power or lights for more than 170 days in the past two and a half years.

3. Jack Idema has been without running water for just under 3 years.  (Water is carried daily by pail from stream water which goes through a storage drum.) He has not had hot water in almost three years, or medical care of any kind in almost three years.

4. Jack Idema, under constant threat of forced transfer to Saderat Interrogation Facility and renewed torture, has been not left his barricade position for 7 months, (with the two exceptions in his affidavit and herein).

---

[17] Counsel is waiting on a second affidavit from Judge Ahmadzai outlining the events since his first statement.

[18] As full disclosure, yes, Jack Idema has at "suite" a Pulacharke Prison, complete with couches, rugs, a desk and television.  He occupies the living area a former president's daughter once occupied. He has the only private bathroom besides the commandant, his own small kitchen and is afforded all courtesies that the Ministry of Justice felt were appropriate for a commander in Massoud's United Front Military Forces. He is allowed to keep a dog, weapons, and a cook.  Why? Because the Anti-Taliban factions of the Afghan government have never, not once, considered him a prisoner, but a temporary guest—temporary until such time as the US government releases their hold on him. The Afghan Ministry of Justice clearly recognizes that he is a prisoner of the US Department of State because of his action s to defend Afghan Mujahadeen heroes who were once the appreciated allies of America after 9/11—before Khalilzad's order to desert them in favor of the Pashtun south. In keeping with the Protocols of the Geneva Convention, the Ministry of Justice has admirably followed them to the letter regarding someone they clearly consider a UFMF officer.  However, all that considered, and taking into account his treatment level far above the terrorists at Pulacharke, it is also likely that the Karzai government considered the potential for armed conflict with the Northern Alliance Mujahadeen if they kept Idema at NDS and allowed his continued torture.  Unfortunately, even a gilded cage is a cage, and regardless of the accouterments in Idema's living quarters, he is still housed in conditions that violate every international human rights treaty.

5. Jack Idema has been without mail for two and half years. An embargo imposed solely by the US Embassy (but just days after this Court's March 21, 2007 Order, the US Embassy delivered to Jack Idema personal mail for the first time in years. These consisted of the letter, and care package of food from a Marine in the Midwest – **Exhibit D**). We estimate, that more than <u>4000</u> letters and care packages have been returned to their senders at taxpayer expense, solely for retaliatory and vicious purposes to impose a brutal existence on these men.[19]

6. Jack Idema has been without a single foreign visitor allowed in since the attack on Bennett—the first Pulacharke village gate, <u>outside</u> the prison at the town, is controlled by forces under the NDS/US Embassy's control. Generals Sidiqi and Mohammed Kaiz,[20] carried out the Embassy's orders during their command between August 2006 and January 2007. Afghan visitors got in by saying they were visiting their relatives or an officer; then they told the inside prison gates they were visiting Jack, and go right in. Obviously it is NOT the prison or the Ministry of Justice stopping his visitors.

7. Jack Idema lives under daily threat, a very real threat, of being attacked with violent force, by not only the terrorists surrounding him, but by the US Embassy and Karzai/Taliban controlled factions which answer to the Embassy, and then taken to the NDS Saderat Interrogation facility where neither this Court nor counsel will hear from him again for a very long time, if ever.

8. Jack Idema and Brent Bennett are being forced through a wide variety of methods, to forfeit all of their property; property which they have defended with their lives. He is being forced, through the withholding of his passport and continued incarceration, to allow its search and seizure by US officials. Although this might change the dynamics and ADD claims[21] to the *habeas corpus* claim of wrongful search and seizure of property it CERTAINLY does not defeat the *habeas corpus* or render it moot, if anything, it makes it clear that the government Respondents must be forced to answer and forced quickly.

9. The Petitioners' exculpatory evidence at NDS is not just being held anymore, now it is to be permanently forfeited, most likely destroyed or placed in a black hole at the FBI, and forever alleged to be lost (just like Idema's passport, which the US government has claimed was lost for 3 years, yet Jack Idema located it within a few days by phone.) Without their exculpatory evidence Jack Idema and Brent Bennett

---

[19] Many Americans have retained the returned letters and boxes and have expressed their desire to testify to this Court about the circumstances of the packages and the content of conversations with the US State Department about the returned mail.

[20] Generals Sidiqi and Mohammed Kaiz were later arrested by the Minister of Justice for their illegal acts.

[21] The denial of Bennett's visa to return to Afghanistan to claim his property after the five month refusal of a US passport , when the visa is blocked solely by the DOS, continues his habeas corpus claims related to right of travel and property rights.

face a long list of possible crimes, all of which would be swiftly defeated with the evidence, and this is not speculation, these are criminal charges which are a real and present threat, as proven by the Grand Jury investigation started <u>just days after</u> this Court issued it's opinion.  Therefore, not only is the *habeas corpus* far from moot, because it seeks the return of exculpatory evidence it is even more important now, and more time sensitive. Idema and Bennett are being prevented from retaining evidence that will clear them of all allegations, past, present, and future.  Jack Idema has repeatedly offered to testify at a Grand Jury, and continued to present that request in writing to the Grand Jury foreman in North Carolina demanding to testify and present evidence; evidence which Respondents NEVER want to see the light of day.

Living under these threats, and these conditions, is it even remotely believable that Jack Idema is holding the keys to his freedom and intentionally delaying his release? The government's motion and supporting affidavit are nothing more than smoke and mirrors to redirect this Honorable Court's attention and make it appear as though Idema is free to go as he pleases.  This is simply not the case.

Finally, on the matter of Respondents claim that Idema holds the key to his freedom, we do not dispute that.  He has always held the key to his freedom.  In the beginning, the key was his signature on a false document implicating American "ex" allies in untrue events. Then the key was making a statement against Karzai's political opponent, Yunis Qanooni.  Then the key was signing false admissions in amnesty agreements.

It can also be said that American soldiers held prisoner or hostage by hostile governments have held their keys to freedom, by simply confessing to false war crimes. Not unlike Americans held in the infamous Hanoi Hilton, who could have been released or treated better by confessing to "American imperialism," or hostages taken by radical Islamic groups who seek conversions to Islam or "confessions,"  Jack Idema's key to freedom is confessing to false crimes, forfeiting exculpatory evidence and evidence of criminal acts by US officials, surrendering his property, Bennett's dog, and voluntarily submitting to continued torture, and possibly death, at the hands of the US government run NDS torture facility, Saderat.

**PETITIONERS REMIND THIS COURT OF MATERIAL FACTS PREVIOUSLY PRESENTED TO THIS COURT WHICH CAME TO LIGHT AND/OR WERE DISCOVERED AFTER AFGHAN MILITARY AND PARA-MILITARY GENERALS REFUSED TO RETALIATE AGAINST IDEMA:**

In July 2004, US Consul Sandra Ingram directed Judge Abdul Basset Bakthyari (Chief Judge in the first trial and former Taliban judge) to find all Petitioners guilty in return for a US Visa and US government protection. Richard Caraballo, brother to Edward Caraballo, has stated that US Consul Sandra Ingram told him that if there were no Afghan charges there could be no US charges. Therefore, Ingram's statements were clearly indicating that the US was using the bogus Afghan charges to hold the petitioners.

In December 2005, US Consul Russel Brown met with each member of the Appeals Court which were conducting a trial *de novo*. These included: Chief Judge Ismail Abed, Chief Religious Judge Saheeb Noor, Second Deputy Judge Latif, Senior Religious Judge Azzizullah, and several others. Brown requested that each judge show their allegiance and support for Ambassador Khalilzad, President Karzai, and "America" by upholding the first court's guilty verdict. Initially each and every judge refused and in the first day of the trial *de novo* they entered a verdict finding all Afghans not guilty, primarily because they were shocked to find out they were all employees of the Afghan government—serving commissioned officers in the Afghan CIA and Ministry of Defense. That resulted in an order for the release of four Afghan citizens. Realizing the implications, US Consul Russel Brown met with each of the judges again. The judges refused him again, except for Judge Abed, who resisted but was open for "suggestions." Judge Abed agreed to assist the US Ambassador if he could visit the United States and receive a "cash present."[22]

Over the next few weeks, without Petitioners' permission, the US Consul Russel Brown, and other US government employees, contacted the Afghan Appeals Court and requested delays so that the Consul could attend the trial. Although he was given repeated delays, the Consul never did attend, instead sending an Afghan aide named Bashir Mamoon to be present after the Chief Religious Judge, Saheb Noor, verbally

---

[22] An Afghan term for a bribe. He received both. A three week trip to the US, a car, and cash.

issued a not guilty verdict.  The US Embassy requested the Court wait for the return of Chief Judge Ismail Abed.  Just two days before Abed's return, the Appeals Court formally declared all men innocent and directed a press conference to convene upon Abed's return.  However, when Abed returned he stated that although the men <u>were innocent</u>, they could not be released.

In 2005, when the US Embassy realized that the petitioners were going to be found innocent, US Consul Russel Brown requested the Afghan court delay their decision and wait until Ambassador Khalilzad could speak to Mawlawi Fazal Hadi Shinwari (Chief of the Supreme Court).  The Appeals Court then told petitioners they would be released immediately anyway, and requested petitioners to participate in a press conference and "show their evidence" so that "the world will know the truth."  The release and press conference was to occur two days later.  During this time, Anbassador Zalmay Khalilzad contacted Shinwari and requested the Court delay their decision until the return of Judge Abed, who was on his State Department financed junket to New York, North Carolina, the Reno Nevada casinos, and California.  Shinwari followed the orders of Ambassador Khalilzad; the press conference was cancelled.

Subsequently, each of the judges, and the prosecutor, told Petitioners that they had been "ordered" not to release the men.

Judge Noor later resigned from the Court in protest to Jack Idema and the others being held after being found innocent. Now it is discovered that Judge Rahim Ahmadzai also resigned over the case and has filed a sworn affidavit with this pleading, which can easily be described as a disturbing revelation of conspiratorial conduct by Respondents.

The Kabul lieutenant governor was also present during several of the instances during which the US Consul pressured the Appeals Court judges, and he is prepared to give testimony to the Court supporting these statements.[23]  Master Sergeant Bumback is

---

[23] Judge Noor is his relative, and also related the pressures of the US Embassy upon the court.  Some of his statements, are addressed hereafter and are contained in a soon to be released documentary in Afghanistan.

also prepared to give testimony to the Court.[24]  Captain Brent Bennett is also prepared to return to the United States to testify before this Court.

Most importantly, now, for the first time, material evidence is available to this Court which fundamentally proves each of these allegations far beyond a reasonable doubt.  First, there is the sworn Affidavit of Supreme Court member, the Honorable Rahim Ahmadzai.  His photograph, sitting at the Court's second bench during the first trial is attached hereto as **Exhibit A-3.** The affidavit is devastating to the governments' position throughout this case.

Second, the sworn Affidavit of Afghan John Doe, who was present for conversations which clearly establish Idema's custody and problems as solely the authority and dominion of the United States Embassy and Respondents.  Like Ahmadzai's affidavit, it is a devastating blow to Respondents' cover stories.

Third, the sworn Affidavit of Commander Abdul Latiff, who was intimately involved in the Embassy's prior attacks against Idema and Bennett outlines Respondents custody and control of Idema.[25]  It is an affidavit that has been in our possession for some time, but was not filed out of fear that Latif would suffer severe retaliation, and we would ask that this Court consider an order of protection for Latif and other witnesses which prevents US Embassy retaliation.[26]

Fourth, with the pending release of a documentary film from Bollywood India, made by two Afghan film companies, we will now be able to provide this Court with numerous tape-recorded conversations, intercepted conversations, and undercover videotapes which are used in the film.  These recordings are, like Ahmadzai's affidavit, completely devastating to the United States government's position and cover story.

They include the following:

---

[24] Bumback has expressed his desire that this Court protect him from retaliation and contact by the FBI, who have repeatedly interrogated him and his family about this case, and have repeatedly harassed him.
[25] Compare to previous Affidavits filed by Senior Afghan Colonels and Commanders who outline the subsequent arrest of two generals that engaged in the conspiratorial enterprise engineered by Respondents to seize Idema, Bennett, and their evidence/property, and the plot to take Bennett and Idema by force.
[26] Deputy Commander Tawous, who previously presented an affidavit to this Court has already felt the effects, intimidation, and threats over his past statement.

1.      **Prosecutor Asadullah Amiri** – "*Saranwal*," NDS High Court Prosecutor/Kabul

Prosecutor Asadullah Amiri says on tape that the Second Court; "everybody" wanted to release Jack Idema and the others but "when the guy [Abed] came from the U.S., the Chief Judge, he stopped all the people."

"I know we have a contact [trust], from the first minute because of his [Jack Idema] honest working and loyalty; he came here and risked his life, and saved our people …We cannot say everything on the phone, the phone can be recorded.  And, anyhow we don't care; we work for freedom without any care.  A hundred times by the name of this country we died, and a hundred times by this country we will die once more.  But there are some difficulties which we cannot say everything right here and now.  But there are ways for solving this problem."

2.      **Chief Judge Ismail Abed** – Chief Appeals Court Judge National Security Court

"I said already I send the case in the investigation room, to arrest the others [terrorists] and the others.  I went to see the High Court chief judge and unofficially I said this to him.  The real criminal people are this guy, this guy, and this guy [the terrorists], and the High Court chief judge said to me, I will speak with President Karzai to arrest this guy, this guy, and this guy.

And two times the High Court chief judge went to see President Karzai, and told him these people are the real criminals [referring to the terrorists Judge Abed written to re-arrest), not the Americans they didn't do anything wrong.  The Americans don't have any crime [didn't do or commit any crime]; and he also told President Karzai, those people should be released.  And President Karzai told the High Court chief judge, now we have a problem in this country.  We can't arrest these people, because the people will use this opportunity [against Karzai]."

Abed goes on to describe his feeling about Jack Idema, "Tell Jack, we like him.  We like his courage, his strength, in helping the Afghan people, and in every place we're proud of him, and in every place I told and said Jack didn't have any crime [he was innocent].  The people asked me; you're afraid from the Americans, you did that and I said none of the Americans had any crimes.  And the real criminal people are not arrested, and I told this to people in every place, and I will tell in Tamiz Court too..."

3.      **Judge Sahab Noor** – Chief Religious Judge, From Ghazni Province

"For me the proof was like the sun, I will tell you, I will tell you, I will tell you [Jack and his men] are the oppressed guys, and I swear to God; several times I have said and I'm telling you now too.  When we made the decision [to release Jack and his men], people from some embassies and foreign countries called us

and asked why we want to decrease their punishments, and I said come here and see for yourselves which kind of evidence and proof they have."

"The press made their names very bad, so because of that every people is calling us from the embassy, from their different offices, saying; why you did this, why you did this; and they asked from our court for the evidence, and we said we cannot give you the copy of the court one [evidence], but if you want you can go to the Pulacharke jail and contact with Jack, and he will give you the evidence and proof you need."

4.    **Judge Abdul Latif** – Appeals Court Judge, From Logar Province

Judge Abdul Latif states that he was trying to release Jack and his men but that "Uh… there was a lot of difficulties; at the level of the Supreme Court, o.k." [see Affidavit of Rahim Ahmadzai].

Then, talking to Banderas Rasuli the judge says: "You are innocent.  But in the society, they will make propaganda for our court, once you pass the First Court, Second Court, Third Court; step by step you will be released; that will be good for our government, for you, and for us.  By God willing you will be released. His idea was very good (Shinwari) and our Chief Judge went to see him, and he said, we helped these people, and these people didn't have any crimes.  We wrote in the case that Jack arrested the real terrorists.

5.    **Judge Mawlawi Azizullah** – Senior Religious Appeals Judge, Panjshir Province

Judge Azizullah states that it was the "foreign hand"[27] that stopped the release of Petitioners and repealed Idema's innocence verdict at the trial *de novo*.

Judge Azizullah, clearly states on the tape played in the film that the United States Embassy stopped Jack Idema's release and that he could not understand why the American government "ordered innocent men put in prison."

He also states; "The target was not Americans, but everything that happened did not come from our courts or us [did not come from any Afghan court or the judges specifically].  It was not clear for us; we still didn't understand what their reason was."

"For all the judges, for the Saranwal, and for me it was our decision for releasing [Jack], and those guys who did this … it was not in our hand … **It has not become clear exactly who stopped it, Khalilzad or someone else.**"

6.    **The Deputy Governor of Kabul**

The Deputy Governor of Kabul states on video that it was the US Consul that ordered Jack Idema's arrest, and "ordered" the court to convict them. That

---

[27] In Afghanistan "the foreign hand" was a term for Soviet control in the 1980's and now refers to US control of Afghan officials and ministers.

the US Consul came to the court secretly and told them what they had to do, and that Judge Noor spoke with him frequently about the pressures and threats by the US Embassy to keep Jack Idema and the other men incarcerated, and that he and the governor met with the Consul and objected to this forced conviction.

These audio and videotapes are being copied from the advance copy of the Afghan documentary onto CD and will be forwarded to this Court in the next few days.[28]   The taped conversations have either translation underneath or on the recordings.  We ask that because they were advance copies given to us under a confidentiality agreement, that the Court seal them until such time as the film is released to the Afghan public.

ARGUMENT

Contrary to Respondents' repeated <u>unsupported</u>, <u>third hand</u>, <u>unsworn</u>, <u>hearsay</u> statements derived from Birsner's references to unknown unidentified Afghan officials and/or their counsel's interpretation of events to which he was not present for, the reality is that the United States government incarcerated these men, and to this day are blocking the release and interfering with almost every basic fundamental liberty guaranteed to Americans by the United States Constitution and Bill of Rights.

This Honorable Court knows more about Constitutional law then either counsel involved.  Therefore, I will not burden the Court with lengthy legal arguments, except to point out factual errors in Respondents' case law interpretation.  Respondents try hard to fit the facts neatly into their citied cases.  The problem with this is that their facts are wrong, either misrepresented, or completely false.

Cutting straight to the quick, Respondents cited cases are a pitiful, if not fraudulent attempt to alter the facts to fit their defense.  In the limited time to file this pleading, here are just a few examples:

Starting at the outset, with Respondents' motion, page 9, ¶3:

> "Accordingly, his habeas claim – which was predicated on respondents'
> alleged interference with the criminal process that resulted in his conviction –
> is now moot. … Indeed, none of the allegations of the Petition relate to the

---

[28] One Afghan diplomat has called it a troubling indictment of American policy and oppression in Afghanistan.

circumstances of Mr. Idema's current detention and the relief sought in the Petition relating to the fact (**as opposed to the conditions**) of petitioner's confinement **all relate to the criminal trial and respondents' alleged interference therewith.**" [Emphasis Added].

This rises to the level of a Rule 11 violation of misrepresentation. The *habeas* petition, and subsequent filings, have for three years been predicated on numerous liberty deprivations: denial of mail and familial contact, conditions, visitors, food, water, communication, torture, threat of torture; and the list goes on. This Court is well aware of what petitioners have actually claimed, and it certainly isn't just rigging the Afghan trial.

As quoted from Respondents' motion, page 12, ¶3:

"[B]ecause that continued detention is no longer predicated on the challenged action (the allegedly improper conviction resulting from respondents' alleged interference with the criminal trial), **but rather on an entirely new and independent legal basis not addressed in the Petition** (the Afghan government's decision to deport Mr. Idema). See also *Hernandez v. Brooks*, No. 98-1358, 1999 WL 298094, at *1 (10th Cir. 1999) [Emphasis Added]

Respondents apparently have not read the hundreds of pages filed, or chose to ignore them in some strange belief the Court has a short memory.

Respondents' motion, page 9, ¶3:

"First, that custody is not based upon the allegedly tainted conviction, but rather upon a separate **Afghan government determination to deport Mr. Idema**… Second, Mr. Idema's continued detention is, at this point, solely a function **of his refusal to take the necessary steps** to make travel arrangements to leave Afghanistan." [Emphasis Added]

Respondents' motion, page 14, ¶2:

"Moreover, because Mr. Idema effectively controls his own freedom at this point – and could effectuate his release by arranging for his travel out of Afghanistan – **his continued detention pending deportation** should not provide the basis for continued habeas jurisdiction.  As set forth above, the Afghan authorities have indicated that while they intend to deport Mr. Idema, they expect him to make his own travel arrangements. Birsner Decl., ¶ 3. And the U.S. Embassy in Kabul is prepared to assist Mr. Idema in making such arrangements, including assisting with procuring Mr. Idema a passport, making flight arrangements, and even providing Mr. Idema a loan in the event that he cannot pay for a flight himself. Id., ¶¶ 4, 9, 15.   **All that it would take for Mr. Idema to be released from custody, therefore, is his taking the necessary steps to get a passport and a plane ticket out of Afghanistan.** Id., ¶ 16." [Emphasis Added]

Opposing counsel has no evidence to support this diatribe of poppycock. He has no document that anyone wants to deport Idema, no deportation order, and most of all, just because Jack Idema refuses to divulge to the US Embassy his travel plans, or his financial ability to travel, does not mean he has not had a full exfiltration plan for two years now, including paid tickets, and other contingency plans. In sum, this is Mr. Lev's opinion, not fact, and not supported by evidence. Further, Idema repeatedly advised Birsner that he had multiple plane tickets and travel venues, none of which he was required to have the US Embassy approve of, and that all he needed was for the Embassy to release his passport and his property and never contact him again. That conversation was tape-recorded, and Mr. Birsner's affidavit is a misrepresentation tantamount to perjury.

Respondents' motion, page 15, ¶1:

> "As one court has put it in denying a habeas petition in an analogous context, Mr. Idema "can end[] his detention immediately. He has the keys in his pocket." *Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999)."

But, unfortunately, he does not have a passport in his pocket, or his property or exculpatory evidence returned. In other words, Idema can end his detention at Pulacharke immediately—he holds the keys to torture, forfeiture of property, continued imprisonment at the NDS Interrogation Facility, loss of evidence and possibly his life. He merely needs to submit to this outrage willingly.

Respondents' motion, page 17, ¶1:

> "For example, in *Pelich v. INS*, 329 F.3d 1057 (9th Cir. 2003), the Ninth Circuit denied a habeas claim where it found that petitioner "himself is responsible for his plight" **because he "steadfastly refused to fill out a Polish passport application."** Id. at 1059. … (citing cases)…." [Emphasis Added]

Senators, foreign ambassadors, the Red Cross, the UN, Congressmen—it took them 5 months just to get Bennett a passport while his was homeless and broke stranded in a foreign country. In three years they have not been able to get Jack Idema a passport. Not even the Vice President of Afghanistan has been successful in breaking through the US Embassy hold over NDS and getting his Idema's passport released.

Respondents' motion, page 17, ¶2:

> "The same reasoning that underlies section 1231(a)(1)(C) and the cases cited
> above supports dismissal of Mr. Idema's Petition as moot. **Mr. Idema has, to
> date, not taken steps to either procure a passport or purchase a plane
> ticket out of Afghanistan.**"  [All Emphasis above added.]

Excuse us?  The entire analysis above is not only comical, but a complete fraud
upon this Honorable Court.  Jack Idema has been demanding a passport for almost three
years, a passport illegally held from him by Respondents.  He has asked his Senator and
Congressmen in writing to assist him with a passport.[29]  He has applied to at least three
different governments for a passport, including the Italian government; he has asked the
UN to consider him a political prisoner and allow him a UN passport; he has asked the
Red Cross to intercede, but Red Cross attorney, Vincent Ballon, stated that Idema's case
was "too political" and that if the Red Cross tried to assist him the US Embassy could
retaliate.[30]  Idema has made it crystal clear to the US Embassy that he has always had the
ability to travel and leave Afghanistan absent a passport.  He could just drive his own
vehicle across the border if allowed by the Embassy.  He could fly on any plane, and he
has held paid tickets on planes, and written orders to fly military aircraft as SOON as
Respondents give him back his passport and property.  He has paid the Embassy for
another passport, paid the Embassy for a visa to his destination, and paid in advance for
Nina the dog to leave with him.

In fact, contrary to Mr. Lev's diatribe about the dog, the Afghan government
cleared Nina to leave Afghanistan a month ago  After her picture appeared in Afghan
papers everyone in the Afghan government acted quickly to issue health certificates,
vaccinations and export certificates.  The Afghans are not preventing Nina the dog from
leaving; her SKY Kennel, travel food, microchip implant, and travel documents have

---

[29] A fact conveniently overlooked by Respondents even though they use the letters as exhibits, they then
contradict the letters' very contents and purpose in their unsworn, unverified, disingenuous pleading.
[30] The Court and Respondents can reach Mr. Ballon at 93.700.297.777 to verify this information.  The
Red Cross has had no problem assisting in the repatriation of Iranian, Pakistani, Iraqi, Yemeni, and other
terrorists released, even paying the full cost of their transport home and allowing them to stay at the Red
Cross facility until such time as they were ready to leave.  Unfortunately, Jack Idema is not a terrorist, so

been secretly at Pulacharke Prison for quite some time. In fact, a Minister sent a General officer and the Chief Veterinarian right to Jack's quarters to make sure they gave Nina everything she needed to leave. More than a month ago she was set to leave on a NATO flight, until NATO Flight Operations did a flight check on her escort and found a State Department flag on his travel.[31] The point is, that it's not about the dog; it's about Idema, and stopping him from taking the dog, or <u>anything</u> else out of Pulacharke or Afghanistan. No doubt the Embassy knows that if Nina the dog does not fly in the next ten days or so, she won't be able to depart until the summer heat flight restrictions on dogs lifts four months from now. Leaving Idema right where the US Embassy wants him—in prison.

As to being uncooperative, Jack Idema has refused nothing, except to submit to continued torture, interrogation, and forfeiture of property. He has never refused any legal requirement or responsibility—contrarily, illegal acts, illegal obstruction, and illegal retaliation have been the sole dominion of Respondents, particularly the US State Department. He has not even refused to sign another passport application (under severe duress), pay cash for the passport, and provide his own pictures. Nowhere do Respondents prove to this Court that anyone wants to deport Jack Idema <u>except</u> the US Embassy. There is NO deportation order, which is why they cannot show it to this Court, there is no restriction on Jack Idema, including just driving out of Pulacharke in his own Land Cruiser to any one of a dozen Northern Alliance controlled locations, to the military airfield, to Kabul Airport, or to the border, by the Afghan government. Nor have Respondents provided a single document stating such. Therefore, once again, the evidence shows that Respondents are the sole purveyor of all liberty deprivations challenged in the petition and subsequent filings.

---

he receives no quarter. Idema wants to pay his own way, but no one it seems in Afghanistan is willing to upset the United States Embassy.

[31] Interestingly, one of the few things Idema agreed to was having the Embassy provide what Birsner called their own research on transporting the dog. The US Embassy provided a bevy of incorrect information about transporting Nina the dog, most of which was either useless, or meant to preclude her from travel. Contrary to the US Embassy's information, Jack Idema found a more acceptable route back to the United States for Nina and advised the Embassy Nina was ready to travel as soon as the Ambassador released his passport and property.

Respondents' motion, page 10, ¶1:

> "The parties must continue to have a stake in the outcome of the lawsuit.
> This means that, throughout the litigation, the plaintiff must have suffered,
> or be threatened with, an actual injury *traceable to the defendant and likely
> to be redressed by a favorable judicial decision. Spencer v. Kemna*, 523
> U.S. 1, 7 (1998) (emphasis added) (internal citations and quotation marks
> omitted). See also *Arizonans for Official English v. Arizona*, 520 U.S. 43,
> 67 (1997).

Respondents' motion, page 10, ¶2:

> Thus, "*[o]nce the convict's sentence has expired*, . . . some concrete and
> continuing injury – other than the now-ended incarceration or parole . . .
> must exist if the suit is to be maintained." *Spencer,* 523 U.S. at 7 (emphasis
> added). See also March 21 Slip Op. at 6."

The concrete and continuing injuries are clear. The actual injuries are clear.  The threats,
the suffering, are all clear.  Furthermore, Jack Idema does NOT have a passport because
Respondents have effectively blocked the return of his original passport and refused to
give him another passport, or his property.

   **In the very words of Respondents, these are "the existence of collateral
consequences."**

   While the US Embassy speaks to this Honorable Court with one face, they act
with another face in Afghanistan.  Their position there is clear: Jack Idema <u>must</u> leave
Afghanistan as Captain Brent Bennett did, stripped and searched before receiving his
passport,[32] wearing handcuffs to the plane and with only the clothes on his back, thereby
forfeiting all he holds dear in life and all property and evidence that will ultimately set
him permanently free.  This image tells the world what the Department of State needs the
world to see; that the Afghans are responsible for all that has occurred.  If Idema were not
truly in the custody of Respondents, the world might see a different picture as Idema left,
dozens of Afghan diplomats and generals wishing him well and a safe return—a stark
contrast to Bennett, who was posed like a trophy for pictures next to State Department
security agents.

---

[32] A 14 day expiring temporary one way passport.

Respondents' motion, page 11, ¶2:

> "Both of these letters [by counsel and Idema related to his passport] were sent, however, when Mr. Idema was indisputably still physically present at Pol-e-Charkhi; indeed, they were **intended to prevent Mr. Idema's transfer from that facility to an NDS detention center pending his deportation.** Thus, petitioner himself recognized that notwithstanding his continued physical detention, he has been "released" from his criminal sentence. Accordingly, the factual premise for Mr. Idema's habeas claim no longer exists and that claim is moot."

Since the onset of this case, Jack Idema has argued that he was "released," first by the Appeals Court, then by a Parliamentary Justice Commission, numerous Amnesty orders, and the Afghan government in general.[33] Nothing has changed. The Afghans are not holding, and never have. It is Respondents who are solely responsible for his continued incarceration, property forfeitures, travel restrictions, etc, and the Afghan government has finally put their position in writing, which is obviously not a happy day for the Respondents.

Respondents' motion, page 13, ¶2:

> "Nor does the mere fact that Mr. Idema remains at Pol-e-Charkhi prison change this analysis. For it is the legal basis for detention – **and not the location of detention or the identity of the custodian – that is relevant.**

*Compare to*, Respondents' motion, pages 13-14:

> Had the Afghan authorities not acceded to Mr. Idema's request, and physically transferred Mr. Idema **to NDS custody pending his deportation, it would be clear that his current custody is legally distinct from the custody he challenges in the Petition.....** The fact remains that Mr. Idema is no longer in custody pursuant to the criminal sentence he challenges in his Petition. And that fact alone - regardless of the physical location of his detention – renders his habeas claim moot."

---

[33] In fact, under the Geneva Convention protections Idema asserted in 2004, had the US Government not removed his passport in violation of law (Caraballo was allowed to retain his civilian journalist passport throughout his imprisonment—a curious difference), Idema could have escaped at anytime, and left Afghanistan without fear or reprisals because there was no extradition treaty and the Geneva Convention specifically authorizes escapes by those under its protection. The only reason he did not take this option is because we have all been infinitely aware that Idema's incarceration was by the US government not the Afghan government, and the US would have denied him a passport in the next country and illegally rendered him back to Pulacharke or NDS all over again.

This contradiction is enlightening.  Why is the US Embassy so intent to see Idema placed at NDS where he no longer has the ability to resist torture, interrogation, and murder?[34] There is no evidence before this Court that the Afghan "government" made any decision to deport Idema.  All Afghan sources of information in all government pleadings, are un-named and not even identified by position, rank, department, ministry, or even the vaguest of descriptions.  There is no evidence, and never has been any, that any of these alleged sources by Birsner or opposing counsel, even exist other than in their fictional cover story of events.  Compare that to every source Idema uses be named, identified, and many signing sworn statements in spite of the repercussions they face.

CONCLUSION

In the face of all this evidence, Mr. Lev, on behalf of Respondents, would have this Court actually believe that Jack Idema holds the keys to freedom and simply enjoys Pulacharke Prison too much to leave.  He prefers to live without water, mail, heat, electricity, eating rice and bread everyday, and under constant threat of assassination by the two thousand terrorists surrounding him.  It is simply unbelievable, not true, and would be comical if this matter were not so serious. Petitioner submits to this Court that Respondents position was taken simply and solely for the purpose of subterfuge and delay, and to avoid answering, and because of that, this Court should direct Respondents to answer in accordance with the Court's March 21st Order, and by May 5th, 2007.

Petitioners Idema and Bennett have read all statements made in this pleading, and have verified and sworn to those facts in the attached verification.

---

[34] Amnesty International recently addressed the ongoing torture and murder at the NDS Saderat Facility. And, the original verified petition clearly outlines torture and murder at NDS Saderat.

**WHEREFORE,** Petitioners request this Honorable Court enter and order, 1) directing Respondents to immediately present Idema's paid passport to him, 2) directing Respondents to place in writing, a release of Idema's passport and property at NDS 17th Division and return to him in accordance with the signed Order of Amrullah Saleh, 3) directing the US Embassy in Kabul to cease any further "assistance" to Idema as unnecessary and unwanted, 4) entering a protective order restricting the US Embassy from contacting the Afghan government, prison authorities, or Jack Idema in regards to his case or status, and, restricting the US Embassy from participating in any alleged deportation, to include any US government presence during Jack Idema's departure from Afghanistan, and restricting the US Embassy, or their agents, from using, requesting, or suggesting the use of force against Idema or illegal seizure of property without a valid warrant or court order, 5) directing the US Embassy to release the one year passport they claim they have to Jack Idema's Afghan representative, Judge Ahmadzai, 6) directing the US Embassy to remove their objection to future Afghan or other visas being issued to either Bennett or Idema, and 7) directing respondents to answer the factual claims of the petition in accordance with the March 21, 2007 Order of this Court by May 7, 2007.

This 2nd Day of May 2007.

_____s/_____
John Edwards Tiffany,
Attorney (JT7322)
*For Petitioner Idema*
Law Offices of John E. Tiffany P.C.
The Robert Treat Center
50 Park Place, 10th Floor,
Newark, New Jersey 07102
Tel: (973) 242-3700
Fax: (973) 242-3799
www.JohnTiffanyLaw.com
Email: Jet@Jet4Law.com

# VERIFICATION OF PETITIONER

**Pulacharke Prison, Kabul, Islamic Republic of Afghanistan: ss.**

1. I am a Petitioner in the §2241 Case of Idema, *et al.,* v. Khalilzad, *et al., DCDC,*
2. I declare under the penalties of perjury as follows, but expressly not limited thereto:
3. I have either read the Response, or had it read to me. I have fully reviewed the Response and found it to be accurate and factual.
4. The facts stated in the attached pleading are true and accurate, and any contrary facts asserted by the government, or Ori Lev, are patently false.
5. The facts stated in Petitioners' Response, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
6. Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this

30th Day of April 2007, in the Islamic State of Afghanistan.

_____
J. K. Idema, Declarant/Petitioner

27

## VERIFICATION OF PETITIONER

**United Kingdom: ss.**

1. I am a Petitioner in the §2241 Case of Idema, *et al.,* v. Khalilzad, *et al., DCDC,*
2. I declare under the penalties of perjury as follows, but expressly not limited thereto:
3. I have read and reviewed the Response and found it to be accurate and factual.
4. I can attest the facts stated in the attached pleading prior to my forced departure from Afghanistan being true and accurate, and any contrary facts asserted by the government, or Ori Lev, are false.
5. Most of the facts, with the exception of current events at Pulacharke and in Afghanistan, as stated in Petitioners' Response, are personally known to me and, if called as a witness, I could testify competently thereto, except to those facts stated under information and belief, which I believe to be true.
6. Further Declarant sayeth not.

Executed under the penalties of perjury, in accordance with 17 U.S.C. §1746 on this

1st Day of May 2007, in the Islamic State of Afghanistan.

Brent Bennett, Declarant/Petitioner

28

# CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing Petitioners' Response has been duly served upon the below named Respondents by depositing it in the mail in the U.S. Post Office, *via* First Class mail, on the 3rd day of May, 2007, addressed as follows;

> MARCIA BERMAN
> Trial Attorney
> (PA Bar No. 66168)
> United States Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Avenue N.W. Room 7204
> Washington, D.C. 20530
> Tel.: (202) 514-3330
> Fax: (202) 616-8470
> Email: marcia.berman@usdoj.gov

This 2nd day of May 2007.

_____s/_____
John Edwards Tiffany