UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
J.K. IDEMA, et al.,                       )
                                          )
       Petitioners,                        )   No. 05 CV 2064 (EGS)
                                          )
v.                                        )
                                          )
RONALD NEUMANN, et al.,                   )
                                          )
       Respondents.                        )
_____)

**REPLY MEMORANDUM IN SUPPORT OF RESPONDENTS'
MOTION TO DISMISS ON GROUNDS OF MOOTNESS**

**INTRODUCTION**

      Mr. Idema's habeas petition is moot and should be dismissed. After a habeas petitioner's sentence expires, a habeas claim becomes moot absent the existence of collateral consequences. Spencer v. Kemna, 523 U.S. 1, 7 (1998). It is undisputed that the Afghan government has commuted Mr. Idema's criminal sentence and has authorized his release, and that Mr. Idema is no longer in custody pursuant to the criminal sentence he challenges in the habeas petition that forms the basis of this case. Mr. Idema fully admits this. There are also no statutory, collateral consequences of Mr. Idema's conviction to prevent his habeas petition from becoming moot. The loss of property that Mr. Idema speculates may occur upon his release from prison is not such a collateral consequence, nor is a habeas petition the proper vehicle for seeking the return of property.

      Because Mr. Idema's criminal sentence has unquestionably expired and there are no collateral consequences of his conviction, his habeas petition is moot, notwithstanding the fact that Mr. Idema remains in Afghan custody at Pol-e-Charkhi prison in Afghanistan. Mr. Idema's continued presence in Pol-e-Charkhi prison is due to his own refusal to leave without his

personal belongings and his desire to dictate the terms of his release, not his expired criminal sentence. Mr. Idema's choice to remain in Pol-e-Charkhi prison cannot forestall the dismissal of this clearly moot case.[1]

## BACKGROUND

As set forth in the declaration of Edward P. Birsner, the Consul at the U.S. Embassy in Kabul, Afghanistan, submitted in support of Respondents' Motion to Dismiss on Grounds of Mootness ("Birsner Decl."); Mr. Birsner's supplemental declaration, attached hereto as Exhibit 1 ("Supp. Birsner Decl."); and Mr. Idema's own response to Respondents' Motion to Dismiss on Grounds of Mootness, Mr. Idema is no longer in custody pursuant to the criminal sentence he challenges in the Petition for Habeas Corpus that forms the basis of this habeas case. It is uncontroverted that the Afghan government commuted Mr. Idema's criminal sentence pursuant to a general amnesty order and authorized Mr. Idema's release from prison. (See Birsner Decl. at ¶ 3; Supp. Birsner Decl. at ¶ 3; Petitioner's Response in Part and Request for Reconsideration ("Petitioner's Response") at 2, 24).[2] Respondents were informed by Afghan officials that the Afghan government decided to deport Mr. Idema and that he was being held in temporary Afghan custody pending deportation. (Birsner Decl. at ¶ 3; Supp. Birsner Decl. at ¶ 3).

---

[1] Mr. Idema's response to Respondents' Motion to Dismiss on Grounds of Mootness is filled with numerous baseless, unsupported, and ultimately irrelevant allegations and rants. Much of it rehashes the averments in his petition. It also refers repeatedly to affidavits, audio and video tapes that are not in the record. Respondents take issue with many of the factual assertions in Mr. Idema's response but will focus this reply memorandum on those facts and issues that are relevant to the instant Motion to Dismiss on Grounds of Mootness.

[2] Former petitioner Brent Bennett purports to "join[] pro se" in Mr. Idema's response to respondents' motion to dismiss. (Petitioner's Response at 1). Mr. Bennett was dismissed from this case (see March 21, 2007 Slip Op. at 9), is not a party to this case, and may not join, pro se or otherwise, in Mr. Idema's response.

In his original declaration, dated April 4, 2007, Mr. Birsner explained respondents' efforts to facilitate Mr. Idema's release from prison and departure from Afghanistan since learning of the expiration of Mr. Idema's criminal sentence.  Embassy officials conveyed to Afghan authorities Mr. Idema's request to stay at Pol-e-Charkhi prison pending deportation, rather than being transferred to the custody of the Afghan National Directorate of Security (NDS), and to take his belongings with him when he was deported (Birsner Decl. at ¶ 8); offered to help Mr. Idema procure a passport to replace his original passport which Mr. Idema apparently did not have (id. at ¶ 9); offered to assist Mr. Idema in booking and paying for an airline ticket (id. at ¶ 9); offered to pass along to Afghan authorities a list of the belongings Mr. Idema wished to take with him (id. at  ¶ 9); and provided Mr. Idema with transportation information for him and for a dog that belonged to former petitioner Brent Bennett.  (Id. at  ¶¶ 11, 13).  At the time of Mr. Birsner's original declaration, it was respondents' understanding that Mr. Idema's release was imminent, pending the completion of the plans for Mr. Idema's departure.  (Id. at ¶ 16).

Since April 4, 2007, U.S. Embassy officials have continued to attempt to facilitate Mr. Idema's release and departure, in response to requests from the Afghan government and Mr. Idema, and consistent with the Embassy's responsibility to provide assistance to U.S. national prisoners incarcerated in its consular district.  As detailed below, the Embassy, among other things, issued and delivered to Mr. Idema a replacement U.S. passport to enable him to depart Afghanistan and to travel internationally; continued to offer to assist Mr. Idema's purchase of an airline ticket, including offering to provide him a loan for this purpose; continued to provide Mr. Idema with information related to the shipment of his effects and Mr. Bennett's dog; made

inquiries of the Afghan government regarding the whereabouts of Mr. Idema's personal possessions and requested that Afghan authorities return Mr. Idema's personal belongings to him, including his original passport if this were to be located; and urged the Afghan government to release Mr. Idema from prison, pursuant to the amnesty order, as soon as possible.

Events Since the Filing of Respondents' Motion to Dismiss on Grounds of Mootness

On April 8, 2007, the Embassy received two phone calls from Mr. Idema. In those calls, Mr. Idema demanded that the Embassy retrieve his passport, which Mr. Idema alleged was either in the custody of the NDS or the custody of the U.S. Embassy. Vice Consul Jessica Simon told Mr. Idema that the Embassy did not have his passport and agreed to call the NDS about the passport. Ms. Simon also discussed with Mr. Idema various ways in which the Embassy could issue him a replacement passport. Subsequently, another member of the Embassy staff, Bashir Mamnoon, spoke to an Afghan official at the NDS, who told him that he did not believe that the NDS had Mr. Idema's passport and gave him the name of another person at the NDS to contact about it. (Supp. Birsner Decl. at ¶ 5).

During the April 8 phone calls, Ms. Simon explained to Mr. Idema that to obtain a new passport he would need to sign and execute a passport application. He stated that he would not come to the Embassy to sign and execute the passport application. On April 10, 2007, Ms. Simon and Mr. Mamnoon went to Pul-e-Charkhi prison to permit Mr. Idema to execute an emergency replacement passport application there. At the prison, Mr. Idema completed the paperwork for the passport application and paid the passport fee. Ms. Simon inquired with the Warden of the prison about the standard procedure for delivery of the passport. The Warden suggested that the Embassy follow the same procedure it used for former petitioners Bennett and

Caraballo -- that is, the Embassy would deliver the passport at the airport at the time Mr. Idema departs Afghanistan, and Mr. Idema would be escorted separately to the airport. (Id. at ¶ 6).

During the same April 10 meeting at the prison, Mr. Idema again asked about the whereabouts of his old passport, and Ms. Simon told him that the Embassy had called the NDS in the past in order to locate the passport but had been unsuccessful. Ms. Simon said the Embassy would keep trying to find the old passport. The Embassy personnel then discussed with Mr. Idema his plans for leaving Afghanistan. Mr. Idema said that he planned to transit New Delhi, since that was his preferred routing. At Mr. Idema's request, the Embassy personnel agreed to assist Mr. Idema with his travel plans to New Delhi, including assisting him to apply for an Indian visa. Mr. Idema expressed an interest in departing on either April 25, 2007 or May 2, 2007, claiming that he needed this amount of time to pack and try to get his personal belongings back from the NDS, and that these were the dates that coordinated with the dog's onward flight, which, according to Mr. Idema, would be on Singapore Airlines. In a subsequent phone call with Ms. Simon later that day, Mr. Idema reiterated his desire to retrieve his personal belongings and further discussed his travel plans. (Id. at ¶ 7).

On April 11, 2007, Embassy staff spoke to an Afghan official at the NDS, General Modafei, whom Mr. Idema identified as having his original passport. General Modafei denied to Embassy staff that he or anyone else at the NDS had Mr. Idema's passport. (Id. at ¶ 8).

On April 12, 2007, Ms. Simon called Mr. Idema to relay the following information: the Embassy would require a signed Privacy Act Waiver before speaking with an individual, Rahim Ahmadzai, who had contacted the Embassy regarding Mr. Idema and who purported to be Mr. Idema's attorney; information about an airline (Singapore Airlines) that would transport a dog as

well as a point of contact at the airline's Kabul office; the Indian Embassy's requirements for obtaining an Indian visa; the fact that the NDS official identified by Mr. Idema denied having his passport; and the fact that Mr. Idema's new passport was ready.  Mr. Idema asked if he could send someone to the Embassy to pick up the passport, and Ms. Simon responded that she wanted to coordinate first with the Warden of the prison.  Mr. Idema also indicated that the dog had received the required shots and paperwork to leave the country.  (Id. at ¶ 9).

On April 15, 2007, Mr. Mamnoon called the Deputy Minister of Justice to inform him that Mr. Idema's passport was ready.  The Deputy Minister of Justice inquired about the provision of a plane ticket to Mr. Idema and mentioned the possibility that a victims' rights complaint against Mr. Idema in the Afghan courts might delay Mr. Idema's departure.  Mr. Mamnoon replied that the Embassy would not be providing Mr. Idema with a plane ticket because it was an Afghan government decision whether or not to deport him and because Mr. Idema was not destitute.  (Id. at ¶ 10).

On April 24, 2007, Mr. Mamnoon called the Warden to ask him for any information he had regarding the court's review of the victims' rights case.  Mr. Mamnoon was told that that the alleged victim went to the prison to discuss the case with Mr. Idema, but Mr. Idema refused to see him.  (Id. at ¶ 11).

On May 3, 2007, the Embassy further communicated to Afghanistan's Ministry of Foreign Affairs (MFA) that it knows of no legal or practical impediments to Mr. Idema's departure from Afghanistan and is willing to take action to facilitate his departure and to support the Afghan government's deportation efforts, consistent with U.S. law, regulations and procedures.  The Embassy summarized the steps that it has taken to facilitate Mr. Idema's

departure, at both his and the Afghan government's request, since it learned of the amnesty decree, including issuing Mr. Idema a new passport, offering to assist in the logistics of and, if necessary, providing a loan toward Mr. Idema's purchase of an airline ticket, asking Mr. Idema to make a list of his personal belongings in order to help facilitate their return to him, and providing Mr. Idema with information regarding the requirements for leaving Afghanistan with his belongings and the dog.  (Id. at ¶ 12).

Also on May 3, 2007, Ms. Simon called Mr. Idema and inquired about the status of his plans to leave Afghanistan.  Mr. Idema informed Ms. Simon that he believed there is a letter in an NDS file, signed by a Robert Kelley (or Klee) who, Mr. Idema claimed, worked under former Ambassador Khalilzad, stating that Mr. Idema is not to receive his belongings or original passport, or be allowed to leave Afghanistan, without the express permission of the U.S. Embassy.  Mr. Idema stated that if the Embassy would put in writing a statement to the effect that the Embassy requests that the NDS release Mr. Idema's belongings and passport and that the Embassy has no objection to Mr. Idema's leaving Afghanistan, his belongings would be released to him, and he would leave tomorrow.  Ms. Simon asked Mr. Idema to make a list of his belongings that the Embassy could use if it decided to make such a written statement to NDS.  Mr. Idema responded that he did not want to identify the items.  Mr. Idema further indicated in this conversation that the dog was ready to leave Afghanistan.  Ms. Simon and Mr. Idema discussed again the issue of the Embassy needing a Privacy Act Waiver in order to speak to Mr. Idema's local attorney, Mr. Ahmadzai.  (Id. at ¶ 13).

Shortly after this phone conversation ended, Mr. Ahmadzai called Ms. Simon saying (as translated by Mr. Mamnoon) that he had a signed statement from Mr. Idema authorizing the

Embassy to speak with Mr. Ahmadzai. Ms. Simon stated that the Embassy needed the actual Privacy Act Waiver form. Mr. Idema called Ms. Simon shortly thereafter to complain about this requirement. At the conclusion of this conversation, Ms. Simon said that she would look into the possibility of the Embassy drafting the letter to NDS as requested by Mr. Idema, and Mr. Idema said that he would check his files for a Privacy Act Waiver form and send it back to the Embassy through his attorney. (Id. at ¶ 14).

On May 6, 2007, Mr. Ahmadzai came to the U.S. Embassy with a signed Privacy Act Waiver form from Mr. Idema and discussed Mr. Idema's case with Embassy personnel. Among the issues discussed were the alleged letter in the NDS file to which Mr. Idema referred on May 3; the status of the victims' rights case; and whether the Embassy could help introduce Mr. Ahmadzai to NDS officials. (Id. at ¶ 15).

On May 8, 2007, Mr. Birsner spoke to Mr. Idema on the phone. He demanded immediate possession of his new passport. Mr. Idema added that he did not want any further assistance from the U.S. Embassy, specifically stating that he did not want Embassy personnel to show up at the airport on the day of his departure, and that he would handle all of his departure plans going forward without the Embassy's help. (Id. at ¶ 16). On May 8, 2007, an Afghan NDS official, General Fatah, informed Mr. Mamnoon that the victims' rights case was likely to be resolved informally. (Id. at ¶ 17).

On May 9, 2007, Mr. Mamnoon traveled to Pol-e-Charkhi prison and personally delivered Mr. Idema's new passport to Mr. Idema, and returned to him the local currency equivalent of approximately $23 in U.S. currency, which represented funds advanced to us by Mr. Idema for the purpose of applying for an Indian visa, as well as change from the U.S.

passport fee. Mr. Mamnoon obtained receipts from Mr. Idema for the passport and for the returned money. (Id. at ¶ 18).

On May 14, 2007, Mr. Birsner wrote to the NDS regarding Mr. Idema's case. The letter was delivered to the NDS on May 15, 2007. In this letter, Mr. Birsner requested, on behalf of the U.S. Embassy, the return of any of Mr. Idema's personal belongings in the possession of the NDS, including his original passport, if this were located, and described the steps taken by the Embassy to facilitate Mr. Idema's departure. Mr. Birsner noted that it was the Embassy's understanding that Mr. Idema would require no further assistance from the Embassy. Mr. Birsner further stated that "[t]he U.S. Embassy urges that Mr. Idema's release from prison, pursuant to the Amnesty declaration of President Karzai, be completed as soon as possible, and is willing to take any additional action necessary to support Mr. Idema's departure, including assistance to facilitate any decision of the Government of Afghanistan to deport Mr. Idema, consistent with U.S. law, regulations and procedures." (Id. at ¶ 19 & Ex. A thereto). On May 15, 2007, a similar letter was delivered to the Afghan Ministry of Justice. (Id. at ¶ 19 & Ex. B thereto).

## ARGUMENT

MR. IDEMA'S HABEAS CLAIM IS MOOT BECAUSE HIS CRIMINAL SENTENCE HAS EXPIRED AND BECAUSE HIS CONTINUED PRESENCE IN POL-E-CHARKHI PRISON IS DUE TO HIS REFUSAL TO LEAVE WITHOUT HIS PERSONAL BELONGINGS.

At the time respondents filed their Motion to Dismiss on Grounds of Mootness, it was clear that Mr. Idema's continued presence in Pol-e-Charkhi prison was due to his refusal to peacefully leave without his belongings, including his original passport, allegedly exculpatory evidence, other possessions, and Mr. Bennett's dog -- not his criminal sentence, which has

unquestionably expired. It is now even clearer that this is the case.

It is undisputed that Mr. Idema is no longer in custody pursuant to the criminal sentence he challenges in his habeas petition. The Afghan government commuted Mr. Idema's criminal sentence and authorized his release. In Mr. Idema's own words, he has been "set free." (Petitioner's Response at 2; see also id. at 24; Affidavit of Judge Rahim Ahmadzai at ¶ 5 ("Ahmadzai Aff."), attached to Petitioner's Response as Exhibit A). In addition, Mr. Idema now has in his possession a replacement passport to enable him to depart Afghanistan and travel internationally. (Supp. Birsner Decl. at ¶ 18). His departure plans are apparently no longer an issue. (Petitioner's Response at 21) ("[Mr. Idema] could just drive his own vehicle across the border if allowed by the Embassy. He could fly on any plane, and he has held paid tickets on planes, and written orders to fly military aircraft as SOON as Respondents give him back his passport and property."); (id. at 20) ("Idema repeatedly advised Birsner that he had multiple plane tickets and travel venues, none of which he was required to have the U.S. Embassy approve of, and that all he needed was for the Embassy to release his passport and his property and never contact him again."). Mr. Idema has repudiated any further assistance from the U.S. Embassy and stated in no uncertain terms that he will handle all of his future departure plans without the Embassy's help. (Supp. Birsner Decl. at ¶ 16). According to Mr. Idema, Mr. Bennett's dog is cleared to leave as well. (Petitioner's Response at 21).

Mr. Idema readily admits that he will not voluntarily leave Pol-e-Charkhi prison if it means "forfeiting exculpatory evidence and evidence of criminal acts by US officials,

10

surrendering his property, [and surrendering] Bennett's dog." (Id. at 12).[3] (See also id. at 20) (responding to respondents' argument that Mr. Idema holds the keys to end his detention by stating "unfortunately, he does not have a passport in his pocket, or his property or exculpatory evidence returned."); (id. at 7) ("[u]nder considerable pressure from his general friends to get a passport and allow them to get him out of Pulacharke, Idema signed the application [for a replacement passport]"). Mr. Idema has made similar admissions in news accounts. (See May 9, 2007 Pajhwok Afghan News article, attached hereto as Exhibit 2, also available at http://www.pajhwak.com/viewstory.asp?lng=eng&id=36072) ("Jack Idema, an American citizen convicted on the charge of running a private jail in Kabul, expects to be released in a couple of weeks. However, the man says [he] will stay in prison as long as intelligence operatives do not return $0.5 million equipment seized from him."). As we said in our opening brief, this is Mr. Idema's prerogative, so long as the Afghan authorities are willing to abide by his continued presence in Pol-e-Charkhi prison.[4] (Motion to Dismiss at 15).

---

[3] Mr. Idema also candidly admits that he is being treated quite well at Pol-e-Charkhi prison:

> As full disclosure, yes, Jack Idema has at [sic] "suite" a [sic] Pulacharke Prison, complete with couches, rugs, a desk and television. He occupies the living area a former president's daughter once occupied. He has the only private bathroom besides the commandant, his own small kitchen and is afforded all courtesies that the Ministry of Justice felt were appropriate for a commander in Massoud's United Front Military Forces. He is allowed to keep a dog, weapons, and a cook. Why? Because the Anti-Taliban factions of the Afghan government have never, not once, considered him a prisoner, but a temporary guest . . .

(Petitioner's Response at 10 n. 18).

[4] Mr. Idema suggests that he would use force to resist an attempt to remove him from Pol-e-Charkhi prison without his belongings. (Petitioner's Response at 8).

However, Mr. Idema's choice to remain in Pol-e-Charkhi prison pending resolution of these issues cannot form the basis for continued federal court jurisdiction over his habeas petition. As we demonstrated in our opening brief, and as this Court recognized in dismissing the habeas claims of Mr. Idema's co-petitioners, after a habeas petitioner's sentence expires, as Mr. Idema's sentence undisputedly has, a habeas claim becomes moot absent the existence of collateral consequences, even where the petitioner remains incarcerated. (Id. at 9-17; Mar. 21, 2007 Slip Op. at 6; Spencer v. Kemna, 523 U.S. 1, 7 (1998)). Mr. Idema does not dispute this legal proposition.

This Court's prior dismissal of petitioner Banderas' habeas claim controls Mr. Idema's case. Banderas was found innocent of all charges by an Afghan Appeals Court and released, but he decided to stay in prison with Mr. Idema and his other team members, as he had been taught to "leave no man behind." Affidavit of Lieutenant Wahid Rasuli Banderas at ¶ 4 (Oct. 6, 2006). The Court held that to the extent that Banderas remained in prison, "it appears to be his choice to do so," and dismissed his habeas claim as moot. Mar. 21, 2007 Slip Op. at 5. Similarly, Mr. Idema's continued incarceration is a result of his own choice to not leave Pol-e-Charkhi prison without his belongings, and his habeas claim is moot.

The loss of property does not constitute a collateral consequence sufficient to keep a habeas petition from becoming moot after the expiration of the petitioner's sentence. (See Petitioner's Response at 23, claiming that the loss of Mr. Idema's original passport and other property constitutes the existence of collateral consequences). As the Court explained in its March 21, 2007 opinion:

> Equitable remedies that courts can provide in habeas cases typically involve "either an order to a custodian to ameliorate the conditions of a petitioner's

> detention . . . or an order freeing a petitioner from penalties resulting from conviction that persist beyond the end of detention." Omar v. Harvey, No. 06-5126, 2007 WL 420137, at *15 (D.C. Cir. Feb. 9, 2007). In Lane v. Williams, 455 U.S. 624, 631-33 (1982), the Supreme Court limited post-release habeas relief to "civil disabilities" imposed on former detainees by operation of law. See also Carafras v. LaVallee, 391 U.S. 234, 237-38 (1968) (finding that habeas petition was not moot after expiration of sentence because of certain statutory consequences of being a convict under New York law such as losing the right to vote, serve as an official in a labor union, serve as a juror or engage in certain businesses). <u>By contrast, non-statutory consequences that flow from a conviction such as loss of employment prospects or affect on a sentence in a future criminal proceeding are not sufficient to keep a habeas petition from becoming moot upon release</u>. Lane, 455 U.S. at 632-33.

Mar. 21, 2007 Slip Op. at 8 (emphasis added). If Mr. Idema were to lose any of his property as a consequence of his leaving Pol-e-Charkhi prison without it, that would not constitute a statutory consequence of his conviction sufficient to prevent his habeas petition from becoming moot. Lane, 455 U.S. at 632-33.

Nor is Mr. Idema's habeas case the proper vehicle for Mr. Idema to seek the return of his possessions, whether from the Afghan government or any other entity. Traditionally, habeas corpus was a means to seek judicial review of unlawful detention, in order to obtain release from that detention. The very term "habeas corpus" derives from the Latin phrase meaning "have the body." See, e.g., Random House Dictionary of the English Language at 856 (2d ed. unabridged 1987); see also United States v. Sinclair, 702 F. Supp. 477, 478 (D. Del. 1989) ("inherent in a federal habeas remedy is the ability of a federal court to direct the release of the person in custody").

> As its Latin meaning suggests, the writ of habeas corpus performs a precise and specific function: it forces the government to justify a decision to hold an individual in custody. "The very office of the Great Writ, its only function, is to inquire into the legality of the detention of one in custody." Heflin v. United States, 358 U.S. 415, 421, 407 (1959); see also Zadvydas v. Davis, 533 U.S. 678, 699 (2001) (holding that the "historic purpose of the writ [is] to relieve detention

13

> by executive authorities without judicial trial") (quoting Brown v. Allen, 344 U.S. 443, 533 (1953) (Jackson, J., concurring in result)). A habeas court must thus confine the scope of its review to considering the legality of the custody at issue.

Zalawadia v. Ashcroft, 371 F.3d 292, 299 (5th Cir. 2004). See also Moore v. Pemberton, 110 F.3d 22, 23 (7th Cir. 1997) ("It is not enough to be 'in custody'; unless one is attacking the legality, duration, or (rarely) severity of that custody," a habeas petition is improper.).

Moreover, "[h]abeas' singular focus on the legality of detention not only constrains the scope of a habeas court's review, it constrains . . . the nature of relief that court may afford if and when the writ issues." Zalawadia, 371 F.3d at 300. Because "habeas relief relates directly to the underlying nature of the writ itself – undoing current or future legal restraints on a person's freedom flowing from an illegal detention," it "*cannot be utilized to bootstrap other claims for relief* unless necessary to assure or to protect the right to the personal liberty interest that is at issue." Id. (emphasis added). Accordingly, a court in a habeas case has no power to order the return of a habeas petitioner's property. See, e.g., In re: Hill, Case No. 04-5436, 2005 WL 613262 at * 1 (D.C. Cir. Mar. 14, 2005) (per curiam) (unpublished disposition) (denying non-habeas relief requested in habeas petition "because the court has no authority to order the return of petitioner's property."); Babinski v. Hunter, Case No. 1:06-CV-01091, 2006 WL 2949264 at * 1 (E.D. Cal. Oct. 16, 2006) (habeas petitioner claimed that prison staff stole his personal property in retaliation for his filing civil rights complaint; court dismissed habeas petition seeking return of property because petitioner challenged conditions of confinement, not fact or duration of confinement); Garrett v. Johnson, Case No. 2:01-CV-0035, 2001 WL 497761 at * 1-2 (N.D. Tex. May 7, 2001) (dismissing habeas petition challenging circumstances, not fact, of confinement and seeking order prohibiting further misconduct by corrections staff and requiring

restitution for wrongfully seized property).  Cf. Fed. R. Crim. P. 41(g) (providing for motions for return of property).[5]

This is especially true here, where Mr. Idema does not seek an order requiring respondents to return his property, but an order requiring respondents to direct the Afghan government to return Mr. Idema's property.  The U.S. Embassy does not have Mr. Idema's property or passport, nor is it Mr. Idema's contention that it does.  (Supp. Birsner Decl. at ¶¶ 5, 8, 13).  Rather, Mr. Idema alleges that the U.S. Embassy blocked the return of his property and original passport, which he claims are in the custody of Afghan authorities (Petitioner's Response at 4, 9; Ahmadzai Aff. at ¶ 7), and requests that the Court order respondents "to place in writing, a release of Idema's passport and property at NDS . . ." (Petitioner's Response at 26).[6]  Putting aside the diplomatic and foreign policy implications of such an order and questions about this Court's jurisdiction to enter such an order, it is clear that the Court lacks the power to order the return of Mr. Idema's property in this habeas case.[7]

---

[5] Nor is this habeas petition the appropriate forum for Mr. Idema's other grievances about his conditions of confinement.  (See Mar. 21, 2007 Slip Op. at 14) ("This Court agrees with respondents that a habeas petition is not the proper vehicle to challenge either conditions of confinement or the provision of consular services to Americans abroad).

[6] The U.S. Embassy has not blocked the return of Mr. Idema's property, including his original passport; has not ordered the NDS to retain Mr. Idema's property, including his original passport; and has not blocked Mr. Idema's release from prison.  (Supp. Birsner Decl. at ¶ 20).

[7] Thus, even if the Court were to credit the vague testimony of Mr. Idema's lawyer that approximately three weeks ago, unnamed "US government agents . . . request[ed] NDS withhold [Mr. Idema's] property, passport, and evidence . . ." (Ahmadzai Aff. at ¶ 7), it would be irrelevant, as the Court has no power to order the return of Mr. Idema's property.  For the same reason, the allegations in the Affidavit of Afghan National John Doe ("Doe Aff."), submitted as Exhibit B in support of Petitioner's Response, that the American government ordered the NDS not to return Mr. Idema's property, passport and evidence, are irrelevant.  (Doe Aff. at ¶¶ 6, 7, 10).  In addition to the irrelevance of these allegations, they are vague and conclusory, and the fact that the affiant remains unidentified and provides no factual information to substantiate how

Moreover, the U.S. Embassy already has made efforts to facilitate the return of Mr. Idema's property. On March 16, 2007, a member of Mr. Birsner's staff spoke with Afghan authorities about, among other things, the return of Mr. Idema's belongings, and they indicated that Mr. Idema would be permitted to take his possessions with him. (Birsner Decl. at ¶ 8). In addition, the Embassy has asked Mr. Idema on several occasions to make a list of his belongings for the NDS, to no avail. (Id. at ¶¶ 8, 9; Supp. Birsner Decl. at ¶ 13). Finally, Mr. Birsner recently wrote to the NDS to request, on behalf of the U.S. Embassy, the return of any of Mr. Idema's personal belongings in the possession of the NDS, including his original passport, if this were to be located. (Supp. Birsner Decl. at ¶ 19; Ex. A to Supp. Birsner Decl.).

## CONCLUSION

For the reasons discussed above as well as the reasons set forth in the Memorandum of Points and Authorities in Support of Respondents' Motion to Dismiss on Grounds of Mootness, Mr. Idema's habeas claim should be dismissed as moot.

Dated: May 16, 2007            Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

---

he knows any of the information to which he attests (other than to say that "for the last few months" he has been "involved in situations and events related to Cmdr. Jack Idema and Captain Brent Bennett, in Afghanistan," Doe Aff. at ¶ 2), raises serious evidentiary concerns about the affidavit overall. Cf. Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

16

        s/ Marcia Berman
MARCIA BERMAN
Trial Attorney
(PA Bar No. 66168)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7204
Washington, D.C.  20530
Tel.: (202) 514-3330
Fax: (202) 616-8470
Email:  marcia.berman@usdoj.gov

Attorneys for Respondents.

CERTIFICATE OF SERVICE

    The undersigned hereby certifies that she has, this 16th day of May, 2007, caused a copy of the foregoing **REPLY MEMORANDUM IN SUPPORT OF RESPONDENTS' MOTION TO DISMISS ON GROUNDS OF MOOTNESS** to be filed via the Court's ECF system and that John Tiffany, attorney for Petitioner Idema, will be served via that system.


                                                              s/ Marcia Berman
                                                               MARCIA BERMAN